## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ADAMS ARMS, LLC,

      Plaintiff,

                                     Case No.:

v.

UNIFIED WEAPON SYSTEMS, INC.,           JURY TRIAL DEMANDED
AGUIEUS, LLC,
MICHAEL C. BINGHAM,
CHRISTIAN QUINTANILLA AURICH, and
MAJOR GENERAL JAMES W. PARKER,
USA, Retired,

      Defendants

_____/

## COMPLAINT FOR DAMAGES – INJUNCTIVE RELIEF SOUGHT

Plaintiff Adams Arms, LLC ("AA") seeks injunctive relief against, and payment of damages from, Defendants for breach of contract, misappropriation of trade secrets, and unfair competition, and states as follows:

## INTRODUCTION

1.      AA is a weapons manufacturer founded and based in the Tampa Bay area that provides cutting edge technology in the engineering, design, development, and manufacture of small arms, including high-powered military rifles.

2.      AA's rifles and rifle retrofits are sold to civilians through large retail chains such as Academy Sporting Goods and Mills Fleet Farm, used around the world by members of police and sheriff departments, SWAT teams, the Federal Bureau of Investigation, the United States Marine Corps, and the Mexican and Panamanian militaries, and AA is an OEM parts provider to other weapons manufacturers such as Stag Arms and Smith & Wesson.

3.      AA has sold more than 100,000 rifles, rifle retrofits, and upper assemblies over its history to civilians, law enforcement, and the military, and is highly-regarded for the quality of its products and the superior accuracy and reliability of its rifles.  AA owns multiple patents on its rifle-related technologies.

4.      Beginning in early 2014, AA developed custom high-powered military rifles for ultimate sale to the Peruvian military through Aguieus, LLC ("Aguieus") and Unified Weapon Systems, Inc. ("UWS").

5.      The Defendants made a series of misrepresentations and signed multiple agreements with AA to induce AA to engineer, design, and develop the weapons, divulge its trade secrets to them, provide them with confidential information, and allow them to use AA's name, reputation, and products to enable them to procure a contract with the Peruvian military, all based on the premise that AA would be the sole provider of the weapons to be sold to the Peruvian military.

6.      AA successfully engineered, designed, and manufactured the prototype weapons that passed the Peruvian military's specifications and multiple tests.

7.      Through the use of AA's prototype weapons, as well as the use of its highly proprietary trade secrets and confidential information, UWS was awarded the bid to manufacture the weapons to be sold to the Peruvian military.

8.      Since the bid award, UWS has in fact entered into a contract with the Peruvian military for the sale of AA's custom designed weapons, but AA has been shut out of the contract. Indeed, through a series of materially false statements, broken contracts, and a scheme of calculated deception, the Defendants have misappropriated AA's trade secrets and confidential

information in order to source the supply for these $100+ million contracts either themselves or through other third parties, depriving AA of the fruits of its labor and the benefits of its contract.

9.      AA seeks injunctive relief to prevent the Defendants from further utilizing and disclosing its trade secrets and confidential information and from marketing, manufacturing, and selling AA's weapons to any third parties, including the Peruvian military.  AA also seeks a judgment for all damages incurred as a consequence of the Defendants' multiple breaches of several contracts and violations of both state and federal laws.

## PARTIES, JURISDICTION AND VENUE

10.     AA is a Florida limited liability company with its principal place of business in Odessa, Florida.

11.     Defendant Unified Weapon Systems, Inc. is a Delaware corporation with its principal place of business in Hillsborough County, Florida.  UWS is a subsidiary of Defendant Aguieus, LLC.  According to its website, UWS is a licensed U.S. weapons manufacturer and registered exporter of armament and munitions.

12.     Defendant Aguieus is a Delaware limited liability corporation authorized and doing business in Hillsborough County, Florida.

13.     Defendant Michael C. Bingham, is the managing member of Aguieus, the Vice President and Chief Operating Officer of UWS, and a resident of Pasco County, Florida.

14.     Defendant Christian Quintanilla Aurich is the President and Chief Executive Officer of UWS.  Upon information and belief, Mr. Aurich is a resident of Peru.

15.     Defendant General James W. Parker is a Director of and the Senior Military Advisor for UWS.  According to UWS's website, General Parker is a retired Major General from the United States Army.  General Parker resides in Hillsborough County, Florida.

16.     Jurisdiction is conferred on this Court by 28 U.S.C. §1331 through a trade secret misappropriation claim under the Defend Trade Secrets Act of 2016 and an unfair competition claim under the Lanham Act; this Court has jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367.

17.     Venue is proper before this Court pursuant to 28 U.S.C. §1391(b) since Defendants UWS, Aguieus, Mr. Bingham, Mr. Aurich, and General Parker are all residents or doing business in this judicial district.  Furthermore, a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred in this judicial district.  Defendants Aguieus and General Parker also expressly agreed in writing that the state and federal courts for Pinellas or Hillsborough County, Florida will have exclusive jurisdiction.

## FACTUAL ALLEGATIONS

### Proposed Joint Venture

18.     In early 2014, Aguieus approached AA with a proposal for the two companies to work together on a bid to supply high-powered military rifles designed and built by AA to the Peruvian military.

19.     According to Mr. Bingham, the Ministry of Defense of the Republic of Peru ("Peruvian MOD") had contacted UWS, Aguieus's subsidiary, concerning the opportunity to secure a multi-year contract for the supply of the rifles.  The Peruvian MOD was purportedly funding the purchase through the Peruvian Factory of Weapons and Ammunition from the Army S.A.C. ("FAME").

20.     The rifles would be built to specifications established by the Peruvian MOD with input by UWS and its business partners.  Aguieus and UWS, through Mr. Bingham and Mr. Aurich, solicited AA to be a business partner in the project.

21.     The project would require AA to provide UWS with product, including working demonstration rifles, for testing by the Peruvian MOD, in addition to trade secret and proprietary confidential information, as well as a tour of the manufacturing facility, which would be AA's facility.

22.     On or about February 24, 2014, as an inducement for AA to join in the project, Aguieus executed a Mutual Confidentiality and Nondisclosure Agreement with AA in which Aguieus agreed not to use AA's confidential information, including AA's technical data, trade secrets, and know-how, for its own use or for any purpose other than the commercial relationship between AA and Aguieus ("NDA").  The NDA permitted Aguieus to disclose AA's confidential information to certain, specified others, including UWS, so long as they acknowledged and agreed to be bound by the NDA.  A true and correct copy of the NDA is attached hereto as **Exhibit "1".**

23.     To memorialize the terms of the parties' joint venture, Mr. Bingham also sent AA a "Letter of Intent" on April 29, 2014, which UWS and AA executed ("LOI").  A true and correct copy of the LOI is attached hereto as **Exhibit "2".**

24.     In the LOI, UWS as "Buyer" agreed with AA as "Seller" that AA would manufacture the rifles at its facility, with the exception of certain parts that would be provided by UWS to AA for final assembly, in accordance with a delivery schedule that would be agreed to by UWS and AA.  This was a binding agreement of UWS.

25.     The LOI further committed AA to provide UWS with demonstration rifles and allow Peruvian MOD personnel to tour the manufacturing facility—AA's facility.

26.     In the LOI, UWS also agreed that given the investment AA would be making in the project "Buyer, Buyer's affiliates and Buyer's respective officers, directors, employees and

agents shall not initiate, solicit, encourage, directly or indirectly, or accept any offer or proposal regarding the possible Project by any person other than Seller" with the exception of specified items not relevant herein.  This was likewise a binding agreement of UWS.

### AA Divulges its Trade Secrets

27.     In reliance upon the LOI and the NDA, and multiple prior and subsequent representations and assurances that there would be significant orders worth in excess of $100 million, AA disclosed its proprietary confidential information, including AA's technical data, trade secrets, and know-how, to UWS, Aguieus, Mr. Bingham, Mr. Aurich, and General Parker.

28.     As a weapons manufacturer, AA owns numerous trade secrets that are crucial and extremely valuable to its business.  By way of example, AA's rifle systems are superior to its competitors in a number of ways, including, but not limited to, the reliability of their performance, which is the result of a number of trade secrets, including by way of example, its specific manufacturing processes, the tools and machinery used to make the parts, the mix of particular part types and sizes, and the mix of particular vendors and pricing for certain parts.

29.     AA has spent a number of years and endless resources developing its knowledge of weapons and corresponding trade secrets.  It exerts great efforts to ensure its trade secrets remain confidential, including, but not limited to, entering into non-disclosure agreements with employees and third parties, such as the Defendants; maintaining security systems and cameras at its facilities; requiring identification and badges for entry into its facilities; and ensuring shipment boxes do not contain the names of applicable vendors on the outside.

30.     While AA already had its own successful and proprietary rifle designs and systems, it further devoted substantial time, money, and resources to customize its rifle design

configuration and provide an engineering platform for use by UWS to market AA's rifle to the Peruvian MOD.

31.     After signing the LOI, on or about June 25, 2014, Mr. Bingham represented to AA that there would be an immediate order for 3,000 units for use by the Peruvian MOD.

32.     In 2014, General Parker met with Michael Froning, AA's President and CEO, and represented to Mr. Froning that General Parker possessed significant expertise and knowledge regarding foreign and domestic military matters, which would be helpful to AA in negotiating the rifle contract with UWS.  General Parker further represented to Mr. Froning that General Parker would represent AA in its negotiations with UWS and use his military experience and relationships to assist AA in closing on the purchase agreement described in the LOI.

33.     At no time did General Parker advise or disclose to Mr. Froning that he was a director and advisor for UWS.  In fact, when Mr. Froning asked General Parker whether he had any conflicts of interest or ties with UWS that would prevent him from being loyal to AA, General Parker misrepresented to Mr. Froning that he had no ties to UWS and no conflict of interest.

34.     In furtherance of General Parker's efforts to induce AA to reveal its trade secrets to General Parker, on June 24, 2014, General Parker executed a Confidential/Nondisclosure Agreement ("Parker NDA") with AA in which General Parker agreed to keep confidential AA's confidential information, trade secrets, and proprietary information and to use such information only for the business purposes for which General Parker was representing AA.  A true and correct copy of the Parker NDA is attached hereto as **Exhibit "3"**.

35.     General Parker also executed a Consulting Services Agreement on July 7, 2014 ("Parker Consulting Agreement"), in which General Parker further agreed to keep AA's

proprietary information confidential and to only use such information in connection with providing services on behalf of AA. A true and correct copy of the Parker Consulting Agreement is attached hereto as **Exhibit "4".**

36.     In reliance upon the Parker NDA and the Parker Consulting Agreement, and multiple subsequent representations and assurances by General Parker that he was representing AA's interests, AA disclosed proprietary confidential information, including AA's technical data, trade secrets and know-how, to General Parker.

