**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ADAMS ARMS, LLC,

      Plaintiff,

                                  CASE NO.: 8:16-cv-1503-VMC-AEP

v.

UNIFIED WEAPON SYSTEMS, INC.,
AGUIEUS, LLC,
MICHAEL C. BINGHAM,
CHRISTIAN QUINTANILLA AURICH, and
MAJOR GENERAL JAMES W. PARKER,

      Defendants.

                                        /

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Adams Arms, LLC ("AA"), moves pursuant to Fed. R. Civ. P. 65(a) and Local Rule 4.06 for a preliminary injunction against Defendants, Unified Weapon Systems, Inc. ("UWS"), Aguieus, LLC ("Aguieus"), Michael C. Bingham, Christian Quintanilla Aurich, and Major General James W. Parker, to enjoin Defendants from: 1) violating the exclusivity provisions of the parties' Letter of Intent and non-compete and non-disclosure obligations of the parties' Mutual Confidentiality and Nondisclosure Agreement; and 2) using and disclosing Adams Arms' highly proprietary confidential information and trade secrets.

### I.      BACKGROUND

**A.**    **Adams Arms, LLC**

AA is a weapons manufacturer founded and based in the Tampa Bay area that provides cutting edge technology in the engineering, design, development, and manufacture of small arms, including high-powered military rifles.  Declaration of Michael J. Froning ("Froning Decl.")[1] at

---

[1] Pursuant to the Court's Order (Dkt. 7), a copy of the declaration and its exhibits was filed under seal.

¶4.   AA owns multiple patents on its rifle technology and sells its rifles and rifle retrofits to consumers through large retail chains.  Froning Decl. at ¶5.  AA's rifles and rifle retrofits are used around the world by police forces, SWAT teams, the Federal Bureau of Investigation, the United States Marine Corps, the Panamanian military, and have been ordered for the Mexican police.   Froning Decl. at ¶6.  AA is also a parts provider to other large weapon manufacturers such as Stag Arms and Smith & Wesson.   Froning Decl. at ¶7.

Over the last 10 years, AA has sold more than 100,000 rifles, rifle retrofits, and upper assemblies to civilians, law enforcement, and the military.  Froning Decl. at ¶8.  AA is highly regarded for the quality of its products and the superior accuracy and reliability of its rifles. Froning Decl. at ¶9.  AA's customer feedback time and time again relates to its rifles and rifle parts being easier to use and of better reliability and operability than those of competitors. Froning Decl. at ¶10.  As a weapons manufacturer whose entire business relies on maintaining the superior quality and functionality of its products, AA possesses an immense amount of highly proprietary confidential business information and owns numerous highly proprietary trade secrets relating to matters such as the manufacturing processes for its rifles; preferable equipment and tooling used to manufacture its rifles; preferable vendors for supplying each rifle part and tooling; and the pricing AA is able to secure from each vendor.  Froning Decl. at ¶11. AA has spent countless years, resources, and money developing and protecting these trade secrets in order to perfect its top-quality rifle and rifle parts and supersede its competitors. Froning Decl. at ¶12.  As any reputable weapons manufacturer would agree, AA's trade secrets are invaluable.  Froning Decl. at ¶13.

**B.      AA's Relationship With Defendants**

In early 2014, Defendant Aguieus approached AA with a proposal for the two companies to partner on a bid to supply to the Peruvian military rifles to be developed and manufactured by AA.  Froning Decl. at ¶14.  According to Defendant Michael Bingham, the Managing Member of Aguieus and Vice President and Chief Operating Officer of Defendant UWS,[2] the Ministry of Defense of the Republic of Peru ("Peruvian MOD") had contacted Aguieus and UWS concerning the opportunity to secure a multi-year contract for the supply of military rifles. Froning Decl. at ¶15.  The Peruvian MOD was purportedly funding the purchase through the Peruvian Factory of Weapons and Ammunition from the Army S.A.C. ("FAME").  Froning Decl. at ¶16.  The rifles would be built to specifications established by the Peruvian MOD with input by UWS and its business partners.  Froning Decl. at ¶17.  Aguieus and UWS, through Mr. Bingham and Defendant Christian Quintanilla Aurich (the President and Chief Executive Officer of UWS), solicited AA to be a business partner in the project.  Froning Decl. at ¶18.

The project required AA to develop and manufacture rifles to be supplied to UWS, including working demonstration rifles for testing by the Peruvian MOD, provide proprietary confidential information and trade secrets to Aguieus and UWS, and host a tour of the manufacturing facility for the rifles, which would be AA's facility.  Froning Decl. at ¶19.  As an inducement for AA to join the project, and in order for AA to protect its trade secrets and confidential information, Aguieus executed a Mutual Confidentiality and Nondisclosure Agreement ("NDA") with AA in which Aguieus agreed not to use AA's confidential information, including its technical data, trade secrets, and know-how ("AA's Confidential Information"), for its own purposes or any purpose other than the commercial relationship between them.  Froning Decl. at ¶20, Exh. 1.  The NDA also extended to Aguieus' directors,

---

[2] UWS is a subsidiary of Aguieus.

officers, employees, consultants, and agents that received AA's Confidential Information, including UWS, Mr. Bingham, Mr. Aurich, and Defendant General James W. Parker (a Director and Senior Military Advisor of UWS).  NDA at ¶2.  Due to the highly proprietary, valuable, and confidential nature of the information and trade secrets to be furnished, the NDA provided that monetary damages would be inadequate to compensate for a breach, and all parties recognized that violations may cause irreparable injury entitling AA to injunctive relief without the necessity of proving actual damages.  NDA at ¶ 10.

In addition, to memorialize the parties' joint venture, Mr. Bingham sent AA a "Letter of Intent" ("LOI"), which UWS and AA executed on April 29, 2014.  Froning Decl. at ¶21, Exh. 2. In the LOI, UWS as "Buyer" agreed with AA as "Seller" that AA would manufacture the rifles at AA's facility, with the exception of certain parts that would be provided by UWS to AA for final assembly, in accordance with a delivery schedule that would be agreed to by UWS and AA.  LOI at ¶1(b).  This was a binding agreement of UWS.  LOI at ¶9.  The LOI further committed AA to provide UWS with demonstration rifles and allow Peruvian MOD personnel to tour the manufacturing facility—AA's facility.  LOI at ¶1(c) and (f).  In the LOI, UWS also agreed that given the investment AA would be making in the project "Buyer, Buyer's affiliates and Buyer's respective officers, directors, employees and agents shall not initiate, solicit, encourage, directly or indirectly, or accept any offer or proposal regarding the possible Project by any person other than Seller" with the exception of specified items not relevant herein.  LOI at ¶5.  This was likewise a binding agreement of UWS.  LOI at ¶9.

