## Contrato de Asociación en Participación

Conste por el presente documento el Contrato de Asociación en Participación (en adelante el "Contrato") que celebran:



- **Fábrica de Armas y Municiones del Ejército - FAME S.A.C.**, con RUC N° 20522449271, con domicilio Legal en Ex Hacienda Nievería S/N-Altura Km 3.5 carretera Cajamarquilla - Huachipa, distrito de Lurigancho-Chosica, provincia y departamento de Lima, debidamente representada por su Gerente General, señor **Crl. EP (R) Armando Elio Rincón Moretti**, identificado con DNI N° 09767263 conforme a facultades inscritas en el Asiento B00003 de la Partida Electrónica N°12334168 del Registro de Personas Jurídicas de la Oficina Registral de Lima (en adelante, "FAME"); y,



- **Unified Weapon Systems Inc.**, con número de archivo 5490680 del Estado de Delaware y nacionalidad norte americana, debidamente representada por el señor Cristhian Javier Quintanilla Aurich, identificado con documento de identidad N° 07627533, señalando domicilio en Jirón Garcilazo de la Vega 2088, Lima 14, Perú (en adelante, "UWS").



El presente contrato se celebra en los términos y condiciones siguientes, dejando constancia que cuando en el texto del presente contrato se utilice el término "Partes" se entenderá referido a ambas Partes en conjunto y cuando se utilice el término "Parte" se entenderá referido a una de ellas:

## CLAUSULA PRIMERA – DEFINICIONES E INTERPRETACION

1.1 Para efectos del presente Contrato, los términos con mayúscula inicial que aparecen a continuación tendrán los siguientes significados:



| Asociación: | Se refiere a la Asociación en Participación que es materia del presente Contrato. |
|---|---|
| Capacitación: | Este término se regula en la Cláusula Sétima del presente Contrato, y se refiere a la transferencia tecnológica, de conocimientos y know how necesaria para que al término del Contrato, FAME se encuentre en condiciones de producir los fusiles de manera autónoma. |
| Compradores | Son las fuerzas armadas, la policía nacional y terceros, nacionales o extranjeros, a los que FAME está facultado a vender Los Fusiles conforme al presente Contrato y a la Normativa Aplicable. |

## Exhibit "A"









| | |
|---|---|
| Concurso: | Se refiere al Concurso Privado 002-2015 y todos los documentos que forman parte del respectivo expediente del Concurso, que forman parte integrante del presente Contrato. |
| Contrato: | Es el presente documento. |
| Días Calendario: | Son los días de la semana, incluyendo al sábado y el domingo, sin importar si se trata de un día en que las empresas bancarias del sistema financiero nacional peruano atienden al público. |
| Días Hábiles: | Son los días de la semana distintos al sábado, domingo y cualquier día en que las empresas bancarias del sistema financiero nacional peruano no atienden al público. |
| FAME: | Es la Fábrica de Armas y Municiones del Ejército - FAME S.A.C., con RUC N° 20522449271 |
| Fecha de Firma: | Es la fecha de suscripción del presente Contrato, que aparece en la primera página del mismo. |
| Fideicomiso: | Contrato de Fideicomiso de Administración constituido por FAME, en calidad de Fideicomitente, en favor de UWS y FAME en calidad de Fideicomisarios, cuyo objeto será la constitución de un patrimonio autónomo sobre los derechos de cobro y los flujos dinerarios que se generen como consecuencia del Negocio. |
| Fusiles: | Sistemas de fusiles de combate Unified Patrol Rifle (UPR) de calibre 5.56x45mm OTAN y el Unified Combat Rifle (UCR) de calibre 7.62x51mm OTAN, indistintamente del modelo y marca del fusil. |
| Gastos Adicionales: | Son los gastos distintos a las obligaciones y aportes de las partes en las que éstas tendrán que incurrir respecto de cada Orden de Servicio, conforme a lo establecido en el numeral 6.4 del Contrato. |









| | |
|---|---|
| Interés Moratorio: | Significa los intereses que se devengarán en caso de mora, a la tasa de interés activa promedio de mercado efectiva en dólares americanos para la fecha que corresponda, de acuerdo a lo publicado por la Superintendencia de Banca, Seguros y AFP del Perú, más el 15% de dicha tasa. |
| Inmueble: | Es el Complejo Ex Hacienda Nevería S/N-Altura Km 3.5 carretera Cajamarquilla - Huachipa, Distrito de Lurigancho-Chosica, provincia y departamento de Lima, de propiedad de FAME. |
| Normativa Aplicable: | Son las leyes y demás normas jurídicas vigentes en la República del Perú. |
| Negocio: | Es, en su conjunto, la fabricación, importación, ensamblaje y comercialización de los Fusiles, que las Partes desarrollarán conjuntamente en los términos del Contrato. |
| Oferta de UWS: | Conjunto de las ofertas de Transferencia Tecnológica, Oferta Técnica y de Calidad y Oferta Económica y Financiera presentadas por UWS en el marco del Concurso, que forman parte integrante del Contrato como su Anexo 02. |
| Orden(es) de Compra: | Son los pedidos de Fusiles efectuados por Los Compradores a FAME conforme a la Cláusula Sexta, los cuales deberán necesariamente estar regulados mediante un Contrato suscrito entre FAME y los Compradores. |
| Partes: | Son FAME y UWS, en conjunto. |
| Personal de FAME: | Trabajadores de FAME cuya labor se aportará a la Asociación en los Términos del numeral 4.2. |
| Personal de UWS: | Trabajadores de UWS cuya labor se aportará a la Asociación en los Términos del numeral 5.3. |
| Plan de Negocios: | Es el documento que, debidamente suscrito por Las Partes, contendrá los lineamientos específicos del Negocio. El Plan de Negocios incluirá, como mínimo, los siguientes elementos: |







| | |
|---|---|
| | - Plan Comercial: Incluye la estimación de ingresos esperados del Negocio, la identificación de Los Compradores. |
| | - Plan Operativo: Incluye la descripción de los procesos de implementación del Negocio, la determinación de personal y horarios, proveedores, capacitación, talleres, layout, equipamiento, lineamientos principales de procesos operativos y administrativos. |
| | - Plan Financiero: Dimensionamiento de inversión y/o costos y gastos y niveles de rentabilidad esperados del negocio. |
| | El Plan de Negocios podrá ser modificado por acuerdo de Las Partes en cualquier momento, de acuerdo a sus necesidades. |
| | - Procedimientos para la implementación de la seguridad de la información de UWS y aseguramiento de su confidencialidad. |
| Terreno: | Parte del Inmueble compuesto por un área máxima de hasta 10 000m2, cuyos planos de ubicación y memoria Descriptiva forman parte integrante del presente Contrato como su Anexo Nº…….., que FAME pondrá a disposición de la Asociación como Aporte en los términos de la Cláusula Cuarta |
| UWS: | **Unified Weapon Systems Inc.**, con número de archivo 5490680 del Estado de Delaware, cuyos datos se consignan en el exordio del presente Contrato y/o la empresa vehículo constituida bajo las leyes de la República del Perú que se creara para la ejecución del presente Contrato, en cuyo caso Unified Weapons Systems Inc. será obligada y responsable solidaria con esta empresa respecto del Contrato y responderá, sin limitación alguna, por todas y cada una de las obligaciones y responsabilidades establecidas en el Contrato. |

4 - 31



1.2 Salvo que expresamente se indique lo contrario o el contexto así lo requiera, en la interpretación de este contrato deberán observarse las siguientes reglas:

(a) El singular incluye al plural y viceversa;

(b) La referencia a cualquier género incluye al otro género.

(c) La referencia a cualquier contrato (incluyendo a este Contrato), documento o instrumento, se entiende efectuada a tal contrato, documento o instrumento, tal como pueda ser modificado o regulado de tiempo en tiempo de acuerdo con los términos contenidos en cada uno de ellos y, de ser aplicables, de acuerdo con los términos contenidos en este Contrato.



(d) Salvo que el contexto exija una interpretación en sentido contrario, la referencia a cualquier Cláusula, Numeral, Sección o Anexo significa aquella Cláusula, Numeral, Sección o Anexos del Contrato.



(e) "Incluyendo" (y, consiguientemente, "incluye", "incluido" o "incluso") significa que comprende aquello que a continuación se indica, sin limitar la generalidad de la descripción que precede al uso de dicho término.

(f) Cualquier enumeración o relación de conceptos donde exista la conjunción disyuntiva "o" comprende a uno, algunos o a todos los elementos de tal enumeración o relación; y cualquier enumeración o relación de conceptos donde exista la conjunción copulativa "y" incluye a todos y cada uno de los elementos de tal enumeración o relación.



(g) En caso de discrepancia entre los documentos del Concurso y/o la Oferta y el presente Contrato, primará lo establecido en este último, luego los documentos del concurso y por ultimo las ofertas del postor; las bases del Concurso Privado de Difusión Publica N° 002-2015, están consideradas dentro de los documentos del concurso, por tanto, las bases forman parte del presente contrato (Anexo 07).



