## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ADAMS ARMS, LLC,

      Plaintiff,

v.                                 CASE NO.: 8:16-cv-1503-VMC-AEP

UNIFIED WEAPON SYSTEMS, INC.,
AGUIEUS, LLC,
MICHAEL C. BINGHAM,
CHRISTIAN QUINTANILLA AURICH, and
MAJOR GENERAL JAMES W. PARKER,
USA, Retired,

      Defendants.

_____/

### DEFENDANT, MICHAEL C. BINGHAM's,
### <u>AFFIDAVIT IN OPPOSITION</u>

STATE OF FLORIDA     )
COUNTY OF PINELLAS  )
Index
I. Credentials and Background II. Chronology and Facts
III. Fronig's Affidavit is inaccurate and incomplete

Before me personally appeared Michael C. Bingham, who upon being duly sworn, deposes and states:

### *I. Credentials and Background*

1.      This Affidavit and information is made and based on my own personal knowledge, information and belief.

2.      I am the President and CEO of Aguieus, Inc., a military training and consulting company that specializes in providing strategic consulting services to governments and businesses in the defense, national security and high-technology arenas.

3.      I am the Managing Member and Co-Founder of Aguieus, LLC.

4.      Prior to the formation of Aguieus, LLC, I was a Personal Security Specialist with Blackwater Security Consulting for the period April 2005 through June 2007 in Baghdad, Iraq and a member of the Tactical Support Team for the Department of State, Diplomatic Security Services, High Threat Protection Office.  In that capacity I was a member of the team which provided quick reaction and counter assault for all U.S. Dept. of State Missions, responded to all coalition troops' distress calls, was the lead up gunner of emergency response vehicle and vehicle commander, and operated with the M240, M4 w/M203, Remington 870 shotgun and Glock 19 pistol.

5.      I am a Florida resident with over a decade of comprehensive defense industry experience.

1

6.      I served in the U.S. Navy as a Gunnersmate, reaching the rank as Petty Officer 3rd Class. As a Gunnersmate, I was trained as a weapons specialist and was responsible for maintaining ship armory, including repair of small arms, and training Navy personnel on marksmanship, tactics, and care of small arms.

7.      I served the U.S. State Department in Iraq[1], in part serving as Personal Security Specialist, Tactical Commander on a Tactical Support Team, and a member of the low profile security team for Ambassador J. Cofer Black[2].

8.      Subsequent to working with the U.S. State Department I advised foreign governments in the Middle East and Latin America on the negotiation and purchase of weapons.

9.      I have an active U.S. State Department Secret Security Clearance and : (1) possesses a U.S. Bureau of Alcohol Tobacco, Firearms and Explosives (*"BATF"*) Type 7 Weapons Manufacture License, (2) possesses a U.S. BATF Special Occupancy Tax Stamp for Class 3 Destructive Device Manufacturing, (3) am a U.S. State Department, Directorate of Defense Trade Control, Registered Manufacturer and Exporter, and (4) am a U.S. Department of Commerce approved vendor.

## II. Chronology and Facts

10.      In late 2013, Aurich contacted me regarding the MOD Project based on the fact that I possessed the necessary licenses, credentials, and vendor contacts necessary to win the MOD Project. Shortly thereafter, Aurich formed UWS, Inc. as its sole owner, and became its president and chief executive officer. Since I (Bingham and Agüieues, LLC) was going to handle all of the vendor relationships associated with the MOD Project, UWS, Inc. granted my company (Agüieus) a license to use the name "Unified Weapon Systems." On March 3, 2014, Agüieus registered "Unified Weapon Systems" as its fictitious name with the Florida Department of State Division of Corporations. UWS, Inc. and Agüieus agreed to move forward together to build two different caliber weapons: a 7.62 x 51mm NATO select-fire weapon system *("UCR")* and a 5.56 x 45mm NATO select-fire weapon system *("UPR") (*collectively *"the rifles")*.

11.      On February 11, 2014, I contacted Adams to discuss use of a specific patented part owned by Adams, commonly known as a short stroke piston.  Shortly thereafter, Aurich and myself visited the Adams' facility. During the visit, in order for Aurich to remain present during the meeting,

---

[1] Bingham served as a Blackwater Security consultant for the Department of State, Diplomatic Security Service, High Threat Protection Office in Baghdad and Mosul, Iraq.
[2] Ambassador J. Cofer Black is the former Director of the CIA Counterterrorist Center.

Adams required that Aurich execute a Mutual Confidentiality and Nondisclosure Agreement *("NDA")*. Aurich executed the NDA in his individual capacity only and never represented he was a manager or member of Aguieus, LLC.[3] Adams did not have U.S. government permission to share any technical data related to weapons with Aurich, a Peruvian citizen, therefore Aurich never received any of Adams' technical data. Through the balance of February, all of March and most of April, 2014, I met with Adam's V.P., Jim Granger *("Granger")*, to discuss Adams' efforts to have an expanded role in the MOD Project by helping to develop the rifles in compliance with MOD's specifications.

12.     On April 29, 2014, Adams and Aguieus d/b/a Unified Weapons System *(not the entity UWS, Inc.)* executed a Letter of Intent *("LOI")* to codify *"…mutual intentions with respect to the potential transaction …"* The LOI delineated principal terms of the *"proposed transaction,"* an overview of the MOD Project, and identified the Adams' facility as the rifles' assembly site. Pursuant to the LOI, Aguieus d/b/a Unified Weapons System *(not the entity UWS, Inc.)* would provide specific parts to Adams for incorporation and assembly of the final product and parts not specified in subsection 1 (b) of the LOI were to be provided by Adams.  Neither Adams' assembly cost nor the pricing of its parts was ever agreed upon. Furthermore, the parties *never* agreed upon a final cost to build the rifles or a price to sell the rifles to MOD and MOD *never* agreed upon a price to purchase the rifles from anyone.

