UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ADAMS ARMS, LLC,

    Plaintiff,

v.                                           CASE NO.: 8:16-cv-1503-VMC-AEP

UNIFIED WEAPON SYSTEMS, INC.,
AGUIEUS, LLC,
MICHAEL C. BINGHAM,
CHRISTIAN QUINTANILLA AURICH, and
MAJOR GENERAL JAMES W. PARKER,
USA, Retired,

    Defendants.

_____/

## DECLARATION OF CHRISTIAN QUINTANILLA AURICH

    I, Christian Quintanilla Aurich, pursuant to 28 U.S.C.A. § 1746, hereby declare as follows:

### Aurich's Background

    1.    I am above eighteen (18) years old, and after reviewing the allegations against me contained in the Complaint and Motion for Temporary Injunction, I am able to make this Affidavit based upon my own personal knowledge, information and belief. I am a Peruvian citizen.

    2.    I have highly specialized training in the field of mechanical engineering, am an entrepreneur and inventor by trade, and intimately familiar with the defense industry generally, and Peruvian defense industry specifically. I am the Chief Executive Officer and President of Laboratorios Induquimica S.A., a pharmaceutical manufacturing company I have expanded over the past ten years.

3. In Peru, the pharmaceutical manufacturing and the defense industry are both highly technological and regulated heavily. Given the similarities between the industries and my mechanical industry background, I became involved with the defense industry seven (7) years ago.

### *The MOD Project*

4. In late 2013, through my various Peruvian defense industry connections, I learned about a potential new project with the Peruvian Ministry of Defense *("MOD")*, which is an agency within the Peruvian Government. MOD exercises command over Peru's armed forces and is responsible for safeguarding its national security on land, air, and sea.

5. MOD was looking to acquire over eight thousand (8,000) fully assembled military-grade rifles for its troops by way of a private bid under a Peruvian secrecy law *(the "MOD Project")*. The terms of the MOD Project were specific rifles consisting of 7.62 x 51 mm NATO select-fire weapon system *("UCR")*, and a 5.56 x 45 mm NATO select-fire weapon system *("UPR") (*collectively, *"the rifles")*.

6. The MOD Project had very specific restrictions, including but not limited to: specifications designed and supplied by MOD; the need to present rifle prototypes prior to the expiration of allocated funding on September 1, 2014; and the rifles had to satisfy and pass specific testing requirements established by MOD. The deadline was a hard and fast one, due to Peru's government's fiscal budget year ending by that date, and I knew that I needed fully assembled and functional rifle prototypes meeting MOD's specifications before I could approach MOD for a possible future consideration and purchase.

7. In learning about the MOD Project, I approached and began working with, Michael Bingham *("Bingham")* to build the rifle prototypes. Bingham possessed the necessary

licenses, credentials and vendor contacts in the United States that were essential to win the MOD Project.

### *Adams Arms and the Failed MOD Project*

8. On February 11, 2014, Bingham approached Adams Arms *("Adams")*, a vendor in the arms and munitions industry about potentially using Adams' patented piston system in the rifles.

9. Later that month, Bingham and I visited the Adams' facility to attend a meeting with Adams. In order to remain present during the meeting with Bingham and Adams, Adams required that I sign a Non-Disclosure Agreement *("NDA")*.

10. I reviewed the NDA attached as an exhibit by Adams as part of its sealed exhibits, and this document is **not** the copy I executed. I only signed the NDA as an individual, and not as Manager for Aguieus, LLC, as I have never been a manager, member or representative of Aguieus, LLC *("Aguieus")* and have never represented otherwise.

11. During the February 2014 visit, I toured Adams' facility but did not receive any technical information about Adams' manufacturing and assembly processes. I was not close enough to Adams' machines to observe specific spacing of parts in the assembly. Furthermore, I have never seen a list of Adams' preferred vendors, its pricing information, its preferred tooling and I never saw detailed technical drawings of rifles and their parts.

12. To my knowledge, Adams never obtained the requisite U.S. government permission to share weapons' technical data with me.

