UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ADAMS ARMS, LLC,

      Plaintiff,

v.                                                                  CASE NO.: 8:16-cv-1503-VMC-AEP

UNIFIED WEAPONS SYSTEMS, INC.,
AGUIEUS, LLC, MICHAEL BINGHAM,
CHRISTIAN QUINTANILLA AURICH, and
MAJOR GENERAL JAMES W. PARKER,

      Defendants.

_____/

**DEFENDANT, MAJOR GENERAL JAMES W. PARKER'S RESPONSE IN
OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION [Doc. 13] AND INCORPORATED
MEMORANDUM OF LAW**

      Defendant(s) MAJOR GENERAL JAMES W. PARKER, USA, "Retired", by and through undersigned counsel, and pursuant to Local Rule 4.06(b)(3), file its Response in Opposition to Plaintiff, ADAMS ARMS, LLC's Motion for Preliminary Injunction (*"Motion"*) [Doc. 13] and Incorporated Memorandum of Law, and in support thereof states as follows:

*EXECUTIVE SUMMARY*

      The Motion must be denied because Adams Arms, LLC (*"Adams"*) has not shown by clear and convincing evidence that it is entitled to a preliminary injunction against MAJOR GENERAL JAMES W. PARKER, USA, "Retired", ("*PARKER*").  Adams cannot enforce a non-disclosure agreement against *PARKER*, when  because *PARKER* never received Adams' purported trade secrets. Given that Adams cannot prove that it has a substantial likelihood of success on the merits of its claims against *PARKER* the Motion must be denied.

*FACTUAL BACKGROUND*

*The Parties*

1

Aurich is a Peruvian citizen and highly trained mechanical engineer and inventor, familiar with the defense industry generally, and the Peruvian defense industry specifically. (Aurich Decl. ¶¶ 1-2.) Aurich is the current CEO and President of Laboratorios Induquimica S.A., a pharmaceutical manufacturing company that he has expanded over the past ten (10) years. (Aurich Decl. ¶ 2). Like the pharmaceutical manufacturing industry, the defense industry is highly technological and heavily regulated. (Aurich Decl. ¶ 3). The industry similarities, combined with Aurich's mechanical engineering background, prompted Aurich to become involved with the defense industry seven (7) years ago. *Id*. During that time, Aurich has expanded his defense industry network at all levels of the industry.[1] On March 3, 2014, Aurich formed UWS, Inc., a corporation organized under the laws of the State of Delaware. (Aurich Decl. ¶ 13).

Michael Bingham (***"Bingham"***) is a Florida resident with over a decade of comprehensive defense industry experience. (Bingham Aff., ¶ 5). Bingham served in the U.S. Navy as a Gunnersmate, reaching the rank as Petty Officer 3rd Class. (Bingham Aff., ¶ 6). As a Gunnersmate, Bingham was trained as a weapons specialist and was responsible for maintaining ship armory, including repair of small arms, and training Navy personnel on marksmanship, tactics, and care of small arms. *Id.* Bingham served the U.S. State Department in Iraq[2], in part serving as Personal Security Specialist, Tactical Commander on a Tactical Support Team, and a member of the low profile security team for Ambassador J. Cofer Black[3]. (Bingham Aff., ¶ 7). Bingham later advised foreign governments in the Middle East and Latin America on the negotiation and purchase of weapons. (Bingham Aff., ¶ 8). In addition to his active U.S. State

---

[1] Aurich sits on the Board of Directors of several companies in Perú and has been an advisor to several government officials including the Peruvian Minister of Agriculture.

[2] Bingham served as a Blackwater Security consultant for the Department of State, Diplomatic Security Service, High Threat Protection Office in Baghdad and Mosul, Iraq.

[3] Ambassador J. Cofer Black is the former Director of the CIA Counterterrorist Center.

Department Secret Security Clearance, Bingham also: (1) possesses a U.S. Bureau of Alcohol Tobacco, Firearms and Explosives (*"BATF"*) Type 7 Weapons Manufacture License, (2) possesses a U.S. BATF Special Occupancy Tax Stamp for Class 3 Destructive Device Manufacturing, (3) is a U.S. State Department, Directorate of Defense Trade Control, Registered Manufacturer and Exporter, and (4) is a U.S. Department of Commerce approved vendor. (Bingham Aff., ¶ 9). Bingham is the managing member of *AGUIEUS*, LLC, a Florida limited liability company *("AGUIEUS")* that provides consulting services to governments and businesses in the defense and national security industry. Aurich has never been a member of *AGUIEUS*. (Bingham Aff., ¶¶ 2-3).

Major General James W. Parker (*"Parker"*) devoted more than thirty-eight (38) years of service to the U.S. Army, most of which was with special operations units.[4] (Parker Aff. ¶¶ 2-5). Parker is a member of the Army OCS Hall of Fame and throughout his career received numerous accolades and military awards, including but not limited to: (1) The Defense Distinguished Service Medal, (2) the Defense Superior Service Medal, (3) the Legion of Merit, (4) the Bronze Star with Valor device, (5) the Defense Meritorious Service Medal, (6) the Army Meritorious Service Medal, (7) the Global War on Terrorism Medal, and (8) the Iraq Campaign Medal with Campaign Star and the Overseas Service Medal, and (9) Ranger and Special Forces Tabs. (Parker Aff. ¶ 8). After leaving the Service in 2008, Parker has worked as a consultant providing services to the defense industry. (Parker Aff. ¶ 6).

