UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ADAMS ARMS, LLC,

    Plaintiff,

v.                                       CASE NO.: 8:16-cv-1503-VMC-AEP

UNIFIED WEAPON SYSTEMS, INC.,
AGUIEUS, LLC,
MICHAEL C. BINGHAM,
CHRISTIAN QUINTANILLA AURICH, and
MAJOR GENERAL JAMES W. PARKER,
USA, Retired,

    Defendants.

_____/

## DEFENDANT, MAJOR GENERAL JAMES W. PARKER, USA, "Retired" <u>AFFIDAVIT IN OPPOSITION</u>

STATE OF FLORIDA    )

COUNTY OF PINELLAS  )

Index

I. Credentials and Background

II. Chronology and Facts

III. Fronig's Affidavit is inaccurate and incomplete

    Before me personally appeared Major General James W. Parker, USA, Retired, who upon being duly sworn, deposes and states:

### *I. Credentials and Background*

    1.    This Affidavit and information is made and based on my own personal knowledge, information and belief.

1

2. I served in the U.S. Army for more than 38 years and left active duty in 2008.

3. During my career with the U.S. Army, I:
   a) served as a weapons Sergeant on a Special Forces A-Team from 1970 through 1975;
   b) attended at Officer Candidate School and was named Honor Graduate;
   c) served as an Infantry and Special Forces Officer, held command positions at every level from Lieutenant to Major General;

4. During my career with the U.S. Army, my assignments included:
   a) Senior Advisor, 4th Infantry Brigade, Republic of El Salvador;
   b) Commander 1st Battalion, 3rd Special Forces Group;
   c) Commander 7th Special Forces Group;
   d) Deputy Commander, US Army Special Operation Command;
   e) Commander Special Operations Command South;
   f) Director of Intelligence and Information Operations USSOCOM;
   g) Deployed to Iraq as Deputy Commander Special Operations Central; responsible for Northern Iraq Operations;
   h) Director, Center for Special Operations (J3, J2, J5) USSOCOM;
   i) Commander, US Army Special Warfare Center and School, Ft. Bragg, NC. During this assignment, I was the architect for a complete transformation and redesign of all courses of instruction for Special Forces, Civil Affairs, and Psychological Operations. While maintaining the highest training standards in the Army, I increased both the effectiveness of the training and the production of special operations soldiers to meet wartime requirements.

5. Upon leaving the Service, I worked as a consultant providing services to the defense industry. My clients included SRA Inc., Laser Shot Inc., Oak Grove Technologies, Textron Systems Inc., and Raytheon. In 2011, I accepted a position with Textron Systems as Vice President, responsible for operations of the Tampa Office. This office was responsible for business development, and customer engagement strategies to include foreign militaries for all Textron Systems Corporation business units working with USSOCOM, USCENTCOM, and USSOUTHCOM. I have now reestablished my consulting firm, Saber Strategies, LLC.

6. I hold a BA in Business Management (Suma Cum Laude), from Ft. Lauderdale University and a Masters of Arts in Government Procurement and Acquisition from Webster University. My military education includes the Armed Forces Staff College, the U.S. Army War College, and the Army Strategic Leaders Course.

7. My military awards and decorations include: The Defense Distinguished Service Medal, the Defense Superior Service Medal (2), the Legion of Merit (2), the Bronze Star with Valor device, the Defense Meritorious Service Medal (2), the Army Meritorious Service Medal (5), the Global War on Terrorism Medal, the Iraq Campaign Medal w/ Campaign Star and the Overseas Service Medal (3). I also earned the Combat Infantryman's Badge, the Combat Action Badge, the Master Parachutist Badge, the Military Free Fall Parachutist Badge, Special Forces and Ranger Tabs, and numerous foreign awards. I am a member of the Army OCS Hall of Fame.

