**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ADAMS ARMS, LLC,**

      **Plaintiff,**

**v.**                                                              **Case No.: 8:16-CV-1503-T-33AEP**

**UNIFIED WEAPON SYSTEMS, INC.,**
**AGUIEUS, LLC,**
**MICHAEL C. BINGHAM,**
**CHRISTIAN QUINTANILLA AURICH, and**
**MAJOR GENERAL JAMES W. PARKER,**

      **Defendants.**
_____/

<u>**ADAMS ARMS, LLC'S RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**</u>

      Plaintiff, Adams Arms, LLC ("AA") hereby responds to the motions to dismiss filed by Defendants Aguieus, LLC, Michael C. Bingham, Major General James W. Parker, Unified Weapon Systems, Inc., and Christian Quintanilla Aurich. (Dkts. 46-50). Defendants entered into multiple agreements with AA in furtherance of their desire for AA to engineer, design, and develop weapons to be supplied to the Peruvian military. Pursuant to such agreements, and Defendants' representations that AA would in fact be the weapons provider for the Peruvian contract, AA divulged numerous valuable trade secrets and confidential information to Defendants. Defendants used this information to successfully secure a contract with the Peruvian government based on AA's weapons but have squeezed AA out of the deal such that AA would no longer be the weapons provider. As a result, AA filed the present action asserting claims for breach of a letter of intent (Count I), breach of a

nondisclosure agreement (Count II), and violation of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 (Count V), among other claims.

All five Defendants moved to dismiss Count V on the basis that the alleged misappropriation began prior to the effective date of the DTSA, which was enacted May 11, 2016.[1]  Additionally, Defendant Unified Weapons Systems, Inc. ("UWS") moved to dismiss Count I on the basis that the letter of intent is not a binding, actionable agreement, and Defendant Christian Quintanilla Aurich ("Aurich") moved to dismiss Count II claiming that AA's sole remedy for breach of the nondisclosure agreement lies against Aguieus as the only Defendant that executed the nondisclosure agreement.

Defendants' arguments are contradicted by the detailed allegations of AA's complaint and are based on narrow readings of the applicable agreements and legal authority. Examining the agreements as a whole and accepting AA's allegations as true, as the Court is required to do on a motion to dismiss, it is evident that AA successfully alleged claims for breach of the letter of intent and breach of the nondisclosure agreement as well as a claim for misappropriation under the DTSA.  Accordingly, AA respectfully submits that the motions to dismiss must be denied.

## I.    BACKGROUND

As alleged in the complaint, AA is a weapons manufacturer founded and based in the Tampa Bay area that provides cutting edge technology with regard to the development and manufacture of high-powered military rifles.  (Dkt. 1 ¶ 1)  Defendant Aguieus, LLC ("Aguieus") is a Delaware limited liability corporation doing business in Hillsborough

---

[1]  *See* Defend Trade Secrets Act of 2016, PL 114-153, 130 Stat. 376 (May 11, 2016).

County, Florida.  (*Id.* ¶ 12)  Defendant Unified Weapons Systems, Inc. ("UWS") is a subsidiary of Aguieus.  (*Id.* ¶ 11)  Individual defendant Michael C. Bingham serves as the managing member of Aguieus and the Vice President and Chief Operating Officer of UWS, and defendant Christian Quintanilla Aurich ("Aurich") is the President and Chief Executive Officer of UWS.  (*Id.* ¶¶ 13-14)

In early 2014, AA began developing high-powered military rifles for ultimate sale to the Peruvian military through Aguieus and UWS.  (*Id.* ¶ 4)  The project required AA to provide UWS with functioning demonstration rifles for testing by the Peruvian Ministry of Defense ("MOD").  (*Id.* ¶ 21)  In addition, AA was required to provide UWS and Aguieus with access to AA's trade secret, proprietary, and confidential information as well as a tour of AA's facilities.  (*Id.*)  The Peruvian MOD was purportedly funding the purchase through the Peruvian Factory of Weapons and Ammunition from the Army S.A.C. ("FAME").  (*Id.* ¶ 19)

On or about February 24, 2014, Aguieus entered a Mutual Confidentiality and Nondisclosure Agreement ("NDA") with AA in which Aguieus agreed not to use AA's confidential information, including AA's technical data, trade secrets, and know-how, for its own use or for any purpose other than the commercial relationship between AA and Aguieus ("NDA").  (*Id.* ¶ 22)  The NDA was executed by Aurich and permitted Aguieus to disclose AA's confidential information to other parties, including UWS, so long as such parties acknowledged and agreed to be bound by the NDA.  (*Id.* ¶ 22 & Exh. 1)

