UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ADAMS ARMS, LLC,

       Plaintiff,

v.                           Case No. 8:16-cv-1503-T-33AEP

UNIFIED WEAPON SYSTEMS, INC.
et al.,

       Defendants.

_____/

## ORDER

    This cause is before the Court pursuant to the following Motions, which are ripe for the Court's review: Defendant Aguieus, LLC's Motion to Dismiss Count V of Plaintiff's Complaint (Doc. # 46), Defendant Michael C. Bingham's Motion to Dismiss Count V of Plaintiff's Complaint (Doc. # 47), Defendant Major General James W. Parker's Motion to Dismiss Count V of Plaintiff's Complaint (Doc. # 48), Defendant Unified Weapon Systems, Inc.'s Motion to Dismiss Counts I, II, and V of Plaintiff's Complaint (Doc. # 49), Defendant Christian Quintanilla Aurich's Motion to Dismiss Counts II and V of Plaintiff's Complaint (Doc. # 50), and Plaintiff Adams Arms' Motion to Dismiss Defendant Unified Weapon Systems' Counterclaim for Tortious Interference (Doc. # 81). For the reasons that follow, the Motions are denied.

## I.  Factual Background

### A. The Parties

    Plaintiff Adams Arms, LLC is a Tampa, Florida,

manufacturer specializing in "small arms, including high-powered military rifles." (Doc. # 1 at ¶ 1).  Adams Arms' rifles are "used around the world by members of police and sheriff departments, SWAT teams, the Federal Bureau of Investigation, the United States Marine Corps, and the Mexican and Panamanian militaries." (Id. at ¶ 2).

Defendant Unified Weapon Systems, Inc. ("UWS") is a Delaware corporation with its principal place of business in Hillsborough County, Florida. (Id. at ¶ 11).  UWS is a subsidiary of Defendant Aguieus, LLC. (Id.).  Defendant Michael Bingham is the managing member of Aguieus, is the Vice President and Chief Operating Officer of UWS, and resides in Pasco County, Florida. (Id. at ¶ 13).  Defendant Christian Quintanilla Aurich is the President and Chief Executive Officer of UWS. (Id. at ¶ 14).  Defendant General James W. Parker is a retired Major General from the United States Army and serves as a Director and advisor for UWS. (Id. at ¶ 15).

**B.   The Letter of Intent and Nondisclosure Agreements**

In early 2014, Aguieus and UWS approached Adams Arms with a proposal for the companies to work together on a bid to supply high-powered military rifles to the Peruvian military. (Id. at ¶¶ 18, 20).  The Ministry of Defense of the Republic of Peru ("Peruvian MOD") was funding the purchase through the Peruvian Factory of Weapons and Ammunition from the Army

2

S.A.C. ("FAME"). The project would require Adams Arms to provide UWS with products, such as demonstration rifles, to disclose trade secrets, and allow a tour of Adams Arms' manufacturing facility. (<u>Id.</u> at ¶ 21).

On February 24, 2014, as an "inducement" for Adams Arms to join the project, Aurich executed a "Mutual Confidentiality and Nondisclosure Agreement" with Adams Arms "in which Aguieus agreed not to use [Adams Arms'] confidential information, including [Adams Arms'] technical data, trade secrets, and know-how, for its own use or for any purpose other than the commercial relationship between [Adams Arms] and Aguieus." (<u>Id.</u> at ¶ 22).

The Mutual Confidentiality and Nondisclosure Agreement, which is attached to the Complaint, explains that the parties contemplated disclosure of confidential information to "Representatives," including "directors, officers, employees, consultants and agents" to facilitate the joint venture's "permitted purpose" and "[e]ach party will require each of its Representatives who has access to Confidential Information of the other party to acknowledge and agree to be bound by" the Mutual Confidentiality and Nondisclosure Agreement. (<u>Id.</u> at 28).

