**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ADAMS ARMS, LLC,

     Plaintiff,

                                 Case No.:  8:16-cv-01503-VMC-AEP

v.

UNIFIED WEAPON SYSTEMS, INC.,           JURY TRIAL DEMANDED
AGUIEUS, LLC,
MICHAEL C. BINGHAM,
CHRISTIAN QUINTANILLA AURICH, and
MAJOR GENERAL JAMES W. PARKER,
USA, Retired,

     Defendants

_____/

**FIRST AMENDED COMPLAINT**
**FOR DAMAGES – INJUNCTIVE RELIEF SOUGHT**

Plaintiff Adams Arms, LLC ("AA") seeks injunctive relief against, and payment of damages from, Defendants for breach of contract, misappropriation of trade secrets, and unfair competition, and states as follows:

**INTRODUCTION**

1.     AA is a weapons manufacturer founded and based in the Tampa Bay area that provides cutting edge technology in the engineering, design, development, and manufacture of small arms, including high-powered military rifles.

2.     AA's rifles and rifle retrofits are sold to civilians through large retail chains such as Academy Sporting Goods and Mills Fleet Farm, used around the world by members of police and sheriff departments, SWAT teams, the Federal Bureau of Investigation, the United States

Marine Corps, and the Mexican and Panamanian militaries, and AA is an OEM parts provider to other weapons manufacturers such as Stag Arms and Smith & Wesson.

3.      AA has sold more than 100,000 rifles, rifle retrofits, and upper assemblies over its history to civilians, law enforcement, and the military, and is highly-regarded for the quality of its products and the superior accuracy and reliability of its rifles.  AA owns multiple patents on its rifle-related technologies.

4.      Beginning in early 2014, AA developed custom high-powered military rifles for ultimate sale to the Peruvian military through Aguieus, LLC ("Aguieus") and Unified Weapon Systems, Inc. ("UWS").

5.      The Defendants made a series of misrepresentations and signed multiple agreements with AA to induce AA to engineer, design, and develop the weapons, divulge its trade secrets to them, provide them with confidential information, and allow them to use AA's name, reputation, and products to enable them to procure a contract with the Peruvian military, all based on the premise that AA would be the sole provider of the weapons to be sold to the Peruvian military.

6.      AA successfully engineered, designed, and manufactured the prototype weapons that passed the Peruvian military's specifications and multiple tests.

7.      Through the use of AA's prototype weapons, as well as the use of its highly proprietary trade secrets and confidential information, UWS was awarded the bid to manufacture the weapons to be sold to the Peruvian military.

8.      Since the bid award, UWS has in fact entered into a contract with the Peruvian military for the sale of AA's custom designed weapons, but AA has been shut out of the contract. Indeed, through a series of materially false statements, broken contracts, and a scheme of

calculated deception, the Defendants have misappropriated AA's trade secrets and confidential information in order to source the supply for these $100+ million contracts either themselves or through other third parties, depriving AA of the fruits of its labor and the benefits of its contract.

9.      AA seeks injunctive relief to prevent the Defendants from further utilizing and disclosing its trade secrets and confidential information and from marketing, manufacturing, and selling AA's weapons to any third parties, including the Peruvian military.  AA also seeks a judgment for all damages incurred as a consequence of the Defendants' multiple breaches of several contracts and violations of both state and federal laws.

## PARTIES, JURISDICTION AND VENUE

10.      AA is a Florida limited liability company with its principal place of business in Odessa, Florida.

11.      Defendant Unified Weapon Systems, Inc. is a Delaware corporation with its principal place of business in Hillsborough County, Florida.  UWS is a subsidiary of Defendant Aguieus, LLC.  According to its website, UWS is a licensed U.S. weapons manufacturer and registered exporter of armament and munitions.

12.      Defendant Aguieus is a Delaware limited liability corporation authorized and doing business in Hillsborough County, Florida.

13.      Defendant Michael C. Bingham, is the Managing Member and Manager of Aguieus, the Vice President, Chief Operating Officer, and Operations Manager of UWS, and a resident of Pasco County, Florida.

14.      Defendant Christian Quintanilla Aurich is the President and Chief Executive Officer of UWS and a Manager of Aguieus.  Upon information and belief, Mr. Aurich is a resident of Peru.

15.     Defendant General James W. Parker is a Director of and the Senior/Principal Military Advisor for UWS.  According to UWS's website, General Parker is a retired Major General from the United States Army.  General Parker resides in Hillsborough County, Florida.

16.     Jurisdiction is conferred on this Court by 28 U.S.C. §1331 through a trade secret misappropriation claim under the Defend Trade Secrets Act of 2016 and an unfair competition claim under the Lanham Act; this Court has jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367.

17.     Venue is proper before this Court pursuant to 28 U.S.C. §1391(b) since Defendants UWS, Aguieus, Mr. Bingham, Mr. Aurich, and General Parker are all residents or doing business in this judicial district.  Furthermore, a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred in this judicial district.  Defendants Aguieus and General Parker also expressly agreed in writing that the state and federal courts for Pinellas or Hillsborough County, Florida will have exclusive jurisdiction.