37.     On August 18, 2014, UWS requested that AA manufacture demonstration units for testing.

38.     On October 13, 2014, UWS sent AA a purchase order for AA rifles totaling $2.1 million for January 2015 delivery.

39.     On October 14, 2014, UWS sent AA a purchase order for AA demonstration rifles for delivery to Peru.

40.     In reliance upon multiple representations by Mr. Bingham and General Parker, AA provided demonstration rifles to UWS for testing and inspection by UWS prior to demonstration for the Peruvian MOD.

41.     On November 17, 2014, Mr. Bingham represented to AA that the testing of the rifles went well and requested additional rifle parts from AA.

42.     On December 29, 2014, Mr. Bingham accepted delivery of AA demonstration rifles for export to Peru and further testing.

43.     On February 8 and 9, 2015, representatives of AA attended the demonstration of AA's rifles to the Peruvian MOD. During the demonstration, UWS leveraged AA's brand name and weapons-making experience, identifying AA as one of its lead partners, and UWS used

AA's trademarks to market the rifles to the Peruvian MOD.  To AA's knowledge, UWS has no ability to design or manufacture any rifles.  Instead, it was marketing AA's rifles to the customer.

44.    The demonstration was successful, and all parties approved moving forward with the joint venture with AA as the manufacturer.

45.    Beginning on April 18, 2015, Mr. Bingham began requesting supplier pricing information from AA for the separate components of AA's rifles.  Mr. Bingham represented to AA that the purpose for this was to support the bid to FAME in conjunction with the joint venture as outlined in the LOI.  After multiple representations and assurances from Mr. Bingham that this information was not being used to identify AA's suppliers and pricing structure to lock AA out of the venture, AA eventually supplied this information to Mr. Bingham and UWS.

46.    On August 28, 2015, Mr. Bingham requested AA to provide backup information on AA's manufacturing facility and equipment to support those portions of the presentation to FAME for which UWS took credit.

47.    In September of 2015, representatives of FAME toured AA's factory to inspect where the rifles would be manufactured and assembled and to conduct further demonstrations of the rifles.  During the tours, and pursuant to the NDA, AA revealed step-by-step details of its manufacturing processes, machinery, and tooling.

48.    During these meetings from September 1-4, 2015, Mr. Bingham represented to Mr. Froning that AA should be prepared for an initial order of 30,000 rifles as soon as possible. Mr. Bingham also represented to Mr. Froning that "this is a sure thing."

49.    Following the meetings in Florida, Mr. Bingham requested that AA supply further confidential and proprietary information to secure the contract with FAME, including, but not limited to:

a.  Photographs of AA's assembly work stations used to manufacture the rifles;

b.  Photographs of AA's tool boxes used to manufacture the rifles;

c.  A complete list of AA's parts and the costs for each part, including the names of AA's suppliers for each part;

d.  Photographs and detailed drawings of exploded views of both AA rifles and all parts;

e.  Additional detailed breakdown of AA's parts and configurations;

f.  Corresponding part numbers on the exploded photographs of AA's rifles and AA's pricing grids;

g.  A list of all tooling needed for assembly of AA's rifles; and

h.  Proprietary details of AA's technician training program.

50.    Mr. Bingham represented that this information was needed to provide to FAME. UWS also used AA's proprietary information to assist FAME in drafting its bid solicitation.

**Defendants Secure the Bid for UWS with AA's Rifles**

51.    On or about September 25, 2015, Mr. Bingham represented to AA that all the submissions to FAME were completed on time thanks to AA.

52.    On November 19, 2015, FAME issued its bid solicitation for the rifles.  Mr. Bingham refused to provide the bid solicitation to AA at the time, despite multiple requests.

53.    On November 20, 2015, Mr. Bingham represented to Mr. Froning that the bid specifications were written such that they would match the specifications of AA's rifles, making it almost impossible for any other manufacturer to bid on the contract.  Mr. Bingham was even concerned that this may raise suspicions and jeopardize a deal struck between FAME and UWS.

54.    On December 10, 2015, UWS submitted a qualified offer in response to the bid solicitation using AA's designs, procedures, and specifications.

55.     On December 10, 2015, General Parker represented to Mr. Froning that he spoke with the U.S. State Department on behalf of AA to facilitate the joint venture with UWS, using AA's status as an American manufacturer to gain approval for the export of weapons to Peru.

56.     General Parker also represented to Mr. Froning on December 10, 2015, that the following events would occur:

    a.     the contract between UWS and FAME would be finalized on January 4, 2016;

    b.     FAME would issue purchase orders to UWS for 18,000 total units immediately;

    c.     FAME would order 85,000 units the first year; and

    d.     The total order size to be supplied by AA would be 240,000 rifles minimum and up to 300,000 rifles.

57.     On December 18, 2015, FAME announced UWS as the winning bidder.

58.     On January 5, 2016, UWS issued a press release announcing it was the winner of the bid to supply rifles to FAME.  UWS stated on its website that AA was its lead partner in the bid.

59.     On January 31, 2016, AA delivered the final demonstration rifles to UWS for final testing in Peru.

### Defendants Exclude AA from Contract

60.     Once UWS secured the winning bid, it began taking steps to squeeze AA out of the final purchase contract, in violation of the LOI.

61.     UWS and Mr. Bingham refused multiple requests from Mr. Froning to supply AA with a copy of the financial terms of the contract with FAME.

62.     UWS and Mr. Bingham refused multiple requests for meetings to finalize timelines and manufacturing plans.

63.     UWS and Mr. Bingham also refused to include AA in any financial discussions with FAME, but Defendants continued to seek guidance and input from AA for the design of AA's rifles.

64.     On December 30, 2015, Mr. Aurich advised Mr. Froning that UWS would take the entire project over, including further testing and design decisions now that UWS had all of AA's technical and pricing data and had won the bid.

65.     In the months following Mr. Aurich's statement to Mr. Froning, AA was excluded from multiple meetings with FAME, including another meeting in Peru to test AA's rifles before final contract execution.  Mr. Froning's repeated requests for financial terms were ignored.

66.     UWS has refused to discuss any terms for a purchase agreement with AA, and no purchase orders have been received by AA from UWS.

67.     Sometime in late May or the first two weeks of June of 2016, UWS posted on its website that it "has signed an assembly, co-production and technology transfer contract with the Peruvian Army's Factory of Weapons and Ammunition FAME SAC."

68.     UWS's contract is undoubtedly a contract for the sale of AA's rifles to FAME, using all the designs, specifications, and processes divulged under false pretenses by AA.  AA's specifications were used to win the bid, and AA's demonstration rifles were used in field testing to procure the contract with FAME.

69.     All conditions precedent to bringing this action have occurred, have been performed, or have been waived.

70.     AA has retained the law firm of Shumaker, Loop & Kendrick, LLP to represent it in this action, and is obligated to pay Shumaker, Loop & Kendrick, LLP a reasonable fee for its services.

## COUNT I
## BREACH OF LOI
### (as to UWS)

71.     AA re-alleges paragraphs 1 through 70 as alleged herein.

72.     Pursuant to the LOI, UWS expressly agreed that AA would manufacture the rifles at AA's facility, with the exception of certain parts that would be provided by UWS to AA for final assembly, in accordance with a delivery schedule that would be agreed to by UWS and AA.

73.     Further pursuant to the LOI, UWS expressly agreed that it would not initiate, solicit, encourage, or accept any offer or proposal regarding the sale of AA's rifles to FAME by anyone other than AA.

74.     In direct breach of this spirit and purpose of the LOI, UWS has taken AA's proprietary confidential information, including AA's technical data and processes, trade secrets, and know-how, including the names of suppliers and their pricing, from AA and is sourcing the manufacture of AA's rifles without AA.

75.     UWS's actions constitute a material breach of the LOI, which breach has damaged AA.

76.     All conditions precedent to the commencement of this action have been satisfied or have otherwise been waived.

WHEREFORE, Adams Arms, LLC demands judgment against Defendant Unified Weapons Systems, Inc. for:

> a. Preliminary and permanent injunctive relief restraining UWS, its representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with them from manufacturing and/or supplying

the rifles itself and from initiating, soliciting, encouraging or accepting any offer or proposal from a third party to manufacture and/or supply the rifles;

b.  Specific performance of the manufacturing and supply provisions of the LOI;

c.  Damages suffered by AA as a result of the breach;

d.  Prejudgment and post-judgment interest at the maximum lawful rate; and

e.  Such other and further relief as this Court deems just and proper.

<u>COUNT II</u>
<u>BREACH OF MUTUAL CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT</u>
**(as to all Defendants)**

77.     AA re-alleges paragraphs 1 through 70 as alleged herein.

78.     Aguieus entered into the NDA with AA, pursuant to which AA disclosed proprietary confidential information, including AA's technical data, trade secrets, and know-how, to Aguieus.

79.     UWS, Mr. Bingham, Mr. Aurich, and General Parker, as affiliates, directors, officers, employees, consultants, and/or agents of Aguieus, all received AA's confidential information in furtherance of the commercial relationship between AA and Aguieus, and as such were required to acknowledge and agree to be bound by the NDA.

80.     The NDA expressly provides that recipients of AA's confidential information will not use AA's confidential information, including AA's technical data, trade secrets, and know-how, for their own use or for any purpose other than the commercial relationship between AA and Aguieus.

14

81.    All Defendants received and used AA's confidential information for the purpose of securing a contract between FAME and UWS for the purchase and sale of AA's rifles, said rifles to be manufactured by UWS or a third party.

82.    AA has been damaged by Defendants' breach of the NDA.

83.    All conditions precedent to the commencement of this action have been satisfied or have otherwise been waived.

WHEREFORE, Adams Arms, LLC demands judgment against all Defendants for:

a.    Preliminary and permanent injunctive relief restraining all Defendants, their representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with them from any use or disclosure of any of AA's proprietary confidential information, including AA's technical data, trade secrets, and know-how;

b.    Damages suffered by Defendants' breach of the NDA;

c.    Prejudgment and post-judgment interest at the maximum lawful rate;

d.    Attorneys' fees and costs; and

e.    Such other and further relief as this Court deems just and proper.

## COUNT III
## BREACH OF CONFIDENTIAL NON DISCLOSURE AGREEMENT
### (as to General Parker)

84.    AA re-alleges paragraphs 1 through 70 as alleged herein.

85.    General Parker entered into the Parker NDA with AA, pursuant to which AA disclosed proprietary confidential information, including AA's technical data, trade secrets, and know-how, to General Parker.