C.      The Project

According to Mr. Bingham, the Peruvian MOD was looking for a multi-year purchase of both 7.62x51mm NATO Select-Fire Weapon Systems and 5.56x45mm NATO Select-Fire

Weapon Systems.  LOI at ¶1(a).  Mr. Bingham told AA that working with the Peruvian MOD, Aguieus and UWS had established what was known as the "Unified Combat Rifle ("UCR"), which would be built to specifications established by the Peruvian MOD with input from Aguieus, UWS, and its industry partners.  *Id*.  The first installment of 50,000 7.62mm NATO UCR's was expected to be 8,100 rifles.  *Id*.  A total of 50,000 7.62mm rifles were expected to be purchased over an 18-month period.  *Id*.  An additional 15,000 5.56mm NATO UCR's were expected to be delivered over the same 18-month period.  *Id*.  The 5.56mm rifle was to be based on the standard AR-15 platform, but would look almost identical to the 7.62mm variant and have the same rail, stock, grip, and sights.  *Id*.

After signing the LOI, Adams Arms began engineering, designing, and developing the rifles.  Froning Decl. at ¶23.  Over the next year, AA invested hundreds of thousands of dollars of time, resources, and money on the project.  Froning Decl. at ¶24.  By November 2014, AA had developed prototype rifles and delivered them to UWS for demonstration to the Peruvian MOD in Peru.  Froning Decl. at ¶25.  The demonstration ultimately took place in February 2015.  Froning Decl. at ¶26.  At the demonstration, UWS made a presentation wherein it identified AA as one of its partners, using AA's name and design logo, included photos of the rifles developed by AA, and used photos of AA's patented short stroke piston system and touted the system as part of "U.W.S. Weapons Technologies."  Froning Decl. at ¶27, Exh. 3.  AA's patent numbers were even visible in some of the photos.  Froning Decl. at ¶27, Exh. 3.

After the initial demonstration, the project bogged down for the first half of 2015.  Froning Decl. at ¶28.  In response to a request for a status update from AA's President and CEO Michael Froning, Mr. Bingham advised AA that:

> Nothing is going to happen too quickly. … Peru is moving along
> however it is going to take time due to the latest political changes

> it will be a decent amount of time before the full process goes
> through.

Froning Decl. at ¶29, Exh. 4.  Finally, in August 2015, the project started moving again—Mr.

Bingham advised Mr. Froning that representatives of FAME would be visiting the United States

in the next few weeks and that UWS, as contemplated by the LOI, needed to bring them to see

the facility where the rifles would be manufactured—AA's facility.  Froning Decl. at ¶30, Exhs.

5, 6 & 7; LOI at ¶1(f).

### D.      AA Provides UWS with AA's Confidential Information and Trade Secrets

Over the course of the development of the rifles and thereafter, AA shared certain of

AA's Confidential Information with UWS, including technical information, trade secrets, and

knowhow relating to matters such as the manufacturing processes, including all functional and

operational aspects of the rifles; preferable equipment and tooling used to manufacture its rifles;

preferable vendors for supplying each rifle part and tooling; and the pricing AA is able to secure

from each vendor.  Froning Decl. at ¶31.  Mr. Bingham frequently visited AA's facilities and

worked with AA's personnel to learn, in detail, about AA's manufacturing processes.  Froning

Decl. at ¶32.  Mr. Bingham learned from AA information such as:

- How to use a common rifle platform to make rifles of different calibers for which a majority of their parts are compatible and interchangeable and why this was a valuable feature.

- The difference between AA's patented inverted short stroke piston system and other standard piston systems and the technical benefits of a piston system such as AA's.

- When FAME asked that the barrels of the rifles be Hard Chrome-coated instead of Melonite-coated as they had been in the original demonstration units, AA provided UWS with the necessary geometric differences between the original demonstration units and the chrome-coated units, as well as the correct twist rates, torque requirements, and measurements to make the platform operate at its most precise.

- AA provided UWS with ballistics information based on the impact a certain projectile and speed would have on the performance.

- AA provided UWS with information on the tilt of the bolt carrier and how to manage the tilt to insure the shooter would not get carrier tilt.

- During many factory visits AA not only showed Mr. Bingham information on shipments, technical drawings, and technical documents, but also provided him with information on the identity of AA's preferred vendors.

Froning Decl. at ¶32.

General Parker spent a full week at AA's facilities (i) observing the firearms assembly area and watching and working with AA's team to learn the assembly process, (ii) spending time in each of AA's manufacturing work cells, (iii) spending time with AA's engineers to learn AA's approach to the engineering and development of new products, and (iv) sitting in on one of AA's new product development meetings to learn how AA managed the development of new products. Froning Decl. at ¶33.  All of this constituted AA's Confidential Information and included trade secrets.  Froning Decl. at ¶34.

AA does not make either this sort of information or its facilities publicly available, and take measures to safeguard its Confidential Information:

- AA's building is locked and cannot be opened from the outside without a pass card.

- Visitors to AA's facility are required to show identification and check in at the front desk and generally receive a badge or pass for entry.

- The operational areas of AA's facility—the offices, manufacturing, assembly, and inventory—cannot be accessed without a pass card and different areas require different clearance levels.

- AA has a sophisticated security system, including cameras and alarms.  AA has 29 security cameras installed inside and outside its building, which are remotely monitored.  Footage from the cameras is taped and maintained for a period of time.

- AA's computer systems are password protected, and computer users only have access to those documents for which they have clearance.

- AA's documents are maintained in its locked operational areas, the most critical of which are generally in locked cabinets.

- AA has confidentiality agreements in place with all of its employees and third party contractors and puts such agreements in place with third parties with which it shares confidential information and trade secrets, such as Aguieus and UWS.

- AA ensures that delivery and storage boxes do not contain vendors' identities on the outside.

Froning Decl. at ¶35.