## CLÁUSULA SEGUNDA - ANTECEDENTES

2.1 FAME es una empresa del Estado con accionariado privado, y dentro del ámbito del Ministerio de Defensa. Se constituye sobre la base de la Unidad Productiva de Material de Guerra creada mediante Decreto Supremo N° 006-2001-DE/EP, modificada por el Decreto Supremo N° 009-2005-DE/EP, se rige por las disposiciones de la Ley N° 29314 y sus modificatorias, por la Ley del Ministerio de Defensa, supletoriamente por el Decreto Legislativo N° 1031, Decreto Legislativo



que promueve la eficiencia de la actividad empresarial del Estado, y la Ley General de Sociedades.

Como parte de su objeto social, FAME está facultado a celebrar convenios asociativos o contratos de cooperación tecnológica, científica y de capacitación con entidades nacionales y extranjeras para promover el desarrollo técnico-científico nacional en asuntos de su competencia; así como aquellos que puedan generar un mejor y estratégico desarrollo en alguno o todos los objetivos de la empresa. Asimismo, FAME está facultado para asociarse con capitales privados nacionales y extranjeros a fin de ampliar su mercado al campo comercial.



2.2    UWS es una empresa privada estadounidense que se dedica a la fabricación de armas y que se encuentra autorizada y registrada para exportar armamento y municiones y, en ese sentido se dedica a la fabricación, producción, ensamblaje, venta, importación, exportación y comercialización de fusiles o armas de fuego, para las fuerzas policiales, militares y civiles, entre otras actividades complementarias y/o accesorias, integrando tecnología en el diseño de armas con el fin de producir avanzados fusiles de combate entre los hoy en día disponibles.



2.3    FAME convocó el Concurso a efectos de suscribir un contrato asociativo con una empresa especializada en el ensamblaje y fabricación de Fusiles, con la finalidad de ensamblarlos, producirlos y comercializarlos y, mediante la transferencia tecnológica, adquirir las capacidades técnicas y conocimientos necesarios para que al término del Contrato, se encuentre en la capacidad de producir los Fusiles de manera autónoma.

En el marco del Concurso, y tras la evaluación de las ofertas de diversos postores, FAME ha seleccionado la oferta de UWS para la constitución de la Asociación, en los términos del presente Contrato, al considerarla la más favorable.



2.4.    FAME declara y garantiza que:

2.4.1.    A la fecha de suscripción del Contrato, se encuentra debidamente legitimada y en plena capacidad para su suscripción y ejecución, contando con los activos, autorizaciones, permisos y licencias necesarios para tal efecto.



2.4. 2.    Es la única y exclusiva propietaria del Inmueble, que cuenta con todas las autorizaciones requeridas por la ley para los fines que se especifican en este Contrato.



2.4.3.    A la fecha de suscripción del presente Contrato, el Área se encuentra libre de toda carga y/o gravamen, derecho real de garantía, medida judicial o extrajudicial y, en general, de todo acto o circunstancia que impida la ejecución del Contrato; y no ninguna circunstancia que pueda ocasionar que FAME pierda los derechos inherentes al Inmueble.



2.4.4.  La suscripción y ejecución del presente Contrato no (i) viola directa o indirectamente ninguna estipulación de contratos que FAME hubiera podido suscribir con terceros; (ii) viola directa o indirectamente ni vulnera ninguna norma vigente, autorización o mandato aplicable a FAME; (iii) no da lugar a que ninguna entidad gubernamental Peruana o del Extranjero, u otra persona natural o jurídica, tenga el derecho a impugnar cualquiera de las prestaciones a su cargo contempladas en el Contrato, o de ejercer cualquier acción tendiente a buscar su invalidez o ineficacia.



2.4.5.  No tiene conocimiento de ningún hecho material o circunstancia que no haya sido revelada por escrito a UWS, y que pudiera afectar la veracidad de las declaraciones contenidas en la presente Cláusula o la ejecución del presente Contrato.

2.4.6.  El representante de FAME que suscribe el presente Contrato se encuentra debidamente autorizado y cuenta con las facultades suficientes para ejercer dicha representación.

2.4.7  En las negociaciones, acuerdos y celebración del presente Contrato, así como en la conducción del Concurso y la selección de UWS, no ha mediado acto de corrupción alguno.



2.5.    UWS declara y garantiza que:

2.5.1.  A la fecha de suscripción del Contrato, se encuentra debidamente legitimada y en plena capacidad para su suscripción y ejecución, contando con los activos, financiamiento, autorizaciones, permisos y licencias necesarios para tal efecto.



2.5.2.  Cuenta con la experiencia suficiente para ejecutar el Contrato. 3.2.6. Asimismo, cuenta con el soporte, autorización y supervisión del Gobierno de los Estados Unidos de América para la ejecución de las prestaciones a su cargo conforme al Contrato. Asimismo, cuenta con todas las licencias, autorizaciones, permisos y patentes necesarios para la importación, adquisición, fabricación y ensamblaje de los Fusiles y/o cada uno de sus componentes.



2.5.3.  La suscripción y ejecución del presente Contrato no (i) viola directa o indirectamente ninguna estipulación de contratos que FAME hubiera podido suscribir con terceros; (ii) viola directa o indirectamente ni vulnera ninguna norma vigente, autorización o mandato aplicable a FAME; (iii) no da lugar a que ninguna entidad gubernamental Peruana o del Extranjero, u otra persona natural o jurídica, tenga el derecho a impugnar cualquiera de las prestaciones a su cargo contempladas en el Contrato, o de ejercer cualquier acción tendiente a buscar su invalidez o ineficacia.







2.5.4.   El representante de UWS que suscribe el presente Contrato se encuentra debidamente autorizado y cuenta con las facultades suficientes para ejercer dicha representación.



2.5.5.   No tiene conocimiento de ningún hecho material o circunstancia que no haya sido revelada por escrito a FAME, y que pudiera afectar la veracidad de las declaraciones contenidas en la presente Cláusula o la ejecución del presente Contrato.



2.5.6   En las negociaciones, acuerdos y celebración del presente Contrato, así como en la conducción del Concurso y la selección de UWS, no ha mediado acto de corrupción alguno.



2.5.7.   Los Fusiles cumplen con las especificaciones técnicas contenidas en el Anexo 04 del presente Contrato. Cualquier cambio en las especificaciones técnicas establecidas en este Anexo, debido a las futuras mejoras en el diseño, performance u otras características de los Fusiles, será informado y a FAME por medio de una comunicación escrita indicando las modificaciones y las nuevas especificaciones técnicas de los Fusiles, a efectos de que ésta última acepte dichas modificaciones.



2.5.8   Ninguno de sus accionistas son nacionales de algún país con el que la República del Perú pudiera tener un conflicto latente, ni es controlada por capitales nacionales de países con los que la República del Perú pudiera tener un conflicto latente.



## CLÁUSULA TERCERA - OBJETO

3.1   En virtud del presente Contrato y de conformidad con el artículo 440° y siguientes de la Ley General de Sociedades (en adelante "LGS"), las Partes convienen en celebrar un contrato de Asociación en Participación con el objeto de llevar a cabo el Negocio.



Queda claramente establecido que la celebración del Contrato no supone la constitución de una persona jurídica ni de una sociedad de hecho, y la vinculación que existirá entre FAME y UWS como consecuencia de este acuerdo se limitará a las actividades expresamente indicadas en este Contrato, no extendiéndose a ninguna otra actividad que pueda ser desarrollada de manera independiente por FAME o por UWS.



En tal sentido, cada una de las Partes será exclusivamente responsable del cumplimiento de sus obligaciones civiles, laborales y tributarias conforme a la





Normativa Aplicable, por lo que incumplimiento de una parte a cualquiera de sus obligaciones no podrá ser imputada a la otra parte.



Las partes declaran expresamente que corresponderá a FAME la gestión, administración y realización del Negocio, por lo que deberá proceder con la diligencia, prudencia, buena fe y lealtad de un ordenado comerciante. En este sentido, corresponderá a FAME cualquier vinculación económica que en el desarrollo del Negocio se acuerde con terceros, para lo cual FAME actuará en nombre propio al celebrar contratos, al asumir obligaciones o al adquirir créditos. En consecuencia, queda convenido que no existirá relación jurídica alguna entre los terceros y UWS; y, asimismo, los terceros no adquirirán derechos ni asumirán obligaciones frente a UWS ni éste ante aquéllos.



3.2   Las Partes acuerdan el siguiente porcentaje de participación en la Asociación:

FAME: 10% (diez por ciento).
UWS:  90% (noventa por ciento).

**CLÁUSULA CUARTA - APORTES DE FAME**

4.1   FAME aporta a la Asociación un derecho de Uso sobre el Terreno a la Asociación, bajo las siguientes condiciones:

.1.1   Durante la Etapa de Ensamblaje, FAME aportará un área de 3 000 m2 del Terreno, que se utilizará de la siguiente manera:

-   Como mínimo, 200 m2 se utilizarán como área cubierta para la construcción y montaje de la línea de ensamblaje de Los Fusiles.
-   Un área de 60m2 para oficinas de administración.
-   Un mínimo de 2,000 m2 para un polígono interior para pruebas de precisión a 25, 50 y 100 Mts

La distribución y ubicación final de las instalaciones antes indicadas forman parte integrante del presente Contrato como su Anexo 06

FAME tendrá libre disponibilidad del remanente del Terreno durante la Etapa de Ensamblaje.