13.     Given that MOD's allocated funding for the MOD Project expired on September 1, 2014, the LOI set dates by which *contemplated* MOD purchase orders might be expected, but conditioned the entire LOI on an executed "Contract between the Ministry of Defense of the Republic of Peru and Unified Weapon Systems *within 30 days of this signed Letter of Intent."* (i.e. May 30, 2014). AA and I recognized exigencies of not only being able to obtain a signed agreement with MOD, but also the need to document an agreement between ourselves relating to the *"proposed transaction"* as well.  Accordingly, the LOI specifies:

---

[3] At the time Aurich signed the NDA, it did **not** designate Aguieus, LLC as the party. Aurich never wrote in "Aguieus, LLC" or "Manager" as his title, because he has never been a manager or member of neither Aguieus, LLC nor Aguieus, Inc. It was only upon the initiation of this lawsuit that Aurich learned that someone, presumably at Adams, wrote in Aguieus, LLC and designated Aurich as manager on the signature page.

"1 (e) **Definitive Purchase Agreement.**  All of the terms and conditions of the *proposed transaction* would be stated in the Purchase Agreement, to be negotiated, agreed and executed by you and us.  Neither party intends to be bound by any oral or written statements or correspondence concerning the Purchase Agreement arising during the course of negotiations, notwithstanding that the same may be expressed in terms signifying a partial, preliminary or interim agreement between the parties." *(Emphasis Supplied).*

Moreover, to avoid the slightest doubt of misunderstanding, the LOI contains a one paragraph provision, printed in capital letters, at the end of the document.

"9.  **No Binding Obligations.** Except for Sections 1(b), (c), (d) and 2 through 7, THIS LETTER OF INTENT DOES NOT CONSTITUTE OR CREATE, AND SHALL NOT BE DEEMED TO CONSTITUTE OR CREATE, ANY LEGALLY BINDING OR ENFORCEABLE OBLIGATION ON THE PART OF EITHER PARTY TO THIS LETTER OF INTENT.  NO SUCH OBLIGATION SHALL BE CREATED, EXCEPT BY THE EXECUTION AND DELIVERY OF THE PURCHASE AGREEMENT CONTAINING SUCH TERMS AND CONDITIONS OF THE *PROPOSED TRANSACTION* AS SHALL BE AGREED UPON BY THE PARTIES, AND THEN ONLY IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF SUCH PURCHASE AGREEMENT." *(Emphasis Supplied).*

14.     In addition to the LOI's express statement that MOD's allocated funding for the MOD Project expired on September 1, 2014, I also carefully explained the same to Granger and Adam's President, Michael K. Froning *("Froning").* All of the parties knew that in order to have a chance at being awarded the MOD Project, Adams first had to develop and test weapons in an expedited fashion. Despite the LOI's expected delivery schedule, which anticipated the first purchase order at the end of May, by late July 2014, Adams advised me that it was *impossible* to meet the MOD Project deadline. Adams advised it would utilize whatever research and development it had performed on the UCR to produce and take to the public, a non-military version of the weapon that it identified as the "SF 308". On October 16, 2014, Adams began taking pre-orders on the SF 308 and advertising the same on their website.

15.     By failing to produce a rifle prototype, Adams did not meet the express deadline for the MOD Project or the internal deadlines set forth in the LOI. As far as Aurich, myself, Aguieus, UWS, Inc., and even Adams were concerned, Adams failed to produce prototype rifles to present to MOD.  The

MOD Project expired, its funding disappeared, and the LOI became obsolete in the absence of a written amendment signed by the parties.

16.     It November of 2014, Adams belatedly notified me that it had successfully developed the UCR prototypes. Hoping that the Peruvian Army might still need rifles, UWS, Inc. used its defense industry connections to coordinate a demonstration of the rifle prototypes in Peru. On February 12, 2015, a crowd of approximately fifty (50) people attended the demonstration. The crowd was made up of Peruvian armed forces and police as well as U.S. Embassy personnel and U.S. military.   Also in attendance were Aurich, Parker, Froning,  Granger, and myself.  Granger anxiously kicked off the demonstration by the UPR. Just after a few rounds, it jammed, continued jamming, and never fired again. Next, the UCR was fired and it also jammed. The demonstration was an embarrassment and total failure.

17.     Later, I discovered that the UCRs jammed because they were chambered for a .308 *commercial market caliber* rather than the 7.62 x 51 NATO military caliber required under MOD's specifications in the MOD Project. Given the very public failure, UWS, Inc. abandoned all hope of supplying the rifles to anyone that witnessed the disastrous demonstration.