13. On March 3, 2014, I formed Unified Weapon Systems, Inc. *("UWS, Inc.")* a corporation organized under the laws of the state of Delaware. Since forming UWS, Inc., I have served as its sole owner and its President and Chief Executive Officer.

14. Given that UWS, Inc. was working with Bingham and Aguieus in connection with the MOD Project, UWS, Inc. granted Aguieus a license to use the name "Unified Weapons Systems" as its fictitious name. On March 3, 2014, Aguieus registered its fictitious name with the Florida Department of State Division of Corporations.

15. Later, I learned that Adams wanted to have bigger role in the MOD Project instead of solely providing its piston system. I was not part of those discussions, and had limited contact with Adams throughout the entire process.

16. On April 29, 2014, Adams and Aguieus d/b/a Unified Weapons System *(not the entity UWS, Inc.)* executed a Letter of Intent *("LOI")*. Neither I nor UWS, Inc. was not involved in negotiating the terms set forth in the LOI. Neither I nor UWS, Inc. executed the LOI or authorized anyone to execute the LOI on behalf of UWS, Inc.

17. By September 1, 2014, Adams still had not provided a single rifle prototype for UWS, Inc. to present to MOD testing to win the MOD Project.

*The MOD Project Aftermath*

18. The first that I heard that Adams had finally developed the UCR prototypes was In November of 2014.

19. Hoping that the Peruvian Army might still need rifles, I used my defense industry connections to coordinate a demonstration of the rifle prototypes in Peru. On February 12, 2015, I attended the rifles' demonstration along with a crowd of approximately fifty (50) people. The crowd was comprised of Peruvian armed forces and police as well as U.S. Embassy personnel and U.S. military, including Bingham, General James Parker, Mike Froning *("Froning")*, and Jim Granger *("Granger")*. Froning is Adams' President and Granger is Adams' Vice-President.

20. Granger anxiously kicked off the demonstration by firing the UPR. Just after a few rounds, it jammed, continued jamming, and never fired again. Next, the UCR was fired and it also jammed. The demonstration was an embarrassment and total failure.

21. Later, Bingham and I discovered that the UCRs jammed because they were chambered for a .308 *commercial market caliber* rather than the 7.62 x 51 NATO military caliber required under MOD's specifications as in the previously cancelled MOD Project. Given the very public failure, UWS, Inc. abandoned all hope of supplying the rifles to anyone that witnessed the disastrous demonstration.

22. In the months following the failed demonstration, my frustration grew because Adams failed to produce any functioning rifles despite having over a year to do so. Without working rifles, UWS, Inc. could not do any additional demonstrations and could not pursue any other opportunities.

### *The FAME Project*

23. In July of 2015, I learned that the Factory of Arms and Ammunition for the Peruvian Army *("FAME")*, was putting out an international private bid for companies to co-manufacture pistols and rifles in Peru. FAME is a privately held and closed stock corporation, comprising of board members of the military and private civilians.

24. FAME is not MOD and does not provide funding to or receive funding from MOD. FAME produces military equipment and accessories, and when doing so, is bound by MOD policies and regulations. FAME maintained a new co-manufacturing plan, which would offer Peruvian agencies with an ability to purchase weapons assembled in Peru.

25. After hearing that FAME signed a contract with the Czech Republic's company, CZ, to co-manufacture pistols in Peru, I knew a bid for rifles would follow. In order to become

one of nearly twenty (20) companies that FAME would invite to the international bid, I approached FAME about UWS, Inc. selling FAME training and specific ammunition. Following that meeting, FAME decided to visit the USA to see and test the ammunition. Due to export permits required in the USA, shipping ammunition from the USA to Peru would take at least sixty to ninety days. Given their tight schedule, FAME opted to travel to the USA.

26. On August 10, 2015, UWS, Inc. conducted ammunition testing for FAME at Adams' facility. Adams does not produce or design ammunition and does not provide training, however, since Adams maintained useful technical testing equipment, Bingham asked Granger for permission to conduct certain munitions tests at Adams' Odessa facility.

27. After a successful demonstration of the technical aspect of the ammunition, on September, 2015, UWS, Inc. and FAME representatives traveled to a local range to test fire the ammunition. Adams was invited to attend the range test and brought the UCR prototype that had previously failed in the Peruvian demonstration. Once again, the UCR embarrassingly failed to fire.