### *The MOD Project*

---

[4] Parker served as Senior Advisor, 4th Infantry Brigade, Republic of El Salvador; Commander 1st Battalion, 3rd Special Forces Group; Commander 7th Special Forces Group; Deputy Commander, US Army Special Operations Command; Commander Special Operations Command South; Director of Intelligence and Information Operations USSOCOM; Deployed to Iraq as Deputy Commander Special Operations Central; responsible for Northern Iraq Operations; Director, Center for Special Operations (J3,J2,J5) USSOCOM; and Commander, US Army Special Warfare Center and School, Ft Bragg, NC.

The Peruvian Ministry of Defense *("MOD")* is an agency of the Peruvian government, exercising command over its armed forces and charged with the responsibility of safeguarding its national security on land, sea and air. (Aurich Decl. ¶ 4). Historically, MOD's effort to secure weapons for its forces has been rife with controversy rooted in the international public bidding process.[5] Given historical controversies over international public bids for munitions in Peru, MOD secretly allotted a budget to purchase over eight thousand (8,000) rifles privately and bypassed the public bid procedure and offered a private bid.[6] (Aurich Decl. ¶ 5). This allocation required weapons development meeting MOD's specifications using MOD's allocated funding which was *only* available through September 1, 2014 *("MOD Project")*. (Aurich Decl. ¶¶ 5-6).

In late 2013, through his Peruvian defense industry contacts, Aurich learned about the MOD Project and knew that before he could even sit down with the MOD to pitch a proposal, he would first need prototype rifles to present. (Aurich Decl. ¶¶ 4, 6). Aurich believed that with speed and efficiency, he could build rifles needed to have a shot at winning the MOD Project. Aurich began by working with Bingham, who possessed the licenses, credentials, and vendor contacts necessary to try to win the MOD Project. (Aurich Decl. ¶ 7). Shortly thereafter, Aurich formed UWS, Inc. as its sole owner, and became its president and chief executive officer. (Aurich Decl. ¶ 13). Since Bingham via *AGUIEUS* was going to handle all of the vendor relationships associated with the MOD Project, accordingly UWS, Inc. granted *AGUIEUS* a license to use the name "Unified Weapon Systems." (Aurich Decl. ¶ 14). On March 3, 2014, *AGUIEUS* registered "Unified Weapon Systems" as its fictitious name with the Florida Department of State Division of Corporations. *Id.* UWS, Inc. and *AGUIEUS* agreed to move

---

[5] International public bids are also referred to as "International Tenders," a process by which the Peruvian government invites certain companies to present offers which are governed by Bases del Concurso (Contest Rules).
[6] The budget was allocated pursuant to a Peruvian secrecy law that applies to purchasing weapons for national defense. The requirements to participate in the private bid differ from a public tender.

forward together to build two different caliber weapons: a 7.62 x 51mm NATO select-fire weapon system *("UCR")* and a 5.56 x 45mm NATO select-fire weapon system *("UPR")* (collectively *"the rifles")*. (Aurich Decl., ¶ 5).

### *Adams Arms' First Failure: Securing the MOD Project*

On February 11, 2014, Bingham contacted Adams to discuss use of a specific patented part owned by Adams, commonly known as a short stroke piston. (Aurich Decl. ¶ 8).  Shortly thereafter, Aurich and Bingham visited the Adams' facility. (Aurich Decl. ¶ 9). During the visit, in order for Aurich to remain present during Adams' and Bingham's meeting, Adams required that Aurich execute a Mutual Confidentiality and Nondisclosure Agreement *("NDA")*. *Id.* Aurich executed the NDA in his individual capacity only and never represented he was a manager or member of Aguieus, LLC.[7] (Aurich Decl. ¶ 10). Adams did not have U.S. government permission to share any technical data related to weapons with Aurich, a Peruvian citizen, therefore Aurich never received any of Adams' technical data. (Aurich Decl. ¶¶ 11-12). Through the balance of February, all of March and most of April, 2014, Bingham and Aguieus met with Adam's V.P., Jim Granger *("Granger")*, to discuss Adams' efforts to have an expanded role in the MOD Project by helping to develop the rifles in compliance with MOD's specifications. (Bingham Aff., ¶ 11).

On April 29, 2014, Adams and Aguieus d/b/a Unified Weapons System *(not the entity UWS, Inc.)* executed a Letter of Intent *("LOI")* to codify their *"…mutual intentions with respect to the **potential** transaction …"* (Bingham Aff., ¶ 12).The LOI delineated principal terms of the *"proposed transaction,"* an overview of the MOD Project, and identified the Adams' facility as

---

[7] At the time Aurich signed the NDA, it did **not** designate Aguieus, LLC as the party. Aurich never wrote in "Aguieus, LLC" or "Manager" as his title, because he has never been a manager or member of neither Aguieus, LLC nor Aguieus, Inc. It was only upon the initiation of this lawsuit that Aurich learned that someone, presumably at Adams, wrote in Aguieus, LLC and designated Aurich as manager on the signature page.

the rifles' assembly site. *Id*. Pursuant to the LOI, Aguieus d/b/a Unified Weapons System *(not the entity UWS, Inc.)* would provide specific parts to Adams for incorporation and assembly of the final product and parts not specified in subsection 1 (b) of the LOI were to be provided by Adams. *Id*. Neither Adams' assembly cost nor the pricing of its parts was ever agreed upon. *Id*. Furthermore, the parties ***never*** agreed upon a final cost to build the rifles or a price to sell the rifles to MOD and MOD ***never*** agreed upon a price to purchase the rifles from anyone. *Id*.