## *II. Chronology and Facts*

8. I was contacted by ADAMS ARMS (AA) President and C.E.O., Mike Froning in July 2014 for the purpose of working as a consultant. I signed a consultant services agreement on July 7th 2014. The agreement states, "James W. Parker is a retired military General who owns Saber Strategies, LLC and possesses significant expertise and knowledge regarding and domestic military matters which could be helpful to the Company and its Business." Correspondingly, AA lacked any officers or personal with a significant military background and I would help them in this regard.

9. I never received any confidential information, trade secrets, technical data. I was not hired as a designer, engineer, or for any technical purpose for that matter. I did not participate in the design or assembly of any rifles. Furthermore, for the last year I had very little contact with AA; I was not invited to any AA meetings, or included in any projects (other than Peru) that AA had ongoing.

10. When I was first contacted by AA the LOI attached to the complaint was already in place. The opportunity to supply finished rifles to the Peruvian Ministry of Defense *("MOD")* as described in the LOI was only available through September 1, 2014. Pursuant to the LOI, UWS, Inc. and Aguieus agreed to move forward together to build two different caliber weapons: a 7.62 x 51mm rifle *("UCR")* and a 5.56 x 45mm NATO select-fire weapon system *("UPR")*.

11. In late July 2014, AA advised all the Defendants that it was *impossible* to meet the MOD Contract deadline and that AA would utilize whatever research and development it had performed on the UCR to produce and take to the public, a non-military version of the weapon, which it identified as the "SF 308"[1]. AA did not meet the deadline for the MOD Project and failed to produce prototype weapons to present to MOD. The MOD Project expired and its funding disappeared. The MOD opportunity to provide complete rifles for the Peruvian Army did not materialize, no one gained from it, it never happened.

12. In November 2014, after the expiration of the LOI, UWS notified me that AA had finished the rifle prototypes. Knowing the Peruvian Army might still need rifles, there was hope we could convince them to purchase the UWS rifles. UWS coordinated a demonstration of the UCR and UPR

---

[1] On October 16, 2014, AA began taking pre-orders of the SF 308 at the shot show in Las Vegas.

3

prototypes in Peru. I coordinated with the US Embassy for representatives of the US Military Advisory and Assistance Group (MAAG) to attend as well. On February 12, 2015, I attended the demonstration along with a crowd of approximately fifty people. The crowd consisted of members of the Peruvian armed forces, Peruvian police, and U.S. military personnel from the Embassy. Also in attendance were Bingham, Aurich, AA' President, Michael Froning, and Adam's V.P., Jim Granger. Granger anxiously kicked off the demonstration by firing the UPR. After just a few rounds, it jammed, continued to jam and never fired again. Attempting to save face, he then picked up the UCR and it jammed as well. The demonstration was an embarrassment. Later, UWS *(not the entity UWS, Inc.)* discovered the UCR's jammed because they were chambered for a .308 **commercial (non-military) market caliber bullet**, not the 7.62 x 51 NATO military caliber required by the Peruvian MOD and specifically specified in the MOD Project and the LOI. Given the very public failure, UWS abandoned all hope of applying for another contract with the Peruvian MOD to supply the UCR and UPR rifles. It also abandoned hope to be able to market the rifles to anyone else that witnessed the disastrous demonstration. Mr. Froning knew the demonstration did not go well; he was there and he later contacted me asking when the "re-test" might be scheduled; there was never a re-test for this opportunity.

        13. In July of 2015, a new opportunity manifested itself when UWS learned that FAME SAC, a private, closed stock, limited company under the banner of FAME SAC *("FAME")*, was soliciting an international public bid for companies to design and assemble pistols and rifles in Peru. To be clear, this opportunity was wholly different than the previous opportunity contemplated in the LOI concerning the Peruvian MOD. In fact, pursuant to the FAME opportunity, the successful bidder would ship the parts, supplied by various vendors, to FAME's factories in Peru where the Peruvian would be taught how to assemble the rifles and eventually how to manufacture some of the parts themselves. The FAME opportunity, unlike the MOD opportunity, did not contemplate the production and supply of finished rifles.