To memorialize the terms of the parties' joint venture, UWS and AA also entered a Letter of Intent ("LOI") dated April 29, 2014 and executed by Defendant Bingham.  (*Id.* ¶ 23

& Exh. 2)  The LOI contains a number of material terms, including a provision granting AA exclusive negotiating rights on the project.  (Dkt. 1, Exh. 5 ¶ 5)  Notably, the LOI also stated that "[t]he Confidentiality Agreement is hereby ratified and confirmed as a separate agreement between the parties thereto."  (*Id.*)

In reliance upon the LOI and the NDA, and multiple prior and subsequent representations and assurances that there would be significant orders worth in excess of $100 million, AA disclosed its proprietary confidential information, including AA's technical data, trade secrets, and know-how, to UWS, Aguieus, Mr. Bingham, Mr. Aurich, and General Parker.  (*Id.* ¶ 27)  In particular, in December 2014, Mr. Bingham accepted delivery of AA demonstration rifles that were utilized in a successful demonstration before the Peruvian MOD less than two months later.  (*Id.* ¶ 42-43)  Throughout the following year, AA continued to provide Defendants with access to AA's trade secrets and confidential information that included supplier pricing information and detailed information concerning AA's manufacturing facility.  (*Id.* ¶¶ 45-49)

On December 10, 2015, UWS submitted a qualified offer in response to a bid solicitation using AA's designs, procedures, and specifications.  (*Id.* ¶ 55)  UWS was awarded the bid by FAME shortly thereafter.  (*Id.* ¶¶ 55-58)  In late May or early June of this year, UWS announced that it entered into a technology transfer contract with FAME that was undoubtedly a contract for the sale of AA's rifles using all of the designs, specifications, and processes divulged under false pretenses by AA.  (*Id* ¶¶ 67-68)  Upon discovering that Defendants had utilized AA's confidential information and trade secrets to enter an

agreement with the Peruvian government, apparently without the intent to further utilize AA to provide the rifles, AA filed the present suit seeking damages and injunctive relief.

## II.  LEGAL STANDARD FOR MOTIONS TO DISMISS

On a motion to dismiss, "the relevant question is whether, assuming the factual allegations are true, the plaintiff has stated a ground for relief that is plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept the allegations as true and construe the allegations in the light most favorable to the plaintiff.  *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004). Further, the Court should favor the plaintiff with all reasonable inferences from the allegations in the complaint.  *Kelliher v. Target Nat. Bank*, 826 F. Supp. 2d 1324, 1326 (M.D. Fla. 2011) (citing *Stephens v. Dep't of Health & Human Servs.*, 901 F.2d 1571, 1573 (11th Cir. 1990)); *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

## III.  DISCUSSION

**A.  Count V adequately alleges a claim for violation of the DTSA.**

Defendants contend that Count V should be dismissed because the alleged conduct underlying AA's misappropriation claim constitutes a single, continuing violation that began prior to the effective date of the DTSA.  In other words, Defendants contend that they are insulated from liability so long as their misappropriation is continuous and unrelenting.  As support for this theory, Defendants rely on a provision of the DTSA governing only the statute of limitations period for civil claims.  Specifically, subsection (d) titled "Period of limitations" states that "[a] civil action under subsection (b) may not be commenced later

than 3 years after the date on which the misappropriation . . . is discovered." 18 U.S.C. § 1836(d). The last sentence of subsection (d) further explains that "***[f]or purposes of this subsection***, a continuing misappropriation constitutes a single claim of misappropriation." *Id.* (emphasis added). Defendants attempt to utilize this last sentence to mean that, if any conduct began prior to the effective date of the DTSA, then none of their conduct is actionable under the DTSA.

The most glaring problem with Defendants' reading of the statute is that it completely ignores the qualifier "for purposes of this subsection" that limits the applicability of the last sentence to matters concerning the limitations period. There is no such issue here as AA initiated this action within weeks of discovering Defendants' misconduct. Thus, the plain and unambiguous language of the statute renders Defendants' argument a nonstarter. Nowhere in the DTSA does it state that, if any conduct of the accused began before the effective date of the DTSA, then no conduct of the accused after the effective date of the DTSA can be the subject of a claim under the DTSA.