Thereafter, on April 29, 2014, Bingham, on behalf of UWS and non-party Jim Granger, the Vice President of Adams Arms,

executed a six-page Letter of Intent.  On page one, the Letter of Intent states: "This document, in and of itself, does not represent a legal contract." (<u>Id.</u> at 31).  The Letter of Intent also states in section nine:

> **9. <u>No Binding Obligation</u>**.  Except for Sections 1(b), (c), (d) and 2 through 7, THIS LETTER OF INTENT DOES NOT CONSTITUTE OR CREATE, AND SHALL NOT BE DEEMED TO CONSTITUTE OR CREATE, ANY LEGALLY BINDING OR ENFORCEABLE OBLIGATION ON THE PART OF EITHER PARTY TO THIS LETTER OF INTENT.  NO SUCH OBLIGATION SHALL BE CREATED, EXCEPT BY THE EXECUTION AND DELIVERY OF THE PURCHASE AGREEMENT CONTAINING SUCH TERMS AND CONDITIONS OF THE PROPOSED TRANSACTION AND SHALL BE AGREED UPON BY THE PARTIES, AND THEN ONLY IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF SUCH PURCHASE AGREEMENT.

(<u>Id.</u> at 35).  Section 1(e), titled "Definitive Purchase Agreement," states that "all of the terms and conditions of the proposed transaction would be stated in the Purchase Agreement, to be negotiated, agreed and executed by you and us." (<u>Id.</u> at 33).  Further, that section states that "[n]either party intends to be bound by any oral or written statements or correspondence concerning the Purchase Agreement arising during the course of negotiations, notwithstanding that the same may be expressed in terms signifying a partial, preliminary or interim agreement between the parties." (<u>Id.</u>).  "After signing the [Letter of Intent], on or about June 25, 2014, Mr. Bingham represented to [Adams Arms] that there would be an immediate order for 3,000 units for use by the Peruvian MOD." (<u>Id.</u> at ¶ 31).

4

During that time, General Parker met with Adams Arms' President and CEO, Michael Froning, "and represented to Mr. Froning that General Parker possessed significant expertise and knowledge regarding foreign and domestic military matters, which would be helpful to [Adams Arms] in negotiating the rifle contract with UWS." (Id. at ¶ 32). According to Adams Arms, General Parker failed to disclose that he was a director and advisor for UWS and "when Mr. Froning asked General Parker whether he had any conflicts of interest or ties with UWS that would prevent him from being loyal to [Adams Arms], General Parker misrepresented to Mr. Froning that he had no ties to UWS." (Id. at ¶ 33).

In furtherance of General Parker's efforts to gain access to Adams Arms' trade secrets, on June 24, 2016, General Parker executed a separate "Confidential/Nondisclosure Agreement" vowing to hold Adams Arms' confidential information and trade secrets "in the strictest confidence" and agreeing "not to use any Confidential Information for any purpose other than the Business Purpose." (Id. at 39). General Parker also executed a Consulting Services Agreement on July 7, 2014, further agreeing to keep Adams Arms' proprietary information confidential and to only use such information in connection with providing services on behalf of Adams Arms. (Id. at ¶ 35).

### C. <u>Adams Arms Divulges Trade Secrets</u>

Adams Arms "has spent a number of years and endless resources" developing "numerous trade secrets that are crucial and extremely valuable to its business." (<u>Id.</u> at ¶¶ 28-29). Adams Arms explains that it "exerts great efforts to ensure that its trade secrets remain confidential," such as requiring employees and third parties to sign nondisclosure agreements, maintaining security cameras at its facilities, and requiring badges for entry into its facilities. (<u>Id.</u> at ¶ 29).

However, in reliance on the non-disclosure agreements, the Letter of Intent, and other assurances, Adams Arms disclosed trade secrets to all Defendants. (<u>Id.</u> at ¶¶ 27, 36). In particular, between August of 2014, and February of 2015, Adams Arms manufactured demonstration rifles for examination and testing by UWS and the Peruvian MOD. (<u>Id.</u> at ¶¶ 37-43). Between April of 2015, and September of 2015, Defendant Bingham, who is a managing member of Aguieus and an executive of UWS, requested supplier pricing information for the separate components of Adams Arms' rifles, which Adams Arms provided. (<u>Id.</u> at ¶¶ 13, 45). Bingham also requested information about Adams Arms' manufacturing facility and equipment, and Adams Arms allowed tours of its facility in Florida during which Adams Arms revealed step-by-step details of its manufacturing processes, machinery, and tooling. (<u>Id.</u>

at ¶¶ 46-47).