## FACTUAL ALLEGATIONS

### Proposed Joint Venture

18.     In early 2014, Aguieus approached AA with a proposal for the two companies to work together on a bid to supply high-powered military rifles designed and built by AA to the Peruvian military.

19.     According to Mr. Bingham, the Ministry of Defense of the Republic of Peru ("Peruvian MOD") had contacted UWS, Aguieus's subsidiary, concerning the opportunity to secure a multi-year contract for the supply of the rifles.  The Peruvian MOD was purportedly funding the purchase through the Peruvian Factory of Weapons and Ammunition from the Army S.A.C. ("FAME").

4

20.     The rifles would be built to specifications established by the Peruvian MOD with input by UWS and its business partners.  Aguieus and UWS, through Mr. Bingham and Mr. Aurich, solicited AA to be a business partner in the project.

21.     The project would require AA to provide UWS with product, including working demonstration rifles, for testing by the Peruvian MOD, in addition to trade secret and proprietary confidential information, as well as a tour of the manufacturing facility, which would be AA's facility.

22.     On or about February 24, 2014, as an inducement for AA to join in the project, Aguieus executed a Mutual Confidentiality and Nondisclosure Agreement with AA in which Aguieus agreed not to use AA's confidential information, including AA's technical data, trade secrets, and know-how, for its own use or for any purpose other than the commercial relationship between AA and Aguieus ("NDA").  The NDA permitted Aguieus to disclose AA's confidential information to certain, specified others, including UWS, so long as they acknowledged and agreed to be bound by the NDA.  The NDA was executed by both Mr. Aurich and Mr. Bingham on behalf of Aguieus.  True and correct copies of the executed NDA are attached hereto as **Exhibits "1" and "2".**

23.     To memorialize the terms of the parties' joint venture, Mr. Bingham also sent AA a "Letter of Intent" on April 29, 2014, which UWS and AA executed ("LOI").  A true and correct copy of the LOI is attached hereto as **Exhibit "3".**

24.     In the LOI, UWS as "Buyer" agreed with AA as "Seller" that AA would manufacture the rifles at its facility, with the exception of certain parts that would be provided by UWS to AA for final assembly, in accordance with a delivery schedule that would be agreed to by UWS and AA.  This was a binding agreement of UWS.

25.     The LOI further committed AA to provide UWS with demonstration rifles and allow Peruvian MOD personnel to tour the manufacturing facility—AA's facility.

26.     In the LOI, UWS also agreed that given the investment AA would be making in the project "Buyer, Buyer's affiliates and Buyer's respective officers, directors, employees and agents shall not initiate, solicit, encourage, directly or indirectly, or accept any offer or proposal regarding the possible Project by any person other than Seller" with the exception of specified items not relevant herein.  This was likewise a binding agreement of UWS.

27.     Further, to induce AA to engage in this venture with UWS, UWS committed in the LOI to execute a contract with the Peruvian MOD within 30 days of the LOI (i.e. May 29, 2014), issue a purchase order for 10,700 rifles to AA within 5 days of signing such contract, and deposit 50% of the purchase order amount with AA within 10 days of issuing the purchase order. UWS further agreed to two further purchase orders to AA for 32,500 rifles and 21,800 rifles, respectively, subsequent to the first purchase order.  The expected dates of these further purchase orders were July 22, 2014 and September 1, 2014, respectively.   These were also binding agreements of UWS.

### AA Divulges its Trade Secrets

28.     In reliance upon the LOI and the NDA, and multiple prior and subsequent representations and assurances that there would be significant orders worth in excess of $100 million, AA disclosed its proprietary confidential information, including AA's technical data, trade secrets, and know-how, to UWS, Aguieus, Mr. Bingham, Mr. Aurich, and General Parker.

29.     As a weapons manufacturer, AA owns numerous trade secrets that are crucial and extremely valuable to its business.  By way of example, AA's rifle systems are superior to its competitors in a number of ways, including, but not limited to, the reliability of their

performance, which is the result of a number of trade secrets, including by way of example, its specific manufacturing processes, the tools and machinery used to make the parts, the mix of particular part types and sizes, and the mix of particular vendors and pricing for certain parts.

30.     AA has spent a number of years and endless resources developing its knowledge of weapons and corresponding trade secrets.  It exerts great efforts to ensure its trade secrets remain confidential, including, but not limited to, entering into non-disclosure agreements with employees and third parties, such as the Defendants; maintaining security systems and cameras at its facilities; requiring identification and badges for entry into its facilities; and ensuring shipment boxes do not contain the names of applicable vendors on the outside.

31.     While AA already had its own successful and proprietary rifle designs and systems, it further devoted substantial time, money, and resources to customize its rifle design configuration and provide an engineering platform for use by UWS to market AA's rifle to the Peruvian MOD.

32.     After signing the LOI, on or about June 25, 2014, Mr. Bingham represented to AA that there would be an immediate order for 3,000 units for use by the Peruvian MOD.