86.     The Parker NDA expressly provides that recipients of AA's confidential information will not use AA's confidential information, including AA's technical data, trade secrets, and know-how, for their own use or for any purpose other than the commercial relationship between AA and General Parker.

87.     General Parker received and used AA's confidential information for the purpose of securing a contract between FAME and UWS for the purchase and sale of AA's rifles, said rifles to be manufactured by UWS or a third party.

88.     AA has been damaged by General Parker's breach of the Parker NDA.

89.     All conditions precedent to the commencement of this action have been satisfied or have otherwise been waived.

WHEREFORE, Adams Arms, LLC demands judgment against Defendant Major General James W. Parker, USA, Retired for:

a.   Preliminary and permanent injunctive relief restraining General Parker, his representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with him from any use or disclosure of any of AA's proprietary confidential information, including AA's technical data, trade secrets, and know-how;

b.   Damages suffered by General Parker's breach of the NDA;

c.   Prejudgment and post-judgment interest at the maximum lawful rate;

d.   Attorneys' fees and costs; and

e.   Such other and further relief as this Court deems just and proper.

**COUNT IV**
**BREACH OF CONSULTING SERVICES AGREEMENT**
**(as to General Parker)**

90.     AA re-alleges paragraphs 1 through 70 as alleged herein.

91.     General Parker entered into the Parker Consulting Agreement, in which General Parker agreed to "hold the Confidential Information in strict confidence and will only use the Confidential Information in connection with providing Services to [AA] under this Agreement." General Parker further agreed "not to use any Confidential Information for Consultant's benefit or for the benefit of any third party."

92.     In reliance upon the Parker Consulting Agreement, AA disclosed proprietary confidential information, including AA's technical data, trade secrets, and know-how, to General Parker.

93.     General Parker received and used AA's confidential information for the purpose of securing a contract between FAME and UWS for the purchase and sale of AA's rifles, said rifles to be manufactured by UWS or a third party.

94.     AA has been damaged by General Parker's breach of the Parker Consulting Agreement.

95.     All conditions precedent to the commencement of this action have been satisfied or have otherwise been waived.

WHEREFORE, Adams Arms, LLC demands judgment against Defendant Major General James W. Parker, USA, Retired for:

a.     Preliminary and permanent injunctive relief restraining General Parker, his representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or

participation with him from any use or disclosure of any of AA's proprietary

confidential information, including AA's technical data, trade secrets, and know-

how;

b.  Damages suffered by General Parker's breach of the NDA;

c.  Prejudgment and post-judgment interest at the maximum lawful rate; and

d.  Such other and further relief as this Court deems just and proper.

### COUNT V
### MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT
### (as to all Defendants)

96.     AA re-alleges paragraphs 1 through 70 as alleged herein.

97.     This is an action for an injunction and damages arising under the Defend Trade

Secrets Act of 2016, 18 U.S.C. § 1836.

98.     The Defendants misappropriated numerous trade secrets belonging to AA related

to its business and its rifles, which are used and intended for use in interstate and foreign

commerce.

99.     As referenced above, pursuant to the LOI and NDA, AA designed a modified

version of its already existing rifles, which is not and never has been on the market.

100.    Throughout AA's development of the designs, and pursuant to the LOI and NDA,

AA revealed trade secrets to the Defendants relating to AA's business and its rifles, including,

but not limited to: working demonstration rifles; the list of all of AA's suppliers for each rifle

component; pricing information for each rifle component; backup information on AA's

manufacturing facility and equipment; photographs of AA's work stations, tools, and tool boxes

uses to manufacture the rifles; photographs of exploded views of the rifles with detailed

breakdown information of the same with corresponding parts and their numbers; detailed

18

information on the specific tools needed to manufacture the parts of the rifles; details on the specific manufacturing process used for the rifles, including specifics as to its equipment and tools, why certain parts are used, how they best work together, and the reasons AA's rifles are superior in that regard (collectively referred to herein as the "Trade Secrets").

101.    All such Trade Secrets are subject to reasonable efforts to maintain their secrecy; have independent economic value; are confidential; are not publicly known or available; and are extremely proprietary to AA.

102.    AA provided the Trade Secrets to the Defendants pursuant to the LOI and NDA, which permitted the Defendants to use the Trade Secrets solely for UWS's commercial relationship with AA.

103.    The Defendants knew they were subject to a duty to maintain the secrecy of and limit the use of the Trade Secrets.

104.    The Defendants have misappropriated the Trade Secrets by acquiring them through the improper means of misleading AA about their intention to enter into a commercial relationship with AA in order to induce AA to disclose the Trade Secrets, when the Defendants in fact intended to cut AA out of the deal such that they could proceed with the bid and resulting contract on their own.

105.    The Defendants have further misappropriated the Trade Secrets by disclosing and using them without AA's consent when they used improper means to obtain them and knew that, pursuant to the LOI, NDA, and the parties' relationship, the Defendants had a duty to maintain the secrecy of the Trade Secrets and limit their use only to actions in furtherance of their commercial relationship with AA.

106.    After securing the winning bid using AA's Trade Secrets, the Defendants have proceeded with the final contract with FAME without AA, while at the same time utilizing the Trade Secrets of AA in order to obtain and perform on the contract with FAME, resulting in irreparable injury and great harm to AA.

107.    The Defendants' acts of misappropriation have caused irreparable injury to AA and will continue to cause irreparable injury to AA if the Defendants are not restrained by this Court from further violating AA's trade secret rights.

108.    As a result of the above-described willful and malicious misappropriation of AA's trade secrets, AA is entitled to an injunction and an award of damages, costs of this action, and attorneys' fees, all as set forth in 18 U.S.C. § 1836, *et al*., subject to the discretion of this Court.

WHEREFORE, AA demands judgment against all Defendants for:

a.    Preliminary and permanent injunctive relief restraining the Defendants, their representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with them from further disclosing and using the Trade Secrets or engaging in any business practices which arose from their misappropriation of the Trade Secrets and requiring affirmative actions be taken by the Defendants to protect the Trade Secrets;

b.    Damages suffered by AA due to the Defendants' misappropriation, including damages for actual losses sustained by AA and damages for unjust enrichment caused by the misappropriation not already taken into account in computing the actual losses; or damages caused by the misappropriation measured by imposition

of liability for a reasonable royalty for the Defendants' unauthorized disclosure and use of the Trade Secrets;

c.     Increased damages in an amount not more than 2 times the amount of the damages award due to the Defendants' willful and malicious misappropriation;

d.     Pre-judgment and post-judgment interest at the maximum lawful rate;

e.     Attorneys' fees and costs; and

f.     Such other and further relief as this Court deems just and proper.

**COUNT VI**
**MISAPPROPRIATION UNDER THE FLORIDA TRADE SECRETS ACT**
**(as to all Defendants)**

109.    AA re-alleges paragraphs 1 through 70 and 97 through 108 as alleged herein.

110.    This is an action for an injunction and damages arising under Section 688.003, Florida Statutes.

111.    The Defendants were provided AA's Trade Secrets pursuant to the LOI and NDA and breached their duty to maintain the secrecy of the Trade Secrets by gaining access to them through improper means and utilizing them for their own interests in proceeding with the final contract without AA.

112.    The Trade Secrets contain information that derives economic value from not being generally known or ascertainable by proper means, and were subject to reasonable efforts by AA to maintain their secrecy.

113.    The Defendants knew or had reason to know that they all had a duty to maintain the secrecy of the Trade Secrets.

114.    Despite this, the Defendants willfully and maliciously misappropriated the Trade Secrets.

21

115.    The Defendants' acts resulted, and will continue to result, in the Defendants being unjustly enriched, and has and will continue to damage AA's business and business interests.

116.    The Defendants, unless restrained, will continue to be enriched unjustly to AA's prejudice and damage.

WHEREFORE, AA demands judgment against all Defendants for:

a.      Preliminary and permanent injunctive relief restraining the Defendants, their representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with them from further disclosing and using the Trade Secrets or engaging in any business practices which arose from their misappropriation of the Trade Secrets and requiring affirmative actions be taken by the Defendants to protect the Trade Secrets;

b.      Damages suffered by AA due to the Defendants' misappropriation, including damages for actual losses sustained by AA and damages for unjust enrichment caused by the misappropriation not already taken into account in computing the actual losses;

c.      Increased damages due to the Defendants' willful and malicious misappropriation;

d.      Pre-judgment and post-judgment interest at the maximum lawful rate;

e.      Attorneys' fees and costs; and

f.      Such other and further relief as this Court deems just and proper.

## COUNT VII
## UNFAIR COMPETITION UNDER THE LANHAM ACT
### (as to UWS)

117.     AA re-alleges paragraphs 1 through 70 as alleged herein.

118.     This is an action for injunctive relief arising under 15 U.S.C. §§1125 and 1116, and for damages arising under 15 U.S.C. §§1125 and 1117.

119.     UWS has, by virtue of its above-described acts, competed unfairly with AA. Throughout the process of securing the bid for the rifles, UWS repeatedly represented that the rifles to be provided under the contract would be AA rifles.  Everything submitted to obtain the bid was based on AA's rifles and its highly proprietary Trade Secrets.  Along those lines, UWS continuously used not only AA's demonstrative rifles and rifle parts, but its trademarks and logos, including during demonstrations to the Peruvian MOD, during which AA's trademarks and logos were placed on banners.

120.     UWS secured the bid by representing not only to AA, but also to third parties such as the Peruvian MOD that any following contract would be fulfilled with AA rifles.

121.     UWS has now secured such contract, but has cut AA out of the deal such that the supplied rifles would no longer be made by AA.

122.     UWS' acts of unfair competition have been committed, and are continuing to be committed, with the knowledge that its representations relating to AA were intended to cause confusion, or to cause mistake, or to deceive.

123.     UWS' above-described acts of unfair competition have caused irreparable injury to AA and will continue to cause irreparable injury to AA if they are not restrained by this Court from further competing unfairly with AA due to the confusion, mistake, or deception that will likely be generated among the trade and the public as a result of UWS now attempting to supply

23

rifles, which although represented as AA rifles, will not in fact be rifles manufactured by AA.  In addition, whatever rifles UWS ends up supplying will likely be of a lesser quality than those made by AA, greatly harming AA's reputation to the extent the trade and the public believe them to be AA rifles.  AA has no adequate remedy at law.