Beginning in August 2015, UWS started preparing its proposal for submission to FAME

(Froning Decl. at ¶36, Exh. 8) and asked AA for everything related to the project:

- On August 28, 2015, Mr. Bingham asked AA for a company overview for AA and pricing for every piece of the rifles.  Froning Decl. at ¶36, Exh. 9.

- On September 9, 2015, Mr. Bingham asked AA for the square footage of its manufacturing facility and a list of significant machines that it used to manufacture the rifles.  Froning Decl. at ¶36, Exh. 10.

- On September 14, 2015, Mr. Bingham asked AA for quotes to manufacture test barrels for FAME.  Froning Decl. at ¶36, Exh. 11.

- On September 15, 2015, Mr. Bingham asked AA for photos of its assembly stations that showed the work stations, tool boxes, and vises in order to show FAME what the work stations UWS was proposing to build for FAME should look like.  Froning Decl. at ¶36, Exh. 12.

- On September 16, 2015, Mr. Bingham asked AA for exploded views of the rifles and parts breakdowns for the rifles.  Froning Decl. at ¶36, Exh. 13.

- On September 22, 2015, Mr. Bingham asked AA about chrome-lined barrels and inquired further on pricing.  Froning Decl. at ¶36, Exh. 14.

- On September 23, 2015, Mr. Bingham asked AA to provided further breakdowns of parts and pricing.  Froning Decl. at ¶36, Exh. 15.

- On November 21, 2015, Mr. Bingham asked AA for updated drawings, including parts numbers and parts lists.  Mr. Bingham told Mr. Froning that this was "part of our proposal, so the sooner the better."  Froning Decl. at ¶36, Exh. 16.

- On November 23, 2015, Mr. Bingham asked AA for a list of any special tools or testing equipment that would be needed or recommended for the assembly phase in Peru.  Froning Decl. at ¶36, Exh. 17.

- On December 11, 2015, Mr. Bingham asked AA for photos of the manufacturing process in order to use them as background photos on a website.  Froning Decl. at ¶36, Exh. 18.

- On December 29, 2015, Mr. Bingham asked AA for the outside diameter measurements for the rifles' barrels so that UWS could have the bayonet mounts made.  Froning Decl. at ¶36, Exh. 19.

AA complied with Mr. Bingham's requests, providing him everything he needed to bid for the project.    Froning Decl. at ¶36, Composite Exh. 20.   Of the large amount of Confidential Information provided by AA, at least the following constitute trade secrets:

- AA's manufacturing and assembly processes, including, by way of example, the specific way and method AA utilizes to prepare the inside of the barrel to ensure reliability and accuracy, and the tilt of the bolt carrier to ensure its proper operation and reliability, as well as the specific spacing of parts in the assembly to ensure high productivity levels and cost effectiveness;

- AA's listing of preferable equipment and machines to ensure efficiency and quality;

- AA's preferred tooling to utilize for each rifle part;

- AA's listing of preferable vendors, many of which are not traditionally used or known in the weapons industry;

- AA's pricing information for each rifle part;

- AA's detailed and technical drawings of the rifles and their parts, which provides information such as the specific cuts to use and how they work best; and

- Pictures of and details on AA's work stations, tooling and tool boxes used in manufacturing its rifles.

UWS used AA's information to assist FAME in drafting its bid solicitation in such a way as to ensure UWS would be the successful bidder, if not the only bidder.   Froning Decl. at ¶39. In fact, upon reviewing the bid solicitation, Mr. Froning asked Mr. Bingham "What are our concerns as we read this?", to which Mr. Bingham responded "That no one else is going to bid and we look suspicious as the only bidder."  Froning Decl. at ¶40, Exh. 22.  Mr. Bingham was so certain of this that he told Mr. Froning that other interested companies could not "comply completely with the specs."  Froning Decl. at ¶41, Exh. 23.

AA complied with Mr. Bingham's requests.  Froning Decl. at ¶36, Exh. 20.  So AA not only designed the rifles, built the prototype demonstration units, and assisted UWS in marketing the rifles to the Peruvian MOD, it provided UWS with everything it needed to bid for the project, every detail of the rifles and how to manufacture them.   Froning Decl. at ¶42.  UWS used this information to prepare and submit its bid for the project.  Froning Decl. at ¶43, Exh. 24.  Mr. Bingham told Mr. Froning in a December 3, 2015 email "I have been using your input during the entire process we have developed this tender."  Froning Decl. at ¶43, Exh. 25.  UWS submitted its bid and was ultimately named the winning bidder.  Froning Decl. at ¶44.  Mr. Aurich wrote to Mr. Froning on December 18, 2015 thanking him for AA's support and telling him:

> Our website is up and running.  If you check the footer it says…certified partners and if you click in there your company shows up first.
>
> I am looking forward for this contract and working with you guys. Your piston system is very good and I am glad we are using it.

Froning Decl. at ¶45, Exhs. 26.  Subsequently AA provided UWS with the final demonstration rifles it needed to provide for testing by FAME, and on March 15, 2016, Mr. Bingham wrote to the team advising that the rifles had "passed all tests with flying colors."  Froning Decl. at ¶47,

Exh. 27.  AA upheld its end of the bargain memorialized in the LOI, and it expected UWS to fulfill its reciprocal obligations under the LOI.

**E.      The Manufacturing Agreement**

UWS and AA agreed in the LOI that AA would be the manufacturer of the rifles.  LOI at ¶1(b).  Recognizing that AA's investment in the engineering, design, and development of the rifles would be extensive, UWS agreed that it would not seek another partner for the project. LOI at ¶5.  Although certain provisions of the LOI were non-binding, these agreements were binding.  LOI at ¶9.