4.1.2   Durante la Etapa de Fabricación: FAME pondrá a disposición de la Asociación un área de hasta 7000 m2 adicionales del Terreno, en función a las expansiones e instalaciones construirá UWS conforme al Plan de Negocios, en el cual también se determinará la extensión total del Terreno para la Etapa de Fabricación, así como las instalaciones adicionales que deban construirse sobre la misma. Dicha área será




la establecida en el Anexo 06

Las Partes podrán acordar que FAME entregue a UWS parte del área antes indicada del plazo establecido en el párrafo anterior, en el supuesto que sea requerida para implementar un polígono de tiro virtual, plantas de fabricación de partes y /o artículos diversos, entre otros.



Cualquier remanente de terreno del Área que no fuera a ser utilizado para la ejecución del presente Contrato será de libre disponibilidad de FAME.

4.1.3   La cesión en uso del Terreno conforme al presente numeral sólo estará vigente durante la vigencia del presente Contrato. Al momento de su conclusión, cualquiera fuere su causa, el uso del Terreno revertirá a FAME de manera automática.



Bajo ningún supuesto, se podrá interpretar que el aporte del Terreno corresponde a una transferencia de propiedad o titularidad del mismo, ni supone limitación alguna para que FAME pueda disponer del Inmueble, siempre y cuando tales actos de disposición no afecten el cumplimiento del presente Contrato.

4.1.4   FAME se obliga a asumir todos los gastos relativos al Terreno durante la Vigencia de la Asociación, lo que incluye, de manera enunciativa más no limitativa: (i) Servicios de agua, desagüe, alcantarillado; (ii) Servicios de energía eléctrica hasta una capacidad contratada máxima de 750kW/H; (iii) Tributos correspondientes al Terreno (impuesto predial y arbitrios).



4.1.5   FAME respetará durante el plazo de vigencia del presente Contrato la ubicación del Terreno, la cual sólo podrá variar por concepto de seguridad y defensa nacional. En este supuesto, FAME se obliga a poner a disposición de la Asociación otro terreno con las mismas características y condiciones técnicas del Terreno, asumiendo los costos que demanden un plazo no mayor de treinta (30) días hábiles de ocurrido el evento, otro inmueble o área con las mismas características y condiciones técnicas y económicas al Inmueble, a fin de que se pueda desarrollar adecuadamente el Negocio y cumplir con las obligaciones que cada Parte ha asumido a través del presente Contrato.



4.2   FAME aportará a la Asociación el Personal de FAME, bajo las siguientes condiciones:

4.2.1   FAME destinará, en coordinación con UWS, (12) trabajadores con los que mantenga vínculo laboral a la ejecución del presente Contrato, sin que ello implique la subordinación de dichos trabajadores a UWS, de los cuales diez (10) trabajadores se destinarán a la Etapa de Ensamblaje y dos (02) adicionales a la Etapa de Fabricación.





4.2.2   FAME estará a cargo del pago total de las remuneraciones y beneficios laborales de los Trabajadores.

4.2.3   FAME declara que el personal que destine a la ejecución del presente Contrato no tiene vínculo laboral alguno con UWS, y que la responsabilidad por el cumplimiento de las obligaciones laborales y previsionales contempladas por la Normativa Aplicable corresponden únicamente a FAME.

4.2.4   FAME hará sus mejores esfuerzos para mantener contratado al Personal de FAME.

**CLAUSULA QUINTA: APORTES DE UWS**



5.1   UWS aporta el know how, la asistencia técnica, los planos de ingeniería y su propiedad intelectual para poder llevar a cabo la transferencia tecnológica para el ensamblaje y la fabricación de los fusiles y demás posibles futuros accesorios o armamento.

5.2   UWS aporta a la Asociación la capacitación del Personal de FAME: UWS capacitará a doce (12) de los trabajadores de FAME respecto al proceso de ensamblaje y producción de los Fusiles en los términos contenidos en la Cláusula Novena del Contrato.



5.3   UWS aportará las instalaciones, maquinaria, equipos, herramientas y componentes para el ensamblaje y fabricación de Los Fusiles, conforme se detalla a continuación:

5.3.1   Aportes durante la Etapa de Ensamblaje:



-   UWS aportará a la Asociación, bajo su cuenta, costo y riesgo, toda la maquinaria, equipos y herramientas necesarios para el ensamblaje de Los Fusiles, las cuales serán importadas directamente por UWS.

-   UWS aportará el montaje de una línea de ensamblaje que producirá, como mínimo, cuarenta (40) Fusiles por jornada cada jornada de trabajo de ocho (08) horas, en los Días Hábiles.

-   UWS aportará a la Asociación, bajo su cuenta, costo y riesgo, el 100% de las partes y piezas necesarias para el ensamblaje de los Fusiles, las cuales serán importadas directamente por FAME. .

5.3.2   Aportes durante la Etapa de Fabricación:



UWS aportará la construcción de las instalaciones necesarias para el desarrollo de la Etapa de Fabricación, adicionales a las indicadas en el numeral 4.1.1. Las





obras a ejecutarse se describirán en el Plan de Negocios y UWS asumirá todos los costos de la construcción de dichas instalaciones, así como las responsabilidades que pudieran derivarse de la misma.

- UWS aportará el 100% de las partes y piezas necesarias para el ensamblaje de los Fusiles, las cuales serán importadas por FAME por cuenta, costo y riesgo de UWS, adquiridas de FAME o fabricadas en las instalaciones de FAME:

   (i)    En el caso que algunas de las partes y/o piezas sean adquiridas a FAME como producto terminado a su valor de mercado.

   (ii)   En el caso que algunas de las partes y/o piezas sean fabricadas por UWS o adquiridas por éstaUWS supervisará el proceso de fabricación y asumirá el 100% de los costos de fabricación y/o compra.

   (iii)  En el caso que para efectos de la adquisición de partes y/o piezas en las que UWS haya apoyado en su manufactura con asistencia técnica o cubriendo los costos, estas piezas serán adquiridas a FAME a un precio negociado por ambos.

En ningún caso, FAME asumirá costo alguno relativo al ensamblaje y/o fabricación de los Fusiles, salvo los que correspondan a sus aportes conforme a lo indicado en el numeral 4.1.

UWS es responsable del cumplimiento por parte de su personal o los terceros que ingresen a las instalaciones de FAME para ejecutar los trabajos de adecuación, equipamiento y acondicionamiento antes mencionados, de la normativa de seguridad, laboral, municipal y en general, cualquier normativa aplicable a las labores que efectuará dentro de las instalaciones de FAME.



5.4    UWS aportará a la Asociación el Personal de UWS, bajo las siguientes condiciones:

5.4.1   UWS destinará dos (02) o más trabajadores con los que mantenga vínculo contractual para la ejecución del presente Contrato, sin que ello implique la subordinación de dichos trabajadores a FAME. El Personal que UWS realizará la supervisión técnica al proceso de ensamblaje de Los Fusiles y a los trabajadores de FAME que realicen las operaciones de ensamblaje de los Fusiles; y/o la supervisión a que se refiere el punto (ii) del numeral 5.2.2.



5.3.2   UWS estará a cargo del pago total de las remuneraciones, viáticos, gastos y beneficios laborales de sus trabajadores.

UWS declara que el personal que destine a la ejecución del presente Contrato no tiene vínculo laboral alguno con FAME, y que la responsabilidad por el cumplimiento





de las obligaciones laborales y previsionales contempladas por la Normativa Aplicable corresponden únicamente a UWS.



5.4     UWS aportará los equipos y herramientas necesarios para realizar las pruebas y control de calidad de Los Fusiles.

5.5     UWS otorgará garantía por los Fusiles que se ensamblen y/o fabriquen en FAME, por un periodo de cinco (05) años contados desde la fecha de compra de los Fusiles, que cubrirá únicamente los defectos de los materiales componentes o su fabricación, los que deberán ser reemplazados por UWS.

## CLÁUSULA SEXTA - OBLIGACIONES DE LAS PARTES

6.1.    Obligaciones de FAME:

6.1.1.  FAME se obliga a efectuar sus mejores esfuerzos para colocar los Fusiles en el mercado, sin que ello implique una cuota mínima de venta. Las Partes declaran que a pesar que UWS transfiera la tecnología y equipos en mérito del presente Contrato, toda venta realizada por FAME a terceros fuera del Perú o extranjeros, quedará supeditada a la previa autorización y aprobación del Departamento de Estado de los Estados Unidos de Norte América.

6.1.2   FAME se encuentra prohibido de ceder o transferir el conocimiento y/o know how recibido por UWS respecto de la tecnología y el negocio que es materia del Contrato durante su vigencia.