18.     In the months following the failed demonstration, my frustration grew over not having working rifles after an entire year. Without working rifles, UWS, Inc. and myself could not do any additional demonstrations and could not pursue any other opportunities. In July of 2015, UWS, Inc. learned that the Factory of Arms and Ammunition for the Peruvian Army *("FAME")*, was putting out an international private bid for companies to co-manufacture pistols and rifles in Peru. FAME is a private, closed stock, limited company that manufactures and assembles weapons systems for both the Peruvian military and law enforcement. FAME is not MOD and does not provide funding to or receive funding from MOD. Historically, FAME only manufactured ammunition and always imported fully assembled pistols and rifles, but under FAME's new co-manufacturing plan, it would provide Peruvian agencies such as the Army, Air Force, Law Enforcement, and others with the ability to purchase weapons assembled in Peru. After hearing that FAME signed a contract with the Czech Republic's company, CZ, to co-manufacture pistols in Peru, UWS, Inc. knew a bid for rifles would follow. In order to become one

5

of nearly twenty (20) companies that FAME would invite to the international bid, UWS, Inc. approached FAME about selling training and specific ammunition.  Following that meeting, FAME decided to visit the USA to see and test the ammunition.[4]

19.     On August 10, 2015, UWS, Inc. tested the ammunition for FAME at Adams' facility. Importantly, Adams does not produce or design ammunition and does not provide training. Because Adams maintained useful technical testing equipment, I asked Granger for permission to administer certain munitions tests at Adams' Odessa facility.  On September, 2015, after a successful demonstration of the technical aspect of the ammunition, UWS, Inc. and FAME representatives traveled to a local range to test fire the ammunition.  Adams was invited to attend the range test and brought the UCR prototype that had previously failed in the Peruvian demonstration.  Once again, the UCR embarrassingly failed to fire.

20.     UWS, Inc. continued to work towards solidifying its relationship with FAME so that it would be invited to the international bid to co-manufacture rifles in Peru *("FAME Project")*. In the interim, I worked with Adams to get basic cost information and parts' illustrations it believed would be needed to compete for an invitation to the bid.  By mid-September, 2015, Adams had failed to provide me with simple exploded view drawings, parts breakdown, and pricing for parts it anticipated would be required by FAME.[5] Exploded view drawings are regularly used in the weapons' industry, are included in operation manuals, including but not limited to those accompanying Adams' weapons, do not contain technical data such as measurements, and are readily available on the internet.

21.     Taking advantage of the fact that the rifles from the February 2015 demonstration were still in Peru, and in hopes that word would spread to FAME about the rifles, in November of 2015, UWS, Inc. asked for and received permission to demonstrate *only* the UPR to the Peruvian Police using different

---

[4] Due to export permits required in the USA, shipping ammunition from the USA to Peru would take at least sixty to ninety days. Given their tight schedule, FAME opted to travel to the USA.
[5] FAME's final bid requirements, which were later publicized, did not require parts' pricing, therefore UWS, Inc. did not submit that information with its bid.

ammunition.[6] As a result of UWS, Inc.'s ingenuity in manipulating the UPR to avoid historical jams, the demonstration was successful. UWS, Inc. also used the opportunity to present its proprietary radio frequency identification technology *("RFID")*. RFID is a technological feature that uses electromagnetic fields to enable an armorer to automatically identify and inventory weapons with their unique maintenance and log records.

22.     In late November, FAME announced that it would accept bids for rifle parts meeting its specifications. After the buzz generated by UWS, Inc.'s demonstration, FAME invited UWS, Inc. to submit its bid. Consistent with FAME's mission to bring weapons' manufacturing to Peru, the successful bidder would ship the parts to FAME's factories in Peru and the Peruvians would be taught how to assemble the rifles, and over time manufacture key components in Peru. UWS, Inc.'s bid stood apart from the rest in that it committed UWS, Inc. to investing millions of dollars in FAME before it would receive a single purchase order for the rifles and it provided a five (5) year warranty on the parts provided. Given UWS, Inc.'s attractive bid, on December 18, 2015, FAME selected UWS, Inc. to co-manufacture the rifles.

23.     Although UWS, Inc. won the FAME Project bid, the rifles had to pass several FAME "torture tests" before FAME would sign a contract with UWS, Inc. With deadlines to pass FAME's weapons' testing fast approaching, on December 30, 2015, UWS, Inc., Adams, and myself tested the UCRs to pinpoint the cause of their failures. At that testing session, the UCRs failed 70% of the time and I grew concerned over the effectiveness of Adams' engineering and testing methods. The next day, UWS, Inc. reached out to Froning and proposed that UWS, Inc. apply a more scientific approach and manage the testing with Adams' assistance. Froning responded that having UWS, Inc. take over testing would require Adams to share its technical drawings and he did not, "…believe that sharing drawings is a good decision for Adams Arms." Even though UWS, Inc. did not ask for any technical drawings and only proposed it

---

[6] In order to avoid risking another jamming incident, UWS, Inc. used ammunition with a larger "kick" which was different from the ammunition used at the February failed demonstration.

manage testing and testing methodologies, Froning responded that he would have to consult Adams' attorneys and Board of Directors before proceeding.

24.    We (including AA) did agree however, to allow the Lancer Systems facility in Quakertown, Pennsylvania to investigate the failures. Lancer manufactured the magazine used in the FAME Project, had several experienced engineers, and owns a high speed camera that would provide operational data on the rifle that was previously unknown.  Lancer suggested multiple revisions to the weapon and the parties agreed to implement these changes.[7]

25.    On January 13, 2016 Adams alerted UWS that it implemented all of the changes to the rifles discussed at Lancer.  At that point, UWS, Inc., Adams, and I decided it was necessary that the rifles be put through the entire FAME testing protocol. Representatives from Adams, UWS, Inc., and I attended the first test run.[8] For the third time, the weapons failed.  In response to the "Accuracy Test," the UCR jammed, failed to feed, and failed to cycle. In the presence of all parties, Granger announced: *"I'm done with this, I was told not to get involved with this anymore."* Granger then got in his van and left before implementation of any the other testing. When the water and sand tests failed, Adams' Product Development Manager, Tyler Martindale, also left the range. Abandoned by Adams' personnel, UWS, Inc. and I were left with non-functioning rifles.