28. I continued to work towards solidifying UWS, Inc.'s relationship with FAME so that UWS, Inc. would be invited to the international bid to co-manufacture rifles in Peru (*"FAME Project"*). In the interim, Aguieus worked with Adams to get basic cost information and parts' illustrations it believed would be needed to compete for an invitation to the bid. I was not present during these discussions and had no involvement in obtaining this information.

29. By mid-September, 2015, Adams had failed to provide Aguieus with simple exploded view drawings, parts breakdown, and pricing for parts it anticipated would be required by FAME.[1] Exploded view drawings are regularly used in the weapons' industry, are included in

---

[1] FAME's final bid requirements, which were later publicized, did not require parts' pricing, therefore UWS, Inc. did not submit that information with its bid.

operation manuals, including but not limited to those accompanying Adams' weapons, do not contain technical data such as measurements, and are readily available on the internet.

30. Taking advantage of the fact that the rifles from the February 2015 demonstration were still in Peru and in hopes that word would spread to FAME about the rifles, in November of 2015, UWS, Inc. asked for and received permission to demonstrate *only* the UPR to the Peruvian Police using different ammunition.[2] As a result of UWS, Inc.'s ingenuity in manipulating the UPR to avoid historical jams, the demonstration was successful. UWS, Inc. also used the opportunity to present its proprietary radio frequency identification technology *("RFID")* that was developed specifically for all possible Peruvian projects. RFID is a technological feature that uses electromagnetic fields to enable an armorer to automatically identify and inventory weapons with their unique maintenance and log records.

31. In late November 2015, FAME announced that it would accept bids for rifle parts meeting its specifications. After the buzz generated by UWS, Inc.'s demonstration, FAME invited UWS, Inc. to submit its bid. Consistent with FAME's mission to bring weapons' manufacturing to Peru, the successful bidder would ship the parts to FAME's factories in Peru and the Peruvians would be taught how to assemble the rifles, and over time manufacture key components in Peru.

32. UWS, Inc.'s bid stood apart from the rest in that it committed UWS, Inc. to investing millions of dollars in FAME before it would receive a single purchase order for the rifles and it provided a five (5) year warranty on the parts provided. Given UWS, Inc.'s attractive bid, ***including the millions of dollars committed to being invested into FAME***, on December 18, 2015, FAME selected UWS, Inc. to co-manufacture the rifles.

---

[2] In order to avoid risking another jamming incident, UWS, Inc. used ammunition with a larger "kick" which was different from the ammunition used at the February failed demonstration.

33. Although UWS, Inc. won the FAME Project bid, the rifles had to pass several FAME "torture tests" before FAME would sign a contract with UWS, Inc. With deadlines to pass FAME's weapons' testing fast approaching, on December 30, 2015, UWS, Inc., Aguieus, and Adams tested the UCRs to pinpoint the cause of their failures. At that testing session, the UCRs failed 70% of the time and I grew concerned over the effectiveness of Adams' quality, engineering and testing methods. The next day, I reached out to Froning and proposed that, given my scientific background, I manage the testing with Adams' assistance. Froning responded that my managing the testing would require Adams to share its technical drawings and he did not, "…believe that sharing drawings is a good decision for Adams Arms." Neither I nor UWS, Inc. requested any technical drawings, rather I only proposed I manage testing and testing methodologies. Despite these remarks, Froning responded that he would have to consult Adams' attorneys and Board of Directors before proceeding.

34. The parties did agree however, to allow the Lancer Systems facility in Quakertown, Pennsylvania to investigate the rifles' failures. Lancer manufactured the magazine used in the FAME Project, had several experienced engineers, and owns a high speed camera that would provide operational data on the rifle that was previously unknown. Lancer suggested multiple revisions to the weapon based upon the conclusion that the spring force on the rifles was insufficient to operate correctly. Lancer further concluded Adams' bolt lacked the force to properly eject the casing and Lancer provided a high speed video to the parties demonstrating Adams' utter failures. Adams agreed to implement Lancer's recommended changes.