Given that MOD's allocated funding for the MOD Project expired on September 1, 2014, the LOI set dates by which *contemplated* MOD purchase orders might be expected, but conditioned the entire LOI on an executed "Contract between the Ministry of Defense of the Republic of Peru and Unified Weapon Systems ***within 30 days of this signed Letter of Intent.***" (i.e. May 30, 2014). (Bingham Aff., ¶ 13). The parties recognized exigencies of not only being able to obtain a signed agreement with MOD, but also the need to document an agreement between themselves relating to the *"proposed transaction"* as well. *Id*. Accordingly, the LOI specifies:

> "1 (e) **Definitive Purchase Agreement.** All of the terms and conditions of the ***proposed transaction*** would be stated in the Purchase Agreement, to be negotiated, agreed and executed by you and us. Neither party intends to be bound by any oral or written statements or correspondence concerning the Purchase Agreement arising during the course of negotiations, notwithstanding that the same may be expressed in terms signifying a partial, preliminary or interim agreement between the parties." ***(Emphasis Supplied)***. *Id*.

Moreover, to avoid the slightest doubt of misunderstanding, the LOI contains a one paragraph provision, printed in capital letters, at the end of the document.

> "9. **No Binding Obligations.** Except for Sections 1(b), (c), (d) and 2 through 7, THIS LETTER OF INTENT DOES NOT CONSTITUTE OR CREATE, AND SHALL NOT BE DEEMED TO CONSTITUTE OR CREATE, ANY LEGALLY BINDING OR ENFORCEABLE OBLIGATION ON THE PART OF EITHER PARTY TO THIS LETTER OF INTENT. NO SUCH OBLIGATION SHALL BE CREATED, EXCEPT BY THE EXECUTION AND DELIVERY OF THE

PURCHASE AGREEMENT CONTAINING SUCH TERMS AND CONDITIONS OF THE *PROPOSED TRANSACTION* AS SHALL BE AGREED UPON BY THE PARTIES, AND THEN ONLY IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF SUCH PURCHASE AGREEMENT." *(Emphasis Supplied)*. *Id*.

In addition to the LOI's express statement that MOD's allocated funding for the MOD Project expired on September 1, 2014, Bingham also carefully explained the same to Granger and Adam's President, Michael K. Froning *("Froning")*. (Bingham Aff., ¶ 14). All of the parties knew that in order to have a chance at being awarded the MOD Project, Adams first had to develop and test weapons in an expedited fashion. *Id*. Despite the LOI's expected delivery schedule, which anticipated the first purchase order at the end of May, by late July 2014, Adams advised *AGUIEUS* that it was *impossible* to meet the MOD Project deadline. *Id*. Adams advised it would utilize whatever research and development it had performed on the UCR to produce and take to the public, a non-military version of the weapon that it identified as the "SF 308". *Id*. On October 16, 2014, Adams began taking pre-orders on the SF 308 and advertising the same on their website.[8] *Id*.

By failing to produce a rifle prototype, Adams did not meet the express deadline for the MOD Project or the internal deadlines set forth in the LOI. *Id*. As far as Aurich, Bingham, *AGUIEUS*, UWS, Inc., and even Adams were concerned, Adams failed to produce prototype rifles to present to MOD. (Bingham Aff., ¶ 15).  The MOD Project expired, its funding disappeared, and the LOI became obsolete in the absence of a written amendment signed by the parties.[9] *Id*.

### *Adams' Second Failure: February 2015 Demonstration*

---

[8] http://blog.adamsarms.net/blog/new-small-frame-piston-driven-.308-now-accepting-pre-order
[9] See Section 8 of the LOI, "This letter may be amended only by written agreement, signed by the parties to be bound by the amendment." [Comp. Exh. 2; Doc. 1].

It November of 2014, Adams belatedly notified *AGUIEUS* that it had successfully developed the UCR prototypes. (Bingham Aff., ¶ 16). Hoping that the Peruvian Army might still need rifles, UWS, Inc. used its defense industry connections to coordinate a demonstration of the rifle prototypes in Peru. *Id*. On February 12, 2015, a crowd of approximately fifty (50) people attended the demonstration. *Id*. The crowd was made up of Peruvian armed forces and police as well as U.S. Embassy personnel and U.S. military. *Id*.  Also in attendance were Bingham, Aurich, Parker, Froning, and Granger. *Id*.  Granger anxiously kicked off the demonstration by firing the UPR. Just after a few rounds, it jammed, continued jamming, and never fired again. Next, the UCR was fired and it also jammed. *Id*. The demonstration was an embarrassment and total failure. *Id*. Later, *AGUIEUS* and UWS, Inc. discovered that the UCRs jammed because they were chambered for a .308 **commercial market caliber** rather than the 7.62 x 51 NATO military caliber required under MOD's specifications in the MOD Project. (Bingham Aff., ¶ 17). Given the very public failure, UWS, Inc. abandoned all hope of supplying the rifles to anyone that witnessed the disastrous demonstration. (Aurich Decl. ¶ 21).