        After learning that FAME had signed a contract with the Czech Republic's company, CZ, to assemble pistols in Peru, UWS had hope that it might be able to secure a contract for assembly of the rifles. In order to become one of nearly twenty (20) companies that FAME would invite to the international bid, UWS, Inc. approached FAME about the prospect of selling training and specific ammunition. Importantly, AA does not produce or design ammunition and does not provide training.

FAME officials agreed to visit the USA to see and test the ammunition.[2] Because Adams Arms maintained useful technical testing equipment, Bingham asked Granger for permission to administer certain munitions tests at AA's Odessa facility. This was also seen by all parties as a good opportunity to show the Peruvians the capabilities of AA (who would be providing some of the parts in a coproduction deal) and how we might be able to provide some of the same capability to them in a Co-production contract.

On September 2, 2015 during a meeting with the Dep. of Commerce Trade office, Mr. Bingham received a call from the range where the rifles were being shown to the FAME personnel. He was told the demonstration was not going well; once again, I was told the UCR's performance was embarrassingly poor. Mr. Bingham left in haste to go to the range.

14. In late November 2015, FAME announced that it would accept bids for the coproduction of rifles meeting its specifications and UWS was invited to submit its bid. Consistent with the mission of FAME, the successful bidder would ship the parts to FAME's factories in Peru where the Peruvian would be taught how to assemble the rifles. Over time, FAME would be provided the equipment and training to manufacture key components of the rifles. On December 18, 2015, FAME selected the UWS' proposal. But, the rifles would have to pass Peru's testing protocols before a contract could be signed.

15. On December 30, 2015, I attended an event where UWS, Aguieus, and AA attempted to put the rifles through the required Peru "torture test", and in the process discovered a horrifying failure rate of 70%.[3] The next day UWS proposed to Froning (I was cc'd on the email) that UWS manage future testing with AA's assistance. Froning responded that having UWS take over testing would require AA to share technical drawings and he did not, "…believe that sharing drawings is a good decision for Adams Arms." Notwithstanding the fact that UWS did not ask for any technical drawings and only proposed that it manage testing and testing methodologies, Froning responded that he would need to consult AA's attorneys and its Board of Directors before proceeding.

Nonetheless, the parties did agree to allow the Lancer Systems facility in Quakertown, Pennsylvania to investigate the failures. Lancer manufactured the magazines used in the FAME Project, employed experienced engineers, and owned testing equipment that would provide operational data

---

[2] Due to export permits required in the USA, shipping ammunition from the USA to Peru would take at least sixty to ninety days. Given their tight schedule, FAME opted to travel to the USA.
[3] This test was conducted at the Black Saddle Ranch (BSR) facility.

previously unknown. Lancer suggested multiple revisions to the weapon and the parties agreed to implement these changes.[4]

On January 13, 2016 AA alerted UWS that it had implemented all of the changes to the rifles discussed at Lancer, and UWS, Aguieus, and AA personnel prepared to put the rifles through the entire FAME testing protocol at the BSR facility.[5] I went to BSR to witness this event. For the third time, the weapons failed. In response to the "Accuracy Test," the UCR jammed, failed to feed, and failed to cycle. In the presence of all parties, Granger announced: ***"I'm done with this, I was told not to get involved with this anymore."*** Granger then got in his van and left before implementation of any the other testing. When the water and sand tests failed, AA's Product Development Manager, Tyler Martindale, also left the range. At this point UWS was left with the non-functioning weapons and to my knowledge, the rifles were never touched by AA again.