But even if Defendants' reading of the statute was correct, the argument still fails in light of the detailed factual allegations of AA's complaint, which describes distinct acts of misappropriation occurring after the effective date of the DTSA. The DTSA defines misappropriation with reference to distinct actions, set out in different subsections, that constitute separate violations—*i.e.*, "acquisition of a trade secret . . . by improper means" or "disclosure or use of a trade secret." 18 U.S.C. § 1839(5)(A) & (B). "Generally, courts have held that where misappropriation is viewed as a continuing tort and the misappropriator keeps the secret confidential, the continued use of trade secrets gives rise to successive

causes of action."  *Bates v. Cook, Inc.*, 615 F. Supp. 662, 681 (M.D. Fla. 1984); *see also*

*Kistler Instrumente A. G. v. PCB Piezotronics, Inc.*, 419 F. Supp. 120, 123 (W.D.N.Y. 1976)

("[T]he continued use of confidential information gives rise to successive causes of action

under the law of New York.").

The complaint alleges that Defendants used improper means to acquire AA's trade

secrets throughout the parties' relationship starting in 2014.  (Dkt. ¶¶ 42-49)  The complaint

also alleges that Defendants used this information to enter into a contract with FAME

sometime in late May or the first two weeks of June 2016 after the enactment of the DTSA.[2]

(*Id.* ¶¶ 67-68)  The FAME contract is "undoubtedly a contract for the sale of AA's rifles to

FAME," (*id* ¶ 68), and delivery of rifles pursuant to the contract would, of course, constitute

further use and misappropriation of AA's trade secret information and a further violation of

the DTSA.   In other words, the complaint contains different sets of actions by the

Defendants, any of which would constitute a trade secret misappropriation claim under the

DTSA, whether it be acquiring the trade secrets through improper means, or, whether or not

they acquired them through improper means, using and disclosing the trade secrets without

permission, since AA is no longer a part of the deal, when the Defendants had a duty to

maintain the secrecy and limit the use of the trade secrets.  (*See, e.g*., Dkt. ¶¶ 104, 105)

Thus, even if certain actions taken prior to May 11, 2016 can be viewed as continuing

violations and Defendants' strained reading of the statute was correct, AA's complaint—the

allegations of which must be accepted as true—sufficiently alleges actionable

---

[2]   Defendants' subsequent filings have confirmed that the FAME contract was entered on May 16, 2016, after
the DTSA became effective.  (Dkt. 52, Defendant Unified Weapons Systems, Inc.'s Counterclaim ¶ 7 & Exhibit
1 thereto)

misappropriation occurring after this date.  Whether or not Defendants' initially acquired AA's trade secrets with improper motives, and whether or not that conduct may have begun before the effective date of the DTSA, Defendants have since been improperly using and disclosing AA's trade secrets in pursuing the contract with the Peruvian government without further involvement of AA, which would have taken place after the effective date of the DTSA.[3]  Defendants' argument regarding Count V should be rejected and the count permitted to stand.

**B.      The Complaint sufficiently alleges a breach of the Letter of Intent.**

To prove the existence of a contract, a plaintiff must plead: (1) an offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms.  *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004).  The parties' intent ultimately controls whether a binding contract has been formed.  *See, e.g.*, *Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 436 (11th Cir. 1995).

"[A]n objective test is used to determine whether a contract is enforceable."  *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985).  A party's subjective intent is not material in determining whether a contract was made.  *Med-Star Cent., Inc. v. Psychiatric Hosps. of Hernando Cty., Inc.*, 639 So. 2d 636, 637 (Fla. 5th DCA 1994)).  "Simply because the parties contemplated the drafting of a subsequent formal, written contract, does not denote that they did not intend to be bound immediately by their oral or written negotiations."  *Lifecare Int'l, Inc.*, 68 F.3d at 436; *see also E. Air Lines, Inc. v. Mobil Oil Corp.*, 564 F. Supp. 1131, 1145 (S.D. Fla. 1983) ("If parties so intend, a contract is binding

---

[3] As alleged in the complaint, Defendants announced their contract in late May or the beginning of June, and the effective date of the DTSA is May 11, 2016.

from the time it is made even though the parties also agree that a formal writing embodying its provisions will subsequently be prepared.").