Following the meetings in Florida, Bingham requested additional confidential and proprietary information, which he represented was necessary to secure the contract with FAME. (Id. at ¶¶ 49-50). This information included photographs of Adams Arms' facility and tool boxes; a complete list of parts, parts configurations, parts suppliers, and prices; and proprietary details of Adams Arms' technician training program. (Id. at ¶ 49).

On September 25, 2015, Bingham represented to Adams Arms that all submissions to FAME were completed on time thanks to Adams Arms. (Id. at ¶ 51). On November 19, 2015, FAME issued its bid solicitation for the rifles. (Id. at ¶ 52). On December 10, 2015, UWS submitted a qualified offer in response to the bid solicitation using Adams Arms' designs, procedures, and specifications. (Id. at ¶ 54). On December 18, 2015, FAME announced UWS as the winning bidder. (Id. at ¶ 57).

### D.   **Defendants Exclude Adams Arms from the Deal**

After UWS obtained the winning bid, UWS "began taking steps to squeeze [Adams Arms] out of the final purchase contract[.]" (Id. at ¶ 60). UWS and Bingham refused Adams Arms' requests for documents and meetings, although Defendants "continued to seek guidance and input" about the design of the rifles. (Id. at ¶¶ 61-63). On December 30, 2015, Defendant

Aurich, the CEO of UWS, advised Adams Arms that UWS would take the entire project over now that UWS had all of Adams Arms' technical and pricing data. (Id. at ¶¶ 14, 64). In the months that followed, Adams Arms was excluded from multiple meetings with FAME, including another meeting in Peru to test Adams Arms' rifles before final contract execution. (Id. at ¶ 65).

Adams Arms voiced its concerns to FAME officials in an email dated May 6, 2016, asserting that the rifles subject to the bid employed technology belonging to Adams Arms and threatening litigation. (Doc. # 52-2 at 1). Thereafter, on May 16, 2016, UWS and FAME entered into a written agreement (the "FAME Agreement") specifying that FAME and UWS agreed to manufacture the rifles in FAME's facilities in Peru. (Doc. # 52 at ¶¶ 7-8). Adams Arms alleges that "UWS's contract is undoubtedly a contract for the sale of [Adams Arms'] rifles to FAME, using all the designs, specifications, and processes divulged under false pretenses by [Adams Arms]." (Doc. # 1 at ¶ 68).

UWS claims that after FAME received Adams Arms' "scathing" email, FAME "refused to issue any purchase orders for the rifles." (Doc. # 52 at Counterclaim ¶¶ 9, 24). UWS indicates that Adams Arms knew about the agreement between UWS and FAME and issued the threatening email in an effort to harm that relationship. (Id. at ¶¶ 21-22). UWS claims that it has

lost millions, if not billions, of dollars due to Adams Arms' interference. (<u>Id.</u> at ¶ 12).

## II.  **Procedural History**

On June 10, 2016, Adams Arms filed its Complaint containing the following counts: breach of Letter of Intent against UWS (Count One); breach of Mutual Confidentiality and Nondisclosure Agreement against all Defendants (Count Two); breach of Confidential Nondisclosure Agreement against General Parker (Count Three); breach of Consulting Services Agreement as to General Parker (Count Four); misappropriation under the Defend Trade Secrets Act as to all Defendants (Count Five); misappropriation under the Florida Trade Secrets Act against all Defendants (Count Six); unfair competition under the Lanham Act against UWS (Count Seven); and unjust enrichment against UWS and Aguieus (Count Eight).