33.     In 2014, General Parker met with Michael Froning, AA's President and CEO, and represented to Mr. Froning that General Parker possessed significant expertise and knowledge regarding foreign and domestic military matters, which would be helpful to AA in negotiating the rifle contract with UWS.  General Parker further represented to Mr. Froning that General Parker would represent AA in its negotiations with UWS and use his military experience and relationships to assist AA in closing on the purchase agreement described in the LOI.

34.     At no time did General Parker advise or disclose to Mr. Froning that he was a director and advisor for UWS.  In fact, when Mr. Froning asked General Parker whether he had

any conflicts of interest or ties with UWS that would prevent him from being loyal to AA, General Parker misrepresented to Mr. Froning that he had no ties to UWS and no conflict of interest.

35.     In furtherance of General Parker's efforts to induce AA to reveal its trade secrets to General Parker, on June 24, 2014, General Parker executed a Confidential/Nondisclosure Agreement ("Parker NDA") with AA in which General Parker agreed to keep confidential AA's confidential information, trade secrets, and proprietary information and to use such information only for the business purposes for which General Parker was representing AA.  A true and correct copy of the Parker NDA is attached hereto as **Exhibit "4"**.

36.     General Parker also executed a Consulting Services Agreement on July 7, 2014 ("Parker Consulting Agreement"), in which General Parker further agreed to keep AA's proprietary information confidential and to only use such information in connection with providing services on behalf of AA.  A true and correct copy of the Parker Consulting Agreement is attached hereto as **Exhibit "5".**

37.     In reliance upon the Parker NDA and the Parker Consulting Agreement, and multiple subsequent representations and assurances by General Parker that he was representing AA's interests, AA disclosed proprietary confidential information, including AA's technical data, trade secrets and know-how, to General Parker.

38.     On August 18, 2014, UWS requested that AA manufacture demonstration units for testing.

39.     On October 13, 2014, UWS sent AA a purchase order for AA rifles totaling $2.1 million for January 2015 delivery.

40.     On October 14, 2014, UWS sent AA a purchase order for AA demonstration rifles for delivery to Peru.

41.     In reliance upon multiple representations by Mr. Bingham and General Parker, AA provided demonstration rifles to UWS for testing and inspection by UWS prior to demonstration for the Peruvian MOD.

42.     On November 17, 2014, Mr. Bingham represented to AA that the testing of the rifles went well and requested additional rifle parts from AA.

43.     On December 29, 2014, Mr. Bingham accepted delivery of AA demonstration rifles for export to Peru and further testing.

44.     On February 8 and 9, 2015, representatives of AA attended the demonstration of AA's rifles to the Peruvian MOD.  During the demonstration, UWS leveraged AA's brand name and weapons-making experience, identifying AA as one of its lead partners, and UWS used AA's trademarks to market the rifles to the Peruvian MOD.  To AA's knowledge, UWS has no ability to design or manufacture any rifles.  Instead, it was marketing AA's rifles to the customer.

45.     The demonstration was successful, and all parties approved moving forward with the joint venture with AA as the manufacturer.

46.     Beginning on April 18, 2015, Mr. Bingham began requesting supplier pricing information from AA for the separate components of AA's rifles.  Mr. Bingham represented to AA that the purpose for this was to support the bid to FAME in conjunction with the joint venture as outlined in the LOI.  After multiple representations and assurances from Mr. Bingham that this information was not being used to identify AA's suppliers and pricing structure to lock AA out of the venture, AA eventually supplied this information to Mr. Bingham and UWS.

47.     On August 28, 2015, Mr. Bingham requested AA to provide backup information on AA's manufacturing facility and equipment to support those portions of the presentation to FAME for which UWS took credit.

48.     In September of 2015, representatives of FAME toured AA's factory to inspect where the rifles would be manufactured and assembled and to conduct further demonstrations of the rifles.  During the tours, and pursuant to the NDA, AA revealed step-by-step details of its manufacturing processes, machinery, and tooling.

49.     During these meetings from September 1-4, 2015, Mr. Bingham represented to Mr. Froning that AA should be prepared for an initial order of 30,000 rifles as soon as possible. Mr. Bingham also represented to Mr. Froning that "this is a sure thing."

50.     Following the meetings in Florida, Mr. Bingham requested that AA supply further confidential and proprietary information to secure the contract with FAME, including, but not limited to:

a.      Photographs of AA's assembly work stations used to manufacture the rifles;

b.      Photographs of AA's tool boxes used to manufacture the rifles;

c.      A complete list of AA's parts and the costs for each part, including the names of AA's suppliers for each part;

d.      Photographs and detailed drawings of exploded views of both AA rifles and all parts;

e.      Additional detailed breakdown of AA's parts and configurations;

f.      Corresponding part numbers on the exploded photographs of AA's rifles and AA's pricing grids;

g.      A list of all tooling needed for assembly of AA's rifles; and

h.      Proprietary details of AA's technician training program.

10

51.     Mr. Bingham represented that this information was needed to provide to FAME. UWS also used AA's proprietary information to assist FAME in drafting its bid solicitation.