WHEREFORE, AA demands judgment against UWS for:

a. Preliminary and permanent injunctive relief restraining UWS, its representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with them from further unfairly competing with AA in any manner whatsoever in connection with the Peruvian military contract, and from continuing to operate in any manner tending to confuse or deceive the public into believing that UWS and the rifles to be supplied are in any way connected with, sponsored by, or affiliated with AA;

b. an accounting of UWS' profits and an order that the same be paid over to AA;

c. Up to three (3) times any damages sustained by AA as a result of the unfair competition;

d. Restitution to AA of any and all the money UWS has acquired by means of its unfair competition;

e. Pre-judgment and post-judgment interest at the maximum lawful rate;

f. Attorneys' fees and costs; and

g. Such other and further relief as this Court deems just and proper.

**COUNT VIII**
**UNJUST ENRICHMENT**
**(as to UWS and AQUIEUS)**

124.    AA re-alleges paragraphs 1 through 70 as alleged herein.

125.    Defendants UWS and Aguieus have received or will receive money as a direct result of the unauthorized use and disclosure of AA's proprietary confidential information and trade secrets as alleged herein.

126.    As a direct result of their unauthorized use and disclosure of AA's trade secrets, Defendants UWS and Aguieus voluntarily accepted and retained the benefit conferred and have been unjustly enriched at AA's expense.

127.    The circumstances are such that it would be inequitable for these Defendants to retain the benefit without paying the value thereof to AA.

WHEREFORE, Adams Arms, LLC demands judgment against Defendants Unified Weapons Systems, Inc. and Aguieus, LLC for:

a.    Damages suffered by Defendants' actions;

b.    Prejudgment and post-judgment interest at the maximum lawful rate; and

c.    Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, Adams Arms, LLC, by and through its undersigned attorneys, requests a trial by jury on all issues so triable.

25

Respectfully submitted,

/s/ Jaime Austrich
Jaime Austrich, Trial Counsel
Florida Bar No. 84565
jaustrich@slk-law.com
J. Todd Timmerman
Florida Bar No. 0956058
ttimmerman@slk-law.com
Mindi M. Richter
Florida Bar No. 0044827
mrichter@slk-law.com
Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard
Suite 2800
Tampa, Florida 33602
Telephone No.: (813) 229-7600
Facsimile No.:  (813) 229-1660

*Attorneys for Plaintiff, Adams Arms, LLC*



## MUTUAL CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

**THIS MUTUAL CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT** (the "**Agreement**") is made as of _FEB, 24, 2014_, by and between Adams Arms, LLC., a Florida corporation, located at 1551 Gunn Hwy., Odessa, Florida 33556 ("**Adams Arms**"), and _AGVIEUS, LLC_, a _DELAWARE_ corporation located at _SUCCESS DR, ODESSA, FL 33556_.

**WHEREAS**, The parties desire to engage in a commercial relationship and, in connection therewith, each party (the "**Disclosing Party**") may disclose its Confidential Information (as defined herein) to the other party (the "**Receiving Party**") solely for the purpose of such commercial relationship (the "**Permitted Purpose**"), and wish to enter into this Agreement to ensure that such Confidential Information is kept confidential.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Definition of Confidential Information**.   For the purposes of this Agreement, "**Confidential Information**" means any information, technical data, trade secrets or know-how of the Disclosing Party or its customers, vendors, business partners or investors that has been previously provided or is hereafter provided to the Receiving Party by or on behalf of the Disclosing Party, either directly or indirectly, whether in writing, orally or by observation, including, but not limited to, research, products, services, product plans, clients, client lists, employees, employee lists, lead lists, markets, marketing, expansion plans, databases, devices, software, developments, inventions, processes, technology, maskworks, designs, drawings, engineering, hardware configuration information, finances, financial information, financial results, business methods, business plans, strategies and programs, operating and production procedures or other business information, in each case which the Disclosing Party considers to be confidential or proprietary. All written material disclosed by the Disclosing party shall be considered Confidential Information whether or not marked as Confidential Information. Confidential Information does not include information, technical data, trade secrets or know-how that:  (i) is in the possession of, or becomes available to, the Receiving Party on a non-confidential basis, as shown by the Receiving Party's files and records, and such information was received from a source not known by the Receiving Party to be bound by any obligation not to disclose the information, (ii) prior to or after the time of disclosure, becomes part of the public knowledge or literature, not as a result of any inaction or action of the Receiving Party, or (iii) is approved for release by the Disclosing Party in writing.  In any dispute involving Confidential Information, the party accused of improper disclosure shall have the burden of proving any of the above exceptions.

2. **Non-Disclosure of Confidential Information**.   The parties agree not to use the Confidential Information disclosed to it by the other party for its own use or for any purpose except the Permitted Purpose.  Neither party will disclose any Confidential Information of the other party to third parties except those directors, officers, employees, consultants and agents, including, without

**EXHIBIT "1"**



limitation, bankers, accountants and attorneys (collectively, "**Representatives**"), who need to have the information in order to carry out the Permitted Purpose.  Neither party will decompile, disassemble, decode, reproduce, redesign or reverse engineer the Confidential Information of the other party. Each party will require each of its Representatives who has access to Confidential Information of the other party to acknowledge and agree to be bound by this Agreement.  In any event, each party will be liable for any breach of this Agreement by any of its Representatives and shall take all reasonably necessary measures to cause such Representatives to be restrained from unauthorized use or disclosure of Confidential Information.  Each party agrees that it will take all reasonable measures to protect the secrecy of and avoid disclosure or nonpermitted use of Confidential Information of the other party in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized hereunder to have any such information, which measures will include the highest degree of care that either party utilizes to protect its own Confidential Information of a similar nature.  Each party agrees to notify the other party in writing of any misuse or misappropriation of such Confidential Information that may come to its attention.

3.  **Disclosure Required by Law**.  In the event that the Receiving Party or any of its Representatives is requested or required by legal process to disclose any of the Confidential Information of the Disclosing Party, the Receiving Party shall give prompt written notice to the Disclosing Party so that the Disclosing Party may seek, at its expense, a protective order or other appropriate relief.  In the event that such protective order is not obtained, the Receiving Party or its Representatives will disclose only that portion of the Confidential Information that, in the advice of its counsel, it is legally required to disclose.

4.  **Return of Materials**.  Any materials or documents that have been furnished by or on behalf of the Disclosing Party to the Receiving Party or its Representatives will be returned to the Disclosing Party promptly upon request, and all copies of such documentation will be destroyed, promptly upon request, provided however that the Receiving Party  may retain one copy for evidentiary purposes.

5.  **No License or Patent Rights Granted**.  Nothing in this Agreement is intended to grant any rights to either party or any of its Representatives under any patent, copyright, trade secret, invention, discovery or other intellectual property right, nor does this Agreement grant either party or any of its Representatives any rights in or to the other party's Confidential Information, except the limited right to review such Confidential Information solely for the Permitted Purpose.

6.  **No Breach of Other Confidentiality Agreements**.  Each Disclosing Party hereby represents and warrants that it may rightfully disclose the Confidential Information to the Receiving Party without violating any contractual, legal, fiduciary or other obligation to any person.  The Disclosing Party shall indemnify and hold harmless the Receiving Party against any damages, costs and expenses (including reasonable attorneys' fees) incurred in connection with any misrepresentation by the Disclosing Party in the foregoing sentence.

7.  **Information Provided As-Is**.  The parties hereto provide Confidential Information on an "as is" basis.  Each Disclosing Party acknowledges that it has attempted in good faith to provide accurate Confidential Information.  Notwithstanding that attempt, except as may be set forth in a



definitive agreement executed by the parties hereto, the Disclosing Party makes no representations or warranties, express or implied, to the Receiving Party as to, and the Receiving Party may not rely on, the completeness or accuracy of the Confidential Information.

8. **No Additional Obligations**.  Except as may be set forth in a definitive agreement executed by the parties hereto, neither party is under any obligation to enter into any commercial relationship or other transaction with the other party and nothing contained in this Agreement shall be deemed to create a joint venture or partnership.

9. **Governing Law and Jurisdiction**.  This Agreement will be governed by and construed and enforced in accordance with the internal laws of Florida without regard to its conflict-of-laws principles.  The state and federal courts within Pinellas or Hillsborough county, Florida will have exclusive jurisdiction to adjudicate any dispute arising out of this Agreement.  Each party irrevocably consents to the personal jurisdiction of such courts and expressly waives any objection to such jurisdiction based on inconvenient forum or otherwise.

10. **Remedies**.  Each party agrees that its obligations hereunder are necessary and reasonable in order to protect the other party and the other party's business and expressly agrees that monetary damages may be inadequate to compensate the other party for any breach by either party of any covenants and agreements set forth herein.  Accordingly, each party agrees and acknowledges that any such violation or threatened violation may cause irreparable injury to the other party and that, in addition to any other remedies that may be available, in law, in equity or otherwise, the other party will be entitled to seek injunctive relief against the threatened breach of this Agreement or the continuation of any such breach, without the necessity of proving actual damages.

11. **Miscellaneous**.  This Agreement is the entire contract between the parties concerning the Confidential Information.  This Agreement will be binding upon and for the benefit of the undersigned parties, their successors and assigns.  Failure to enforce any provision of this Agreement will not constitute a waiver of any term hereof.  This Agreement may not be amended except by a writing signed by both parties.

12. **Term**.  This Agreement will survive any termination of discussions or termination of a commercial relationship between the parties, and will continue for a period of three (3) years following the date of disclosure of Confidential Information provided, however, that with respect to Confidential Information that is deemed to be a trade secret under applicable law this Agreement shall continue in effect past the two year period until such time as the Confidential Information no longer qualifies as a trade secret.

16. **Severability.**   If any provision of this Agreement is held invalid, illegal, or unenforceable, the remainder shall remain in full force and effect.

17. **Attorneys' Fees.**   If any dispute, arbitration, litigation, or other legal proceeding occurs between the parties relating to this Agreement, the prevailing party shall be entitled to recover (in addition to any other relief awarded or granted) its reasonable costs and expenses, including attorneys' fees, incurred in the proceeding.



18. **Assignment.**   The parties may not assign or transfer their obligations under this Agreement.

19. **Counterparts and Facsimile.**   This Agreement may be executed in one or more counterparts and by facsimile or other electronic transmission, each of which shall be deemed an original and all of which shall constitute one and the same document.