Consistent with the parties' agreement that AA would manufacture and supply the rifles, on October 9, 2014, Aguieus and UWS issued a purchase order for 3,000 of the 5.56mm rifles for a proposed deal with the Peruvian police.  Froning Decl. at ¶48, Exh. 28.  This purchase order, however, was issued "pending US STATE DEPT APROVAL", and never filled as AA never heard whether State Department approval was ever requested or granted.  Froning Decl. at ¶48.  As the parties got closer to the date of the bid solicitation, AA asked UWS repeatedly about a purchase order for the rifles it would be supplying.  Froning Decl. at ¶49, Exhs. 29 (9/7/15 – asking about a "30,000 rifle order"), 30 (10/19/15 – "Any  news on the Police putting in the order yet?  Contract?"), 31 (10/27/15 – "Any more update on the Police Order?"), 32 (11/6/15 – "…if you are able to send us a P.O….").  On November 27, 2015, Mr. Froning asked Mr. Bingham for forecasts as to timing and units UWS expected to order by month in 2016.  Froning Decl. at ¶50, Exh. 33.  Mr. Bingham never provided a purchase order, contract, or forecasts. Froning Decl. at ¶51.  Finally, on December 31, 2015, after UWS won the bid, Mr. Aurich wrote to Mr. Froning criticizing the very designs and rifles that had enabled UWS to win the bid and telling Mr. Froning that UWS was going to "take over the project", a concept Mr. Froning flatly

rejected.  Froning Decl. at ¶¶52 & 53, Exhs. 34 & 35.  A few days later Mr. Aurich changed his tune and admitted that there were only "minor issues" with the rifles. Froning Decl. at ¶54, Exh. 36.

Mr. Froning continued afterwards to ask about purchase orders and a "manufacturing/supplier agreement".  Froning Decl. at ¶55, Exhs. 37 & 38.  When Mr. Froning began pushing the issue, Mr. Aurich again changed his tune and again claimed there were issues with the rifles, the same rifles that had passed rigorous testing by FAME "with flying colors" less than a week earlier.  Froning Decl. at ¶56, Exh. 39.  Mr. Aurich wrote to Mr. Froning on March 22, 2016, telling him that UWS only planned to buy AA's patented piston system from AA, but that AA would not manufacture or supply the rifles.  Froning Decl. at ¶56, Exh. 39.  AA rejected this proposal as well, which would violate both the LOI and NDA.  Froning Decl. at ¶57, Exh. 40.

**F.      The Contract with FAME**

After inducing AA to engineer, design, and develop the rifles, after using AA's resources and Confidential Information to prepare a bid submission and win a bid to supply the rifles to FAME, and after passing FAME's post-bid testing using demonstration rifles manufactured and provided by AA, UWS set out to negotiate its contract with FAME.  There were requirements built into the bid solicitation that were directed to the AA-developed rifles, for example:

- More than 50% of the parts of the AA-developed 7.62mm and 5.56mm NATO UCR's are compatible and interchangeable between rifles of different calibers, something AA educated UWS as to the value of in earlier product development. This was built into the bid solicitation as a requirement, and UWS was able to satisfy this requirement as a result of the AA rifle designs.  Adams Arms provided UWS with the parts overlap list, which it used in its bid submission.

- The AA-developed 7.62mm rifles weigh less than 4000 grams.  It was built into the bid solicitation that the 7.62mm rifles could not weigh more than 4100 grams, and UWS was able to satisfy this requirement as a result of the AA rifle designs.

- The precision of the AA-developed rifles was less than or equal to 3 MOA 60% 10 shots (a measure of accuracy in the industry), a level of accuracy which AA's rifles possessed. was built into the bid solicitation as a requirement, and UWS was able to satisfy this requirement as a result of the AA rifle designs.

- The AA-developed rifles have ambidextrous features, including their charging handles (or cocking levers), bolt catches, mag releases, and safety selectors. This was built into the bid solicitation as a requirement, and UWS was able to satisfy this requirement as a result of the AA rifle designs.

- AA and UWS specifically discussed chrome-lining the inside of the barrels of the rifles, and AA provided UWS with the information on how to change from Melonite-lined barrels to chrome-lined barrels operate at their most precise. This was built into the bid solicitation as a requirement, and UWS was able to satisfy this requirement as a result of the AA rifle designs.

Froning Decl. at ¶58. As Mr. Bingham told Mr. Froning, there was no other rifle in existence that could "comply completely with the specs" contained in FAME's bid solicitation. Froning Decl. at ¶41, Exh. 23. The bid prepared by UWS and submitted to FAME included AA's design drawings, parts lists, parts overlap list and showed the patented AA gas piston system as part of the assembly. Froning Decl. at ¶59, Exh. 24. UWS won the bid using AA's rifles and Confidential Information, and then passed FAME's post-bid testing using those very rifles.

In order to manufacture the rifles that won the bid, any manufacturer would have to use AA's designs, which means they would have to have all of the information that went into those designs. If the manufacturer is AA, that complies with the LOI and NDA, because AA's Confidential Information will not be shared with third parties, other than with AA's knowledge, consent, and appropriate confidentiality agreements in place. If the manufacturer is anyone other than AA, that would by necessity entail violations of the LOI and NDA because (i) in the LOI UWS agreed that it would not have another partner for the project and AA would be the manufacturer of the rifles, and (ii) UWS cannot share AA's Confidential Information with others or use it for any purpose other than in furtherance of its relationship with AA. In addition, the

bid calls for UWS to create and install an assembly line in Peru and transfer to FAME the technology necessary to manufacture the rifles itself.  Froning Decl. at ¶38, Exh. 21.  UWS received all of the information it has relative to the rifles and their manufacturing processes from AA, and that is AA's Confidential Information.  As such, by the terms of the NDA, UWS will violate the NDA if it transfers that information to FAME without AA's consent.

The signing of the contract between FAME and UWS to proceed with the project was announced by UWS on May 16, 2016.  Froning Decl. at ¶60, Exh. 41.  To date there is no manufacturing or supply agreement in place between AA and UWS, and UWS has told AA that it does not intend for there to ever be one.  Froning Decl. at ¶61, Exh. 42.  UWS cannot proceed with the project pursuant to this contract absent AA's participation without violating the LOI, the NDA, and AA's trade secret rights.

### III.    LEGAL STANDARDS

**A.    Elements of the Right to Preliminary Injunctive Relief.**

"To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor."  *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).  Rather, the court may issue a preliminary injunction if it determines that the evidence establishes: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest."  *Id.* (citing *Church v. City of Huntsville*, 30 F.3d 1332, 1341-42 (11th Cir. 1994)).