6.1.3   FAME se obliga a implementar las herramientas de gestión necesarias para la ejecución del presente contrato, lo que incluye la apertura de cuentas bancarias destinadas exclusivamente a la ejecución del Contrato, facilidades de almacenamiento y una contabilidad independiente para el negocio materia del presente Contrato.

6.1.4   FAME efectuará las gestiones de todos los documentos necesarios ante Aduanas y Organismos Oficiales de la República del Perú, para la importación de las partes y piezas de los fusiles, asumiendo UWS los costos correspondientes.

6.1.5   FAME se obliga a permitir el ingreso del Personal de UWS al Terreno para los fines del presente Contrato, para lo cual entregará a UWS los protocolos de acceso y seguridad a sus instalaciones, que serán de obligatorio cumplimiento para el Personal de UWS.



6.1.6   FAME se obliga a cumplir con sus obligaciones contractuales con la debida diligencia, efectuando oportunamente las coordinaciones que fueran necesarias.

13 - 31





6.1.7. FAME se obliga a no realizar en el Perú, en forma directa o indirecta, a través de terceros, actividad empresarial o negocios consistentes en la fabricación, importación, ensamblaje y comercialización de los Fusiles, durante la vigencia del Contrato.



6.1.8 FAME tendrá la posibilidad de importar, fabricar, ensamblar, representar y comercializar fusiles semi-automáticos (mecanismo de disparo tiro por tiro) u otro tipo de armamento de otras marcas y/o calibres distintos a Los Fusiles.

Sin perjuicio de lo anterior, en el caso que un cliente solicitara un producto distinto a los Fusiles, FAME podrá requerir a UWS que lo fabrique o importe, quien a su discreción podrá ejecutar dicho pedido.



6.1.9 FAME se obliga a comunicar de inmediato a UWS cualquier hecho que sobrevenga, prohíba, límite, impida o restrinja la ejecución del presente Contrato, incluso cuando únicamente exista amenaza de que ello ocurra, siendo que para dichos efectos deberá tomar todas las acciones y medidas inmediatas para que dicho hecho no ocurra.

6.1.10 FAME se obliga a responder por la calidad defectuosa del ensamblaje de Los Fusiles por parte del Personal de FAME, siempre y cuando éste no hubiera cumplido con el protocolo de ensamblaje proporcionado por UWS.



6.2.    Obligaciones de UWS:





6.2.1. UWS se obliga a otorgar una garantía por los Fusiles que se ensamblen y/o fabriquen bajo los alcances del presente Contrato por un periodo de cinco (05) años, contado desde la fecha de compra de los Fusiles. Esta garantía cubrirá los defectos de los materiales componentes o su fabricación, los que deberán ser reemplazados por UWS. UWS no responderá por defectos en el ensamblaje o fabricación de Los Fusiles imputables a FAME.

6.2.2. UWS se compromete a llevar a cabo la Capacitación a los Trabajadores de conformidad con la Cláusula Novena.

6.2.3. UWS se obliga a no destinar el terreno a fines distintos a los previstos en el Contrato.

6.2.4. Asumir la responsabilidad correspondiente al cumplimiento con las Órdenes de Compra, de conformidad con la Cláusula Sétima.



6.2.5. UWS se obliga a no realizar en Perú en forma individual o a través de terceros actividad empresarial o negocios consistentes en la fabricación, importación, ensamblaje y comercialización de los Fusiles, dentro del período de duración del Contrato.










6.2.6.   Compromiso de inversión: UWS se obliga a invertir los montos que se consignan a continuación durante la ejecución del Contrato:

(i)      Etapa de Ensamblaje: La suma total de US$ 341,425.00 (Trescientos Cuarenta y Un Mil Cuatrocientos Veinticinco y 00/100 Dólares Americanos), durante los ciento ochenta (180) días siguientes a la Fecha de Firma, conforme al Plan de Negocios.

Para garantizar el cumplimiento de este compromiso de inversión en el plazo antes indicado, UWS entregará a FAME una carta fianza emitida por un Banco del sistema financiero peruano, irrevocable y de realización automática, por la suma  de US$ 34,142.50 (Treinta y Cuatro Mil Ciento Cuarenta y Dos y 50/100 Dólares Americanos).

Luego de verificado el cumplimiento de la inversión realizada por UWS conforme a este numeral, al Plan de Negocios y a la Oferta, devolverá la carta fianza dentro de los diez (10) días calendario siguientes.

(ii)     Etapa de Ensamblaje: La suma total de US$ 1, 207,925.00 (Un Millón Doscientos Siete Mil Novecientos Veinticinco y 00/100 Dólares Americanos), la cual deberá ejecutarse inmediatamente al término de la fase de ensamblaje, en los plazos y forma contenidos en el Plan de Negocios.

Para garantizar el cumplimiento de este compromiso de inversión UWS entregará a FAME una carta fianza emitida por un Banco del sistema financiero peruano, irrevocable y de realización automática, por la suma de US$ 120,792.50 (Ciento Veinte Mil Setecientos Noventa y Dos y 50/100 Dólares Americanos). Una vez que FAME verifique el cumplimiento de la inversión realizada por UWS en esta fase de fabricación, conforme a este numeral, al Plan de Negocios y a la Oferta, devolverá la carta fianza dentro de los diez (10) días calendarios siguientes.

6.2.7.   UWS se obliga a cumplir con las condiciones de la Oferta y con las obligaciones que asume en virtud del Contrato con la debida diligencia, efectuando oportunamente las coordinaciones que fueran necesarias.

6.2.8    UWS garantiza que la línea de ensamblaje que implementará conforme al numeral 5.2.1, producirá como mínimo producir cuarenta (40) Fusiles por jornada de trabajo de ocho (08) horas, en los días hábiles.



UWS se compromete a transferir todo el conocimiento necesario y experiencia al personal de FAME para el desarrollo del negocio y objeto del presente Contrato, de



manera que a su conclusión, FAME tenga la capacidad técnica y tecnológica necesaria para fabricar los Fusiles de manera autónoma.

6.2.10 UWS se obliga a informar por escrito a FAME acerca de las personas naturales y/o jurídicas con las cuales se asocie y/o a las que transfiera acciones, así como en caso de cambios del control de UWS. No obstante lo anterior, UWS se obliga a no asociarse ni transferir sus acciones a empresas de capitales públicos o privados o a accionistas nacionales de países con los que el Perú mantenga un conflicto latente.



6.2.11 UWS se obliga a comunicar de inmediato a FAME cualquier hecho que sobrevenga prohíba, límite, impida o restrinja la ejecución del presente Contrato, incluso cuando únicamente exista amenaza de que ello ocurra, siendo que para dichos efectos deberá tomar todas las acciones y medidas inmediatas para que dicho hecho no ocurra.



6.2.12. UWS se compromete a asumir la completa responsabilidad por las acciones de las empresas asociadas a UWS, así como de su calidad moral.

6.2.13. UWS responderá por que los equipos, herramientas, maquinarias e instalaciones necesarias para la ejecución del presente Contrato se mantengan en óptimas condiciones para su operación eficiente. En tal sentido, se obliga a efectuar bajo su cuenta, costo y riesgo los trabajos de mantenimiento preventivo y correctivo de todas las instalaciones, maquinarias, herramientas y equipos aportados por Las Partes a la Asociación y a los suyos propios, cuando éstos estén destinados a la ejecución del presente Contrato. La obligación antes indicada tendrá como excepción aquellos casos en que las fallas o daños de tales bienes se originen por causas imputables al Personal de FAME, en cuyo caso será ésta quien asuma los costos y/o gastos para reparar, comprar o restituir las referidas instalaciones, herramientas, máquinas y equipos.





6.2.14. Una vez iniciada la etapa de ensamblaje, UWS se compromete a trabajar conjuntamente con FAME, para realizar las gestiones correspondientes y lograr la obtención a favor de FAME la certificación ISO 9001 o la certificación ISO vigente para ensamblaje y producción de los Fusiles..



6.2.15 UWS trasladará a su costo, cuenta y riesgo la maquinaria, equipos, herramientas y componentes necesarios para la ejecución del Negocio.

6.2.16 UWS se obliga a contratar y mantener al día durante el plazo de vigencia del Contrato una póliza de seguros que cubra íntegramente sus activos, maquinarias, equipos, partes y piezas de Los Fusiles, y en general, todos los bienes muebles de su propiedad que se encuentren dentro de la Inmueble, así como el lucro cesante, riesgos, contingencias de incendio y líneas aliadas (terremoto, explosión, huelgas,





conmociones civiles, daños maliciosos, vandalismo y terrorismo y daño por agua) por su valor de reconstrucción o reposición.

## CLÁUSULA SÉTIMA- PROCEDIMIENTO DE COMERCIALIZACIÓN DE LOS FUSILES, LIQUIDACIONES Y PAGO

7.1     Procedimiento de Recepción y Aceptación de Órdenes de Compra

7.1.1    FAME se encargará de negociar con Los Compradores los términos esenciales de la Orden de Servicio, en coordinación con UWS. Tras dicha negociación, Los Compradores efectuarán pedidos de Fusiles a FAME mediante las órdenes de compra y/o contratos de compraventa, en las que deberán estar detalladas las características de Los Fusiles, el plazo y condiciones de entrega y la forma de pago, que deberá ser acorde con la establecida en el numeral 6.2 del Contrato.