26.    Facing a deadline less than two weeks away and with Adams having abandoned the entire FAME Project, I took the rifles to Serbu Firearms, Inc. (*"Serbu"*)[9], where UWS, Inc. and I participated in extensive testing with Serbu experts between January 13th and January 29th. The tests revealed major faults in the application of Adams' parts in a product needed to meet FAME's specifications[10].  UWS,

---

[7] During this testing, between January 7-9 2016, Lancer engineers concluded that the spring force on the rifles was insufficient to operate the rifle correctly.  The engineers also concluded that the ejector on the Adams bolt lacked the force to properly eject the casing efficiently.  Lancer provided a high speed video to Aguieus, UWS, Inc. and Adams.

[8] Aurich, Bingham, Charles Ferrera, Parker, Granger and Tyler Martindale (Adams' product development manager) were present for the referenced testing.

[9] Mark Serbu is an experienced weapon designer and mechanical engineer.

[10] These included but are not limited to:
Upper receiver design errors that ventured away from the original 1955 design by Eugene Stoner, using a tear drop design that induced malfunctions.

Inc. made the necessary modifications based on the revealed faults and on February 8, 2016 the modified rifles were shipped to Peru for final testing, where they finally passed in early March.

27.     On March 22, 2016, UWS, Inc. advised Adams that given its quality control issues, UWS, Inc. would only acquire Adam's patented piston system from Adams in conjunction with the FAME Project. In its March 23, 2016 response, Adams advised UWS, Inc. that it was not authorized to use its patented piston system and it would "utilize all legal means necessary to enforce" its patent and technical data that it shared with UWS, Inc. and Aguieus under the LOI, even though the LOI specifically related *only* to the expired MOD Project. Importantly, UWS, Inc., Aguieus, Aurich, Parker, and I never received Adam's trade secret information and have never seen a technical drawing of Adam's piston system.  In response to Adam's cease and desist letter, UWS, Inc. and I found alternative vendors to provide necessary parts. Consequently, the UWS, Inc. rifles that are in FAME's possession have no Adams' parts in them.

28.     Even though UWS, Inc. and I respected Adams' demand, secured other vendors for the FAME Project, and replaced Adams' piston system from the prototypes, on May 6, 2016, Froning sent FAME officials an email warning that he has "… major contacts in the key departments in Washington … engaged key lobbyist in Lima that has the right contacts to guide me on how to litigate and we are ready to take this public." He also wrote that his objective is "… accountability, recovering of financial and brand damages and insure that anyone that did allow this solicitation to become corrupt gets the punishment they deserve."[11]  As a result of Froning's May 6, 2016 letter to FAME, UWS has not received a single purchase order under the FAME contract.

### III. Fronig's Affidavit is Inaccurate and Incomplete

29.     The declarations contained Mike Froning's Affidvait as they relate to Aguieus and Michael Bingham in paragraphs are false.

Specifically:

---

Incorrectly cut fire control pocket in the lower receiver causing the auto sear to cut into and stick in the aluminum, therefore causing a malfunction.
Inadequate spring force in the receiver extension, and excessive buffer mass.
Incorrectly installed parts, including doubling up on a broken spring, in the bolt catch
[11] May 6, 2016 email from Froning.

a)      Paragraph 4 is false. Based on my personal knowledge, information and belief AA is not a weapons designer/developer, rather they are a weapons manufacturer. I only know of their attempts at reverse engineering, which have failed at every attempt.  Furthermore, to my knowledge AA has never successfully manufacturing High Powered Military Rifle.

b)      Paragraph 5 is false. The patents identified are for a piston system. There are no patents in regards to the AR platform design. In fact subject rifle design and related components are based on engineer Eugene Stoner's 1955 rifle design. The design and associated comments of any rifles related to this law suit are public knowledge and are widely known and copied throughout the rifle industry. *Furthermore, the rifle that will potentially be co-produced with FAME pursuant TO THE FAME/UWS, Inc. contract does not include a single AA part, idea or design.*

c)      Paragraph 9 is false. It is common knowledge throughout the rifle industry that over the last 2 years AA's rifles and components have had substantial quality control, and delivery issues, and have been dropped from many major distributers and dealers throughout the United States.

d)      Paragraph 10 is false. The internet blogs and firearm websites have blasted AA's quality control and performance issues over the last few years. This includes both their 5.56 riles and new "SF308" Rifles.

e)      Paragraphs 11, 12 and 13 are false. Any information shared by AA is common knowledge throughout the rifle industry.

f)      Paragraphs 14 and 15 are false. In early 2014 Aguieus was preparing for a expected bid from the Peruvian Army to buy 8110 rifles chambered in 7.62x51 NATO. This purchase would not be a multi-year contract as all rifles should have been delivered in 90 days, however there was an additional 42,000 rifles that the army required and were expect to order if everything went as planned.  This never happen and to this day the Peruvian Army has yet to receive the 7.62 NATO rifles. Furthermore, pursuant to the LOI, AA was to serve as a vendor and NOT as a partner or joint venture partner.