35. On January 13, 2016 Adams alerted UWS, Inc. that it implemented all of the changes to the rifles discussed at Lancer. At that point, UWS, Inc., Aguieus, and Adams decided it was necessary that the rifles be put through the entire FAME testing protocol. Representatives

from Adams, UWS, Inc., and Aguieus attended the first test run. For the third time, the weapons failed. In response to the "Accuracy Test," the UCR jammed, failed to feed, and failed to cycle. In the presence of all parties, Granger announced: *"I'm done with this, I was told not to get involved with this anymore."* Granger then got in his van and left before implementation of any the other testing. When the water and sand tests failed, Adams' Product Development Manager, Tyler Martindale, also left the range. Abandoned by Adams' personnel, UWS, Inc. was left with non-functioning rifles.

### *Adams Abandons the FAME Project*

36.     Facing a deadline less than two weeks away and with Adams having abandoned the entire FAME Project, UWS, Inc. and Aguieus took the rifles left behind to Serbu Firearms, Inc. (*"Serbu"*)[3], where UWS, Inc. and Aguieus participated in extensive testing with Serbu experts between January 13th and January 29th. The tests revealed major faults in the application of Adams' parts in a product needed to meet FAME's specifications, and consequently Adams' parts were replete with errors.[4]

37.     UWS, Inc. made the necessary modifications based on the revealed faults and on February 8, 2016, the modified rifles were shipped to Peru for final testing, where they finally passed in early March of 2016. The rifles that passed were nearly *__two years__* after the LOI between Aguieus and Adams was signed and only after me and my team made the modifications to satisfy FAME's specifications.

---

[3] Mark Serbu is an experienced weapon designer and mechanical engineer. On or around September 9, 2015, Adams knew that Mr. Serbu was a consultant for the Defendants and was brought on to review the rifles' numerous errors.

[4] These included but were not limited to: (1) upper receiver design errors that ventured away from the original 1955 design by Eugene Stoner; (2) using a tear drop design that induced malfunctions; (3) incorrectly cutting the fire control pocket in the lower receiver causing the auto sear to cut into and stick in the aluminum, therefore causing a malfunction; (4) inadequate spring force in the receiver extension, and excessive buffer mass; and (5) incorrectly installing parts, including doubling up on a broken spring, in the bolt catch.

38. On March 22, 2016, UWS, Inc. advised Adams that given its quality control issues, UWS, Inc. would only acquire Adam's patented piston system from Adams in conjunction with the FAME Project.

39. In its March 23, 2016 response, Adams advised UWS, Inc. that it was not authorized to use its patented piston system and it would "utilize all legal means necessary to enforce" its patent and technical data that it shared with UWS, Inc. and Aguieus under the LOI, even though the LOI specifically related *only* to the expired MOD Project, and neither UWS, Inc. nor Aurich are part of the LOI. Importantly, UWS, Inc., Aguieus, Aurich, Bingham and Parker never received Adam's trade secret information and have never seen a technical drawing of Adam's piston system. In response to Adam's cease and desist letter, UWS, Inc. found alternative vendors to provide necessary parts. Consequently, the UWS, Inc. rifles that are in FAME's possession have **no** Adams' parts in them.

40. Even though UWS, Inc. respected Adams' demand, secured other vendors for the FAME Project, and replaced Adams' piston system from the prototypes, on May 6, 2016, Froning sent FAME officials an email warning that he has "… major contacts in the key departments in Washington … engaged key lobbyist in Lima that has the right contacts to guide me on how to litigate and we are ready to take this public." He also wrote that his objective is "… accountability, recovering of financial and brand damages and insure that anyone that did allow this solicitation to become corrupt gets the punishment they deserve."[5]

41. As a result of Froning's May 6, 2016 letter to FAME, UWS has not received a single purchase order under the FAME contract.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[5] May 6, 2016 email from Froning.

42. This Declaration was not signed in the United States.

FURTHER DECLARANT SAYETH NAUGHT.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 14th day of July, 2016.

_____
Christian Quintanilla Aurich

00497096-3

11