### Adams' Third Failure: The FAME Project Demonstration

In the months following the failed demonstration, UWS, Inc.'s frustration grew over not having working rifles after an entire year. (Aurich Decl. ¶ 22). Without working rifles, UWS, Inc. could not do any additional demonstrations and could not pursue any other opportunities. *Id*. In July of 2015, UWS, Inc. learned that the Factory of Arms and Ammunition for the Peruvian Army **("FAME")**, was putting out an international private bid for companies to co-manufacture pistols and rifles in Peru. (Aurich Decl. ¶ 23).  FAME is a private, closed stock, limited company that manufactures and assembles weapons systems for both the Peruvian military and law enforcement. (FAME Decl. ¶ 4).  FAME is not MOD and does not provide funding to or receive

funding from MOD. (FAME Decl. ¶ 12, 13).    Historically, FAME only manufactured ammunition and always imported fully assembled pistols and rifles, but under FAME's new co-manufacturing plan, it would provide Peruvian agencies such as the Army, Air Force, Law Enforcement, and others with the ability to purchase weapons assembled in Peru. (FAME Decl. ¶ 6, 17). After hearing that FAME signed a contract with the Czech Republic's company, CZ, to co-manufacture pistols in Peru, UWS, Inc. knew a bid for rifles would follow. (Aurich Decl. ¶ 25). In order to become one of nearly twenty (20) companies that FAME would invite to the international bid, UWS, Inc. approached FAME about selling training and specific ammunition. *Id*. Following that meeting, FAME decided to visit the USA to see and test the ammunition.[10] *Id*.

On August 10, 2015, UWS, Inc. tested the ammunition for FAME at Adams' facility. (Aurich Decl. ¶ 26). Importantly, Adams does not produce or design ammunition and does not provide training. *Id*. Because Adams maintained useful technical testing equipment, Bingham asked Granger for permission to administer certain munitions tests at Adams' Odessa facility. *Id*. On September, 2015, after a successful demonstration of the technical aspect of the ammunition, UWS, Inc. and FAME representatives traveled to a local range to test fire the ammunition. (Aurich Decl. ¶ 27). Adams was invited to attend the range test and brought the UCR prototype that had previously failed in the Peruvian demonstration. *Id*. Once again, the UCR embarrassingly failed to fire. *Id*. UWS, Inc. continued to work towards solidifying its relationship with FAME so that it would be invited to the international bid to co-manufacture rifles in Peru *("FAME Project")*. Aurich Decl. ¶ 28). In the interim, *AGUIEUS* worked with Adams to get basic cost information and parts' illustrations it believed would be needed to compete for an invitation to the bid. *Id*.   By mid-September, 2015, Adams had failed to provide

---

[10] Due to export permits required in the USA, shipping ammunition from the USA to Peru would take at least sixty to ninety days. Given their tight schedule, FAME opted to travel to the USA.

*AGUIEUS* with simple exploded view drawings, parts breakdown, and pricing for parts it anticipated would be required by FAME.[11] (Bingham Decl. ¶ 20). Exploded view drawings are regularly used in the weapons' industry, are included in operation manuals, including but not limited to those accompanying Adams' weapons, do not contain technical data such as measurements, and are readily available on the internet. *Id.*

### UWS, Inc. Wins the FAME Project in Spite of Adams' Failures

Taking advantage of the fact that the rifles from the February 2015 demonstration were still in Peru and in hopes that word would spread to FAME about the rifles, in November of 2015, UWS, Inc. asked for and received permission to demonstrate *only* the UPR to the Peruvian Police using different ammunition.[12] (Aurich Decl. ¶ 30).  As a result of UWS, Inc.'s ingenuity in manipulating the UPR to avoid historical jams, the demonstration was successful. *Id.* UWS, Inc. also used the opportunity to present its proprietary radio frequency identification technology *("RFID")*.  *Id.* RFID is a technological feature that uses electromagnetic fields to enable an armorer to automatically identify and inventory weapons with their unique maintenance and log records. *Id.*

In late November, FAME announced that it would accept bids for rifle parts meeting its specifications. (Aurich Decl. ¶ 31). After the buzz generated by UWS, Inc.'s demonstration, FAME invited UWS, Inc. to submit its bid. *Id.* Consistent with FAME's mission to bring weapons' manufacturing to Peru, the successful bidder would ship the parts to FAME's factories in Peru and the Peruvians would be taught how to assemble the rifles, and over time manufacture key components in Peru. *Id.* UWS, Inc.'s bid stood apart from the rest in that it committed UWS,

---

[11] FAME's final bid requirements, which were later publicized, did not require parts' pricing, therefore UWS, Inc. did not submit that information with its bid.

[12] In order to avoid risking another jamming incident, UWS, Inc. used ammunition with a larger "kick" which was different from the ammunition used at the February failed demonstration.

Inc. to investing millions of dollars in FAME before it would receive a single purchase order for the rifles and it provided a five (5) year warranty on the parts provided. (Aurich Decl. ¶ 32). Given UWS, Inc.'s attractive bid, on December 18, 2015, FAME selected UWS, Inc. to co-manufacture the rifles. *Id*.