16. Facing the FAME deadline less than two weeks away, and with AA having apparently abandoned the entire FAME Project, UWS took the rifles to Serbu Firearms, Inc. in Tampa (***"Serbu"***) where the UWS and Aguieus teams participated in extensive testing with Serbu experts between January 13th through January 29th. I personally saw design and manufacturing errors. The malfunctions were caused by poor quality control during assembly and the tests revealed major faults in the application of AA's parts in a product needed to meet FAME's specifications[6]. Before the weapons were taken to Serbu, UWS and Aguieus conducted the specified Drop Test, which necessitated the weapon be dropped from a certain height onto a concrete floor. When the upper receiver broke off, it was learned that **CAST** aluminum had been used, not forged aluminum as specified. The UCR was brought to the 2016 Las Vegas Shot Show where it had a catastrophic failure at the range-day event and could not be used. Substitutions and modifications for AA' parts were subsequently made at the Serbu facility and in the second week of March, the modified rifles passed the required performance tests in Peru.

---

[4] During this testing, between January 7-9 2016, Lancer engineers concluded that the spring force on the rifles was insufficient to operate the rifle correctly. The engineers also concluded that the ejector on the AA bolt lacked the force to properly eject the casing efficiently. Lancer provided a high speed video to Aguieus, UWS and AA.

[5] Aurich, Bingham, Charles Ferrera, Major General James Parker, Jim Granger (AA's Vice-President) and Tyler Martindale (AA's product development manager) were present for the referenced testing.

[6] These included but are not limited to:
Upper receiver design errors that ventured away from the original 1955 design by Eugene Stoner, using a tear drop design that induced malfunctions.
Incorrectly cut fire control pocket in the lower receiver causing the auto sear to cut into and stick in the aluminum, therefore causing a malfunction.
Inadequate spring force in the receiver extension, and excessive buffer mass.
Incorrectly installed parts, including doubling up on a broken spring, in the bolt catch

17. At this point, notwithstanding the repeated failures of AA's rifles, I managed to convince UWS and AGUIEUS to at least use the AA piston system. I lobbied UWS and AGUIUES by reminding them that AA had been involved with the different opportunities since 2014 and should be given a chance to supply their parts that actually work.

18. Accordingly, On March 22, 2016, UWS advised AA that, given its quality control issues, UWS would only acquire certain parts from AA in conjunction with the FAME Project, including AA's patented piston system. However, in its March 23, 2016 response, AA advised UWS that it was not authorized to use its patented piston system and it would "utilize all legal means necessary to enforce" its patent and technical data that it shared with UWS and Aguieus under the LOI, even though it specifically related only to the withdrawn MOD Project.

19. On 23 March, 2016 Mr. Froning sent me an email accusing me of a Conflict of Interest and asked for my resignation as a consultant to AA. I told him I did not see a Conflict of Interest and notwithstanding the foregoing, sent a Letter of Resignation as requested on 28 March, 2016.

20. In response to Adam's email to cease and desist, UWS found another supplier for the piston system. It is my understanding that the UWS weapons now in possession of FAME have no AA parts in them.

21. On May 16, 2016, UWS was awarded the FAME contract. Even though UWS respected AA's demand and secured other suppliers for the FAME Project, and replaced the removed AA's piston system from the prototypes, on May 6, 2016, Froning sent FAME officials an email warning that he had "... major contacts in the key departments in Washington ... engaged key lobbyist in Lima that has the right contacts to guide me on how to litigate and we are ready to take this public." He also wrote that his objective is "... accountability, recovering of financial and brand damages and insure that anyone that did allow this solicitation to become corrupt gets the punishment they deserve."[7] I believe this is the reason UWS has not received a single purchase order under the FAME Project.

22. AA withdrew their permission to use the Piston system or anything related to AA.

---

[7] May 6, 2016 email from Froning.

23. I never received AA's trade secret information and to be certain, have never seen any technical drawings of Adam's piston system. However; I must say that as an Army Special Forces General Officer, I had access to the highest levels of our Nation's secrets and without fail I protected that information. AA's accusation that I violated the NDA is ridiculous.

24. The NDA, as drafted by AA, is incorrect. In the recitals section on page one the NDA states that: " The receiving party (Parker) is in the business of manufacturing the company's patented product". As mentioned earlier, I am not a manufacturer or designer of any product.