Defendant UWS contends that Count I for breach of the LOI should be dismissed because the LOI is not a binding agreement, and it lacks essential provisions, such as monetary and financial terms. UWS further contends AA cannot enforce the LOI because AA did not perform its obligation to deliver rifles by September 2014. However, these arguments are all premised on the erroneous notion that the LOI is a purchase agreement and not its own independent and binding agreement with definite terms and specific obligations and consideration attributable to each party. In addition, the LOI states that "Buyer," i.e. UWS, agrees to meet any timeline laid out in the LOI, not AA. (Dkt. 1, Exh. 2 ¶ 7) Along the same lines, the reference in the LOI to a purchase order expected by September 1, 2014 refers to an expectation that the Peruvian MOD would execute the same and that "Buyer," i.e. UWS, would issue such purchase orders to AA. (*Id*. ¶¶ 6, 7) Simply put, the LOI contains no timeline-related obligation of AA related to delivering rifles by September 2014. Moreover, UWS is able to assert these arguments only by ignoring the clear and unequivocal allegations of AA's complaint, which must be accepted as true and construed in a light most favorable to AA for purposes of deciding a motion to dismiss. *Jackson*, 372 F.3d at 1262.

Whether a binding agreement has been formed depends on the objective intent of the parties, and AA's allegations establish that the parties intended that the LOI be an enforceable contract. First and foremost, the LOI specifically states that, while some paragraphs would be considered nonbinding, other paragraphs, namely subparagraphs 1(b), (c), (d) and paragraphs 2 through 7, would be binding. (Dkt. 1, Exh. 2 ¶ 9) In addition to the

express and unambiguous language in the LOI itself, the complaint describes specific provisions and obligations set forth in the LOI and alleges that the LOI was binding. (Dkt. 1 ¶ 24 ("In the LOI, UWS as 'Buyer' agreed with AA as 'Seller' that AA would manufacture the rifles at its facility, with the exception of certain parts that would be provided by UWS . . . . This was a binding agreement of UWS."), ¶ 26 ("In the LOI, UWS also agreed that given the investment AA would be making in the project "Buyer . . . shall not . . . . accept any offer or proposal regarding the possible Project by any person other than Seller . . . . This was likewise a binding agreement of UWS."))

But even if the Court were to accept UWS's invitation to overlook these allegations, an examination of the LOI itself reveals that it contains sufficient indicia of objective intent to survive a motion to dismiss. The reality is that the LOI is a definite, detailed agreement spanning five pages in which both parties assented to certain rights and obligations. Of particular relevance is paragraph 5 where UWS agreed that it would not initiate, solicit, encourage, or accept any offer or proposal regarding the possible project by anyone other than AA. (Dkt. 1, Exh. 2) In exchange, AA agreed that it would commit resources and forego other potential opportunities as well as incur the legal, accounting, and incidental expenses necessary to properly evaluate the project. (*Id.*) In addition, as mentioned, the LOI also expressly states that certain paragraphs were nonbinding but that this did not apply to subparagraphs 1(b), (c), (d) and paragraphs 2 through 7. (Dkt. 1, Exh. 2 ¶ 9) The LOI was duly executed and initialed on each page by representatives of both AA and UWS.

Given the foregoing allegations of the complaint and the agreement itself, there are sufficient allegations and evidence of objective intent as to the binding nature of the LOI, and

Count I should stand.  The fact that the parties expressed an intent to later enter a separate purchase agreement does not somehow render the LOI unenforceable.  *See Lifecare Int'l, Inc.*, 68 F.3d at 436; *see also E. Air Lines, Inc.*, 564 F. Supp. at 1145 ("If parties so intend, a contract is binding from the time it is made even though the parties also agree that a formal writing embodying its provisions will subsequently be prepared.").

Because the LOI is not itself a purchase agreement, it is of no moment that financial terms were not included or that rifles were not delivered prior to the due date alleged by UWS in its motion to dismiss.  UWS's argument only serves to inject confusion as to the nature of the agreement.  Furthermore, even if the due date asserted by UWS was binding, as mentioned above, the timeline obligations laid out in the LOI were on UWS, not AA, which if anything would merely constitute further breaches on the part of UWS.  In addition, UWS's motion does not explain how missing this alleged delivery date, even if it was an obligation on the part of AA, excuses UWS's breach of separate provisions containing independent covenants.  *See Seybold v. Nicholson USA Props., LTD.*, 890 So. 2d 351, 353 (Fla. 5th DCA 2004) ("[W]hen an undertaking in the same contract is to be performed at a different time, the covenant is independent and an action at law may be maintained for its breach.); *see also AVVA-BC, LLC v. Amiel*, 25 So. 3d 7, 11 (Fla. 3d DCA 2009) (citing *Steak House, Inc. v. Barnett*, 65 So. 2d 736, 737 (Fla. 1953)) (holding that a contract cannot be rescinded for failure to perform a covenant or promise to do an act in the future, unless the covenant breached is a dependent one).