On July 12, 2016, Defendants Aguieus, Bingham, and General Parker filed their respective Answers and Affirmative Defenses to the Complaint, each asserting the "affirmative defense" of "failure to state a claim" as to all counts. (Doc. ## 43-45). On the same day, Defendants Aguieus, Bingham, and General Parker each filed a Motion seeking the dismissal of Count Five only. (Doc. ## 46-48).

On July 13, 2016, Defendant UWS filed its Motion to Dismiss Counts One, Two and Five (Doc. # 49), as well as its

Answer, Affirmative Defenses, and a tortious interference counterclaim against Adams Arms. (Doc. # 52). Aurich likewise filed a Motion to Dismiss Counts Two and Five of the Complaint (Doc. # 50) along with his Answer and Affirmative Defenses on July 13, 2016. (Doc. # 51). Thereafter, on August 2, 2016, Adams Arms filed a Motion to Dismiss UWS' tortious interference counterclaim. (Doc. # 81). All motions are ripe for the Court's review and are addressed herein.

## III. Legal Standard

Defendants Aguieus, Bingham, and Parker filed their Motions to Dismiss Count Five immediately after filing Answers to the Complaint. (Doc. ## 43-48). Rule 12(b) requires that a motion filed pursuant to Rule 12(b)(6) "must be made before pleading if a responsive pleading is allowed." However, Rule 12(h) specifies that the defense of failure to state a claim may also be raised in a motion for judgment on the pleadings pursuant to Rule 12(c). Fed. R. Civ. P. 12(h)(2)(B). Thus, although Aguieus, Bingham, and Parker's Motions are technically legal nullities, Leonard v. Enter. Rent a Car, 279 F.3d 967, 971 n.6 (11th Cir. 2002), the Court will construe the Motions as made under Rule 12(c). Whitehurst v. Wal-Mart Stores E., L.P., 329 F. App'x 206, 208 (11th Cir. 2008); Alilin v. State Farm Mut. Auto. Ins. Co., No. 6:14-CV-1183-ORL, 2014 WL 7734262, at *3 (M.D. Fla. Jan. 30,

2014).

Aguieus, Bingham, and Parker's construed Rule 12(c) Motions are governed by the same standard applicable to motions filed pursuant to Rule 12(b)(6). Hogan v. Provident Life & Acc. Ins. Co., No. 6:08-CV-1897-ORL-19K, 2009 WL 2169850, at *3-4 (M.D. Fla. July 20, 2009). This is an effective manner in which to approach the motions because other Defendants filed procedurally appropriate Rule 12(b)(6) Motions to Dismiss Count Five.

In addressing all Motions now before the Court, the Court accepts as true all of the factual allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, this Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990) ("On a motion to dismiss, the facts stated in [the] complaint and all reasonable inferences therefrom are taken as true."). However, the Supreme Court explains that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative

11

level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted).  Further, courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

In accordance with Twombly, Federal Rule of Civil Procedure 8(a) calls "for sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Twombly, 550 U.S. at 570).  A plausible claim for relief must include "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

**IV.   Discussion**

    **A.   Defend Trade Secrets Act - Count Five**

All Defendants seek dismissal of Count Five, in which Adams Arms alleges a violation of the Defend Trade Secrets Act.  That Act creates a private cause of action in favor of the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).

The DTSA includes definitions, remedies, and a statute of limitations substantially similar to provisions in the Uniform

Trade Secrets Act ("UTSA").  H. Rep. No. 114-529, at 4-5, 12-14 (2016), as reprinted in 2016 U.S.C.C.A.N. 195-211. Although the UTSA is effective in 48 states, those laws "vary in a number of ways and contain built-in limitations that make them not wholly effective in a national and global economy." Id. at 4.  DTSA is intended to provide a "single, national standard for trade secret misappropriation with clear rules and predictability for everyone involved."  Id.