**Defendants Secure the Bid for UWS with AA's Rifles**

52.     On or about September 25, 2015, Mr. Bingham represented to AA that all the submissions to FAME were completed on time thanks to AA.

53.     On November 19, 2015, FAME issued its bid solicitation for the rifles.  Mr. Bingham refused to provide the bid solicitation to AA at the time, despite multiple requests.

54.     On November 20, 2015, Mr. Bingham represented to Mr. Froning that the bid specifications were written such that they would match the specifications of AA's rifles, making it almost impossible for any other manufacturer to bid on the contract.  Mr. Bingham was even concerned that this may raise suspicions and jeopardize a deal struck between FAME and UWS.

55.     On December 10, 2015, UWS submitted a qualified offer in response to the bid solicitation using AA's designs, procedures, and specifications.

56.     On December 10, 2015, General Parker represented to Mr. Froning that he spoke with the U.S. State Department on behalf of AA to facilitate the joint venture with UWS, using AA's status as an American manufacturer to gain approval for the export of weapons to Peru.

57.     General Parker also represented to Mr. Froning on December 10, 2015, that the following events would occur:

a.      the contract between UWS and FAME would be finalized on January 4, 2016;

b.      FAME would issue purchase orders to UWS for 18,000 total units immediately;

c.      FAME would order 85,000 units the first year; and

d.      The total order size to be supplied by AA would be 240,000 rifles minimum and up to 300,000 rifles.

58.     On December 18, 2015, FAME announced UWS as the winning bidder.

59.     On January 5, 2016, UWS issued a press release announcing it was the winner of the bid to supply rifles to FAME.  UWS stated on its website that AA was its lead partner in the bid.

60.     On January 31, 2016, AA delivered the final demonstration rifles to UWS for final testing in Peru.

**Defendants Exclude AA from Contract**

61.     Once UWS secured the winning bid, it began taking steps to squeeze AA out of the final purchase contract, in violation of the LOI.

62.     UWS and Mr. Bingham refused multiple requests from Mr. Froning to supply AA with a copy of the financial terms of the contract with FAME.

63.     UWS and Mr. Bingham refused multiple requests for meetings to finalize timelines and manufacturing plans.

64.     UWS and Mr. Bingham also refused to include AA in any financial discussions with FAME, but Defendants continued to seek guidance and input from AA for the design of AA's rifles.

65.     On December 30, 2015, Mr. Aurich advised Mr. Froning that UWS would take the entire project over, including further testing and design decisions now that UWS had all of AA's technical and pricing data and had won the bid.

66.     In the months following Mr. Aurich's statement to Mr. Froning, AA was excluded from multiple meetings with FAME, including another meeting in Peru to test AA's rifles before final contract execution.  Mr. Froning's repeated requests for financial terms were ignored.

67.     UWS has refused to discuss any terms for a purchase agreement with AA, and no purchase orders have been received by AA from UWS.

68.     Sometime in late May or the first two weeks of June of 2016, UWS posted on its website that it "has signed an assembly, co-production and technology transfer contract with the Peruvian Army's Factory of Weapons and Ammunition FAME SAC."  A true and correct copy of the contract, interpreted to English, is attached hereto as **Exhibit "6".**

69.     UWS's contract is undoubtedly a contract for the sale of AA's rifles to FAME, using all the designs, specifications, and processes divulged under false pretenses by AA.  AA's specifications were used to win the bid, and AA's demonstration rifles were used in field testing to procure the contract with FAME.  The contract even depicts the rifles with AA's patented "direct drive system".

70.     All conditions precedent to bringing this action have occurred, have been performed, or have been waived.

71.     AA has retained the law firm of Shumaker, Loop & Kendrick, LLP to represent it in this action, and is obligated to pay Shumaker, Loop & Kendrick, LLP a reasonable fee for its services.

**COUNT I**
**BREACH OF LOI**
**(as to UWS)**

72.     AA re-alleges paragraphs 1 through 71 as alleged herein.

73.     Pursuant to the LOI, UWS expressly agreed that AA would manufacture the rifles at AA's facility, with the exception of certain parts that would be provided by UWS to AA for final assembly, in accordance with a delivery schedule that would be agreed to by UWS and AA.

74.     Further pursuant to the LOI, UWS expressly agreed that it would not initiate, solicit, encourage, or accept any offer or proposal regarding the sale of AA's rifles to FAME by anyone other than AA.

75.     In direct breach of this spirit and purpose of the LOI, UWS has taken AA's proprietary confidential information, including AA's technical data and processes, trade secrets, and know-how, including the names of suppliers and their pricing, from AA and is sourcing the manufacture of AA's rifles without AA.