20. **Warranty of Authority.**   The persons executing and delivering this Agreement on behalf of the parties represent and warrant that each of them is duly authorized to do so and that the execution of this Agreement is the lawful and voluntary act of the parties.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

Receiving Party: AGNIFUS, LLC

By: _____

Print Name: Cristhian Quintanilla

Print Title: MANAGER

**Adams Arms, LLC**

By: Tк mАr Fʼnd̄ʼ

Print Name: Tr

Print Title: Prod dev refused

# UNIFIED WEAPON SYSTEMS

<u>LETTER OF INTENT</u>

April 29, 2014

From:     Unified Weapon Systems
          2410 Success Drive Unit 11
          Odessa, FL 33556

To:       Jim Granger
          Vice President
          Adams Arms
          1551 Gunn Hwy
          Odessa, FL 33556

Dear Mr. Granger:

This letter confirms your and our mutual intentions with respect to the potential transaction described herein between <u>Unified Weapon Systems</u> ("Buyer") and <u>Adams Arms</u> ("Seller").   This document, in and of itself, does not represent an enforceable legal contract.

1.  **Terms**:  The principal terms of the proposed transaction would be substantially as follows:

    a)  **Overview of Project**:  Unified Weapon Systems (UWS), a jointly owned company of Aguieus, LLC and Vorn Tactical, LLC has been contacted by the Ministry of Defense of the Republic of Peru concerning a large multi-year purchase of both 7.62x51 NATO Select-Fire Weapon Systems as well as 5.56 x 45 NATO Select-Fire Weapon Systems.  Working with the Peruvian MOD we have established the Unified Combat Rifle (UCR).  The UCR will be built to the specifications established by the Peruvian MOD using our input and the input of our industry partners.  The first installment of 7.62 NATO UCR's is expected to be 8,100 Rifles.  A total of 50,000 7.62mm NATO UCR's are expected to be purchased over a 18 month period. Additionally UWS has received an additional request for 15,000 UCR's in a 5.56 NATO caliber, delivered over the same 18 month period.  The 5.56mm NATO rifle will be based on the standard AR-15 platform, however will look almost identical to the 7.62 variant and consist of the same rail, stock, grip, sights.

Initialed:  Michael Bingham _MCB_          Jim Granger _JG_

**EXHIBIT "2"**

# UNIFIED WEAPON SYSTEMS

b) **Unified Combat Rifle Overview:** Unified Weapon Systems in conjunction with several industry partners including Adams Arms have proposed components for the rifle to withstand the rigorous test the Peruvian Military has designed for the weapon selection program.

After inspection of your facility we have determined that your capabilities of production are vast and diverse, we believe that the majority of the components can be manufactured at your facility with the exception of the items listed below. UWS will provide the following items to Adams Arms for final assembly within the delivery schedule agreed to between the parties.

    I.    Stock (Mil-Spec)
    II.    Grip
    III.    Rail (Samson Evo Variant) Samson is awaiting barrel nut design from Adams Arms for final design of thermal bushings.
    IV.    Flip up Sights
    V.    Optic
    VI.    Sling and Sling Mount
    VII.    Ambi- Magazine Release (Possible AA Manufactured Part)
    VIII.    Ambi- Safety Selector
    IX.    Ambi- Charging Handle (Raptor or BCM)
    X.    FERFRANS DSAS
    XI.    Magazines
    XII.    Gem-Tech Compatable Muzzle Device (Possible AA Manufactured Part with GT licensing on lugs)
    XIII.    Cleaning Kit

c) **Unified Combat Rifle (Requirements):** Below are the specific requirements as it pertains to the design and durability. This is a general list and is subject to change based on prototype performance and future findings. Due to the fast pace of this project a demo unit in each variant is requested as soon as possible to lock down the final layout and equipment list.

      **7.62mm NATO Varient:**
      AR Style Platform Chambered in 7.62 x 51 NATO
      Ambidextrous Controls (Safety Selector, Magazine Release, Charging Handle)
      Field Maintainable
      Piston Driven Operating System
      Select Fire/Full Auto
      Anti-Walk Pins
      Delayed Sear Activate System (FERFRANS)
      Controllable and lightweight
      Coated to withstand extreme environmental conditions
      Max Effective Range of at least 800 meters

Initialed: Michael Bingham _meß_     Jim Granger

# UNIFIED WEAPON SYSTEMS

## 5.56mm NATO Varient:

AR Style Platform Chambered in 5.56 x 45 NATO
Ambidextrous Controls (Safety Selector, Magazine Release,
Charging Handle)
Field Maintainable
Piston Driven Operating System
Select Fire/Full Auto
Anti-Walk Pins
Delayed Sear Activate System (FERFRANS)
Controllable and lightweight
Coated to withstand extreme environmental conditions
Max Effective Range of at least 600 meters

    d) **Products being Supplied:** The seller will supply the rifles in
accordance with the bill of materials attached as Exhibit 1 to this Letter
of Intent. The Buyer will deliver the items they have sourced in
accordance with a to be determined delivery schedule to meet the
manufacturing requirements of Seller.

    e) **Definitive Purchase Agreement**.  All of the terms and conditions of
the  proposed transaction would be stated in the Purchase Agreement,
to be  negotiated, agreed and executed by you and us.  Neither party
intends to be  bound by any oral or written statements or
correspondence concerning the  Purchase Agreement arising during
the course of negotiations,  notwithstanding that the same may be
expressed in terms signifying a partial,  preliminary or interim
agreement between the parties.

    f) **Expediency**. Due to the possibility of an upcoming pre purchase visit
of Peruvian Defense personnel for the sole purpose of conducting a
demonstration of the Unified Combat Rifle the first week of May,
including a tour of the manufacturing facility which would be the
Adam's Arms facility, we are under a very short time period to test,
and evaluate the proposed system.  Therefore it is imperative that we
strive to execute the development and testing immediately.

2. **Expenses**.  You and we will pay our respective expenses incident to this
letter of intent, the Purchase Agreement and the transactions contemplated
hereby and thereby.

3. **Public Announcements**.  Neither you nor we will make any announcement of
the proposed transaction contemplated by this letter of intent prior to the
execution of the contract and final delivery of the weapon systems without the
prior written approval of the other, which approval will not be unreasonably
withheld or delayed.   The foregoing shall not restrict in any respect your or
our ability to communicate information concerning this letter of intent and the
transactions contemplated hereby to your and our, and your and our respective
affiliates', officers, directors, employees and professional advisers, and, to the
extent relevant, to third parties whose consent is required in connection with

Initialed: Michael Bingham _MꞕB_         Jim Granger _JG_

# UNIFIED WEAPON SYSTEMS

the transaction contemplated by this letter of intent.

4. **Broker's Fees**.  All parties have represented to each other that no brokers or finders have been employed who would be entitled to a fee by reason of the transaction contemplated by this letter of intent.

5. **Exclusive Negotiating Rights:**  In order to induce Seller to commit the resources, forego other potential opportunities, and incur the legal,  accounting and incidental expenses necessary to properly evaluate the  Project described above, and to negotiate the terms of, and consummate the  transaction contemplated hereby, Buyer agrees that the Buyer, Buyer's  affiliates and Buyer's respective officers, directors, employees and agents  shall not initiate, solicit, encourage, directly or indirectly, or accept any offer  or proposal regarding the possible Project by any person other than the  Seller with the exception of the items listed in section 1.b.I thru XII of this agreement.

6. **Expected Delivery Schedule:**  Below is the expected delivery schedule based on the current discussions with the Peruvian Ministry of Defense, Department of the Army.  Although this is likely the actual delivery schedule as it pertains to purchase orders to be submitted by the Peruvian MOD, this is subject to change.  All purchase orders for the entire 7.62 and 5.56 project are expected to be executed by Peruvian MOD NLT 09/01/2014 due to the fact that the Peruvian Army has until the end of August to spend the funds or they will be reallocated back to the MOD.

   a) **First Purchase Order:** Expected by 22MAY2014
      **(1)** 8,100 UCR (7.62x51 NATO)
      **(2)** 2,600 UPR (7.62x45 NATO)
   b) **Second Purchase Order:** Expected by 22JUL2014
      **(1)** 25,000 UCR (7.62x51 NATO)
      **(2)** 7,500 UPR (5.56x45 NATO)
   c) **Third Purchase Order:** Expected by 01SEP2014
      **(1)** 16,900 UCR (7.62x51 NATO)
      **(2)** 4,900 UPR (5.56x45 NATO)

7. **Timeline:** In order to induce Seller to commit the resources, forego other potential opportunities, and incur the legal, accounting and incidental  expenses necessary to properly evaluate the Project described above, and to  negotiate the terms of, and consummate the transaction contemplated hereby,  Buyer agrees to meet the timeline as follows:

   I.   Execute a Contract between the Ministry of Defense  of the Republic of Peru and Unified Weapon Systems within 30 days of  this signed Letter of Intent.
   II.  Issue a Purchase Order to the Seller in accordance with section 6 "Expected Delivery Schedule" stated amount within 5 days of signing of contract between Unified Weapon Systems and the Republic of Peru.
   III. Deposit 50% of the Purchase Order amount to the Seller within 10 days  of Issued Purchase Order.

Initialed: Michael Bingham ᴍᴄᴮ       Jim Granger

# UNIFIED WEAPON SYSTEMS

8. **Miscellaneous**.  This letter shall be governed by the substantive laws of the State of Florida without regard to conflict of law principles.  This letter constitutes the entire understanding and agreement between the parties hereto and their affiliates with respect to its subject matter and supersedes all prior or contemporaneous agreements, representations, warranties and understandings of such parties (whether oral or written).  No promise, inducement, representation or agreement, other than as expressly set forth herein, has been made to or by the parties hereto.  This letter may be amended only by written agreement, signed by the parties to be bound by the amendment. Evidence shall be inadmissible to show agreement by and between such parties to any term or condition contrary to or in addition to the terms and conditions contained in this letter.  This letter shall be construed according to its fair meaning and not strictly for or against either party.

9. **No Binding Obligation**.  Except for Sections 1(b), (c), (d) and 2 through 7, THIS  LETTER OF INTENT DOES NOT CONSTITUTE OR CREATE, AND SHALL NOT BE DEEMED TO CONSTITUTE OR CREATE, ANY LEGALLY BINDING OR ENFORCEABLE OBLIGATION ON THE PART OF EITHER PARTY TO THIS LETTER OF INTENT. NO SUCH OBLIGATION SHALL BE CREATED, EXCEPT BY THE  EXECUTION AND DELIVERY OF THE PURCHASE AGREEMENT CONTAINING SUCH TERMS AND CONDITIONS OF THE PROPOSED TRANSACTION AS SHALL BE AGREED UPON BY THE PARTIES, AND THEN ONLY IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF SUCH PURCHASE AGREEMENT.

The Confidentiality Agreement is hereby ratified and confirmed as a separate  agreement between the parties thereto.

If the foregoing terms and conditions are acceptable to you, please so indicate by initialing each page and signing the enclosed copy of this letter and returning  it to the attention of the undersigned.