**B.      Breach of Contract and Injunctive Relief.**

Florida federal courts routinely enforce contracts by granting injunctive relief to enjoin a party's continuing breach of contract.  *See, e.g.*, *Technomedia Solutions, LLC v. Scopetto*, 2013 WL 6571558, at *16-*18 (M.D. Fla. Dec. 13, 2013); *Int'l Hair & Beauty Systems, LLC v. Simply Organic, Inc.*, 2011 WL 5359264 (M.D. Fla. Sept. 26, 2011); *Milner Voice & Data, Inc. v. Tassy*, 377 F. Supp. 2d 1209, 1216-17 (S.D. Fla. 2005); *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1309-10 (S.D. Fla. 2004); *N. Am. Products Corp. v. Moore*, 196 F. Supp. 2d 1217, 1220-22 (M.D. Fla. 2002).   In addition, <u>Florida</u> <u>Statutes</u> § 542.335(1)(j), in speaking of restrictive covenants, specifically provides for temporary and permanent injunctions.  Restrictive covenants under the statute are enforceable if a contracting party can prove: (1) the existence of one or more legitimate business interests justifying the restrictive covenant; and (2) that the contractually specified restraint is reasonably necessary to protect the established interests of the employer. *See, e.g.*, *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009); *Autonation*, 347 F. Supp. 2d at 1304.

Once a legitimate business interest is established, irreparable injury must be presumed.  <u>Fla.</u> <u>Stat.</u> § 542.335(1)(j) ("The violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement."); *see also Autonation*, 347 F. Supp. 2d at 1304 ("[W]hen the employer establishes a legitimate business interest, irreparable injury must be presumed.").   Protectable business interests include, but are not limited to, an interest in protecting: (1) trade secrets; (2) valuable confidential information that does not otherwise qualify as a trade secret; (3) substantial relationships with prospective or existing customers; (4) customer goodwill; and (4) extraordinary or specialized training.  <u>Fla.</u> <u>Stat.</u> § 542.335(1)(b).  Restrictive covenants must be construed in favor of providing reasonable

protection to all legitimate business interests. *Id.* § 542.335(1)(h). Courts "shall not employ any rule of contract construction that requires the court to construe a restrictive covenant narrowly, against the restraint, or against the drafter of the contract." *Id.*

**C.** **Trade Secret Misappropriation and Injunctive Relief.**

Florida federal courts also routinely grant injunctive relief in trade secret misappropriation cases. *See, e.g., Aquent, LLC v. Stapleton,* 2014 WL 117095 (M.D. Fla. Jan. 13, 2014); *Int'l Hair & Beauty Systems, LLC,* 2011 WL 535926; *Talk Fusion, Inc. v. J.J. Ulrich,* 2011 WL 2681677 (M.D. Fla. June 21, 2011); *Southeastern Mech. Serv., Inc. v. Brody,* 2008 WL 4613046 (M.D. Fla. Oct. 15, 2008). Both the Defend Trade Secrets Act and Florida's Uniform Trade Secrets Act specifically provide for injunctive relief to prevent not only actual misappropriation, but threatened misappropriation of trade secrets.[3] Defend Trade Secrets Act, § 2(b)(3)(A)(i); Fla. Stat. § 688.002; *see also Talk Fusion, Inc.,* 2011 WL 2681677, *4 (stating "the 'actual *or threatened* misappropriation [of trade secrets] may be enjoined.'").

## IV.    DISCUSSION

**A.    AA will prevail on its claims for breach of contract and trade secret misappropriation.**

A likelihood of success on the merits is generally the most important factor when considering a preliminary injunction. *Talk Fusion, Inc.,* 2011 WL 2681677, *4. In order to satisfy this element, the movant is required to show "only *likely*, rather than *certain*, success." *Id.* In addition, in cases where the balance of equities "weighs heavily in favor of granting the [injunction], the movant need only show a 'substantial case on the merits.'" *Id., citing Schiavo v. Schiavo,* 357 F. Supp. 2d 1378, 1383 (M.D. Fla. 2005).

---

[3] While the Defend Trade Secrets Act is new, effective May 11, 2016, the Act, like Florida's Act, largely tracks the Uniform Trade Secrets Act, subjecting them both to the same basic analysis.

a. <u>The LOI's Restrictive Covenant</u>

AA is likely to succeed on its claims for breach of the LOI and the NDA, as well as its claims for trade secret misappropriation.  In regards to the LOI, the restrictive covenant prohibiting UWS from initiating, soliciting, encouraging, directly or indirectly, or accepting any offer or proposal by any person other than AA is enforceable, and there is no question that UWS is violating the covenant by now proceeding with the Peruvian MOD contract without AA as the rifle supplier.  This covenant is justified by numerous legitimate business interests.  Once the parties entered into the LOI, AA began its engineering, design, and development of the rifle and invested hundreds of thousands of dollars of time, resources, and money in the project.  While developing the rifle, AA obviously frequently updated the Defendants, and throughout the process repeatedly answered the Defendants' inquiries about the rifle specifics, leading to AA's disclosure of endless proprietary business information, much of which constitutes trade secrets.  Trade secrets, as well as valuable information that does not qualify as trade secrets, are unquestionably protectable and legitimate business interests.  <u>Fla.</u> <u>Stat.</u> § 542.335(1)(b).  It would make no sense for AA to exert such a huge amount of its business efforts, money, and resources in developing the rifles for well over a year, and reveal large amounts of its highly proprietary information, including trade secrets, if the Aguieus and UWS could at any point decide to replace AA with themselves or a third party.   This is particularly true given AA's position as a highly specialized and smaller business.

The covenant was also reasonable in time, area, and duration.  It only limited UWS in terms of its ability to initiate, solicit, encourage, or accept any offer or proposal from someone other than AA in relation to the project at hand.  The applicable project was limited to UWS's attempt to enter into a contract with the Peruvian MOD to supply a very specific weapon system

and otherwise placed no limitations on UWS's business.  AA therefore will be able to prove both that the restrictive covenant was justified by legitimate business interests and that it was reasonable in scope, time, and area.