7.1.2    FAME deberá remitir la Orden de Compra a UWS dentro de las veinticuatro (24) horas siguientes a su recepción para ensamblar o fabricar los Fusiles en función de la producción establecida en el numeral 5.2.1 Aceptada la orden por parte de UWS en un plazo máximo de tres días calendario luego de su recepción, UWS procederá a realizar las gestiones necesarias para el ensamblaje y fabricación de los Fusiles.

La fabricación y ensamblaje de Los Fusiles se ejecutará según lo dispuesto en el Plan de Negocios y en función de los Aportes y obligaciones de las Partes detallados en el Contrato.

7.1.3    Las Partes acuerdan que para Órdenes de Compras que impliquen producciones mayores a ochocientos (800) Fusiles por mes, serán previamente discutidas, planificadas y acordadas por las Partes.

7.2     Liquidación de Gastos y Forma de Pago

7.2.1    La distribución de las utilidades provenientes el Negocio se distribuirán respecto de cada Orden de Compra, conforme a lo siguiente:

(i)     FAME: 10% (diez por ciento) del valor de venta de los Fusiles en cada Orden de Compra. Para estos fines se entiende por valor de venta al total del importe facturado al Comprador sin incluir el Impuesto General a las Ventas, menos los Gastos Adicionales, que no debe ser mayor al tres por ciento (3%).

(ii)     UWS: La utilidad de UWS se determinará como consecuencia de deducir del 90% (noventa por ciento) del valor de venta de los Fusiles en cada Orden de Compra, los gastos correspondientes al ensamblaje y fabricación de Los Fusiles distintos a Los Aportes o a los que FAME se ha obligado en virtud del presente

17 - 31






Contrato. Estos gastos incluyen, sin que esta numeración sea taxativa sino meramente enunciativa, (i) los costos y gastos de importación y/o fabricación de las piezas y partes de los Fusiles conforme a la Cláusula Cuarta; (ii) los gastos de transporte; (iii) gastos de las cartas fianzas y garantías similares exigidos por los adelantos a ser entregados por las Fuerzas Armadas, al margen de los gastos, UWS será el encargado de tramitar directamente la carta fianza de un banco de primera línea garantizando a FAME, a favor del cliente que otorgará el adelanto (iv) gastos del fideicomiso, y; (v) otros gastos operativos previamente acordados con FAME.

7.2.2   Los pagos que reciban las Partes como consecuencia del Negocio por parte de Los Compradores serán depositados por éstos en el Fideicomiso, que las Partes se obligan a constituir en los términos siguientes:



(i)     Las Partes elegirán de común acuerdo a la entidad que actuará como Fiduciario, en función de las cotizaciones que obtendrá UWS de las fiduciarias que se indiquen a continuación, en un plazo máximo de diez (10) días calendario contado desde la fecha de suscripción del presente Contrato:

-       La Fiduciaria S.A.

-       División de Negocios Fiduciarios del Banco Interbank.

-       Unidad de Fideicomisos del Banbif.

En el caso que las partes no llegaran a un acuerdo sobre la entidad fiduciaria a elegirse, se elegirá aquella que hubiera presentado la oferta económica total (comisión de estructuración y comisión de administración) de menor monto.



(ii)    El Fideicomiso será constituido por FAME, UWS y la entidad Fiduciaria que elijan las Partes conforme al numeral precedente en un plazo máximo de treinta días calendario, contado desde la fecha de elección de la entidad Fiduciaria.

(iii)   Todos los costos y gastos que se produzcan para perfeccionar este contrato de fideicomiso correrán por cuenta de UWS.



(iv)    El encargo fiduciario que será materia del Fideicomiso comprenderá lo siguiente:

-       En la fecha de suscripción del Fideicomiso, FAME se obligará a transferir a favor del Fiduciario los derechos de cobro y los flujos dinerarios de cada una de las Órdenes de Compra que reciba en ejecución del Contrato. A efectos de lo anterior, el Fiduciario abrirá una cuenta bancaria a favor del fideicomiso (en adelante la Cuenta Recolectora). Esta cesión incluye los derechos de cobro y los flujos dinerarios









derivados de las acciones legales contra Los Compradores a que se refiere el numeral 6.3.

- En cada Orden de Compra, Los Compradores depositarán en el Fideicomiso, en calidad de adelanto, el treinta por ciento (30%) del valor total de la Orden de Compra como mínimo. Recibida dicha suma, El Fiduciario entregará a FAME el 10% de dicha suma, y el 90% restante lo entregará a UWS.

- El Saldo de la Orden de Compra, luego de que sea depositado por Los Compradores en el Fideicomiso, será repartido entre las Partes en la misma proporción establecida en el numeral (ii) precedente, previo descuento de los costos o gastos a que se refiere el numeral 6.2.4 del Contrato. La liquidación de tales gastos deberá ser remitida al Fiduciario por Las Partes mediante documento escrito suscrito por ambas Partes.

- En caso que las Órdenes de Compra consideren pagos en cuotas o armadas, El Fiduciario entregará a FAME el 10% de cada una de estas sumas, y el 90% restante lo entregará a UWS. En este supuesto, los gastos adicionales que comunicaden por las partes al Fideicomiso serán descontados de la última cuota o armada, repartiéndose el remanente entre Las Partes en los mismos porcentajes antes establecidos.

(v)  El Fideicomiso estará vigente hasta la conclusión de La Asociación.



7.2.3  FAME emitirá a favor de Los Compradores las facturas que correspondan conforme a las Órdenes de Compra. Por su parte, UWS facturará a FAME las sumas que reciba conforme al Fideicomiso.

7.2.4  FAME realizará sus mejores esfuerzos para negociar con Los Compradores que los pagos por la venta de Los Fusiles estén expresados en dólares americanos. No obstante lo anterior, Las Partes acuerdan que también aceptarán Órdenes de Servicio cuyo pago esté expresado en nuevos soles, asumiendo cada una, de considerarlo conveniente, el riesgo cambiario de convertir dicho pago a otra moneda, en función de sus necesidades.

7.2.5  Las Partes reconocen que, como consecuencia de la ejecución del Contrato, pueden surgir gastos adicionales a los previstos en el presente Contrato, que no debe ser mayor al tres por ciento (3%). Tales gastos adicionales se podrán generar respecto de cada Orden de Compra y deberán ser aprobados por Las Partes por escrito de forma previa a su ejecución.









7.3   Responsabilidad de Las Partes relativas al ensamblaje y/o fabricación de los Fusiles y a las Órdenes de Compra

7.3.1   Conforme a la naturaleza del Contrato, FAME responderá ante Los Compradores y/o terceros respecto de la ejecución del presente Contrato.

Sin perjuicio de lo anterior, UWS responderá ante FAME por el incumplimiento de sus obligaciones contenidas en el presente Contrato. En tal sentido, en el supuesto que se impute a FAME cualquier penalidad, indemnización o pago a terceros, multas, y en general, cualquier pago que se imponga a **FAME** como consecuencia del incumplimiento de UWS de sus obligaciones contractuales, serán asumidos íntegramente por esta última, incluyendo los costos de defensa en que pudiera incurrir FAME.



Del mismo modo, FAME responderá ante UWS por los daños y perjuicios que le pudiera causar respecto de las Órdenes de Compra por el incumplimiento de sus obligaciones contractuales.



7.3.2   En el supuesto que Los Compradores no cumplieran con efectuar los pagos correspondientes a las Órdenes de Compra, FAME está obligada a ejecutar las acciones legales permitidas por la legislación vigente, y los términos de la Orden de Compra, a efectos de obtener dicho pago y/o las indemnizaciones y penalidades que correspondan.



Sin perjuicio de lo anterior, en el supuesto que UWS lo solicite por escrito, FAME le cederá los derechos correspondientes a las acciones legales descritas en el párrafo precedente, a efectos de que sea UWS quien ejecute dichas acciones. La forma de dicha cesión y la documentación correspondiente será acordada por Las Partes en cada oportunidad.



7.3.3   UWS otorgará garantía y responderá por la calidad de los Fusiles que se ensamblen y/o fabriquen en FAME, por un periodo de cinco (05) años contados desde la fecha de compra de los Fusiles, que cubrirá únicamente los defectos de los materiales, componentes o su fabricación, los que deberán ser reemplazados por UWS.

Sin perjuicio de lo anterior, UWS no responderá por defectos en el ensamblaje o fabricación de Los Fusiles imputables a FAME

**CLÁUSULA OCTAVA - CAPACITACIÓN**



8.1.   UWS se obliga a capacitar al Personal de FAME en sus instalaciones ubicadas en los Estados Unidos de América, respecto del ensamblaje y la fabricación de los Fusiles.