g)      Paragraph 16 is false. The original rifles for the Army (MOD) had nothing to do with the current co-manufacturing contract with FAME, S.A.C..

h)      Paragraph 17 is false. First, it must be pointed out the LOI identifies "industry partners" NOT "business partners". Second, The 7.62 Rifle (UCR) was created using input from Peruvian Military and MOD personnel.  It was with this input that we decided to use a small frame 7.62 rifle design similar to the DPMS rifle platform but still based on the original Eugene Stoner design. With the first opportunity which was a direct purchase from the Peruvian Army, they would be purchasing complete rifles.  With

10

the 3rd opportunity which is the contract with FAME, S.A.C. the rifle parts would be sent down and assembled, and after a certain number of rifles, Aguieus would transfer to Peru the technology on how to manufacture some of the components and those components would be assembled in Peru, and then the entire rifle assembled in Peru. The relationship was always between Adams Arms and Aguieus, with UWS always a customer of Aguieus, Not Adams Arms,

i)       Paragraph 18 is false. Adams Arms was always a vendor, not a Partner. Even in the initial LOI executed between Aguieus and Adams Arms, it clearly states that Adams Arms is the "Seller" and Aguieus is the "Buyer". Adams Arms can't base this entire 2 year relationship off the LOI and then avoid the clear language in the LOI.

j)       Paragraph 19 is false. The LOI required AA to provide working rifles using the rifles Aguieus provided to AA. They only needed to get their Piston system to work with the provided rifles, which they never accomplished. It was in discussions with AA that they stated they could and requested such to manufacture the other components such as the lower receiver, upper receiver and barrel extension, which Adams Arms had reversed engineered from a DPMS G2 Rifle.

k)       Paragraph 20 is false. The only NDA's provided by Adams Arms are the NDA signed by Christian Quintanilla Aurich, and James W. Parker. Neither Quintanilla nor Parker are members of Aguieus. Not a single NDA bearing Michael Bingham's signature has been produced or is believed to exist. Michael Bingham did sign a non-binding Letter of Intent (LOI) on April 29th, 2014.

l)       Paragraph 21 is false. I signed the non-binding LOI on April 29th, 2014 to lay out the intensions of both parties. This was executed specifically to pursue the direct purchase by the Peruvian Army, however due to Adams Arms unable to deliver working rifles, this opportunity failed to materialize. Additionally on July 27th, less than 3 months after signing the LOI, Adams Arms Notified Aguieus that they could no longer wait or dedicate resources to the project and planned to conduct a "dynamic roll out" of the .308 platform to the commercial market, which they did. One year after the DPMS G2 rifle was debuted at the Shot Show 2014, Adams Arms displayed their "SF 308 Rifle". Furthermore, I never entered into a joint venture agreement with AA.

m)       Paragraph 22 is true in the fact that, at the time based on the information available from Peru this information was put into the "LOI". However this information and other information described in the "LOI" changed substantially in 2014 following the unsuccessful attempts of AA to provide working rifles.

n)        Paragraph 23 is false. After The UCR 7.62 and UPR 5.56 rifles were both based on the original AR platform designed by Eugene Stoner initially in 1955 which was chambered in 7.62 NATO. As mentioned previously, *the AR platform is common knowledge throughout the rifle industry.*

o)        Paragraph 24 is false. Whatever investment made by AA was a waste, as AA never produced a working rifle to Aguieus.

p)        Paragraph 25 is false. After missing all of deadlines laid out in the LOI to provide working rifles, Adams Arms notified Aguieus on July 27th, 2014 that it could no longer commit funds or resources to the project laid out in the LOI and that the proposed project could no longer meet the timelines.  Therefor the project in the LOI was no longer pursued.  In November 2014 Adams Arms notified Aguieus that it had working rifles.  Aguieus sent the rifles provided by Adams Arms to Peru to try and set up a demo to showcase he rifles.  This was a complete failure and both the 5.56 and 7.62 rifles failed during the demo in front of personnel form the Peruvian Army, Navy, Airforce, Marines, and National Police as well as U.S. Military and U.S. Embassy personnel.

q)        Paragraph 26 is false. A demonstration was conducted in Peru in February 2015, however this was not the demonstration described in the LOI.  In fact, after missing all of the deadlines set in the LOI and the fact that the Army lost the allocated budget for the rifles, it was difficult to convince the Peruvian armed forces to even attend this event.  To make it attractive to all of the armed forces, including the National Police we decided to showcase several products the armed forces were currently looking for, to include Night Vision, Thermal Weapon Sights, Body Armor, Sniper Rifles, Medical Supplies and the 5.56 and 7.62 combat rifles.

r)        Paragraph 27 is patently false. The presentation that is mentioned only had pictures of the DPMS G2 Rifle platform with modified components, not AA rifles, because the rifles provide by Adams Arms were not made available to Aguieus prior to the shipping to Peru.  Therefor Aguieus used one of the many DPMS rifles it had to conduct testing and take photos. Adams arms was listed as a industry partner and their piston system was highlighted in addition to other vendors or industry partners products and components.

s)        Paragraph 28 is true. This was due to the disastrous performance of the rifles provided by Adams Arms.  One of the most notably issues is that the rifles were chambered in .308 a commercial cartridge rather than 7.62x51 which is a standard Military cartridge causing the rifles to jam and become inoperable.