### *Adams' Fourth Failure: The Rifles Consistently Fail FAME Tests*

Although UWS, Inc. won the FAME Project bid, the rifles had to pass several FAME "torture tests" before FAME would sign a contract with UWS, Inc. (Aurich Decl. ¶ 33). With deadlines to pass FAME's weapons' testing fast approaching, on December 30, 2015, UWS, Inc., *AGUIEUS*, and Adams tested the UCRs to pinpoint the cause of their failures. At that testing session, the UCRs failed 70% of the time and UWS, Inc. grew concerned over the effectiveness of Adams' engineering and testing methods. *Id*. The next day, UWS, Inc. reached out to Froning and proposed that UWS, Inc. apply a more scientific approach and manage the testing with Adams' assistance. *Id*. Froning responded that having UWS, Inc. take over testing would require Adams to share its technical drawings and he did not, "…believe that sharing drawings is a good decision for Adams Arms." *Id*. Even though UWS, Inc. did not ask for any technical drawings and only proposed it manage testing and testing methodologies, Froning responded that he would have to consult Adams' attorneys and Board of Directors before proceeding. *Id*.

The parties did agree however, to allow the Lancer Systems facility in Quakertown, Pennsylvania to investigate the failures. (Bingham Aff., ¶ 24). Lancer manufactured the magazine used in the FAME Project, had several experienced engineers, and owns a high speed camera that would provide operational data on the rifle that was previously unknown. *Id*. Lancer

suggested multiple revisions to the weapon and the parties agreed to implement these changes.[13] *Id*. On January 13, 2016 Adams alerted UWS, Inc. that it implemented all of the changes to the rifles discussed at Lancer. (Aurich Decl. ¶ 35).  At that point, UWS, Inc., *AGUIEUS*, and Adams decided it was necessary that the rifles be put through the entire FAME testing protocol. *Id*. Representatives from Adams, UWS, Inc., and *AGUIEUS* attended the first test run.[14] *Id*. For the third time, the weapons failed. *Id*. In response to the "Accuracy Test," the UCR jammed, failed to feed, and failed to cycle. In the presence of all parties, Granger announced:  ***"I'm done with this, I was told not to get involved with this anymore."*** *Id*. Granger then got in his van and left before implementation of any the other testing. *Id*. When the water and sand tests failed, Adams' Product Development Manager, Tyler Martindale, also left the range. *Id*. Abandoned by Adams' personnel, UWS, Inc. and *AGUIEUS* were left with non-functioning rifles. *Id*.

### *UWS, Inc. Modifies the Rifles and They Finally Pass FAME Testing Protocol*

Facing a deadline less than two weeks away and with Adams having abandoned the entire FAME Project, UWS, Inc. and *AGUIEUS* took the rifles to Serbu Firearms, Inc. (***"Serbu"***)[15], where UWS, Inc. and *AGUIEUS* participated in extensive testing with Serbu experts between January 13th and January 29th. (Aurich Decl. ¶ 36).The tests revealed major faults in the application of Adams' parts in a product needed to meet FAME's specifications[16]. *Id*. UWS, Inc.

---

[13] During this testing, between January 7-9 2016, Lancer engineers concluded that the spring force on the rifles was insufficient to operate the rifle correctly.  The engineers also concluded that the ejector on the Adams bolt lacked the force to properly eject the casing efficiently.  Lancer provided a high speed video to Aguieus, UWS, Inc. and Adams.

[14] Aurich, Bingham, Charles Ferrera, Parker, Granger and Tyler Martindale (Adams' product development manager) were present for the referenced testing.

[15] Mark Serbu is an experienced weapon designer and mechanical engineer.

[16] These included but are not limited to:
Upper receiver design errors that ventured away from the original 1955 design by Eugene Stoner, using a tear drop design that induced malfunctions.
Incorrectly cut fire control pocket in the lower receiver causing the auto sear to cut into and stick in the aluminum, therefore causing a malfunction.
Inadequate spring force in the receiver extension, and excessive buffer mass.
Incorrectly installed parts, including doubling up on a broken spring, in the bolt catch

made the necessary modifications based on the revealed faults and on February 8, 2016 the modified rifles were shipped to Peru for final testing, where they finally passed in early March. (Aurich Decl. ¶ 37).

On March 22, 2016, UWS, Inc. advised Adams that given its quality control issues, UWS, Inc. would only acquire Adam's patented piston system from Adams in conjunction with the FAME Project. (Aurich Decl. ¶ 38). In its March 23, 2016 response, Adams advised UWS, Inc. that it was not authorized to use its patented piston system and it would "utilize all legal means necessary to enforce" its patent and technical data that it shared with UWS, Inc. and *AGUIEUS* under the LOI, even though the LOI specifically related ***only*** to the expired MOD Project. (Aurich Decl. ¶ 39). Importantly, UWS, Inc., *AGUIEUS*, Aurich, Bingham and Parker never received Adam's trade secret information and have never seen a technical drawing of Adam's piston system. *Id.*   In response to Adam's cease and desist letter, UWS, Inc. found alternative vendors to provide necessary parts. Consequently, the UWS, Inc. rifles that are in FAME's possession have __**no**__ Adams' parts in them. *Id.*

Even though UWS, Inc. respected Adams' demand, secured other vendors for the FAME Project, and replaced Adams' piston system from the prototypes, on May 6, 2016, Froning sent FAME officials an email warning that he has "… major contacts in the key departments in Washington … engaged key lobbyist in Lima that has the right contacts to guide me on how to litigate and we are ready to take this public." (Bingham's Aff., ¶ 28).   He also wrote that his objective is "… accountability, recovering of financial and brand damages and insure that anyone that did allow this solicitation to become corrupt gets the punishment they deserve."[17] (Aurich Decl. ¶ 40). As a result of Froning's May 6, 2016 letter to FAME, UWS has not received a single purchase order under the FAME contract. (Aurich Decl. ¶ 41).