### III. Fronig's Affidavit is Inaccurate and Incomplete

25. The declarations contained in paragraphs 33 through 35 are false.

a) I am not a director of either UWS entity. I never told Mike Froning or anyone at AA that I was a Director because as mentioned above I was not. I have no formal agreement with UWS, no NDAs, no agreement in writing of any type. I have never even had a conversation with Christian Quintanilla about being a board member or the duties of such a position. I never conducted any of the activities that would be expected of a Director in normal business affairs. I was never made aware of the details of UWS business activities, strategies, or financial arrangements.

Correspondingly, there was no conflict of interest. It was in the best interest of all parties and vendors that either the earlier direct sale effort mentioned in the LOI or the subsequent Co-Production proposal become a success. In fact, due to my agreement with AA which provides a payment to my company, Saber Strategies, of "3% of AA profits on the Peru project", it was clearly in my best interest that I be loyal to AA and they remained one of the vendors, especially considering I had no agreement with UWS for compensation of any type. .

b) I did not spend a full week at AA's facility. Instead, I only spent 2 ½ days of a scheduled four day agenda. I was never exposed to or shown any technical or proprietary information of any kind. In fact, I was only being given an orientation of the facilities so that I could advocate on behalf of AA. I was not there for any technical purposes. On the first day of my visit, I was given a generic tour of the facilities. On the second day, I was shown of some of the work stations and how parts were controlled. I spent a couple of hours with the armorers mainly learning how to install the AA piston system which I thought might be a good item to show the military as a way to convert older direct impingement gas rifles. I do not recall spending any time with any of AA's "engineers." I met several of the officers of the

company and chatted with them about various things depending on their specialty. I was never exposed to any of AA's approaches to engineering and development of product. I did a attend a meeting that was called a "product development meeting" but, it was more of a status update on ongoing issues such as parts orders, inventory etc. and lasted about an hour. Furthermore, I have reviewed at least two videos on the internet that provide a great deal more information and detail regarding AA's rifles than was ever shared with me during my visit. Please see the following video links: https://www.youtube.com/watch?v=i93N1kWq5EA and https://www.youtube.com/watch?v=KKSs42MGyj0.

      c) I was never given any confidential information or trade secrets of any kind. The subject rifle design and related components are based on engineer Eugene Stoner's 1955 rifle design. Other than the details of the AA piston system, the design and components are public knowledge and common knowledge throughout the industry. As far as the functioning of the AR platform goes; I was originally taught this when I went through the Army Special Forces Weapons Sergeant's Course in 1971 and I continued to improve my knowledge of the weapon system as I carried it in training and combat over 38 years.

      d) All information shared with my company and myself was freely given for the express purpose of getting a deal with Peru. AA clearly knew the photos we requested, the non-technical drawings, and the other info was going into a proposal that would be sent to Peru and they eagerly provided it with no caveats. In fact, they were participants in the "disclosure;" traveling to Peru, helping prepare presentations, attending meetings. It was not used for any other "non- authorized purpose." If, If we had used that information to seek a contract with another entity or a country other than Peru without including AA or asking for their permission, well then they would have justification for violation of the NDA. Finally, any information, of any kind, shared with me starting July 7, 2014 and going forward had already been shared with the other Defendants in this case.

FURTHER AFFIANT SAYETH NAUGHT.

_____
MAJOR GENERAL JAMES W. PARKER, USA, Retired

The foregoing instrument was acknowledged before me this 11th day of July, 2016, by Major General James W. Parker, USA, Retired, who is personally known to me or who produced _____ as identification and who did/did not take an oath.

_____
Notary Public, State of Florida
My Commission Expires:

JUDY HAYES RIVAIS
Notary Public - State of Florida
Commission # FF 953726
My Comm. Expires May 8, 2020
Bonded through National Notary

10