In short, AA's complaint successfully alleges that the LOI is a binding agreement with specific rights and obligations assigned to each party.  UWS's arguments overlook the

allegations of the complaint and do not rely on a reading of the agreement as a whole.  While UWS may assert arguments in the future as to what is binding and whether there was a breach, such arguments are not appropriate at the motion to dismiss stage given the sufficiently plead allegations of the complaint.  UWS's motion to dismiss Count I should, therefore, be denied.

**C.**     **Count II for breach of the NDA should stand as to Defendants Aurich and UWS.**

Defendants Aurich and UWS moved to dismiss Count II for breach of the NDA arguing that AA's only recourse for breach of the NDA is against Aguieus.  But once again, Defendants' contention glosses over the express language of the agreements at issue as well as the allegations of the complaint, which must be accepted as true on a motion to dismiss. Defendants also attempt to establish a *per se* rule that simply does not exist by suggesting that only a corporate party and not its principals or agents can be bound by an agreement.

The complaint alleges that the NDA permitted Aguieus to disclose confidential information to other parties so long as they agreed to be bound by the NDA.  (Dkt. ¶ 22) This much is expressly spelled out in the NDA attached to the complaint as Exhibit 1 and that was executed by Defendant Aurich.  (Dkt. 1, Exh. 1)  The complaint further alleges that UWS and Aurich, as affiliates, directors, officers, employees, consultants, and/or agents of Aguieus, all received AA's confidential information and were required to acknowledge and agree to be bound by the NDA.  (Dkt. 1 ¶ 79)  The LOI entered by UWS states that "[t]he Confidential Agreement is hereby ratified and confirmed as a separate agreement between the parties thereto."  (Dkt. 1, Exh. 2)

In sum, the NDA states that those who receive AA's confidential information must agree to be bound by the terms of the NDA, and AA has incorporated this allegation as part of Count II.   UWS agreed in the LOI to be bound by the NDA, and Defendant Aurich executed the NDA and was certainly aware of its terms.   Contrary to the position taken by Aurich and UWS, there is no *per se* rule that a principal, agent, or affiliate cannot be bound by an agreement entered by a corporate party.  *See, e.g.*, *Onderko v. Advanced Auto Ins., Inc.*, 477 So. 2d 1026, 1028 (Fla. 2d DCA 1985) ("When he signed in his representative capacity [Capitano] also became bound in his individual capacity under the terms of the leases.   It would have made no difference had he added any *descriptio personae* beside his signature . . . . A party has a duty to learn and know the contents of an agreement before signing it."); *Sabin v. Lowe's of Fla., Inc.*, 404 So. 2d 772, 773 (Fla. 5th DCA 1981) ("Here the contract was clear . . . . that whoever signed was personally obligating himself.   The fact that he signed it 'as president' should not alter the plain and obvious meaning and intent expressed in the document.).

Considering the detailed allegations of the complaint as well as the terms of the NDA and letter of intents, AA has sufficiently alleged a cause of action for breach of the NDA as to Aurich and UWS.   Again, while Aurich and UWS may make arguments in the future as to which parties can be held liable and what provisions in certain agreements are binding or were breached, such arguments are not appropriate at the motion to dismiss stage when all plead facts must be taken as true.   The motions to dismiss should be denied as to Count II for breach of the NDA.

## IV.   CONCLUSION

For the foregoing reasons, AA respectfully requests that this Court deny Defendants' motions to dismiss.

Dated: July 26, 2016.                          Respectfully submitted,

/s/ Mindi M. Richter
Jaime Austrich, Trial Counsel
Florida Bar No. 84565
jaustrich@slk-law.com
J. Todd Timmerman
Florida Bar No. 0956058
ttimmerman@slk-law.com
Mindi M. Richter
Florida Bar No. 0044827
mrichter@slk-law.com
101 East Kennedy Boulevard
Suite 2800
Tampa, Florida 33602
Telephone No.: (813) 229-7600
Facsimile No.:  (813) 229-1660

*Attorneys for Plaintiff, Adams Arms, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on July 26, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic filing to all counsel of record.

/s/ Mindi M. Richter
Attorney