Pursuant to DTSA, prohibited "misappropriation" includes both the acquisition of a trade secret and its disclosure.  18 U.S.C. § 1839(5)(A)-(B).  Adams Arms bases its DTSA claim on both types of misappropriation.  (Doc. # 1 at ¶¶ 104-05).  A "trade secret" encompasses:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).  Adams Arms alleges that the reliability

13

of its rifles' performance "is the result of a number of trade secrets, including by way of example, its specific manufacturing processes, the tools and machinery used to make the parts, the mix of particular part types and sizes, and the mix of particular vendors and pricing for certain parts." (Doc. # 1 at ¶ 28).

Defendants do not dispute that the Complaint adequately alleges the existence of a "trade secret" and its "misappropriation." Instead, Defendants argue that Count Five should be dismissed with prejudice because DTSA did not become effective until May 11, 2016, which is after the relevant events at issue.

As the sole support for their argument, Defendants rely on DTSA's statute-of-limitations provision, which is adopted from the UTSA and provides:

> A civil action under [18 U.S.C. § 1836(b)] may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered. <u>For purposes of this subsection, a continuing misappropriation constitutes a single claim of misappropriation</u>.

18 U.S.C. § 1836(d) (emphasis added). Defendants contend that Subsection 1836(d) means, as a general matter, that "any 'continuity' of a misappropriation shall be treated as one misappropriation." (Doc. # 46 at 2). Defendants further maintain that this action is premised on such a continuing

14

misappropriation.  The Court is not persuaded on either front.

As Adams Arms points out, while Subsection 1836(d) states that a continuing misappropriation constitutes a single claim, it does so only "for purposes of this subsection."  That subsection addresses only when a claim accrues for statute of limitations purposes, and it does not purport to address the issue in this case:  whether an owner may recover under DTSA when the misappropriation occurs both before and after the effective date, assuming the entire misappropriation is within the 3-year limitations period.

Section 2(e) of DTSA speaks more to the issue presented.  Section 2(e) specifies that DTSA applies to "any misappropriation . . . for which any act occurs" after the effective date.  Pub. L. No. 114-153, § 2(e).  At the least, this language suggests that when an "act" occurs after the effective date, a partial recovery is available on a misappropriation claim.[1]  Supporting this interpretation, the Court notes that Congress omitted from DTSA the following language from Section 11 of the UTSA:  "With respect to a

---

[1] Adams does not appear to contend that an act occurring within the effective date would bring the entire misappropriation claim within the effective date.  That argument, if made, would implicate the usual presumption against a statute being retroactive, an issue neither side addresses - e.g., W.R. Huff Asset Mgmt. Co., LLC v. Kohlberg Kravis Roberts & Co., L.P., 234 F. Supp. 2d 1218, 1222 (N.D. Ala. 2002).

continuing misappropriation that began prior to the effective date, the [Act] also does not apply to the continuing misappropriation that occurs after the effective date." UTSA, Section 11.[2]

Based on the foregoing, the Court finds that Adams Arms may state a plausible claim for relief, if Adams Arms sufficiently alleges a prohibited "act" occurring after May 11, 2016. With respect to Adams Arms' disclosure theory of recovery (Doc. # 1 at ¶ 105), Adams Arms does so. The Complaint specifically alleges that UWS signed a contract with the Peruvian military in late May or early June 2016, which was after DTSA's effective date, and that the contract used "all the designs, specifications, and processes divulged under false pretenses by [Adams Arms]." (Id. at ¶¶ 67-68). That allegation supports an inference that Defendants disclosed Adams Arms' trade secrets after the effective date. Through discovery, the parties may clarify the timing and nature of

---

[2] Likewise, states adopting the UTSA have not uniformly adopted this language. Compare Tenn. Code. § 47-25-1701 (Notes) (including this language); BP Chemicals Ltd. v. Jiangsu Sopo Corp., 429 F. Supp. 2d 1179, 1190 (E.D. Mo. 2006) (rejecting continuing violation theory because "[t]he [Missouri UTSA] specifically states that if a misappropriation began before the effective date, the Act cannot apply to continuing misappropriation that occurs after that date"), with Cal. Civ. Code § 3426.10 (specifying that, if a continuing misappropriation commenced prior to effective date, the act applies to the part of the misappropriation occurring after the effective date).

any such disclosures.