76.     UWS's actions constitute a material breach of the LOI, which breach has damaged AA.

77.     All conditions precedent to the commencement of this action have been satisfied or have otherwise been waived.

WHEREFORE, Adams Arms, LLC demands judgment against Defendant Unified Weapons Systems, Inc. for:

a.   Preliminary and permanent injunctive relief restraining UWS, its representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with them from manufacturing and/or supplying the rifles itself and from initiating, soliciting, encouraging or accepting any offer or proposal from a third party to manufacture and/or supply the rifles;

b.   Specific performance of the manufacturing and supply provisions of the LOI;

c.   Damages suffered by AA as a result of the breach;

    d.   Prejudgment and post-judgment interest at the maximum lawful rate; and

    e.   Such other and further relief as this Court deems just and proper.

**COUNT II**
**BREACH OF MUTUAL CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT**
**(as to all Defendants)**

78.    AA re-alleges paragraphs 1 through 71 as alleged herein.

79.    Aguieus entered into the NDA with AA, pursuant to which AA disclosed proprietary confidential information, including AA's technical data, trade secrets, and know-how, to Aguieus.

80.    UWS ratified and confirmed the NDA as a separate agreement between AA and UWS.

81.    UWS, Mr. Bingham, Mr. Aurich, and General Parker, as affiliates, directors, officers, employees, consultants, and/or agents of Aguieus, all received AA's confidential information in furtherance of the commercial relationship between AA and Aguieus, and as such were required to acknowledge and agree to be bound by the NDA.

82.    The NDA expressly provides that recipients of AA's confidential information will not use AA's confidential information, including AA's technical data, trade secrets, and know-how, for their own use or for any purpose other than the commercial relationship between AA and Aguieus.

83.    All Defendants received and used AA's confidential information for the purpose of securing a contract between FAME and UWS for the purchase and sale of AA's rifles, said rifles to be manufactured by UWS or a third party.

84.    AA has been damaged by Defendants' breach of the NDA.

85.     All conditions precedent to the commencement of this action have been satisfied or have otherwise been waived.

WHEREFORE, Adams Arms, LLC demands judgment against all Defendants for:

a.  Preliminary and permanent injunctive relief restraining all Defendants, their representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with them from any use or disclosure of any of AA's proprietary confidential information, including AA's technical data, trade secrets, and know-how;

b.  Damages suffered by Defendants' breach of the NDA;

c.  Prejudgment and post-judgment interest at the maximum lawful rate;

d.  Attorneys' fees and costs; and

e.  Such other and further relief as this Court deems just and proper.

### COUNT III
### BREACH OF CONFIDENTIAL NON DISCLOSURE AGREEMENT
**(as to General Parker)**

86.     AA re-alleges paragraphs 1 through 71 as alleged herein.

87.     General Parker entered into the Parker NDA with AA, pursuant to which AA disclosed proprietary confidential information, including AA's technical data, trade secrets, and know-how, to General Parker.

88.     The Parker NDA expressly provides that recipients of AA's confidential information will not use AA's confidential information, including AA's technical data, trade secrets, and know-how, for their own use or for any purpose other than the commercial relationship between AA and General Parker.

16

89.     General Parker received and used AA's confidential information for the purpose of securing a contract between FAME and UWS for the purchase and sale of AA's rifles, said rifles to be manufactured by UWS or a third party.

90.     AA has been damaged by General Parker's breach of the Parker NDA.

91.     All conditions precedent to the commencement of this action have been satisfied or have otherwise been waived.

WHEREFORE, Adams Arms, LLC demands judgment against Defendant Major General James W. Parker, USA, Retired for:

a.  Preliminary and permanent injunctive relief restraining General Parker, his representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with him from any use or disclosure of any of AA's proprietary confidential information, including AA's technical data, trade secrets, and know-how;

b.  Damages suffered by General Parker's breach of the Parker NDA;

c.  Prejudgment and post-judgment interest at the maximum lawful rate;

d.  Attorneys' fees and costs; and

e.  Such other and further relief as this Court deems just and proper.

**COUNT IV**
**BREACH OF CONSULTING SERVICES AGREEMENT**
**(as to General Parker)**

92.     AA re-alleges paragraphs 1 through 71 as alleged herein.

93.     General Parker entered into the Parker Consulting Agreement, in which General Parker agreed to "hold the Confidential Information in strict confidence and will only use the

Confidential Information in connection with providing Services to [AA] under this Agreement." General Parker further agreed "not to use any Confidential Information for Consultant's benefit or for the benefit of any third party."

94.     In reliance upon the Parker Consulting Agreement, AA disclosed proprietary confidential information, including AA's technical data, trade secrets, and know-how, to General Parker.

95.     General Parker received and used AA's confidential information for the purpose of securing a contract between FAME and UWS for the purchase and sale of AA's rifles, said rifles to be manufactured by UWS or a third party.

96.     AA has been damaged by General Parker's breach of the Parker Consulting Agreement.

97.     All conditions precedent to the commencement of this action have been satisfied or have otherwise been waived.

WHEREFORE, Adams Arms, LLC demands judgment against Defendant Major General James W. Parker, USA, Retired for:

a.  Preliminary and permanent injunctive relief restraining General Parker, his representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with him from any use or disclosure of any of AA's proprietary confidential information, including AA's technical data, trade secrets, and know-how;

b.  Damages suffered by General Parker's breach of the NDA;

c.  Prejudgment and post-judgment interest at the maximum lawful rate; and

d.   Such other and further relief as this Court deems just and proper.