Sincerely,

Michael Bingham
Managing Member
Unified Weapon Systems
   2410 Success Drive Unit 11
   Odessa, FL 33556

By: _____  Date: 4/29/2014

Title: _____ Managing Member

Initialed: Michael Bingham _____   Jim Granger _____

# UNIFIED WEAPON SYSTEMS

<u>ACCEPTED AND AGREED</u>

Jim Granger
Vice President
Adams Arms
    1551 Gunn Hwy
    Odessa, FL 33556

By: _____  Date: 4-29-2014

Title: _____ V.P. Fire Arms

Initialed:  Michael Bingham _MCB_      Jim Granger

EXHIBIT 1

**AARA-15-M-$-PERU Less Accessories**

| Type | | |
|---|---|---|
| Upper Receiver | | Material & Machining |
| Upper Receiver | | Anodize |
| Upper Receiver | | Laser |
| Upper Receiver | | Forward Assist |
| Upper Receiver | | Spring - FA |
| Upper Receiver | | Pin - FA |
| Upper Receiver | | Ejection Port Door |
| Upper Receiver | | Spring - EPD |
| Upper Receiver | | Pin - EPD |
| Upper Receiver | | C-clip EPD |
| **Upper Receiver Total** | | |
| Bolt Carrier | | Material & Machining |
| Bolt Carrier | | Vent Bleed |
| Bolt Carrier | | Laser |
| **Bolt Carrier Total** | | |
| Bolt Assy | | Bolt |
| Bolt Assy | | Extractor |
| Bolt Assy | | Spring - Ext |
| Bolt Assy | | Extractor Spring |
| Bolt Assy | | Extractor Pin |
| Bolt Assy | | Ejector |
| Bolt Assy | | Ejector Spring Roll Pin Insert |
| Bolt Assy | | Ejector |
| Bolt Assy | | Ejector Spring |
| Bolt Assy | | O-Ring |
| **Bolt Assy Total** | | |
| Firing Pin | | Firing Pin |
| **Firing Pin Total** | | |
| Cam Pin | | Cam Pin |
| **Cam Pin Total** | | |
| Cotter Pin | | Cotter Pin |
| **Cotter Pin Total** | | |
| Barrel | | Extension |
| Barrel | | Machining |
| Barrel | | Laser |
| Barrel | | Material |
| Barrel | | Pin |
| Barrel | | Nut |
| **Barrel Total** | | |
| Gas Block | | Material & Machining |
| Gas Block | | Machining |
| Gas Block | | Laser |
| Gas Block | | Dowel Pin (2) |
| **Gas Block Total** | | |
| Gas Plug | | Material & Machining |
| Gas Plug | | Machine |
| Gas Plug | | Detent Button |
| Gas Plug | | Machine - OB |
| Gas Plug | | Spring - DB |
| Gas Plug | | Pin - OB |
| **Gas Plug Total** | | |
| Drive Rod - Mid | | Material & Machining |
| **Drive Rod - Mid Total** | | |
| Spring - OR | | Spring - OR |
| **Spring - OR Total** | | |
| Bushing - OR | | Material & Machining |
| **Bushing - OR Total** | | |
| Crush Washer | | Standard |
| **Crush Washer Total** | | |
| Lower Receiver | | Material & Machining |
| Lower Receiver | | Anodize |
| Lower Receiver | | Laser |
| **Lower Receiver Total** | | |
| Upper Parts Kit | | Buffer Retainer |
| Upper Parts Kit | | Spring - Buffer Retainer |
| Upper Parts Kit | | Spring - Takedown Pin |
| Upper Parts Kit | | Detent - Takedown Pin |
| Upper Parts Kit | | Takedown Pin |
| Upper Parts Kit | | Detent - Safety |
| Upper Parts Kit | | Spring - Safety Selector |
| Upper Parts Kit | | Safety Selector Lever - Standard |
| Upper Parts Kit | | Pin - Trigger |
| Upper Parts Kit | | Pin - Hammer |
| Upper Parts Kit | | Spring - Hammer |
| Lower Parts Kit | | Hammer |
| Lower Parts Kit | | Trigger |
| Lower Parts Kit | | Disconnector |
| Lower Parts Kit | | Spring - Disconnector |
| Lower Parts Kit | | Spring - Trigger |
| Lower Parts Kit | | Trigger Guard |
| Lower Parts Kit | | Roll Pin - Trigger Guard |
| Lower Parts Kit | | Bolt Catch |
| Lower Parts Kit | | Spring - Bolt Catch |
| Lower Parts Kit | | Roll Pin - Bolt Catch |
| Lower Parts Kit | | Catch - Mag Release |
| Lower Parts Kit | | Button - Mag Release |
| Lower Parts Kit | | Spring - Mag Release |
| Lower Parts Kit | | Pivot Pin |
| Lower Parts Kit | | Detent - Pivot Pin |
| Lower Parts Kit | | Spring - Pivot Pin |
| Lower Parts Kit | | Screw - Grip |
| Lower Parts Kit | | Washer - Grip |
| **Lower Parts Kit Total** | | |
| Rifle Box | | REAL AUTO |
| **Rifle Box Total** | | |
| Plastic Bag | | Rifle |
| **Plastic Bag Total** | | |
| Manual | | Manual |
| **Manual Total** | | |
| Labor | | Upper |
| Labor | | Lower |
| **Labor Total** | | |
| **Grand Total** | | |
| **TOTAL BY PIECES** | 462% | |
| Only Base? | | |

$413.00

Exhibit 2

AARA-16-A4-5-556-Peru

| Type | Item |
|---|---|
| Upper Receiver | Machined & Machining |
| Upper Receiver | Anodize |
| Upper Receiver | Laser |
| Upper Receiver | Forward Assist |
| Upper Receiver | Spring / D |
| Upper Receiver | Pin / D |
| Upper Receiver | Ejection Port Cover |
| Upper Receiver | Spring / EPC |
| Upper Receiver | Pin / EPC |
| Upper Receiver | C-Clip / EPC |
| Bolt Carrier | Machined & Machining |
| Bolt Carrier | Gas Key |
| Bolt Carrier | Laser |
| Bolt Assy | Bolt |
| Bolt Assy | Lubricant |
| Bolt Assy | Spring / EE |
| Bolt Assy | Extractor |
| Bolt Assy | Extractor Spring |
| Bolt Assy | Extractor Pin |
| Bolt Assy | Ejector Spring Buffer Insert |
| Bolt Assy | Ejector |
| Bolt Assy | Ejector Spring |
| Bolt Assy | Ejector Pin |
| Bolt Assy | O-Ring |
| Firing Pin | Firing Pin |
| Firing Pin | Firing Pin |
| Cam Pin | Cam Pin |
| Cotter Pin | Cotter Pin |
| Barrel | Blank |
| Barrel | Extrusion |
| Barrel | Machining |
| Barrel | Laser |
| Barrel | Indicator |
| Barrel | Pin |
| Barrel | Nut |
| Barrel Total | |
| Gas Block | Machined & Machining |
| Gas Block | Anodize |
| Gas Block | Laser |
| Gas Block | Detent Pin (x2) |
| Gas Plug | Machined & Machining |
| Gas Plug | Anodize |
| Gas Plug | Detent Button |
| Gas Plug | Roll pin |
| Gas Plug | Spring / GB |
| Gas Plug | Pin / GB |
| Gas Plug | |
| Delta Ring | Machined & Machining |
| Delta Ring Weld Assy | Weld |
| Barrel Nut | Barrel Nut |
| Spring / DR | Spring / DR |
| Snap Ring | Snap Ring |
| Handguard | Machined & Machining |
| Handguard | Anodize |
| Handguard | Laser |
| Flash Hider | Standard |
| Flash Hider | Machined |
| Crush Washer | Standard |
| Crush Washer | Machined |
| Lower Receiver | Machined & Machining |
| Lower Receiver | Anodize |
| Lower Receiver | Laser |
| Lower Parts Kit | Buffer Retainer |
| Lower Parts Kit | Spring - Buffer Retainer |
| Lower Parts Kit | Spring - Takedown Pin |
| Lower Parts Kit | Detent - Takedown Pin |
| Lower Parts Kit | Takedown Pin |
| Lower Parts Kit | Detent - Safety |
| Lower Parts Kit | Spring - Safety Selector |
| Lower Parts Kit | Safety Selector Lever - Standard |
| Lower Parts Kit | Pin - Trigger |
| Lower Parts Kit | Trigger |
| Lower Parts Kit | Pin - Hammer |
| Lower Parts Kit | Hammer |
| Lower Parts Kit | Pin - Hammer |
| Lower Parts Kit | Spring - Hammer |
| Lower Parts Kit | Trigger |
| Lower Parts Kit | Disconnector |
| Lower Parts Kit | Spring - Disconnector |
| Lower Parts Kit | Spring - Trigger |
| Lower Parts Kit | Trigger Guard |
| Lower Parts Kit | Roll Pin - Trigger Guard |
| Lower Parts Kit | Bolt Catch |
| Lower Parts Kit | Spring - Bolt Catch |
| Lower Parts Kit | Buffer - Bolt Catch |
| Lower Parts Kit | Roll Pin - Bolt Catch |
| Lower Parts Kit | Catch - Mag Release |
| Lower Parts Kit | Button - Mag Release |
| Lower Parts Kit | Spring - Mag Release |
| Lower Parts Kit | Pistol Grip |
| Lower Parts Kit | Spring - Pivot Pin |
| Lower Parts Kit | Detent - Pivot Pin |
| Lower Parts Kit | Pivot Pin |
| Lower Parts Kit | Washer - Grip |
| Lower Parts Kit | Screw - Grip |
| Buffer Tube | Rifle or Buffer |
| Buffer Tube | Rifle Base |
| Buffer Tube | Rifle Bolt |
| Plastic Bags | Rifle |
| Plastic Bags | Manual |
| Labor | Upper |
| Labor | Lower |
| TOTAL W/LABOR | |
| IDEAS NO VAT | |

Total Price



## CONFIDENTIAL / NON DISCLOSURE AGREEMENT

This Agreement is made as of ___24 June___, 2014, by and between **ADAMS ARMS, LLC.,** a Florida corporation whose address is 1551 Gunn Hwy, Odessa FL 33556 ("Company") and ___James W. Parker___, an individual whose address is ___929 Allegro Lane, Apllo Beach, FL___ ("Receiving Party").