In addition, there is no question that UWS violated the LOI, including the restrictive covenant not to initiate, solicit, encourage, or accept any offer or proposal from someone other than AA in relation to the Peruvian MOD project.  UWS secured the bid with the Peruvian MOD with the help of AA and based on the AA rifle and rifle system.  The LOI mandated not only that UWS not accept offers or proposals from others, but also that AA be the rifle supplier.  However, UWS has since signed a contract with the Peruvian MOD to supply rifles, but has not contracted with AA as the rifle supplier.  If UWS is not supplying AA rifles then it is supplying rifles manufactured either by itself or one or more third parties.  It cannot do the same without violating the LOI.  AA is thus likely to succeed on its claim for breach of the LOI.

   b.  The NDA

AA will likewise prevail on its claim for breach of the confidentiality provisions of the NDA.  To prevail on a breach of contract claim, AA will need to establish: (1) the existence of a contract; (2) a material breach of the contract; and (3) damages resulting from the breach.  *Int'l Hair & Beauty Systems, LLC*, 2011 WL 5359264, *6.  The existence of a contract is clear in that Aguieus and AA signed the mutual NDA in February 2014 in furtherance of the Peruvian project and with benefits running to both parties.  The NDA further stated that each party would require each of its representatives having access to AA's Confidential Information to acknowledge and agree to be bound by the terms of the NDA, meaning that UWS, Mr. Bingham, Mr. Aurich, and General Parker would also be bound.[4]

---

[4] "Confidential Information" is defined in the NDA as "any information, technical data, trade secrets or know-how of the Disclosing Party . . ."

The Defendants have clearly breached the NDA in at least two ways.  First, the NDA expressly prohibits them from using any of AA's Confidential Information for their own use or for any other purpose except the "Permitted Purpose."  The "Permitted Purpose" is defined as the commercial relationship between the parties, with the only commercial relationship being that covered under the LOI relating to the Peruvian project.  The Defendants have undoubtedly used AA's Confidential Information, including highly proprietary information and trade secrets, outside of their commercial relationship with AA.  UWS won the bid with FAME based on AA's rifle and rifle design; it was AA's rifle that was used in and passed the required testing with FAME.  Given UWS's recent actions of cutting AA out of the deal and signing a contract with FAME, shortly after winning the bid based on AA's rifle and rifle design, it is now clear that the Defendants used AA's Confidential Information from the beginning, not in furtherance of their relationship with AA, but rather in furtherance of their own goal of using AA to win the bid and then improperly cutting out AA.  This appears to have been the plan all along given Aguieus' and UWS's actions of entering into the LOI and NDA with AA, repeatedly pushing for more and more confidential information from AA, and then immediately pushing AA out once they won the bid and could sign a contract with the Peruvian MOD.  This is a clear breach of the NDA.

Second, in addition to the NDA's limits on how AA's Confidential Information can be used, the NDA further prohibits the Defendants from disclosing any Confidential Information to any third party other than those needing it in order to carry out the permitted purpose, i.e. the commercial relationship between AA and the Defendants.  Given that UWS has proceeded to sign a contract with FAME based on AA's rifle, but AA is not a part of the FAME contract and will not be supplying the rifles, it would be impossible for the Defendants to proceed without AA without improper disclosure of AA's Confidential Information.  Even if UWS fulfilled the

FAME contract with a modified rifle made by them or a third party, there is no way they could proceed without disclosure of AA's Confidential Information used in whatever they end up providing to FAME. Given that UWS signed the FAME contract only a number of weeks after using AA's rifles to pass the Peruvian MOD's testing, it would be impossible for them to have somehow come up with a completely different rifle in no way based on the AA rifle and designs, not to mention whatever they modified would still need to meet the specifications of the solicitation. Disclosing AA's Confidential Information in this manner is also a breach of the NDA.

All such breaches would and are resulting in significant damages to AA given the amount of time, money, and resources it put into the Peruvian project, as well as the disclosure of its highly proprietary information, including trade secrets, to the Defendants, who in turn are continuing to use and disclose such information with no permission from or control by AA.

c. Trade Secret Misappropriation

The clear breaches of the LOI and NDA also lead to AA's success on its trade secret misappropriation claims. To prevail on a claim for trade secret misappropriation, AA must demonstrate: (1) a likelihood that Defendants misappropriated trade secret information from AA; and (2) that AA made reasonable efforts to maintain the secrecy of its trade secrets, resulting in damages. *Southeastern Mech. Serv., Inc*., 2008 WL 4613046, *10.

A "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique or process that a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Fla. Stat.

§§ 688.002(4)(a), 688.002(4)(b).   Here, there is no question that the documents and information

provided by AA to the Defendants constitute trade secrets.   Specifically, AA provided them with

the following:

- AA's manufacturing and assembly processes, including, by way of example, the specific way and method AA utilizes to prepare the inside of the barrel to ensure reliability and accuracy, and the tilt of the bolt carrier to ensure its proper operation and reliability, as well as the specific spacing of parts in the assembly to ensure high productivity levels and cost effectiveness;

- AA's listing of preferable equipment and machines to ensure efficiency and quality;

- AA's preferred tooling to utilize for each rifle part;

- AA's listing of preferable vendors, many of which are not traditionally used or known in the weapons industry;

- AA's pricing information for each rifle part;

- AA's detailed and technical drawings of the rifles and their parts, which provides information such as the specific cuts to use and how they work best; and

- Pictures of and details on AA's work stations, tooling and tool boxes used in manufacturing its rifles.

This is all crucial information with a high economic value.   It is essentially AA's entire business

with every secret pertaining to its rifles and why they are superior.   Without this information, AA

would have no business or any value at all.

Further, none of this information is readily ascertainable by proper means.   There is no

public or third party source from which it could be obtained, and AA has consistently exercised

reasonable efforts to maintain the secrecy of these trade secrets.   For example, the Defendants

were only able to obtain the trade secrets after entering into an NDA, and AA consistently

requires its employees and third parties to enter into confidentiality agreements.   In addition,

AA's facility is locked, requires a pass card for entry, and has and always has had a sophisticated

security system, including cameras and alarms.  It further requires anyone entering the premises

to show identification, check in, and obtain a proper badge or pass for entry.  Once inside, the

operational areas of AA's facility—the offices, manufacturing, assembly, and inventory room—

cannot be accessed without a pass card and different areas require different clearance levels.

AA's documents are maintained in its locked operational areas, the most critical of which are

generally in locked cabinets.  Anyone accessing AA's computer system must have an active

password, and only has access to those documents for which they have clearance.  Moreover, AA

takes great caution in maintaining the confidentiality of each of its vendors, including by

ensuring delivery and storage boxes do not contain their identities on the outside.  These are

more than sufficient efforts by AA to maintain the secrecy of the trade secrets.  *Southeastern

Mech. Serv., Inc.*, 2008 WL 4613046, *12 (finding computer passwords and confidentiality

agreements to constitute reasonable efforts); *Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*,

10 So. 3d 202, 206 (4th DCA 2009) (finding keeping proprietary machine in a separate room

away from the public to constitute reasonable efforts).