La capacitación antes indicada comprende la capacitación de diez (10) personas en la primera Etapa de Ensamblaje, y dos (02) personas en la Etapa de Fabricación de los Fusiles, incluyendo la capacitación necesaria a (02) personas para que éstas puedan capacitar y certificar (en adelante los Capacitadores), en los mismos términos, a otros trabajadores de FAME que pudieran vincularse al Contrato.

UWS garantiza que la capacitación de los Capacitadores será suficiente para que éstos puedan transferir a otros trabajadores de FAME que se vinculen con el Contrato el conocimiento necesario para la fabricación y el ensamblaje de Los Fusiles, sin necesidad de Certificación adicional alguna por parte de UWS.

En el caso que durante la vigencia del Contrato, alguno de los Capacitadores renunciaran a FAME, ésta asumirá los costos relacionados a la capacitación de nuevos Capacitadores, incluyendo viáticos, hospedaje y alimentación

8.2.   UWS se hará cargo de todos los costos y gastos que correspondan a la capacitación del Personal de FAME, incluyendo los viáticos, hospedaje y alimentación de dicho personal para efectos de la Capacitación.

8.3    Asimismo, UWS efectuará la capacitación permanente del Personal de FAME mediante la supervisión del ensamblaje y fabricación de Los Fusiles, de modo que una vez culminado el plazo de vigencia del presente Contrato, el Personal de FAME se encuentre plenamente capacitado para realizar el proceso de ensamblaje y producción de los Fusiles de manera autónoma.

La capacitación adicional que se requiera efectuar al Personal de FAME como consecuencia del cambio de especificaciones o mejoras tecnológicas, de ser el caso, deberá ser asumida, costeada y realizada por UWS.

## CLÁUSULA NOVENA - PLAZO

9.1.   El presente Contrato entrará en vigencia a partir del día siguiente de su suscripción y tendrá una vigencia de quince (15) años, por lo que ninguna de las Partes podrá darlo por concluido unilateralmente de manera anticipada.

9.2.   Sin perjuicio de lo anterior, FAME se reserva el derecho de resolver el presente Contrato por causas estrictamente relacionadas con la Seguridad Nacional, situación que para dichos efectos hayan sido declaradas mediante ley, resolución, decreto o similar, por el órgano gubernamental legalmente autorizado y competente para ello, debiendo para ello comunicar inmediatamente de forma escrita a UWS acerca de dicha circunstancia, así como su decisión de concluir el Contrato.








9.3   Sin perjuicio de lo anterior, UWS se reserva el derecho de resolver el presente contrato por causas estrictamente relacionadas a decisión del Departamento de Estado de los Estados Unidos de Norteamérica de no continuar con la transferencia tecnológica, en cualquier momento debiendo para ello comunicar inmediatamente de forma escrita a FAME acerca de dicha circunstancia, adjuntando el sustento documental respectivo así como su decisión de concluir el contrato.

## CLÁUSULA DÉCIMA - CONCLUSIÓN DE LA ASOCIACIÓN

10.1   En caso de conclusión de la Asociación, cualquiera fuere su causa, se seguirán las reglas siguientes:

10.1.1 Dentro de los cinco (05) días hábiles siguientes a la conclusión del Contrato, cualquiera fuere su causa, ambas Partes efectuarán la liquidación correspondiente. La falta de acuerdo en la mencionada liquidación no será motivo para que UWS no se retire de las instalaciones de FAME conforme a esta Cláusula, por lo que la controversia deberá someterse al procedimiento regulado en la Cláusula Décimo Sétima del presente documento.

10.1.2 En caso de conclusión o resolución del Contrato por causas imputables a UWS, e uso del Terreno revertirá a FAME de manera automática, y UWS devolverá la posesión del mismo en un plazo máximo de 30 días calendario luego de la conclusión, retirándose de manera definitiva de las instalaciones de FAME, sir importar la forma de conclusión del presente contrato y sin necesidad de que media requerimiento o intimación alguna por parte de FAME. La Infraestructura será devuelta sin más desgaste que el correspondiente a su uso ordinario. La constitución en mora ante el incumplimiento de esta estipulación es automática.

Todas las mejoras e inversiones realizadas por UWS en las instalaciones de propiedad de FAME o en el Terreno en virtud del presente Contrato quedarán a favor de la FAME al término del plazo de vigencia del presente Contrato o en caso de resolución por causas imputables a UWS, sin que medie contraprestación económica alguna a favor de UWS.



En el caso que UWS no cumpla con devolver el Terreno conforme al párrafo precedente, quedará obligado a pagar una penalidad ascendente a la suma de cinco mil y 00/100 dólares americanos (US$ 5 000,00) por cada día de atraso, sin perjuicio de la indemnización por daño ulterior.



10.1.3 En el caso que la conclusión del Contrato se efectúe por causas imputables a FAME, UWS podrá optar por retirar las mejoras efectuadas en el terreno y la maquinaria, herramientas y equipos destinados a la ejecución del Negocio por cuenta de FAME, o a recibir el valor de mercado que corresponda a éstas, y a pagar el valor de la



Transferencia Tecnológica que al efecto acuerden las Partes; o, en caso de falta de acuerdo, conforme al Procedimiento de Solución de Controversias contemplado en la Cláusula Décimo Sétima.

10.1.4. En el caso de conclusión del Contrato por causas no imputables a las Partes, se procederá a la liquidación del Contrato, debiendo las Partes acordar si UWS retirará las mejoras efectuadas en el terreno y la maquinaria, herramientas y equipos destinados a la ejecución del Negocio, bajo su cuenta y costo, o éstas se transfieren a FAME, a su valor de mercado.



En los supuestos de conclusión del Contrato por causas no imputables a las Partes, ninguna de las Partes estará obligada a pagar a la otra penalidad o indemnización alguna.

Las Partes reconocen que no se considerará una causal imputable a las Partes el supuesto que el Departamento de Estado de los Estados Unidos de América cancele o prohíba, a su discreción y en cualquier momento, la autorización de UWS para la comercialización, capacitación y/o transferencia del conocimiento para el ensamble y fabricación de los Fusiles.



Asimismo, ante la ocurrencia de un siniestro o evento no imputable a las partes que imposibilite el uso del Terreno o el Negocio, las partes evaluaran su magnitud y plazo de reconstrucción. En el caso que el evento se hubiera producido por causas no imputables a las Partes, las obligaciones que son materia del presente contrato quedarán suspendidas durante todo el tiempo que dure dicha imposibilidad. Si la imposibilidad se extiende por un período superior a seis (6) meses, cualquiera de las partes podrá dar por concluido el presente Contrato, sin que se devengue indemnización o compensación alguna a favor de la otra.

10.1.5. UWS tendrá derecho a retirar al finalizar el contrato las maquinarias y equipos de su propiedad que no estén directamente vinculados o que sean utilizados en el ensamblaje y/o fabricación de los Fusiles.



## CLÁUSULA DÉCIMA PRIMERA - RESOLUCIÓN

11.1. De conformidad con el artículo 1429 del Código Civil, cualquiera de las Partes que se vea perjudicada por el incumplimiento de la otra, puede requerirla para que satisfaga su prestación, dentro de un plazo adecuado para dicho cumplimiento, el que en ningún caso podrá ser inferior a (15) días calendario, bajo apercibimiento de que, en caso contrario, el presente Contrato quede resuelto.

Sin perjuicio de lo establecido en el numeral 10.1 precedente, cualquiera de las partes podrá resolver el Contrato en forma automática y de pleno derecho, de





conformidad con el artículo 1430° del Código Civil, si se produce alguno de los siguientes supuestos:

(a) Que la otra parte entre en situación de insolvencia o sea sometido a concurso o Convocatoria a Junta de Acreedores, cualquiera fuere su causa.



(b) Que exista un conflicto entre los accionistas de alguna de las Partes que, a criterio unilateral y exclusivo de **FAME,** pueda afectar la ejecución del presente Contrato, o su imagen institucional.

(c) Que efectuara acciones que conlleven el descrédito comercial de la otra parte.



(d) Cesión de posición contractual sin autorización previa y por escrito de la otra parte.

(e) Incumplimiento de las obligaciones de exclusividad y no competencia.

(f) Incumplimiento de los compromisos de inversión o aportes



(g) Si una parte demandase judicial o arbitralmente a la otra y/o a algunos de sus trabajadores, representantes o directores, denunciase a estos últimos y/o testificase en contra de ellos y/o los involucrase de cualquier manera en una causa judicial, extrajudicial, administrativa y/o tributaria, por cualquier hecho, motivo o causa que tenga relación directa o esté asociado a la prestación de servicios o estipulaciones a que se contrae y/o están contenidas en el presente contrato.



11.3 La resolución del contrato bajo cualquiera de los numerales de esta cláusula no genera para la parte afectada por el incumplimiento obligación de pago de indemnización alguna en favor de la otra parte



Sin perjuicio de lo anterior, en el caso de resolución del contrato por causal imputable a una de las partes, la otra parte la indemnizará por los daños y perjuicios que le hubiere causado.