t)      In response to Paragraph 29 it is important to note that at this time AA had blown two chances at the rifles project. First was Adams Arms failure to produce working rifles in accordance with the project laid out in the LOI. Second was by bringing down non-working rifles chambered in .308, even the 5.56 rifle suffered a catastrophic failure at the opening of the demonstration while being shot by Jim Granger, VP of Adams Arms.

u)      Paragraph 30 is patently false. The project laid out in the initial LOI was dead, and no longer an option. The second opportunity was also dead due to the failed Demo in Peru to the entire armed forces. A co-production contract with FAME was looked at since FAME had launched a similar tender for pistols. FAME is a private company in Peru, and would be manufacturing and assembling the rifles. FAME personnel came to the United States specifically to test ammunition for a current requirement. It was decided that showing the FAME personnel the rifles would be a good seed to plant for a possible upcoming request similar to the pistol co-production contract.

v)      **Paragraph 31 is patently false. AA never provided me (or Aguieus) any technical information, trade secrets, or knowhow related to the manufacturing or operation of rifles.** The subject rifle has been manufactured by hundreds of companies since it was designed in 1955 so there are not many if any things not known in the manufacturing or operation of this platform. I served in the Navy as a Gunners Mate and was trained as a small arms expert, additionally I served as a Diplomatic Security contractor in Iraq for the U.S. State Department with a U.S. Government issued Colt M-4 Rifle, as well as a Bushmaster AR-15 which was almost identical to the colt, After living with the M-4/AR-15 rifle for 3 years not more than arms reach from it at any time, and numerous firefights and extended combat with such rifle I am confident that Jim Granger who never served in the military or Mike Froning could teach me anything about the functional and operational aspects of the rifles he states.

w)      Paragraph 32 is patently false. Additionally the information listed in this paragraph is covered in detail in a two part youtube.com video titles "Adams Arms Warehouse PT1 and Adams Arms Warehouse PT2" ( https://www.youtube.com/watch?v=i93N1kWq5EA  and https://www.youtube.com/watch?v=KKSs42MGyj0). Please see additional public vidoes listed here: https://www.youtube.com/watch?v=TGIbZaO2YUE; and https://www.youtube.com/watch?v=h1_Obv8UWmY).

  *A wholly different company, DPMS designed this rifle configuration a year prior and debuted the rifle at the Shot Show, January 2014, where both myself and AA personnel first learned about it. Additionally I provided the DPMS rifles to AA so they could get their piston system to work on it or in their words "Reverse Engineer".

  *This information though never provided by AA to myself is available on the open market. Including promotional videos and blog post by AA.

  *Denied, this declaration couldn't be farther from the truth. AA begged that we use melonite barrels, however it was Aguieus NOT Fame that insisted on chrome lined barrels, as is used in the U.S. Military Rifles, and is considered MIL-SPEC.

  *Denied, This is completely made up. In fact when I asked about certain ballistics, AA did not have any so we went to the range to get ballistic data, it was at this time that Jim Granger accidentally shot the chronograph. Thus terminating the testing for the day. I flew to Potlatch, Idaho to visit PNW Arms who manufactures ammunition to obtain real data.

  *Denied and completely false. AA never shared any information with me, and definitely never showed me any technical drawings, as I am convinced they do not

have them.  Additionally I never received information of their preferred vendors until Mike Froning sent an email on March 24 after his withdrawal of participation in the project to myself, Christian, and General Parker instructing us not to delete any communications with a list of vendors that previously we had never seen. Although most are common in the industry and we have had previous relationships with prior to meeting Adams Arms.

x)    Paragraph 33 is false. Major General James W. Parker, U.S. Army Retired is not currently, or ever was a director of Aguieus or Unified Weapon Systems.  He has provided advice to all parties of this lawsuit to include Adams Arms, however he never had an official title or relationship with Aguieus or UWS.

y)    Paragraph 34 is patently false. See my response to paragraph 31 above. Furthermore, Any information that AA alleges it provided myself on behalf of Aguieus or General Parker while we drafted the proposal to FAME was done so with the express permission to use it in the proposal which was known to be a public tender process advertised on a public website and all information was subject to public disclosure.  Mike Froning asked several times if the information requested was for the proposal, and was told several times yes.  See emails provided dated 22 NOV 2015, Mike Froning ask me "What is the timeline on when you need this by? Is this part of the tender response?".  I reply 50 minutes later "Yes it is part of our proposal, so the sooner the better." Jim Granger, VP Adams Arms arranges the meeting and Mike Froning tells his employee to "Insure we have all the part numbers correct".

z)    Paragraph 35 is patently false. AA has almost point to point listed the information alleged to be so secret on their website under their blog.   See printout attached.
- I never had a key and was escorted by AA personnel most but not all of the time
- I signed in however rarely was I given a badge
- I walked around the facility without interference as I was a value to Adams Arms, not the other way around.
- If the footage is available showing me doing anything wrongful, or them showing me any "technical drawings", Secret machining procedures, or anything else alleged they should produce it as evidence.
- I was never given access to their computer system.
- I was never given access to these cabinets or "operational areas".
- I myself do not recall ever signing a NDA with Adams Arms, and one has not been produced as evidence.

aa)    Paragraph 36 is for the most part inaccurate. Aguieus began working on the framework for the proposal using the bases used in the FAME pistol tender.
- This point is true, I asked for the company overview from AA as well as all the vendors we were working with.  None of which thought of themselves as partners, and all provided the requested information.
- This point is true, I did asked this from AA as well as all the other vendors to make a joint capabilities statement of the "Team".
- This point is misleading, these quotes were never provided and had nothing to do with any of these projects, FAME is an ammunition manufacture who

requires testing of ammunition to ensure quality control.  Some of the barrels needed replacing and we asked AA if they could quote them.  However since AA doesn't make the barrels they never provided a quote.