---

[17] May 6, 2016 email from Froning.

## LEGAL STANDARD

In order to obtain a preliminary injunction, the movant must establish through **clear and convincing evidence** that: (1) it has a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest. *Church v. City of Huntsville*, 30 F.3d 1332, 1334 (11th Cir. 1994); *see also Direx Israel Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 818 (4th Cir. 1991) (reversing preliminary injunction because the plaintiff failed to satisfy burden of proof by "clear and convincing" evidence). The preliminary injunction is "an extraordinary and drastic remedy." *Church v. City of Huntsville*, 30 F.3d 1332, 1334 (11th Cir. 1994). Since the issuance of a temporary injunction is such a "drastic remedy, its grant is the exception rather than the rule." *Cheng Ke Chen v. Holder*, 783 F. Supp. 2d 1183. 1186 (N.D. Ala. 2011); *U.S. v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983).

## LEGAL ARGUMENT

### The LOI is Not a Contract

The Court cannot enforce the LOI's purported restrictive covenant because Fla. Stat. § 542.335(1) applies to **contracts** and the LOI is not a contract. At best, letters of intent are often "agreements to agree" or preliminary frameworks to a future contract, all of which are unenforceable under Florida law. *See e.g. Bergman v. Delulio*, 826 So. 2d 500 (Fla. 4th DCA 2002); *Spanish Broadcasting Sys. of Fla., Inc. v. Alfonso*, 689 So. 2d 1092 (Fla. 3d DCA 1997). "In Florida, 'courts will recognize a contract so long as no essential terms remain open for consideration and negotiation.'" *Berkery v. Pratt*, 390 Fed.Appx. 904, 907 (11th Cir. 2010)

(quoting *Townsend Contracting, Inc. v. Jensen Civil Const., Inc.* 728 So.2d 297, 301 (Fla.App. 1999)). In this case, the LOI expressly states that it relates to a "proposed transaction" and that "[a]ll terms and conditions of the proposed transaction would be stated in the Purchase Agreement, to be negotiated, agreed and executed by you and us." The LOI is devoid of essential contract terms, such as monetary terms, and contemplates the need for a binding contract, if and when the MOD Project comes to fruition.   Given that the LOI is not a contract The LOI is unenforceable.

Furthermore, the MOD Project is not a legitimate business interest and the purported restrictive covenant is not reasonable in time. The LOI's purported restrictive covenant should not carry on indefinitely and should not extend to the FAME Project, over two years later. Despite the clear expiration of the MOD Project, Adams baselessly asserts that the LOI's Section 5, entitled "Exclusive Negotiating Rights," is the restrictive covenant warranting injunctive relief.

> [Unified Weapons System], [its] affiliates and [its] respective officers, directors, employees and agents shall not initiate, solicit, encourage, directly or indirectly, or accept any offer or proposal **regarding the possible Project** by any person other than [AA] with the exception of items listed in section 1.b.I thru XII of this agreement. (Emphasis Added).

The LOI's "possible Project" (aka – MOD Project) died on September 1, 2014, therefore it cannot be a protectable legitimate business interest. *Wolf v. James G. Barrie, P.A.*, 858 So.2d 1083, 1086 (Fla. 2d DCA 2003) (holding that a closed veterinary clinic could not enforce a noncompete agreement against former employee because the closed business had no legitimate business interest to protect). Since the MOD Project is not a legitimate business interest, Adams has not shown a substantial likelihood of success on the merits on its breach of restrictive covenant claim that would warrant a temporary injunction.

### *There is No Material Breach of the NDA*

*PARKER* never received or disclosed Adams' purported confidential information. Accordingly, the purported confidential information relates to the configuration of the rifle design and associated parts created by rifle designer Eugene Stoner in 1955. The "Stoner" rifle "platform" has been widely used throughout the rifle industry since its creation and is common knowledge throughout the rifle industry. Adams has not shown a substantial likelihood of success on the merits related to Bingham and *AGUIEUS*'s alleged breach of the NDA, to warrant a temporary injunction. (Bingham Aff., ¶ 29 (b) and (v)) (Parker Aff., ¶ 25 (c)).

### *The Defend Trade Secrets Act Is Not Applicable*

Adams is not entitled to a temporary injunction against *PARKER* under The Defend Trade Secrets Act *("the Act")*, because the Act went into effect *after* *PARKER*'s alleged misappropriation. According to Adams, *PARKER* used Adams' trade secret information to submit UWS, Inc.'s bid to FAME in December 2015 and to pass FAME's testing protocol in March 2016[19]. Pursuant to the Act, any "continuity" of a misappropriation shall be treated as one misappropriation. *See* 18 U.S.C.A § 1836(d). Accordingly, any purported misappropriation occurred before May 11, 2016, which renders the Act inapplicable. Since the Act does not apply here, Adams does not have a substantial likelihood of success on the merits under the Act and is not entitled to a temporary injunction. *See* 18 U.S.C.A. § 1833(e).