The Complaint does not, however, state any claim based on an acquisition theory after the effective date of the DTSA. (Id. at ¶ 104).  Even taking the available inferences in Adams Arms' favor, the facts indicate that Defendants acquired all information well prior to May of 2016.  The Court denies the Motions to Dismiss Count Five, but finds that the Count is limited to a disclosure theory and cannot proceed under an acquisition theory.

**B.   <u>Breach of Letter of Intent - Count One</u>**

In Count One of the Complaint, Adams Arms claims that UWS breached the terms of the April 29, 2014, Letter of Intent. The Letter of Intent is before the Court and contains nine substantive paragraphs, some that include subparts.  UWS seeks dismissal of Count One, arguing that (1) UWS is not a party to the Letter of Intent and (2) the Letter of Intent is not an enforceable contract.

The Court rejects UWS's argument that it is not a party to the Letter of Intent out of hand.  The Letter of Intent is presented on Unified Weapon Systems letterhead and the words "UNIFIED WEAPON SYSTEMS" appear prominently on the top of every page in bold, capitalized, and underlined text. The Letter of Intent is executed by Michael Bingham as the Managing Member of UWS, and each page of the Letter of Intent

is initialed by Bingham.  These objective indications belie UWS's assertion that it is not a party to the Letter of Intent.

The next argument espoused by UWS is that the Letter of Intent is not an enforceable contract.  The Court will first evaluate whether the Letter of Intent is a contract at all. Thereafter, the Court will consider whether language contained in the Letter of Intent bars its enforcement.

The label placed on a document is not dispositive of whether it is a contract.  To constitute a contract, an agreement "is subject to the basic requirements of contract law such as offer, acceptance, consideration, and sufficient specification of essential terms." St. Joe Corp. v. McIver, 875 So. 2d 375, 381 (Fla. 2004).  Here, UWS claims that the Letter of Intent was not solidified into a contract because essential terms were not agreed upon.  UWS points to the absence of certain price terms.  As stated in John I. Moss, Inc. v. Cobbs Co., 198 So. 2d 872, 874 (Fla. 3d DCA 1967):

> The rule that it is possible for parties to make an enforceable contract binding them to prepare and execute a subsequent agreement is well recognized. However, if the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called "contract to make a contract" is not a contract at all.

Id.

Adams Arms persuasively contends that, at this procedural

18

juncture, the allegations contained in the Complaint support the creation of a contract with respect to the Letter of Intent. The Complaint alleges: "In the [Letter of Intent] UWS as 'Buyer' agreed with [Adams Arms] as 'Seller' that [Adams Arms] would manufacture the rifles at its facility, with the exception of certain parts that would be provided by UWS . . . This was a binding agreement of UWS." (Doc. # 1 at ¶ 24). The Complaint also alleges that given Adams Arms' investment in the project, UWS would not "accept any offer or proposal regarding the possible Project by any person other than Seller" which was "likewise a binding agreement." (Id. at ¶ 26). And, because the Letter of Intent is not a purchase agreement, it did not necessarily need to contain financial terms. The material terms that the parties included support the creation of a binding contract.

UWS also points to the following language that appears on page one of the Letter of Intent: "This document, in and of itself, does not represent a legal contract." (Doc. # 1 at 31). However, the final paragraph of the Letter of Intent provides a more detailed discussion regarding enforceability:

> **9. No Binding Obligation.** Except for Sections 1(b), (c), (d) and 2 through 7, THIS LETTER OF INTENT DOES NOT CONSTITUTE OR CREATE, AND SHALL NOT BE DEEMED TO CONSTITUTE OR CREATE, ANY LEGALLY BINDING OR ENFORCEABLE OBLIGATION ON THE PART OF EITHER PARTY TO THIS LETTER OF INTENT. NO SUCH OBLIGATION SHALL BE CREATED, EXCEPT BY THE EXECUTION AND DELIVERY OF THE PURCHASE AGREEMENT

> CONTAINING SUCH TERMS AND CONDITIONS OF THE
> PROPOSED TRANSACTION AND SHALL BE AGREED UPON BY
> THE PARTIES, AND THEN ONLY IN ACCORDANCE WITH THE
> TERMS AND CONDITIONS OF SUCH PURCHASE AGREEMENT.