## COUNT V
## MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT
### (as to all Defendants)

98.     AA re-alleges paragraphs 1 through 71 as alleged herein.

99.     This is an action for an injunction and damages arising under the Defend Trade

Secrets Act of 2016, 18 U.S.C. § 1836.

100.    The Defendants misappropriated numerous trade secrets belonging to AA related

to its business and its rifles, which are used and intended for use in interstate and foreign

commerce.

101.    As referenced above, pursuant to the LOI and NDA, AA designed a modified

version of its already existing rifles, which is not and never has been on the market.

102.    Throughout AA's development of the designs, and pursuant to the LOI and NDA,

AA revealed trade secrets to the Defendants relating to AA's business and its rifles, including,

but not limited to: working demonstration rifles; lower receivers for the rifles; the list of all of

AA's suppliers for each rifle component; pricing information for each rifle component; backup

information on AA's manufacturing facility and equipment; photographs of AA's work stations,

tools, and tool boxes uses to manufacture the rifles; technical drawings for the rifles;

photographs of exploded views of the rifles with detailed breakdown information of the same

with corresponding parts and their numbers; detailed information on the specific tools needed to

manufacture the parts of the rifles; details on the specific manufacturing process used for the

rifles, including specifics as to its equipment and tools, why certain parts are used, how they best

work together, and the reasons AA's rifles are superior in that regard (collectively referred to

herein as the "Trade Secrets").

103.    All such Trade Secrets are subject to reasonable efforts to maintain their secrecy; have independent economic value; are confidential; are not publicly known or available; and are extremely proprietary to AA.

104.    AA provided the Trade Secrets to the Defendants pursuant to the LOI and NDA, which permitted the Defendants to use the Trade Secrets solely for UWS's commercial relationship with AA.

105.    The Defendants knew they were subject to a duty to maintain the secrecy of and limit the use of the Trade Secrets.

106.    The Defendants have misappropriated the Trade Secrets by acquiring them through the improper means of misleading AA about their intention to enter into a commercial relationship with AA in order to induce AA to disclose the Trade Secrets, when the Defendants in fact intended to cut AA out of the deal such that they could proceed with the bid and resulting contract on their own.

107.    The Defendants have further misappropriated the Trade Secrets by disclosing and using them without AA's consent when they used improper means to obtain them and knew that, pursuant to the LOI, NDA, and the parties' relationship, the Defendants had a duty to maintain the secrecy of the Trade Secrets and limit their use only to actions in furtherance of their commercial relationship with AA.

108.    After securing the winning bid using AA's Trade Secrets, the Defendants have proceeded with the final contract with FAME without AA, while at the same time utilizing the Trade Secrets of AA in order to obtain and perform on the contract with FAME, resulting in irreparable injury and great harm to AA.

109.    The Defendants' acts of misappropriation have caused irreparable injury to AA and will continue to cause irreparable injury to AA if the Defendants are not restrained by this Court from further violating AA's trade secret rights.

110.    As a result of the above-described willful and malicious misappropriation of AA's trade secrets, AA is entitled to an injunction and an award of damages, costs of this action, and attorneys' fees, all as set forth in 18 U.S.C. § 1836, *et al*., subject to the discretion of this Court.

WHEREFORE, AA demands judgment against all Defendants for:

a.    Preliminary and permanent injunctive relief restraining the Defendants, their representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with them from further disclosing and using the Trade Secrets or engaging in any business practices which arose from their misappropriation of the Trade Secrets and requiring affirmative actions be taken by the Defendants to protect the Trade Secrets;

b.    Damages suffered by AA due to the Defendants' misappropriation, including damages for actual losses sustained by AA and damages for unjust enrichment caused by the misappropriation not already taken into account in computing the actual losses; or damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the Defendants' unauthorized disclosure and use of the Trade Secrets;

c.    Increased damages in an amount not more than 2 times the amount of the damages award due to the Defendants' willful and malicious misappropriation;

d.    Pre-judgment and post-judgment interest at the maximum lawful rate;

e.      Attorneys' fees and costs; and

f.      Such other and further relief as this Court deems just and proper.

## COUNT VI
## MISAPPROPRIATION UNDER THE FLORIDA TRADE SECRETS ACT
### (as to all Defendants)

111.    AA re-alleges paragraphs 1 through 71 and 100 through 110 as alleged herein.

112.    This is an action for an injunction and damages arising under Section 688.003, Florida Statutes.

113.    The Defendants were provided AA's Trade Secrets pursuant to the LOI and NDA and breached their duty to maintain the secrecy of the Trade Secrets by gaining access to them through improper means and utilizing them for their own interests in proceeding with the final contract without AA.

114.    The Trade Secrets contain information that derives economic value from not being generally known or ascertainable by proper means, and were subject to reasonable efforts by AA to maintain their secrecy.