**Recitals:**

The Company owns a certain patent that is pending and Receiving Party is in the business of manufacturing the Company's patented product. The Company and Receiving Party desire to enter into confidential negotiations with respect to manufacturing Company's product (the "Business Purpose"). In order to pursue the mutual Business Purpose, Company and Receiving Party recognize that there is a need for the Company to disclose to Receiving Party certain of its confidential information to be used only for the Business Purpose and a need for Receiving Party to protect the Company's confidential information from unauthorized use and disclosure.

**NOW, THEREFORE**, in consideration of the mutual covenants and conditions herein contained, the parties hereto agree as follows:

**1. Confidential Information, Trade Secrets and Proprietary Information Not Otherwise Qualifying for Trade Secret Protection.**

As used herein, the following terms shall have the following meanings:

"Confidential Information" shall mean all information existing as of the Effective Date or thereafter developed in which there is a proprietary interest and that there is a legitimate business reason for guarding against unauthorized use or disclosure.

"Medium" shall mean any physical form or manner of storing or preserving information temporarily or permanently, including, without limitation, paper, photographic film, slides or prints, transparencies, drawings or pictures, electronic or magnetic memory devices (e.g., magnetic disks or tapes, bubble memories, or semiconductor devices such as DRAM, SRAM, EPROM, FLASH or PAL chips, optical laser disks (e.g., CD ROM disks)).

"Subject Information" shall mean any Confidential Information, Trade Secret(s) or other proprietary information provided by one party to the other whether oral or in writing or

*Page 1 of 8*

**EXHIBIT "3"**

stored on any form of Medium.

"Trade Secrets" shall mean any information or thing that constitutes a trade secret under Florida law, including, without limitation, a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**2.**      **Identification of Confidential Information**

It is acknowledged by the parties to this agreement that all information supplied by Company, regardless of its form such as, but not limited to, written, oral, or electronic medium is to be identified as confidential by the Receiving Party.

**3.**      **Exclusions**

Receiving Party, however, shall have no liability to the other party, under this Agreement with respect to the disclosure and/or use of any such Confidential Information that it can establish:

(a)      has become generally known or available to the public without breach of this Agreement by the Receiving Party;

(b)      was known by the Receiving Party before receiving such information from the Company;

(c)      has become known by or available to Receiving Party from a source other than the Company, without any breach of any obligation of confidentiality owed to the Company, subsequent to disclosure of such information to it by the Company;

(d)      has been disclosed to persons regularly employed by the Receiving Party who have previously agreed in writing not to disclose such information or to use such information for any purpose other than to assist it to determine whether to pursue the Business Purpose;

(e)      has been independently developed by the Receiving Party without use of or reference to the Confidential Information by persons who had no access to the Confidential Information;

(f)      has been provided to the Receiving Party with a written statement that it is provided without restriction on disclosures; or

(g)      has been approved for release or use by written authorization of the Company.



## 4.    Obligations

The Receiving Party acknowledges that irreparable injury and damage will result from disclosure to third parties, or utilization for purposes other than those connected with the proposed acquisition or other business relationship, of the Confidential Information. Accordingly, the Receiving Party agrees:

      (a)      to hold the Confidential Information in strict confidence;

      (b)      not to disclose such Confidential Information to any third party except as specifically authorized herein or as specifically authorized by the Company in writing;

      (c)      to use all reasonable precautions, consistent with the Receiving Party's treatment of its own confidential information of a similar nature, to prevent the unauthorized disclosure of the Confidential Information, including, without limitation, protection of documents from theft, unauthorized duplication and discovery of contents, and restrictions on access by other persons to such Confidential Information; and

      (d)      not to use any Confidential Information for any purpose other than the Business Purpose.

## 5.    Detailed Enumeration of Receiving Party's Obligations

The Receiving Party represents, warrants and covenants to the Company, each of the following:

The Receiving Party shall, indefinitely, hold any Subject Information in the strictest confidence and will not disclose any Subject Information to any person or entity whatsoever, absent the prior express written instruction, signed by the president or chief executive officer of the   Company. The Receiving Party shall take all steps necessary to ensure that any Subject    Information is held in the strictest confidence and that the terms and conditions of this Agreement are strictly adhered to by the Receiving Party and its employees and agents.

The Receiving Party may provide access to the Subject Information to its authorized officers and employees on, and only on, a need to know basis which is directly and solely for the authorized purposes under this Agreement and any such person being provided with access to any of the Subject Information shall be subject to the terms of this Confidential / Non-Disclosure Agreement.

Notwithstanding the provisions of Section 3, except as to authorized officers and

employees employed by the Receiving Party and as to whom the Receiving Party is in compliance with the provisions of Section 4, in no event shall the Receiving Party provide, inadvertently or otherwise, any of the Subject Information to any person or entity who is directly or indirectly engaged, or who is planning to directly or indirectly engage in competition with the Company.

The standard of care to be utilized by the Receiving Party in the performance of its representations, warranties, covenants and obligations set forth in this Agreement relative to its treatment of the Subject Information shall be the standard of care, but in no event less than a reasonable standard of care, utilized by Receiving Party in treating its own most proprietary, secret and confidential information, and such information shall not be subject to any right of waiver.

Receiving Party further agrees to indemnify the Company against any loss or liability resulting from, or arising in connection with, unauthorized use or disclosure of the Confidential Information by the Receiving Party or its directors, employees or other representatives.

**6.      Permitted Disclosures.**

Receiving Party may disclose the Confidential Information to its responsible employees and professional advisers with a bona fide need to know such Confidential Information, but only to the extent necessary to carry out the Business Purpose and only if such employees are advised of the confidential nature of such Confidential Information and the terms of this Agreement and are bound by a written agreement or by a legally enforceable code of professional responsibility to protect the confidentiality of such Confidential Information.

**7.      Required Disclosures**

Receiving Party may disclose the Confidential Information if and to the extent that such disclosure is required by applicable law, provided that the Receiving Party uses reasonable efforts to limit the disclosure by means of a protective order or a request for confidential treatment and provides the Company a reasonable opportunity to review the disclosure before it is made and to interpose its own objection to the disclosure.

**8.      Copies and Abstracts**

Receiving Party shall not make or use any copies, synopses or summaries of oral or written material, photographs or any other documentation or information made available or supplied by the Company to the Receiving Party except such as are necessary for the Receiving Party's internal communications in connection with carrying out the Business Purpose. All such copies and abstracts must themselves be marked as confidential and the Receiving Party shall maintain a written record of the distribution of all such copies and

abstracts.

9.    **Return of Confidential Information**

Upon the Company's request, or upon the conditions as set forth in paragraph 15 of this
Agreement, the Receiving Party will promptly return to the Company
all copies of the Confidential Information, will destroy all notes, abstracts and other
documents that contain Confidential Information, and will provide the Company a written
certification of an officer of the Receiving Party that it has done so.

10.    **No Representations as to Accuracy**

The Company warrants that it has the right to make the disclosure of Confidential
Information contemplated by this Agreement. In providing the Confidential Information
under this Agreement, the Company makes no representation, either express or implied,
as to its adequacy, sufficiency, or freedom from defect of any kind, including freedom
from any patent infringement that may result from the use of such Confidential
Information, and the Company shall not incur any responsibility or obligation whatsoever
by reason of such Confidential Information.

11.    **Retention of Legal Rights**

The Company retains all rights and remedies with respect to the Confidential Information
afforded it under the patent and other laws of the United States and other countries both
during and after the term of this Agreement, including without limitation any trade secret
or other laws designed to protect proprietary or confidential information.

12.    **No Creation of Ownership Rights**

Nothing in this Agreement, nor any action taken by the Receiving Party, including,
Without limitation, any payment of monies by the Receiving Party to the Company,
during any discussions prior to the consummation of the proposed acquisition or other
business relationship shall be construed to convey to the Receiving Party any right, title
or interest in the Confidential Information, or any license to use, sell, exploit, copy or
further develop in any way any Confidential Information. No license is hereby granted or
implied under any patent, copyright or trademark, any application for any of the
foregoing, or any trade name, trade secret or other proprietary information, in which the
Company has any right, title or interest.

13.    **Public Announcement**

Case 8:16-cv-01503-VMC-AEP   Document 1   Filed 06/10/16   Page 44 of 50 PageID 44

All public announcements or other statements to third parties related to the discussions referred to in the recitals of this Agreement by either of the parties shall be subject to prior approval by the other party, except for such statements as may be necessary, in the opinion of their respective counsel, to comply with the requirements of any law, governmental order, or regulation.

## 14.    Injunctive Relief

Receiving Party acknowledges that the Confidential Information is of a proprietary and confidential nature and that any failure to maintain the confidentiality of the Confidential Information in breach of this Agreement cannot be reasonably or adequately compensated for in money damages and would cause irreparable injury to the Company. Accordingly, the Receiving Party agrees that the Company is entitled to, in addition to all other rights and remedies available to the Company at law or in equity, to an injunction restraining the Receiving Party and any agents of the Receiving Party, from directly or indirectly committing or engaging in any act restricted by this Agreement in relation to the Confidential Information.

## 15.    Term of Agreement

From the date of signing this Agreement, the Receiving Party shall have _____ days to present a letter of intent setting forth the terms on which the Receiving Party is willing to proceed with the Business Purpose.  Upon receipt and acceptance of a written letter of intent, the Company will forward the necessary drawing, plans, and a functioning unit of the Company's patented product to the Receiving Party.

Furthermore, this Agreement applies to all Confidential Information that is disclosed by the Company to the Receiving Party during the period that begins on the date set forth above and will remain in effect for Five (5)  years after the date of the last disclosure of Confidential  Information hereunder, at which time this Agreement will terminate.

## 16.    Applicable Law

This Agreement will be construed, interpreted and applied in accordance with the laws of the State of Florida (excluding its body of law controlling conflicts of law).

## 17.    Notice

Any notice, communication, offer, acceptance, request, consent, reply, or advice (collectively referred to here as "Notice"), provided or permitted to be given, served, made, or accepted by any party or person to any other party or parties, person or persons, hereunder must be in writing, addressed to the party to be notified at the address set forth below such party's name on the signature page of this Agreement, or such other address of which one party has notified the other in writing pursuant to the terms of this Section, and must be served: (1) by facsimile or other similar electronic method with a hard copy of such notice sent no later than the next business day as specified under (2) below; (2)

**ADAMS ARMS®**
PRECISION TECHNOLOGY FOR THE MODERN WARRIOR

by depositing the same in the United States mail, certified or registered mail, return receipt requested and postage paid; or (3) by personal delivery. Notice shall be effective: (i) twenty-four (24) hours after being transmitted by facsimile or other similar electronic method, provided a hard copy is sent as specified in (1) above; (ii) seventy-two (72) hours following being properly mailed; or, (iii) immediately upon personal delivery. Notice otherwise given is effective only if and when received.