Misappropriation of a trade secret involves disclosure or use of the trade secret without

consent by one who used "improper means" to acquire it, or at the time of disclosure or use knew

or had reason to know that his or her knowledge of the trade secret was acquired under

circumstances giving rise to a duty to maintain its secrecy or limit its use.  *Southeastern Mech.

Serv., Inc.*, 2008 WL 4613046, *10.  Actual or threatened misappropriation may be enjoined.

*Aquent, LLC*, 2014 WL 117095, *3.  As explained, given the Defendants' recent actions of

cutting AA out of the deal once UWS won the bid based on AA's rifle and they had AA's trade

secrets in their possession, it has become clear that the Defendants acquired the trade secrets

through improper means, namely, enticing AA to disclose the same under misrepresentations that

UWS would use AA to ultimately fulfill the rifle orders of the Peruvian MOD.  AA obviously would never have revealed its trade secrets to any of the Defendants had it known it would not ultimately be the supplier of the rifles for the deal with the Peruvian MOD—the Defendants knew that, hence their many misrepresentations in order to obtain the trade secrets.

In addition, regardless of their misrepresentations, once the Defendants acquired the trade secrets, they clearly had a duty both to maintain their secrecy and to limit the use of them.  To that end, the LOI expressly referred to the NDA, stating that "the Confidentiality Agreement is hereby ratified and confirmed as a separate agreement between the parties thereto," and the NDA lays out in detail that the Defendants are not to use or disclose any confidential information of AA, including its trade secrets, unless it is in furtherance of their commercial relationship with AA in relation to the Peruvian project.  UWS won the bid with FAME based on and because of AA and its rifle designs, and the rifles used to pass the Peruvian MOD testing in order to get the contract were AA rifles.  It would be impossible for the Defendants to now proceed forward with the Peruvian contract without using and/or disclosing any of AA's trade secrets.  Even if the Defendants made some changes to the rifles to ultimately now be supplied to the Peruvian MOD, which there is no indication that they did, the Defendants would still undoubtedly continue to utilize AA's trade secrets, particularly given that utilization of such information, and AA's particular designs and systems, were what won them the bid and ultimate contract.  *See Jadael Inc. v. Elliott*, 2007 WL 2480387, *8 (M.D. Fla. Aug. 29, 2007) (stating "misappropriation may occur even where the defendant did not use or disclose the alleged trade secret in its original form, and a defendant is liable for use of a trade secret 'with independently created improvements or modifications if the result is substantially derived from the trade secret . . .'").

AA protects its trade secrets, and the Defendants blatantly misappropriated them.  AA is likely to succeed on its trade secret misappropriation claims.

**B.**      **AA will suffer irreparable injury absent injunctive relief.**

AA will suffer irreparable injury as a result of the Defendants' breaches and trade secret misappropriation, but in these instances under the law, irreparably injury is presumed.  "Once the party seeking enforcement of a restrictive covenant establishes one or more legitimate business interests justifying the restriction, irreparable injury is 'presumed.'"  *See, e.g.*, *Autonation*, 347 F. Supp. 2d at 1308; *N. Am. Products Corp.*, 196 F. Supp. 2d at 1230; *Sun Elastic Corp. v. O.B. Indus.*, 603 So. 2d 516, 517 (Fla. 3d DCA 1992) ("[A] trial court is required to enjoin the violation of a noncompetitive agreement which is reasonable as to its duration and geographical limitation."); "[U]se of specific trade secrets, customer lists, or direct solicitation of existing customers shall be presumed to be an irreparable injury and may be specifically enjoined."  Fla. Stat. § 542.33(2)(a).

The presumption of irreparable harm arises in part "because of the inherently difficult task of determining just what damage is actually caused by the . . . breach of [a restrictive covenant]."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555, 1559 (S.D. Fla. 1992); *see also N. Am. Products Corp.*, 196 F. Supp. 2d at 1231 ("Plaintiff's argument that there is no irreparable harm because Plaintiff's injuries, if any, are subject to a monetary judgment, is equally without merit and has been rejected by other courts, where, as here, there is a statutory presumption of irreparable harm.").  Immediate injunctive relief is generally the proper remedy, and "[i]t truly can be said in this type of litigation that relief delayed is relief denied."  *Capraro v. Lanier Bus. Prods., Inc.*, 466 So. 2d 212, 213 (Fla. 1985).

Irreparable harm and inadequate remedy at law are also presumed in actions for injunctive relief with respect to misappropriation of trade secrets. *Aquent, LLC*, 2014 WL 117095, *3 (stating "under Florida law, 'irreparable harm and inadequate remedy at law should be presumed in an action for . . . misappropriation of a trade secret'"); *Talk Fusion, Inc*., 2011 WL 2681677, *5 (stating "the presumption of irreparable harm also exists in cases involving alleged misappropriation of trade secrets"); *Dotolo v. Schouten*, 426 So.2d 1013, 1015 (2nd DCA 1983) (stating the "misappropriation and continuing use of a trade secret constitutes a continuing tort. The prevention of continuing wrongs is a well-recognized basis for injunctive relief . . .").

However, even without the presumption, AA will unquestionably suffer irreparable harm without preliminary injunctive relief. Without injunctive relief, the Defendants will continue to utilize AA's Confidential Information, including trade secrets, as they move forward with the FAME contract; they will also disclose such information to FAME and the Peruvian MOD, as well as likely other third parties involved in the contract. To the extent the Defendants replace or have replaced AA with a third party rifle manufacturer to fulfill the Peruvian MOD contract, they could even be disclosing AA's trade secrets to AA's own direct competitors. *See Talk Fusion, Inc*., 2011 WL 2681677, *5 (noting the irreparable harm presumption and the argument that the defendant would "continue to solicit Talk Fusion Associates in violation of its non-solicitation covenants"); *Southeastern Mech. Serv., Inc.*, 2008 WL 4613046, *15 (noting that the plaintiff "expended considerable time, money and resources in building its field weld overlay business" and "Defendants will continue to use such confidential and proprietary information" for their own benefit). AA's entire business is its rifle and proprietary rifle systems. If the Defendants are entitled to freely move forward utilizing this information with no protection and no benefit to AA, the effects to AA's business would be disastrous.