11.4 Sin perjuicio de lo establecido en la presente Cláusula, las partes del presente contrato están obligadas a cumplir con todas las obligaciones que hubieran contraído hasta la fecha en que se produzca su resolución y/o conclusión, aun cuando éstas se hagan exigibles con posterioridad a dicha resolución y/o conclusión.

## CLÁUSULA DÉCIMO SEGUNDA - CASO FORTUITO O FUERZA MAYOR

En el supuesto caso que cualquiera de las partes se vea en el incumplimiento total o parcial de sus obligaciones por razones de Caso Fortuito o de Fuerza Mayor, tales






obligaciones se suspenderán en la medida y durante el tiempo que tales obligaciones se vean afectadas por motivos de Caso Fortuito o de Fuerza Mayor y la parte que reclama en virtud a este artículo tendrá derecho a tal prórroga de tiempo para cumplir con tales obligaciones como sea razonablemente necesario en vista de las circunstancias, sujeto a los términos de la notificación a la otra parte, detallando su naturaleza, fecha en que dicho retraso se inició, duración, razones y consecuencias de la misma, acreditándolas fehaciente por correo aéreo certificado dentro de los veinte (20) días de producido el hecho.

12.2   A efectos de lo anterior, se entenderá como Caso Fortuito o Fuerza mayor aquel hecho o evento que aun pudiendo ser previsto por Las Partes, no puede resistirse ni evitarse, como actos terroristas, sedición, sabotaje, guerra, preparación para la guerra, bloqueo de vías de transporte, revolución, insurrección, movilización, conmoción civil, disturbios, huelgas, fuego, explosión, accidente, paro forzoso, acto de las autoridades gubernamentales (incluyendo la negación de licencia de exportación), el embargo de mercancías, la no-disponibilidad del medio de transporte en el momento de la fecha de vencimiento y desastres naturales.

## CLÁUSULA DÉCIMO TERCERA -  PREVENCIÓN CONTRA EL LAVADO DE ACTIVOS Y ANTICORRUPCIÓN

13.1.   FAME declara conocer el contenido de la Ley 27693 y su Reglamento aprobado por Decreto Supremo 018-2006-JUS así como todas sus normas conexas y vinculadas; asumiendo la obligación de cumplir con todas sus disposiciones.

13.2.   FAME declara haber implementado dentro de su organización, en lo que fuere aplicable, los mecanismos requeridos por las normas antes señaladas para la prevención de lavado de activos y financiamiento del terrorismo.

13.3.   FAME asume total responsabilidad por las infracciones a las normas sobre la prevención del lavado de activos y financiamiento del terrorismo cometidas en el cumplimiento de sus obligaciones ante la UIF, por lo que se obliga a indemnizar y a liberar de responsabilidad y dejar a salvo a UWS de toda reclamación, demanda, multas, ejercicio de acciones o litigio de cualquier naturaleza.

13.4.   Ninguna de las Partes, ni cualquiera de sus sub-contratistas, agentes, representantes, apoderados, directores, accionistas o personal en general podrán dar, ofrecer, consentir y/o insinuar el ofrecimiento, a terceros, en especial a ningún funcionario perteneciente a cualquier estamento de la administración pública, entidades del Estado y/o empresas públicas, candidato a servidor o funcionario público y/o partido político, directa o indirectamente, de ninguna donación, objeto de valor, promesa, pago, auspicio, promesa o autorización de pago, remuneración, entrega de cualquier bien, suma de dinero, ventaja de cualquier índole u objeto con







algún valor pecuniario, ni a solicitar, comprometer o aceptar para sí mismo o para otros, directa o indirectamente, regalos, obsequios, viajes, contribuciones, entretenimientos, comisiones, dádivas, favores, sobornos, ofrecimientos de empleo o cualquier otro tipo de ventajas con el propósito de influenciar en terceros, en especial un funcionario y/o en un miembro de cualquier Entidad del Estado, para lograr una ventaja inapropiada, sea que se trate de la realización, demora, agilización u omisión de cualquier acto, o algún negocio en beneficio propio y/o de la otra parte, sea por acto propio y/o por su influencia, o actos que puedan ser considerados como una práctica ilegal o de corrupción.

13.5.   Esta obligación se hace extensiva a los ejecutivos, empleados y/o toda persona que trabaje o preste algún tipo de servicio para cada una de las partes, incluyendo sin limitación alguna a sus subsidiarias, sucursales, afiliadas, subcontratistas, consultores, representantes e intermediarios.

13.6.   En caso de incumplimiento de lo antes señalado, ambas partes se reservan el derecho de accionar por la correspondiente indemnización por daños y perjuicios que el incumplimiento de la presente cláusula pudiera ocasionarle a ella o a sus funcionarios, directivos y/o empleados.

13.7.   Ambas Partes se comprometen a no realizar ninguna actividad que constituya violación de las leyes, los reglamentos, acuerdos, y/o las directivas gubernamentales en la República del Perú.

## CLÁUSULA DÉCIMO CUARTA -   COSTOS   LEGALES,   NOTARIALES   Y REGISTRALES.

Cada una de las Partes contractuales asumirá íntegramente el pago de sus respectivos costos legales y de los costos notariales y cualquier otro, que puede generar la elevación a Escritura Pública de este Contrato, siempre y cuando sea decidida dicha formalidad por las Partes.

## CLÁUSULA DÉCIMO QUINTA -   NO SUBORDINACIÓN

15.1.   Queda expresamente establecido que el presente Contrato es de naturaleza civil y no laboral, por lo que queda establecido que este Contrato  - en lo que no se encuentra expresamente pactado - se rige por las normas de la Ley General de Sociedades, el Código Civil peruano y las demás normas peruanas vigentes aplicables.

15.2.   Las Partes reconocen que están actuando en forma independiente y que ninguna disposición de este Contrato deberá ser interpretada a favor de la existencia entre




aquellas de una relación de empleador y empleado, mandante y apoderado u otra relación similar entre aquellas. Por ello, ninguna de las Partes se encuentra subordinada a la otra, ni tiene facultades para obligar a la otra Parte frente a terceros, ni podrá asumir ni contraer ninguna obligación o responsabilidad, expresa o implícita en nombre de la otra, pudiendo realizar exclusivamente los actos expresamente estipulados en este Contrato y sus anexos.

15.3. Como consecuencia del numeral anterior, el personal de ninguna de las Partes tiene ni tendrá ninguna relación laboral con la otra parte, ni con sus subcontratistas, ni con el personal de sus subcontratistas, para la ejecución de las actividades materia del Contrato.



15.4. En este sentido, cualquier reclamo del personal de una parte contra la otra ante cualquier autoridad o instancia judicial o administrativa será atendido y/o defendido por la parte empleadora de tal personal bajo su exclusiva cuenta y costo quedando expresamente establecido que ninguna de las Partes responderá por ninguna posible contingencia laboral imputable a la otra frente a su personal.



15.5. Las Partes reconocen que están actuando en forma independiente y que ninguna disposición de este Contrato deberá ser interpretada en favor de la existencia entre aquellas de una relación de empleador y empleado, mandante y apoderado, o socios u otra relación similar entre aquellas. Por ello, ninguna de las Partes frente a terceros podrá asumir ni contraer ninguna obligación o responsabilidad expresa o implícita en nombre de la otra, bajo ningún motivo.

15.6 Las Partes declaran también que este Contrato no afecta, directa ni indirectamente, los derechos laborales y de seguridad social de su personal.



15.7 Cada una de Las Partes se obliga a cumplir estrictamente las obligaciones tributarias, administrativas, laborales y de seguridad y salud en el trabajo que le corresponden, y asume plena y exclusivamente cualquier responsabilidad o sanción derivada del incumplimiento de las referidas obligaciones.



15.8 Cada Parte se obliga a mantener indemne a la otra, sus agentes, funcionarios y/o empleados respecto de toda demanda, acción, reclamo, costo, gasto, denuncia que se dirija contra éstos por su personal, o por cualquier acción iniciada por cualquier autoridad, judicial o administrativa, con relación a las obligaciones laborales, previsionales, tributarias, de seguridad social y de seguridad y salud en el trabajo, cualquiera que sea la naturaleza, alcance y nivel de ésta, cualquiera que fuese la decisión que pudiese adoptar la autoridad administrativa, laboral o judicial.



Cada Parte se obliga a asumir directamente, y de ser el caso, restituir a la otra, todo derecho económico o de cualquier naturaleza, incluyendo indemnizaciones, derechos, beneficios, remuneraciones, aportes previsionales y de la Seguridad







Social, impuestos de ley, multas y demás conceptos, que le sea exigido a la contraparte, sus agentes, sus funcionarios y/o empleados por acciones o reclamos promovidos por su personal por cualquier autoridad, judicial o administrativa, con relación a las obligaciones laborales, provisionales, tributarias, de seguridad social y de seguridad y salud en el trabajo, incluyendo los gastos en que incurriera la parte afectada como consecuencia de los hechos antes descritos.