- This point is misleading, I did ask for that, however it was such a rudimentary picture we could not submit the picture to FAME, it actually caused us to design a new work station from the ground up. In fact, I designed a state of the art armorer station with integrated touchscreen computer, RFID scanner, Internet, onboard air compressor, overhead lighting, Integrated tool box, vise, tool storage, and customized software package that tracks, and trouble shoots the rifle systems, additionally is capable of video conferencing with personnel back in the US via the internet.

- This point is true but misleading, as this is required for the parts that AA was quoting.  The exploded views included parts provided by all the vendors for which Aguieus arranged to be sent to AA to include in the exploded view.

- This point is true but misleading, AA does not make chrome lined barrels, they use the cheaper melonite barrels.  Chrome lined barrels are currently in use in the U.S. Military and militaries around the world.

- This point is true but misleading, after a back and forth with Mike Froning, pricing was provided.  I told Mike Froning that whatever parts I don't have a quote on from Adams Arms by the end of the day I will have to source somewhere else.  A quote not actually cost was provided.

- True. I did request the information as part of the proposal and it was provided by AA to be used in the proposal.  Providing me written permission to use the provided data in a public forum and provide to a Non U.S. Company as part of a public tender.  Therefor this information was not so secret it was kept under lock in key in the secret vault of AA.

- This point is true but misleading, I did ask for a list of special tools needed, though this was never provided by AA. These items were supplied by other vendors

- This point is true but misleading, and it was provided to be put on a public website with the permission from AA.

- **This point is true but misleading; this diameter could have been anything and is not a trade secret.  It is very common in the industry for a manufacture to provide another manufacture such a simple measurement to insure one manufactures part works with another manufactures part that compliments each other.  This was exactly the case as the bayonet lug was a requirement for the specifications per the contract.**

bb)     **Paragraph 37 is patently false**.

- **AA does not even make the barrels we used in the subject rifles.  All the barrels were manufactured by Artisan Arms.**
- **This is industry standard machines and commonly used throughout the industry.**
- **I was never told the preferred tooling for each part. That being said, I restate that the overwhelming likelihood is that the preferred tooling used was the same as the rest of the industry. Furthermore, AA shares this exact information publicly in the internet links referenced above.**

- **I was never given the list of AA vendors until after AA withdrew from this project and was listed in an email from Mike Froning instructing us not to delete any communications from any of the parties listed.**
- **I was only provided a quote which includes AA's overhead and profit. This was given for the expressed and written authorized use in a tender process.**
- **This declaration is a flat out lie. AA never provided any technical drawings nor did I ever request any technical drawings from AA. Furthermore, this declaration CONTRADICTS previous e-mails from Mike Froning such as on 31DEC2015 (AA Exibit #35) when he states "I don't believe that sharing drawings is a good decision for Adams Arms". This was after UWS had won the tender and we MADE NO further request for information to Adams Arms.**
- **The pictures provided by Adams Arms for their "Armorer Cells" are ridiculous; it is a white table with a vise mounted on it and a commercially available tool box sitting on it.  Detailed videos of their entire facility including these benches and special tools are available online posted by Adams Arms.**

cc)      Paragraph 38 is false. This was provided to him from Jim Granger, VP of Adams Arms in an email dated 11/20/2015.  The Spanish version was available on the FAME website which is open access and available to the public.  Neither Aguieus nor UWS provide this translated document.

dd)      Paragraph 39 is false. No trade secrets were used from any party.  It was the specific offerings of UWS that insured its success.  Aguieus and UWS offered a substantial transfer of technology to FAME that would allow them to produce their own weapon systems.  A crucial requirement in the FAME bases is that the rifles have either 2D Matrix or RFID technology, none of which AA uses. As a point of emphasis, Aguieus and UWS designed the RFID software and mechanical incorporation and have incorporated in the rifle platforms offered to FAME.

ee)      Paragraph 40 is true and it is important to clarify that FAME was asking for such a lerge investment of cash and only three companies bid on their pistol contract.

ff)      Paragraph 41 is true and it is important to clarify that I heard from Brian Browe, of Browe optics who is a vendor of ours, that he talked to two other companies that had received the tender and were looking into it, one of which was Rock River Arms, I knew they did not have a lightweight 7.62 rifle that could meet the requirements.

gg)      **Paragraph 42 is patently false. AA did not even provide working rifles, a key component of the rifle tender process.**

hh)      **Paragraph 43 is true and it is important to clarify that I had been incorporating input from numerous other vendors as well.  AA was never mentioned in the proposal, or the**

16

following contract.  UWS got the contract with the assistance of Aguieus and the team we had put together.