### *There is No Trade Secret Misappropriation*

Adams bears the burden of proof in demonstrating specific information constitutes protected trade secrets and information that is known or generally made available to the public *cannot* constitute trade secret. *American Red Cross v. Palm Beach Blood Bank*, 143 F. 3d 1407, 1410 (11th Cir. 1998). When a secret process is at issue in a misappropriation of trade secrets

---

[19] Both of those dates predate the Act, which became effective on May 11, 2016.

case, plaintiff bears the burden of showing: (a) the process is a secret, (b) the extent to which information is known outside of plaintiff's business, (c) the extent to which it is known by employees and others involved in plaintiff's business, (d) the extent of measures taken by plaintiff to guard secrecy of information, (e) the value of information to plaintiff and to his competitors, (f) the amount of effort or money expended by plaintiff in developing information, and (g) the ease or difficulty with which information could be properly acquired or duplicated by others.   *Premier Lab Supply, Inc. v. Chemplex Industries, Inc.*, 10 So.3d 202 (Fla. 4th DCA 2009). Here, Adams boldly identifies information that it freely publishes on the internet as "trade secret" information. Adams wrongfully alleges that the specific method it uses to prepare the inside of the barrel and tilt of the bolt carrier are trade secrets, however, Adams discloses all of those processes in its own online blog. Adams' October 22, 2014 blog post states in part:

- "We begin our bolts with Mil-Spec C158 material that is machined using some of the most technologically advanced equipment available. This allows us to machine the bolt without multiple touches, therefore reducing the potential of human error while driving down the overall cost. Once the bolt bodies are machined they go through a rigorous internal inspection to confirm they meet our strict guidelines and prints. After the bolts are cleared QA they are then put through MPI testing and are Shot Peened to eliminate any sharp corners as well as harden the outside of the bolt. Next the bolts are sent to be processed in Nickel. This seals the bolt both internally as well as externally. Once the bolt has been sealed in Nickel we then send it through a Physical Vapor Deposition process to harden the outside of the nickel as well as give it the added protection and color of the PVD."
- "Barrels undergo a QPQ or Quench Polish Quench process to increase corrosion resistance, wear strength, fatigue strength, and lubricity. QPQ is a 3 step process that starts with the Nitro-Carburizing of the part, the part is then mechanically polished, and finally re-immersed into the sale quench bath to optimize the corrosion resistance and to create a uniform pigment in the finish. This process offers several distinct advantages for barrels because the bath Nitro-Carburizing process does not add any tolerance stack compared to traditional hard chrome. This allows us to bore the barrels diameter closer to the projectile diameter decreasing the gas passage around the projectile. This along with the surface properties and strength of the QPQ process creates faster and more accurate barrels."[20]

---

[20] See http://blog.adamsarms.net/blog/voodoo-innovations-what-is-lifecoat

Adams has not established that its "manufacturing and assembly processes" constitute trade secrets because it publicizes the very processes it claims are secret. Similarly, Adams' "pictures of and details on" its work stations, tooling and tool boxes used in manufacturing rifles is one click away from public view on YouTube.[21]

Any information requested of Adams was requested in anticipation of securing the FAME Project and using Adams as a vendor. Therefore, Adams freely shared information in anticipation of a future working relationship and the information it shared was not acquired by improper means. There were no nefarious motives, rather, Adams' perpetual failures and last minute abandonment prior to the final FAME testing made working with Adams a liability for the other Defendants.  In spite of the fact that Adams became a liability to the FAME Project, *PARKER*, in good faith, lobbied on behalf of Adams in an effort to convince the other Defendants to offer to use Adams' piston system and offer Adams' a potentially bigger role if and when Adams worked out its quality control issues. (Froning Dec. Exh. 39). When UWS, Inc. accepted *PARKER's* advice and made said offer to Adams, Adams refused. Ultimately, Adams took an all or nothing position, which *PARKER* honored, and now Adams' wrongfully accuses *PARKER* of misappropriation of trade secrets. Adams failed to show it has a substantial likelihood of success on the merits of its Florida Uniform Trade Secrets Act claim and is not entitled to a temporary injunction.

### Adams Will <u>Not</u> Suffer Irreparable Injury Absent Injunctive Relief

*PARKER*  has rebutted the presumption of irreparable injury created by Fla. Stat. § 542.33(2)(a) because (1) the LOI is not a contract, (2) Adams has disseminated the information it purports to be trade secrets through various public mediums making the NDA document

---

[21] See https://www.youtube.com/watch?v=Lx46cwtqi24 published September 9, 2013

unenforceable, (3) *PARKER* never possessed or used Adams' trade secret information and, (4) the purported restrictive covenant is unreasonable in duration. Fla. Stat. § 542.33(2)(a) prohibits the court from entering an injunction, "…where the injunction enforces an ***unreasonable covenant*** not to compete or where there is ***no showing of irreparable injury***." (Emphasis added). Here, the LOI's purported restrictive covenant applied to a different project that died years ago and is unreasonable in duration.