(Id. at 35). This paragraph supports Adams Arms' assertion that the parties intended to be bound by the terms contained within paragraphs 1(b), 1(c), 1(d), and 2 - 7 of the Letter of Intent.

The Court reminds the parties that its analysis at this stage of the action is restricted to the four corners of the Complaint and undisputed attachments thereto. With this in mind, the Court determines that Adams Arms has alleged the existence of a valid contract and the breach thereof. The Court acknowledges UWS's assertion that Adams Arms' cannot enforce the contract because Adams Arms failed to timely deliver certain rifles prior to September 1, 2014. (Doc. # 49 at 4). However, this argument is not amenable to resolution at the Motion to Dismiss stage and is better addressed at the Summary Judgment stage, where the Court may consider evidentiary sources beyond the Complaint and exhibits.

Particularly given the procedural posture of the case, the Court agrees with Adams Arms that the Letter of Intent "is a definite, detailed agreement spanning five pages in which both parties assented to certain rights and obligations." (Doc. # 77 at 10). UWS' Motion to Dismiss is accordingly denied with respect to Count One.

### C.   <u>Breach of Non-Disclosure Agreement - Count Two</u>

In Count Two, asserted against "all Defendants," Adams Arms seeks redress for breach of the Mutual Confidentiality and Nondisclosure Agreement.  A representative of Adams Arms and Aguieus signed the Nondisclosure agreement.  However, Adams Arms also claims that: "UWS, Mr. Bingham, Mr. Aurich, and General Parker, as affiliates, directors, officers, employees, consultants, and/or agents of Augieus, all received [Adams Arms'] confidential information in furtherance of the commercial relationship between Adams Arms and Aguieus, and as such were required to acknowledge and agree to be bound by the [Nondisclosure Agreement]." (Doc. # 1 at ¶ 79).

The Nondisclosure Agreement provides that recipients of Adams Arms' confidential information will not use that information for their own use or for any purpose other than the commercial relationship between Adams Arms and Aguieus. (<u>Id.</u> at ¶ 80).  Despite this provision, Adams Arms claims that the Defendants used Adams Arms' "confidential information for the purpose of securing a contract between FAME and UWS." (<u>Id.</u> at ¶ 81).

UWS and Aurich seek dismissal of Count Two, pointing out that they did not sign the agreement and that the agreement was between Adams Arms and Aguieus only.  The Court denies the Motion to Dismiss with respect to UWS.  The Letter of Intent

that UWS executed through its representative on April 29, 2014, specifically refers to the Confidentiality Agreement and "ratifie[s]" and "confirm[s]" the Confidentiality Agreement. (Doc. # 1 at 35).

The Court also denies the Motion to Dismiss as to Aurich because Mr. Aurich himself signed the Confidentiality Agreement.  He may have done so in a representative capacity, but, at this juncture, that argument does not lead to the dismissal of the Count, with prejudice, as Aurich requests.

### D.  **Tortious Interference Counterclaim**

Adams Arms seeks the dismissal of the tortious interference counterclaim brought by UWS.  Adams Arms asserts that UWS's counterclaim fails to allege the required elements of the tort and also that the counterclaim is barred by Florida's Litigation Privilege.

### 1.  **Elemental Analysis of Tortious Interference**

"To prove tortious interference, Plaintiff must show: (1) the existence of a contract or business relationship not necessarily evidenced by an enforceable contract under which [the plaintiff] has rights; (2) defendants' knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by defendants; and (4) damage as a result of the interference." Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC, 845 F. Supp. 2d 1241, 1258 (M.D. Fla.

2012).