115.    The Defendants knew or had reason to know that they all had a duty to maintain the secrecy of the Trade Secrets.

116.    Despite this, the Defendants willfully and maliciously misappropriated the Trade Secrets.

117.    The Defendants' acts resulted, and will continue to result, in the Defendants being unjustly enriched, and has and will continue to damage AA's business and business interests.

118.    The Defendants, unless restrained, will continue to be enriched unjustly to AA's prejudice and damage.

WHEREFORE, AA demands judgment against all Defendants for:

a.  Preliminary and permanent injunctive relief restraining the Defendants, their representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors, and all other persons and entities in active concert or participation with them from further disclosing and using the Trade Secrets or engaging in any business practices which arose from their misappropriation of the Trade Secrets and requiring affirmative actions be taken by the Defendants to protect the Trade Secrets;

b.  Damages suffered by AA due to the Defendants' misappropriation, including damages for actual losses sustained by AA and damages for unjust enrichment caused by the misappropriation not already taken into account in computing the actual losses;

c.  Increased damages due to the Defendants' willful and malicious misappropriation;

d.  Pre-judgment and post-judgment interest at the maximum lawful rate;

e.  Attorneys' fees and costs; and

f.  Such other and further relief as this Court deems just and proper.

**COUNT VII**
**UNFAIR COMPETITION UNDER THE LANHAM ACT**
**(as to UWS)**

119.  AA re-alleges paragraphs 1 through 71 as alleged herein.

120.  This is an action for injunctive relief arising under 15 U.S.C. §§1125 and 1116, and for damages arising under 15 U.S.C. §§1125 and 1117.

121.  UWS has, by virtue of its above-described acts, competed unfairly with AA. Throughout the process of securing the bid for the rifles, UWS repeatedly represented that the

rifles to be provided under the contract would be AA rifles.  Everything submitted to obtain the bid was based on AA's rifles and its highly proprietary Trade Secrets.  Along those lines, UWS continuously used not only AA's demonstration rifles and rifle parts, but its trademarks and logos, including during demonstrations to the Peruvian MOD, during which AA's trademarks and logos were placed on banners.

122.   UWS secured the bid by representing not only to AA, but also to third parties such as the Peruvian MOD that any following contract would be fulfilled with AA rifles.

123.   UWS has now secured such contract, but has cut AA out of the deal such that the supplied rifles would no longer be made by AA.

124.   UWS' acts of unfair competition have been committed, and are continuing to be committed, with the knowledge that its representations relating to AA were intended to cause confusion, or to cause mistake, or to deceive.

125.   UWS' above-described acts of unfair competition have caused irreparable injury to AA and will continue to cause irreparable injury to AA if they are not restrained by this Court from further competing unfairly with AA due to the confusion, mistake, or deception that will likely be generated among the trade and the public as a result of UWS now attempting to supply rifles, which although represented as AA rifles, will not in fact be rifles manufactured by AA.  In addition, whatever rifles UWS ends up supplying will likely be of a lesser quality than those made by AA, greatly harming AA's reputation to the extent the trade and the public believe them to be AA rifles.  AA has no adequate remedy at law.

WHEREFORE, AA demands judgment against UWS for:

a.   Preliminary and permanent injunctive relief restraining UWS, its representatives, officers, agents, servants, lessees, employees, affiliates, subsidiaries, distributors,

and all other persons and entities in active concert or participation with them from further unfairly competing with AA in any manner whatsoever in connection with the Peruvian military contract, and from continuing to operate in any manner tending to confuse or deceive the public into believing that UWS and the rifles to be supplied are in any way connected with, sponsored by, or affiliated with AA;

b.      an accounting of UWS' profits and an order that the same be paid over to AA;

c.      Up to three (3) times any damages sustained by AA as a result of the unfair competition;

d.      Restitution to AA of any and all the money UWS has acquired by means of its unfair competition;

e.      Pre-judgment and post-judgment interest at the maximum lawful rate;

f.      Attorneys' fees and costs; and

g.      Such other and further relief as this Court deems just and proper.

**COUNT VIII**
**UNJUST ENRICHMENT**
**(as to UWS and AGUIEUS)**

126.    AA re-alleges paragraphs 1 through 71 as alleged herein.

127.    Defendants UWS and Aguieus have received or will receive money as a direct result of the unauthorized use and disclosure of AA's proprietary confidential information and trade secrets as alleged herein.

128.    As a direct result of their unauthorized use and disclosure of AA's trade secrets, Defendants UWS and Aguieus voluntarily accepted and retained the benefit conferred and have been unjustly enriched at AA's expense.

129.     The circumstances are such that it would be inequitable for these Defendants to retain the benefit without paying the value thereof to AA.

WHEREFORE, Adams Arms, LLC demands judgment against Defendants Unified Weapons Systems, Inc. and Aguieus, LLC for:

a.       Damages suffered by Defendants' actions;

b.       Prejudgment and post-judgment interest at the maximum lawful rate; and

c.       Such other and further relief as this Court deems just and proper.

**COUNT IX**
**SPECIFIC PERFORMANCE OF THE NDA**
**(as to AGUIEUS and UWS)**

130.     AA re-alleges paragraphs 1 through 71 as alleged herein.

131.     This is an action for specific performance of the NDA.

132.     Further to the joint venture evidenced by the LOI, AA provided to Aguieus fully-built rifles and lower receivers for rifles pursuant to a marking variance issued by the U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATFE"), bearing the following serial numbers:

> Rifles – UC000001, UC000002, UC000003, UC000004, UC000005, UC000006, UC000007, UC000008, UC000009, UC000010, UC000018, UC000019, UC000020, UC000021, UC000022, UP000001, UP000002, UP000003, UP000004, UP000007, UP000008

> Lower Receivers – UC000011, UC000012, UC000013, UC000014, UC000015, UC000016, UC000017, UC000023, UC000024, UC000025, UC000026, UC000027, UC000028, UC000029, UC000030, UC000031, UC000032, UP000005, UP000006, UP000009, UP000010

133.     These rifles, the parts on them, and the lower receivers, designed by AA for Aguieus and UWS (the "Property"), reflect dimensions and nominal tolerances and are themselves confidential information and trade secrets.   They were developed solely for the

purpose of the joint venture among the parties, and while they have been shown to third parties, they are not publicly available for sale or distribution such that anyone other than AA, Aguieus, UWS, and other third parties under confidentiality obligations to AA would have access to them in order to be able to try to reverse engineer them.

134.   The Property was not sold to Aguieus or UWS, but rather provided to Aguieus under the NDA pursuant to the joint venture reflected by the LOI.

135.   UWS ratified and confirmed the NDA as a separate agreement between AA and UWS.

136.   The NDA provides that:

> Any materials or documents that have been furnished by or on behalf of the Disclosing Party to the Receiving Party or its Representatives will be returned to the Disclosing Party promptly upon request, and <u>all</u> copies of such documentation will be destroyed, promptly upon request, provided however that the Receiving Party may retain one copy for evidentiary purposes.

137.   AA has requested that Aguieus and UWS return the Property as provided in the NDA.  *See* demand letter attached hereto as **Exhibit "7"**.

138.   Aguieus and UWS have refused to return the Property.

WHEREFORE, Adams Arms, LLC demands judgment against Defendants Aguieus, LLC and Unified Weapons Systems, Inc.:

  a.   Requiring them to return the rifles, parts, and lower receivers as set forth in the NDA;

  b.   Attorneys' fees and costs; and

  c.   Such other and further relief as this Court deems just and proper.

**COUNT X**
**REPLEVIN**
**(as to AGUIEUS and UWS)**

139.     AA re-alleges paragraphs 1 through 71 and 132 through 138 as alleged herein.

140.     This is an action to recover possession of personal property in Hillsborough

County, Florida.

141.     The property is the following rifles (including all parts on the rifles) and lower

receivers bearing the following serial numbers:

> Rifles – UC000001, UC000002, UC000003, UC000004, UC000005, UC000006,
> UC000007, UC000008, UC000009, UC000010, UC000018, UC000019, UC000020,
> UC000021, UC000022, UP000001, UP000002, UP000003, UP000004, UP000007,
> UP000008

> Lower Receivers – UC000011, UC000012, UC000013, UC000014, UC000015,
> UC000016, UC000017, UC000023, UC000024, UC000025, UC000026, UC000027,
> UC000028, UC000029, UC000030, UC000031, UC000032, UP000005, UP000006,
> UP000009, UP000010

142.     AA, as the owner of the Property, is entitled to possession of the Property, and

Aguieus and UWS have agreed to return this Property to AA on request in the NDA.

143.     To AA's knowledge, information, and belief, the Property is located at 6019 West

Chelsea Street, Tampa, Florida 33634.

144.     The Property is wrongfully detained by Aguieus and UWS.  Aguieus and UWS

came into possession of the Property when AA delivered it to Aguieus pursuant to the LOI, and

have detained the property claiming to own it and to be unable to return it to AA under ATFE

regulations.

145.     The Property has not been taken for any tax, assessment, or fine pursuant to law.

146.     The Property has not been taken under an execution or attachment against AA's

property.

WHEREFORE, Adams Arms, LLC demands judgment against Defendants Unified Weapons Systems, Inc. and Aguieus, LLC:

    a.   Requiring them to return the rifles, parts, and lower receivers; and

    b.   Such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, Adams Arms, LLC, by and through its undersigned attorneys, requests a trial by jury on all issues so triable.

Respectfully submitted,

/s/ J. Todd Timmerman
Jaime Austrich, Trial Counsel
Florida Bar No. 84565
jaustrich@slk-law.com
J. Todd Timmerman
Florida Bar No. 0956058
ttimmerman@slk-law.com
Mindi M. Richter
Florida Bar No. 0044827
mrichter@slk-law.com
Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard
Suite 2800
Tampa, Florida 33602
Telephone No.: (813) 229-7600
Facsimile No.:  (813) 229-1660

*Attorneys for Plaintiff, Adams Arms, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 13, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic filing to all counsel of record.

<u>/s/ J. Todd Timmerman</u>
Attorney