18.     **Entire Agreement, Amendments, Prior Discussions**

This Agreement constitutes the final, exclusive and complete statement of the parties agreement respecting the subject matter addressed herein. This Agreement may not subsequently be amended or modified except by a writing signed by both parties hereto. The Receiving Party hereby confirms that any information disclosed to it by the Company, or any discussions held between the parties, prior to the date of this Agreement shall be subject to the terms of this Agreement.

19.     **Successors and Assigns**

This Agreement shall be binding on, and shall inure to the benefit of, the parties to it and their respective legal representatives, successors and assigns.  Furthermore, Receiving Party may not assign this Agreement without the prior written consent of Adams Arms, which consent may be withheld for any reason.

20.     **Survival**

This Agreement shall survive the cessation of any discussions between the parties with regard to the proposed acquisition or other business relationship.

21.     **Severability**

If any provision of this Agreement is declared void or unenforceable, such provision shall be severed from this Agreement, which shall otherwise remain in full force and effect.

22.     **Counterparts**

This Agreement may be signed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

23.     **Attorneys' Fees to Prevailing Party in Any Legal Action Brought To Enforce or Interpret Agreement**

In the event any suit or other action is commenced to construe or enforce any provision of this Agreement, the prevailing party, in addition to all other amounts such party shall be entitled to receive from the other party, shall be paid by the other party a reasonable sum for its attorneys' fees and costs.

**Company:**

**ADAMS ARMS, INC.** (a Florida corporation)

By: _____     Dated: 6/24/14

Mike Froning, President

**Receiving Individual:**

By: _____ Sign     Dated: 24 June 2014

JAMES W PARKER _____ Print

OWNER, Saber Strategies, LLC Position

*Page 8 of 8*

EXECUTION COPY

### CONSULTING SERVICES AGREEMENT

THIS CONSULTING SERVICES AGREEMENT (the "Agreement") is made and entered into this 7th day of July, 2014, by and between Adams Arms, LLC, a Florida limited liability company (the "Company") and Saber Strategies, LLC, a Florida limited liability company and James W. Parker, an individual (together "Consultant").

### RECITALS:

A.   The Company is engaged in the manufacturing and sales of rifles and other weapons ("Business").

B.   James W. Parker is a retired military general, owns Saber Strategies, LLC, and possesses significant expertise and knowledge regarding foreign and domestic military matters which could be helpful to the Company and its Business.

C.   The Company desires to enter into this Agreement to obtain the benefit of Consultant's knowledge and expertise and Consultant is willing to enter into this Agreement upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual promises hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1.   **Engagement of Consultant.** The Company hereby engages Consultant as a senior military advisor consultant to the Company and the Consultant hereby agrees to provide such advisory and other services reasonably requested by the company (the "Services").

2.   **Term of Agreement.** The term of this Agreement shall be for a period of three (3) years, commencing on the date of execution of this Agreement ("Initial Term") and shall automatically renew for additional and consecutive one-year terms ("Renewal Term," and collectively with the Initial Term, the "Term"), subject however, to prior termination as hereinafter provided.

3.   **Performance of Services by Consultant.** Consultant shall perform the Services as requested by the Board. Consultant shall fully comply with all of the Company's policies and procedures, including any Code of Ethics, as such policies and procedures may be amended from time to time, in performing any Services.

4.   **Option Grant, Compensation and Expense Reimbursement.** As an incentive to execute this Agreement, Consultant shall receive options to purchase up to 20,000 of the Company's common units at a strike price of $4.67 per unit which units shall time vest in equal installments over a period of three (3) years. The foregoing option will be subject to the Company's standard form of option agreement. Consultant shall be paid a daily rate of $1,500.00 ($187.50 per hour) for Services not directly related to revenue producing opportunities (for example, attending a Company Board of Managers meeting as an observer). For revenue producing opportunities, Consultant shall also be entitled to receive cash payments equal to 3% of the gross profits (i.e. net revenues less cost of goods sold in accordance with US GAAP) of the Company on any sales of Company products generated directly through the efforts of Consultant which shall also include the current Peru project if Consultant becomes actively involved in such including testing. The Company shall also reimburse Consultant for reasonable incidental and travel expenses pre-approved by the Company's CEO upon presentation to the Company of receipts or the reasonably satisfactory evidence thereof. All payments and reimbursements shall be made to Saber Strategies, LLC.

5.   **Relationship of Parties.** Consultant is, and shall at all times during the term of this Agreement be, an independent contractor of the Company. Consultant shall be solely responsible for payment of all federal, state and local taxes or contributions required under social security and income tax laws with respect to Consultant. Except as specifically authorized in writing by the Company, Consultant shall not enter into, or in any way be authorized to enter into, any contract, agreement, warranty or representation on behalf of the Company and shall not act as an agent of the Company. Nothing in this Agreement is intended or shall be construed to create any partnership, joint venture, franchise or other similar arrangement between Consultant and the Company for any purpose.

**EXHIBIT "4"**

**CONSULTANT UNDERSTANDS THAT CONSULTANT IS OBLIGATED TO PAY FEDERAL, STATE AND LOCAL INCOME TAX AND SELF EMPLOYMENT TAX ON ANY MONIES PAID PURSUANT TO THIS AGREEMENT. CONSULTANT FURTHER UNDERSTANDS THAT THE COMPANY WILL NOT WITHHOLD FICA (SOCIAL SECURITY) FROM CONSULTANT'S COMPENSATION, WILL NOT WITHHOLD FEDERAL OR STATE INCOME TAX FROM CONSULTANT'S COMPENSATION AND WILL NOT OBTAIN WORKER'S COMPENSATION INSURANCE ON BEHALF OF CONSULTANT.**

6.    **Confidential Information.**

(a)    Confidential Information Defined. It is contemplated that the Company may disclose to Consultant information concerning the Company's inventions, confidential know-how and trade secrets to further the performance of this Agreement. "Confidential Information" means technical and business information relating to the Company's inventions or products, research and development, production, manufacturing and engineering processes, software produced by or for the Company, costs, profit or margin information, finances, customers, marketing, and production and future business plans; all related information and documentation; and any other information which is marked "Confidential" or otherwise identified by the Company to be confidential. All material and information disclosed by the Company to Consultant will be presumed to be Confidential Information and will be so regarded by Consultant. The term "Confidential Information" shall also include all of Consultant's work product, working papers and results derived from the foregoing.

(b)    Confidentiality Agreement. Consultant agrees that Consultant will hold the Confidential Information in strict confidence and will only use the Confidential Information in connection with providing Services to the Company under this Agreement. Consultant further agrees that Consultant will not make any disclosure of the Confidential Information (including methods or concepts utilized in the Confidential Information) to anyone without the express written consent of the Company. Consultant will take all reasonable steps to ensure the confidentiality of all Confidential Information. Consultant agrees not to copy any Confidential Information and not to use any Confidential Information for Consultant's benefit or for the benefit of any third party.

(c)    Exceptions. Notwithstanding the other provisions of this Agreement, nothing received by Consultant will be considered to be Confidential Information of the Company if: (i) it has been published or its otherwise readily available to the public other than by a breach of this Agreement; (ii) it has been rightfully received by Consultant from a third party other than the Company without confidentiality limitations; or (iii) it is required to be disclosed by order of court or other governmental authority.

(d)    Survival of Obligations.  This Section 6 will survive any termination of this Agreement.

7.    **Foreign Corrupt Practices Act.** Consultant shall not offer, promise to pay, pay, promise to give, give and/or authorize the paying or giving of anything of value, directly or indirectly, to a foreign government official, a foreign political party or official thereof or a foreign political candidate ("Foreign Official") for the purpose of influencing the Foreign Official's actions or decisions or inducing the Foreign Official to use his influence with others who affect the actions or decisions of a foreign government, government instrumentality or political party, if this is done in order to obtain, retain or direct business to the Company. Further, Consultant is forbidden from making payments to any person when Consultant knows of or has "reason to know" that all or a portion of such payments will be offered, promised or given, directly or indirectly, to a Foreign Official for the purpose of influencing his actions or decisions or inducing him to use his influence to affect the actions or decisions of a foreign government, government instrumentality or political party to obtain, retain or direct business to the Company.

8.    **Termination.**

(a)    This Agreement may be terminated:

i. At any time upon the written agreement of both parties.

ii. By either party upon sixty days written notice to the other party.

iii.  By either party, at its option, upon Default by the other party if such Default has not been corrected within the cure period set forth in Section 8(b) below.  "Default" shall mean the failure of a party to perform any of its material obligations under this Agreement

(b)  Opportunity to Cure.  Upon the occurrence of any Default by a party, the non-defaulting party may terminate its further obligations under this Agreement by giving written notice of termination specifying the specific nature of the Default.  The parties will continue to perform their obligations pursuant to this Agreement for a period of thirty (30) days following the defaulting party's receipt of such notice, to enable the defaulting party to cure the Default.  Failure to cure the Default within such thirty (30) day period will result in termination without further notice by the non-defaulting party.

9.    **General Provisions.**

(a)  Compliance with Laws.  The parties agree that they will comply with all applicable laws and regulations of government bodies or agencies in their respective performance of their obligations under this Agreement. Consultant shall comply with all federal, state and municipal laws, rules and regulations and the laws of any relevant foreign jurisdiction that are now or may in the future become applicable to Consultant or the Services.

(b)  Governing Law and Construction. This Agreement will be governed by and construed in accordance with the laws of the State of Florida.

(c)  Assignment. This Agreement will be binding upon the parties hereto and their respective heirs, successors and permitted assigns. Neither party may assign this Agreement and/or any of its rights and/or obligations hereunder without the prior written consent of the other party, provided, however, that the Company may assign this Agreement to an affiliate of the Company without Consultant's prior written consent.

(d)  Survival of Obligations. The restrictions and obligations of this Agreement shall survive any expiration, termination or cancellation of this Agreement, and shall continue to bind Consultant, his successors, personal representatives, heirs and assigns.

(e)  Waiver. Any one or more waivers of any covenant or condition by either party shall not be construed as a waiver of the subsequent breach of the same or any other covenant or condition. Failure or delay by either party to enforce compliance with any term or condition of this Agreement will not constitute a waiver of such term or condition.

(f)  Counterparts. This Agreement may be executed in counterparts and by facsimile or other electronic transmission, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

*[remainder of page is blank and signature page follows]*

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the day and year first above written.

ADAMS ARMS, LLC

By: MICHAEL FRONING, CEO

SABER STRATEGIES, LLC

JAMES W. PARKER, individually and as owner

*[Signature page of Consulting Agreement]*