## C.      The balance of hardships favors AA.

AA faces irreparable injury in the form of lost business, disclosure and utilization of its Confidential Information, and misappropriation of its trade secrets.  It is a smaller company, with its whole business being based on its rifles and rifle systems, and it spent large amounts of time, resources, and money pursuant to the parties' LOI, with its rifle designs ultimately securing the bid for UWS.  The balance of hardships to AA should a preliminary injunction not be entered far outweighs any hardship to the Defendants in having to follow contractual provisions of the LOI and NDA that they were already well aware of and bound by.  *Southeastern Mech. Serv., Inc*., 2008 WL 4613046, *16 (finding balance of hardships in plaintiff's favor when trade secrets were misappropriated, plaintiff was a smaller business, and defendants improperly used confidential information to secure new business); *see also Aquent, LLC*, 2014 WL 117095, *3 (finding balance of hardships in plaintiff's favor due to it "facing substantial harm if its trade secrets are misappropriated").   The only possible hardship the Defendants might face is delay or interference in relation to their Peruvian MOD contract, but they were well aware of their obligations with respect to AA and AA's Confidential Information and trade secrets.  It was their choice to take the risk of cutting AA out of the deal at the end after using AA's rifle and rifle designs to secure the bid with FAME.  Whatever hardship the Defendants could attempt to argue could not outweigh the substantial harm AA faces with the use and disclosure of its Confidential Information, including trade secrets, that serve as the foundation for its entire business.

## D.      The public interest favors granting injunctive relief.

Multiple public interests support injunctive relief in this instance.  First, there is a public interest in the protection and enforcement of contractual rights, including restrictive covenants. *Pitney Bowes Inc. v. Acevedo*, 2008 WL 2940667, at *6 (S.D. Fla. July 28, 2008) ("The public

has a cognizable interest in the protection and enforcement of contractual rights."); *Technomedia Sols., LLC*, 2013 WL 6571558, at *17 ("Under Florida law, the public has an interest in the enforcement of restrictive covenants.") ; *see also 7-Eleven, Inc. v. Kapoor Bros. Inc.*, 977 F. Supp. 2d 1211, 1230 (M.D. Fla. 2013) ("A preliminary injunction enforcing the restrictive covenants will serve the public interest, because enforcement of a valid restrictive covenant encourages parties to adhere to contractual obligations.").   In addition, there is a strong public interest in protecting confidential information and trade secrets from unlawful use and disclosure.  *Int'l Hair & Beauty Systems, LLC*, 2011 WL 5359264, *9; *Talk Fusion, Inc.*, 2011 WL 2681677, *5 (stating "here, a preliminary injunction would affirmatively serve the public interest by protecting businesses from misappropriation of trade secrets and upholding the terms of enforceable contracts.")  The public interest will be served by granting an injunction in this case, as that relief will uphold and promote the integrity and validity of binding contracts and the protection of trade secrets under federal and Florida law.

## V.    CONCLUSION

UWS and AA entered into a valid and enforceable LOI under which AA was to be the rifle supplier for any rifle contract secured by UWS with the Peruvian MOD.  Pursuant to the LOI, AA worked with the Defendants for well over a year to develop the appropriate rifle design, revealing to the Defendants a plethora of confidential information and trade secrets along the way, which were protected by the NDA.  UWS secured the bid with AA's rifle and rifle designs. The Defendants' actions of signing a contract with the Peruvian MOD that no longer includes AA as the rifle supplier violates the LOI, NDA, and constitutes trade secret misappropriation. To allow the Defendants to proceed with a different rifle supplier and continue using and

disclosing AA's Confidential Information, including its trade secrets, throughout this case is impermissible under the law and would be irreparably catastrophic for AA.

For the foregoing reasons, AA respectfully requests that the Court grant this motion and:

(a)     preliminarily enjoin UWS, its representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with them from manufacturing and/or supplying the rifles for the FAME contract itself and from initiating, soliciting, encouraging or accepting any offer or proposal from a third party to manufacture and/or supply the rifles;

(b)     preliminarily enjoin all Defendants, their representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with them from any use or disclosure of any of AA's proprietary Confidential Information, including AA's technical data, trade secrets, and know-how;

(c)     preliminarily enjoin all Defendants, their representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with them from further disclosing and using AA's trade secrets or engaging in any business practices which arose from their misappropriation of any trade secrets and requiring affirmative actions be taken by the Defendants to protect the trade secrets;

(b)     ordering Defendants to return all of AA's Confidential Information (as that term is defined and used in the NDA);

(c)     awarding AA its attorneys' fees and costs, and all other relief to which AA is entitled at law or in equity.

Dated:  June 16, 2016.

Respectfully submitted,

/s/ J. Todd Timmerman
Jaime Austrich, Trial Counsel
Florida Bar No. 84565
jaustrich@slk-law.com
J. Todd Timmerman
Florida Bar No. 0956058
ttimmerman@slk-law.com
Mindi M. Richter
Florida Bar No. 0044827
mrichter@slk-law.com
101 East Kennedy Boulevard
Suite 2800
Tampa, Florida 33602
Telephone No.: (813) 229-7600
Facsimile No.:  (813) 229-1660

*Attorneys for Plaintiff, Adams Arms, LLC*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 16, 2016, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send electronic filing to all counsel of

record and served the following Defendant via U.S. Mail:

Major General James W. Parker, U.S.A, Retired
929 Allegro Lane
Apollo Beach, FL  33572

and served the following Defendants via Hand Delivery:

Unified Weapon Systems, Inc.
c/o Agents and Corporations, Inc.
1201 Orange Street, Suite 600
One Commerce Center
Wilmington, DE 19801

Aguieus, LLC
c/o Matthew B. Sullivan, Esq.
4756 Central Avenue
St. Petersburg, FL 33711

Michael C. Bingham
7441 Ambleside Drive
Land O'Lakes, FL 34637

Christian Quintanilla Aurich
6855 SW 45th Lane
Apartment 7
Miami, FL 33155

/s/ J. Todd Timmerman
Attorney