15.10 Las Partes se obligan a cumplir y a hacer cumplir a sus trabajadores con todas las obligaciones y pagos exigidos por las normas de la legislación laboral, previsional, tributaria, en Seguridad Social y en Seguridad y Salud Ocupacional. Cada Parte libera expresamente a la otra de cualquier responsabilidad al respecto, sin reserva ni limitación alguna.



## CLÁUSULA DÉCIMO SEXTA - DOMICILIO Y NOTIFICACIONES

16.1. Para la validez de todas las comunicaciones y notificaciones a las Partes con motivo de la ejecución de este Contrato, ambas Partes señalan como sus respectivos domicilios los indicados en el encabezado del presente contrato.



16.2. El cambio de domicilio de cualquiera de las Partes surtirá efecto desde la fecha de comunicación de dicho cambio a la otra Parte, por cualquier medio escrito cursado al menos con quince (15) días útiles de anticipación. Si no se cumpliese con esta formalidad, surtirán plenos efectos las comunicaciones que se reciban en los domicilios arriba mencionados.



## CLÁUSULA DÉCIMO SÉTIMA - SOLUCIÓN DE CONTROVERSIAS Y LEY APLICABLE

17.1 Cualquier controversia derivada de la interpretación, cumplimiento, validez o aplicación de los contratos será resuelta por las partes, para cuyo efecto éstas se comprometen a realizar sus mayores esfuerzos para la solución armónica de sus controversias en base a las reglas de la buena fe y atendiendo a la común intención expresada en los contratos, en un plazo máximo de quince (15) días calendario.



17.2 Si vencido el plazo indicado en el párrafo anterior las diferencias entre las partes subsisten, serán resueltas mediante un arbitraje de derecho bajo la administración del Centro de Arbitraje de la Cámara de Comercio de Lima, conforme a su Reglamento, el mismo que las Partes declaran aceptar y conocer.



El arbitraje será resuelto por un tribunal arbitral (el "Tribunal Arbitral"), conformado por 3 miembros que serán designados conforme a los dispuesto en el Reglamento, quedando acordado que corresponderá al Vendedor designar a uno y al Comprador a otro. Los árbitros así designados se pondrán de acuerdo sobre quién se desempeñará como presidente del Tribunal Arbitral. Si los árbitros no designan al







presidente dentro de los 5 días calendario contados a partir de la fecha en la que la Secretaría General del Centro les comunicó que sus designaciones han quedado firmes, el presidente será designado por el Consejo Superior de Arbitraje, conforme lo establecido por el Reglamento.

El laudo que se emita en el proceso arbitral será inapelable y tendrá carácter definitivo. La parte que estime conveniente impugnar el laudo a través del recurso de anulación ante el Poder Judicial, deberá acompañar a su demanda una carta fianza solidaria de un banco del sistema financiero peruano, irrevocable y de realización automática por el monto que el laudo le haya ordenado pagar, a favor de la contraparte o, en caso de tratarse de una pretensión de cuantía indeterminada, el tribunal arbitral deberá fijar en el laudo el monto al que deberá ascender la referida fianza.



Para cualquier intervención de los jueces y tribunales ordinarios dentro de la mecánica arbitral, las Partes se someten expresamente a la jurisdicción de los jueces y tribunales de la ciudad de Lima, renunciando al fuero de sus domicilios.

Corresponderá a la Parte vencida reembolsar a la Parte vencedora los costos y gastos del arbitraje. En caso no sea posible determinar la Parte vencida, el Tribunal Arbitral fijará la proporción en que serán asumidos los costos y gastos del arbitraje por cada Parte.



17.3    En todo lo que no se encuentre previsto en este Contrato, se aplicará supletoriamente las disposiciones de la Ley General de Sociedades, el Código Civil o en su defecto los demás dispositivos legales que resulten aplicables.

## CLÁUSULA DÉCIMO OCTAVA – CONFIDENCIALIDAD



Las Partes deberán guardar absoluta reserva y tratar con total confidencialidad cualquier información que pudiesen adquirir, ya sea con autorización o sin ella, de las actividades que realicen como consecuencia del Contrato, así como de las técnicas industriales, métodos de trabajo, estudios, planes, programas, costos, proveedores, clientes e infraestructura de la otra parte, así como todo elemento constitutivo o relativo a la propiedad industrial de la otra parte, la información relativa a sus negocios y cualquier otra que de manera voluntaria o involuntaria, directa o indirecta llegue a su conocimiento como consecuencia de la ejecución del presente contrato o de sus actividades extracontractuales. El incumplimiento de esta estipulación generará para la parte infractora la obligación de resarcir a la parte afectada por los daños y perjuicios que pudieren habérsele causado. Asimismo, el incumplimiento de la obligación de confidencialidad contenida en la presente Cláusula será causal de resolución del presente Contrato bajo los alcances del artículo 1430º del Código Civil.

La obligación de confidencialidad regirá durante la vigencia del presente Convenio y por el período de 3 años luego de su terminación, cualquiera fuere su causa, salvo que: (i) alguna



de las Partes cuente con la autorización expresa y por escrito de la otra Parte para efectos de la divulgación de esta información a terceros; (ii) sea de dominio público o esté à disposición del público debido a una causa distinta a un acto u omisión de la Parte que corresponda; (iii) requiera ser divulgada obligatoriamente bajo las Leyes Aplicables o bajo mandato firme de una autoridad competente, siempre y cuando la Parte obligada a comunicar haya notificado por escrito inmediatamente a las otras Partes del mandato legal o de la autoridad competente, a fin de que puedan interponer las medidas legales pertinentes.

Las Partes únicamente podrán revelar la información que obtengan como consecuencia de la ejecución del presente Contrato al equipo de trabajo y a sus representantes autorizados o asesores externos que necesiten conocer la misma, con el único propósito de ejecutar el presente Contrato. La Parte que divulgue la información a dicho personal responderá ante cualquier incumplimiento de éste a las obligaciones contenidas en la presente Cláusula.

### CLÁUSULA DÉCIMO NOVENA - DISPOSICIONES VARIAS

19.1  Las Partes acuerdan que el presente Contrato no crea ni de hecho ni derecho:

i.  Una relación laboral o de trabajo bajo ninguna clase entre UWS y FAME; o,

ii.  Una empresa conjunta o sociedad de hecho, creación de empresa subsidiaria, o fusión.

19.2  Las Partes dejan constancia que los títulos que encabezan las cláusulas de este Contrato son meramente enunciativos y no serán tomados en cuenta para la interpretación de su contenido.

19.3  Las Partes también dejan constancia que las cláusulas y numerales del presente contrato son separables y que la nulidad, ineficacia o invalidez de una o más de ellas no perjudicará a las restantes en tanto se mantenga la esencia de este contrato. En caso que alguna de las cláusulas o numerales del presente contrato sea declarada nula, ineficaz o inválida, las Partes harán todo esfuerzo razonable para elaborar e implementar una solución legalmente válida que logre el resultado más cercano a aquél que se buscaba obtener con el numeral y/o cláusula declarada nula, ineficaz o inválida.

19.4  Las Partes declaran que en la redacción y suscripción de este documento no ha mediado vicio alguno capaz de invalidarlo.

19.5  El sólo hecho que alguna de las Partes no ejerza alguno de los derechos que le confiere el presente convenio, en ningún caso podrá considerarse como una renuncia a tal derecho, el cual se mantendrá vigente en tanto subsista el hecho que

le dio origen. Cualquier renuncia de las Partes a derechos conferidos por el presente convenio deberá ser expresa y por escrito.



19.6   Este documento, debidamente suscrito por las Partes, constituye título y prueba suficiente del acuerdo total de las Partes, con relación a la función del mismo y reemplaza todos los acuerdos previos, escritos u orales, salvo que de manera expresa se estipule lo contrario en este documento.

19.7   Los términos de este documento deben entenderse e interpretarse en forma integral.

19.8   Cualquier modificación o ampliación de los términos del presente contrato deberá realizarse por escrito y con participación de las Partes.

19.9   Las Partes se garantizan mutuamente que se encuentran debidamente autorizadas y que cuentan con poderes suficientes para suscribir el presente contrato y que suscribir el mencionado contrato y que las obligaciones asumidas de conformidad con el mencionado contrato no violan ningún contrato que exista entre las Partes y alguna otra persona natural o jurídica o alguna ley o regulación gubernamental.



19.10  Forman parte del presente contrato los siguientes anexos:

- Anexo 01   Oferta de transferencia tecnológica
- Anexo 02   Oferta económica y financiera
- Anexo 03   Oferta técnica y de calidad
- Anexo 04   Especificaciones técnicas de los fusiles
- Anexo 05   Plan de Negocios
- Anexo 06   Áreas e instalaciones
- Anexo 07   Bases generales integradas del concurso

En señal de conformidad y ratificación de los términos que contiene el presente Contrato, suscriben las Partes en duplicado a los 16 días del mes de mayo del año 2016.

FAME SAC                                             UWS Inc

............................................              ............................................
ARMANDO ELIO RINCON MORETTI          CRISTHIAN QUINTANILLA AURICH
GERENTE GENERAL                              PRESIDENTE
DNI: 09767263                                     DNI: 07627533