ii)    **Paragraph 46 is patently false. The rifles provide to Aguieus on January 13th, 2016 failed every pretest, and AA personnel Jim Granger, VP and Tyler Martindale , Product Development Manger left Aguieus with non-working rifles.**

jj)    **Paragraph 47 is false and misleading. The email does not refer to the AA rifles that failed every test. Instead the email refers to different rifles that did in fact perform.**

kk)    **Paragraph 48 is false and misleading.** This purchase order was at the request of Mike Froning as he stated needed to secure financing and needed to show the bank and his investors a PO from Peru.   Since this was something we were hoping would come through I did not see it as an issue.  Mike froning sent me a draft PO on 10/09/14 at 1139 "Mike, Here is a Purchase Order. Just go ahead and look at it and e mail it to me so I have it in the system…thanks, Mike" at 2156 I received a second e-mail from Mike Froning "Mike, Please forward as I told our bank we would have it on Thursday,,,thanks" I replied at 2201 "I will get it to you tonight just getting my kids to bed." I stated to him on the phone that I was not comfortable just giving a PO with no actual need for the rifles so we agreed that I would put "Pending U.S. State Department Approval" in the PO as no approval would be given if I never filed for it because I never actually receive a PO from Peru.  Once again in his own exhibit #32 he states "if you are able to send us a P.O. at any point that would allow me to go raise funds against it lets discuss."

ll)    Paragraph 49 is misleading. There was nothing to update him on, as of today we have not received any purchase orders for rifles.

mm)    In regard to Paragraph 50, based on information and belief, Mr. Foning consistently attempted to use this deal to raise funds with his investors and banks, however, at the same time he kept delivering failed products and telling me they needed to focus on the commercial market.

nn)    **Paragraph 51 is true notwithstanding the fact that Froning falsely alleges that I did provide him a purchase order in Paragraph 48!**

oo)    **Paragraph 52 is false and misleading. The proposal won the bid however as of that email and confirmed by an email from Jim Granger the rifles were not working.  Mike was notified that we were going to take the rifles to Lancer with Jim Granger and Tyler Martindale to test the rifles at the lancer facility, utilizing their high speed cameras and engineering staff.  Christian only requested that our team lead the testing there since we had more engineers than AA and to date AA had not been able to get the rifles to work.**

pp)    **Paragraph 53 is true and it is critically important to point out that Froning admits he never provided us any technical drawings as alleged in the complaint and declaration. Froning rejected this request and in the admission of his own exhibit #35 he STATES that to date he did not provide us with technical drawings AND THEN STATES "I don't believe that sharing drawings is a good decision for Adams Arms. That makes your suggested approach a real challenge. I will get legal input on Monday as to what protection I need."  No response from Mike Froning on this topic was ever given, and thirteen days later the non-working guns were delivered and abandoned on Aguieus.**

qq)     Paragraph 54 is misleading. While this email was sent, it was sent prior to review of the data and video provided by Lancer. After further scientific testing was conducted, once we received the rifles, it was concluded that the rifles had several serious issues.

rr)     **Paragraph 56 is true. Due to severe issues discovered in the days following 13 January, 2016 Aguieus and UWS concluded that it would be detrimental to the FAME contract to rely on AA to produce the components that had quality control issues.**

ss)     Paragraph 58 is false. The majority of the requirements were from the Peruvian Army requirements issued 6 years prior.

- So is the DPMS G2 Rifle which AA reversed engineered and the Mega Arms SF Maten who manufactured the uppers and 80% lowers used by Adams Arms. AA never educated UWS or Aguieus on anything except how to build rifles that **DO NOT** work.
- So does multiple other rifle platforms including the DPMS G2 and the Mega Arms SF-Maten. This is common knowledge throughout the rifle industry
- 3 MOA or Minutes of Angle is a horrible accuracy requirement, and in fact the standard AR platform is capable of 1 MOA or less which is required per MIL-SPEC. Any AR on the market from hundreds of providers would be able to meet the 3 MOA requirement, however most if not all would meet or beat 1 MOA. Except apparently AA who strives for 3 MOA or less.
- Denied. **The FN Scar is ambidextrous and these requirements were left in from the Peruvian Army Requirements. Additionally UWS provided the ambidextrous parts. AA tried to skirt a patent from one of our vendors Teal Blue Bravo, LLC who makes an ambidextrous bolt catch.**
- Denied. **AA insisted on using Melonited Barrels while Aguieus and UWS insisted on Chrome lined which is something AA does not do. The chrome lined requirement was part of the original requirement as all of the companies who previously competed use chrome lined barrels.**

tt)     Paragraph 59 is partially true and it is of critical importance to point out that this submittal was approved in writing by Mike Froning. However, **once Mike Froning instructed us not to use the Adams Arms Patented Piston system, I flew down to Peru and swapped it out with the Black Rifle Arms Piston System. AA was immediately removed from the UWS website and never mentioned in the final contract or the initial proposal with FAME**. Drawings were never received from AA or used in the UWS/FAME proposal, only illustrations of parts with no technical data, measurements, or critical points.

uu)     Paragraph 62 is false. The Adams Arms/Aguieus non-binding LOI was terminated July 27th, 2014 by Mike Froning. The MOD was seeking to purchase complete rifles independent of FAME involvement. Furthermore, Aguiues never executed the NDA described in paragraph 22. Aurich signed the NDA in his individual capacity. Finally, Aurich is not a member of Aguieus and was certainly not authorized to the sign the NDA on behalf of Aguieus.

18

FURTHER AFFIANT SAYETH NAUGHT.

_____
MICHAEL C. BINGHAM

The foregoing instrument was acknowledged before me this _11_ day of July, 2016, by Michael C. Bingham, who is personally known to me or who produced _____ as identification and who did/did not take an oath.

_____
Notary Public, State of Florida
My Commission Expires:

JUDY HAYES RIVAIS
Notary Public - State of Florida
Commission # FF 953726
My Comm. Expires May 8, 2020
Bonded through National Notary Assn.

20