Additionally, irreparable injury must be an injury of a peculiar nature, so that monetary compensation cannot atone for it. *First Nat. Bank in St. Petersburg v. Ferris*, 156 So.2d 421, 423 (Fla. 2d DCA 1963) (citing *Indian River Steam-Boat Co. v. East Coast Transp. Co.*, 10 So. 480, 487 (Fla. 1891). Adams has not shown irreparable injury as its claims are tantamount to breach of contract claim or unjust enrichment claims, where monetary compensation is appropriate. Furthermore, irreparable injury cannot be speculative, rather, an actual injury must be imminent. *See Charles Schwab & Co. v. McMurry*, 2008 WL 5381922 (M.D. Fla. 2008). Here, Adams has not shown that *PARKER*'s ongoing business relationship with the other Defendants, or any other third parties for that matter, requires use of Adams' trade secret information that would result in actual imminent injury. Thus, any future injury is speculative at best, and the Motion fails.

### *Balance of Hardship Favors Aurich and UWS, Inc.*

Issuing a preliminary injunction against *PARKER* would have disastrous effects on their reputation in the Peruvian defense industry and American defense industry. In its prayer for relief, Adams moves to enjoin and prevent UWS, Inc. from performing under the FAME Contract. An injunction would not only kill the FAME Project, it would devastate the ongoing business relationships that took *PARKER* years in the industry to build. The initiation of this suit

alone has stifled the FAME Contract and UWS, Inc. has yet to receive a single purchase order. Issuance of an injunction would put a nail in the coffin in the FAME Contract and strip *PARKER* of his business dealings in Peru and elsewhere.

### *Public Interest Weighs against an Injunction*

Adams' public interest argument assumes that it has a substantial likelihood of establishing a breach of a valid restrictive covenant and/or misappropriation of trade secret information.  As explained above, however, that is simply not the case.  The restrictive covenant Adams seeks to enforce is unenforceable, and no misappropriation has occurred.   Because Adams has failed to show a likelihood of establishing its claimed breaches, an injunction would not serve public interest and, to the contrary, would disserve public interest by serving only to unfairly and inappropriately restrain trade. *See GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1339 (M.D. Fla. 2010) (holding that public interest considerations did not support granting an injunction where the movant failed to show a likelihood of establishing that the restrictive covenants were valid and enforceable or that the respondent in fact breached those provisions and that, to the contrary, the refusal to award injunctive relief served the public interest by disallowing unreasonable restrictive covenants to unfairly restrain trade).

### *A Substantial Security Bond Must Be Set*

As discussed above, injunctive relief should be denied.  However, in the event this Honorable Court does grant a preliminary injunction, pursuant to Fed. R. Civ. P. 65(c) and Fla. Stat. § 542.335(1)(j), no preliminary injunction shall be issued absent a bond.  The bond should be sufficient to pay for the costs and damages incurred should the injunction be wrongfully issued.  *Id*.; *see also Technomedia Solutions, LLC v. Scopetto*, 2013 WL 6571558, at *17–*18

(M.D. Fla. 2013) (awarding preliminary injunction on condition of posting a $250,000.00 bond). The trial court is vested with broad discretion in awarding the amount of a bond. *See Southeastern Mech. Srvcs., Inc. v. Brody*, 2008 WL 4613046, at *17 (M.D. Fla. 2008) (recommending $100,000 bond for alleged misappropriation of trade secrets and alleged violation of other laws). Here, in the event that UWS, Inc. is enjoined, and to the extent *PARKER* is enjoined from performing under the FAME Contract, the Court should enter a bond sufficient for payment of *PARKER*'s costs and damages for wrongful enjoinment.

## CONCLUSION

For all of the foregoing reasons, *PARKER* respectfully request that Adams' Motion be denied. In the alternative, *PARKER* request that this Honorable Court enter a substantial bond, sufficient to cover *PARKER* costs and damages associated with being wrongfully enjoined.

DATED this <u>14th</u> day of July, 2016.

By: _____ */s/ Matthew B. Sullivan* _____

MATTHEW B. SULLIVAN, ESQUIRE
4756 Central Avenue
St. Petersburg, Florida 33711
Telephone: 727-385-4049
Fax: 727-328-7103
E-mail: matthewbsullivan@aol.com
*Attorney for AGIUEUS and BINGHAM*

21

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 14, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I further certify that the foregoing document is being served this day on all counsel of record listed on the Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

By: _____*/s/ Matthew B. Sullivan*_____
*Attorney for AGUIEUS and BINGHAM*

**SERVICE LIST**

CASE NO.  8:16-cv-1503-VMC-AEP

Jaime Austrich, Esquire, jaustrich@slk-law.com
J. Todd Timmerman, Esquire, ttimmerman@slk-law.com
Mindi M. Richter, Esquire, mrichter@slk-law.com
SCHMUKER, LOOP & KENDRICK,  LLP
101 East Kennedy Boulevard, #2800
Tampa, FL  33602
*Attorneys for Plaintiff*

Leonard S. Englander, Esquire, eservice@eflegal.com and chanley@eflegal.com
Beatriz McConnell, Esquire, bmcconnell@eflegal.com and tdillon@eflegal.com
Joseph Wesley Etter, IV, Esquire, jetter@eflegal.com and jkillett@eflegal.com
ENGLANDER FISCHER
721 First Avenue North
St. Petersburg, FL  33701
*Attorneys for Defendants/UWS and Aurich*

22