A tortious interference claim will fail absent "a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 815 (Fla. 1994). Florida law also requires actual harm to a business relationship, as opposed to merely a suspicion or unsupported and speculative supposition of harm. Realauction.com, LLC v. Grant St. Grp., Inc., 82 So. 3d 1056, 1058 (Fla. DCA 2011).

Here, the counterclaim sufficiently alleges each required element. UWS claims that a business relationship existed between FAME and UWS that afforded UWS with existing or prospective legal rights, that Adams Arms was aware of that relationship, and that Adams Arms intentionally interfered with the relationship without justification, causing harm to UWS.

Specifically, UWS claims that Adams Arms sent a defamatory and threatening email to FAME "just as UWS and FAME were getting ready to ink the deal" and that the email caused damage to UWS. (Doc. # 90 at 3-4). UWS claims that due to the email from Adams Arms, FAME refused to issue any purchase orders, effectively depriving UWS of its expected monetary

benefits under the contract.

At this juncture, these allegations are sufficient to withstand Adams Arms' Motion to Dismiss.   The Court acknowledges Adams Arms' argument that the email in question was sent ten days before the formal agreement between UWS and FAME was executed, such that the email could not have interfered with or otherwise compromised the execution of that agreement.   However, the argument is unavailing because UWS has alleged that FAME did not follow through with the FAME Agreement with purchase orders because of what was stated in Adams Arms' email.   As stated by UWS: "The specific facts and circumstances surrounding FAME's receipt of [Adams Arms'] email and the effects it had on FAME and its relationship with UWS are questions going to the merits of the case, not items that UWS is required to plead in its Counterclaim to state a cause of action." (Doc. # 90 at 4).

## 2.   **Litigation Privilege**

"Florida's litigation privilege affords absolute immunity for acts occurring during the course of judicial proceedings." Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1275 (11th Cir. 2004).   The privilege applies to all misconduct, whether based in statute or common law. Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole, 950 So. 2d 380, 384 (Fla. 2007).

It cannot be disputed that Adams Arms' initiation of this

suit by filing the Complaint is not actionable as tortious interference. <u>See</u> <u>BOCA Inv'rs Grp., Inc. v. Potash</u>, 835 So. 2d 273, 274 (Fla. 3d DCA 2002); <u>Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.</u>, 639 So. 2d 606, 608 (Fla. 1994)("Absolute immunity must be afforded to any act occurring during the course of a judicial proceeding, regardless of whether the act involves . . . tortious behavior . . . so long as the act has some relation to the proceeding.").

The issue is whether Adams Arms' email transmission to FAME is protected by the litigation privilege. Because the email was sent by a non-attorney before the lawsuit was initiated and because the email was sent to a non-party, it does not appear that the email in question is protected by the privilege. <u>See</u> <u>LatAm Invs., LLC v. Holland & Knight, LLP</u>, 88 So. 3d 240, 243 (Fla. 3d DCA 2011)("The litigation privilege, by definition, is limited to actions taken during a judicial proceeding and which are related to the judicial proceeding."). However, the Court would be willing to hear further argument on this matter at the summary judgment stage, if properly raised at that time.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED** that:

(1) Defendant Aguieus, LLC's Motion to Dismiss Count V of

25

Plaintiff's Complaint (Doc. # 46) is **DENIED**.

(2) Defendant Michael C. Bingham's Motion to Dismiss Count V of Plaintiff's Complaint (Doc. # 47) is **DENIED**.

(3) Defendant Major General James W. Parker's Motion to Dismiss Count V of Plaintiff's Complaint (Doc. # 48) is **DENIED**.

(4) Defendant Unified Weapon Systems' Motion to Dismiss Counts I, II, and V of Plaintiff's Complaint (Doc. # 49) is **DENIED**.

(5) Defendant Christian Quintanilla Aurich's Motion to Dismiss Counts II and V of Plaintiff's Complaint (Doc. # 50) is **DENIED**.

(6) Plaintiff Adams Arms' Motion to Dismiss Defendant Unified Weapon Systems' Counterclaim for Tortious Interference (Doc. # 81) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>27th</u> day of September, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE