UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ADAMS ARMS, LLC,

       Plaintiff,

v.                           Case No. 8:16-cv-1503-T-33AEP

UNIFIED WEAPON SYSTEMS, INC.
et al.,

       Defendants.
_____/

**ORDER**

This cause is before the Court pursuant to Adams Arms, LLC's Motion to Dismiss or Strike Unified Weapon Systems, Inc.'s First Amended Counterclaim (Doc. # 119), which was filed on October 28, 2016. On November 18, 2016, Unified Weapon Systems, Inc. ("UWSI") filed a Response in Opposition to the Motion. (Doc. # 128). Also before the Court is Adams' Motion to Dismiss Aguieus, LLC's Counterclaim (Doc. # 123), which was filed on November 2, 2016. Aguieus filed a Response to the Motion on November 28, 2016. (Doc. # 131).

As explained below, the Court denies Adams' Motion to Dismiss UWSI's Counterclaims. The Court grants in part Adams' Motion to Dismiss Aguieus' Counterclaims to the extent that Aguieus' Counterclaim for breach of the Letter of Intent is dismissed without prejudice and with leave to amend by **February 21, 2017**.

I.   **Facts**

A. **The Parties**

Adams is a Tampa, Florida, weapons manufacturer specializing in "small arms, including high-powered military rifles." (Doc. # 106 at ¶ 1). UWSI is a Delaware corporation with its principal place of business in Florida. (Id. at ¶ 11). UWSI is alleged to be a subsidiary of Aguieus. (Doc. # 106 at ¶ 11). Aguieus is a Delaware limited liability corporation. (Id. at ¶ 12). Michael Bingham claims to be the managing member of Aguieus and the Vice President and Chief Operating Officer of UWSI. (Id. at ¶ 13).[1] Christian Quintanilla Aurich, an individual who resides in Peru, is the President and Chief Executive Officer of UWSI. (Doc. # 106 at ¶ 14). General James W. Parker, a resident of Hillsborough County, is a retired Major General from the United States Army

_____

[1] On January 20, 2017, UWSI and Aurich filed an eleven-count Cross-claim against Aguieus and Bingham, alleging, inter alia, that Bingham falsely represented that he was the true owner of UWSI and containing the following counts: Fla. Stat. § 495.151 (Count One); common law trade name & trademark infringement (Count Two); Fla. Stat. § 495.131 (Count Three); tortious interference (Count Four); Lanham Act (Count Five); Fla. Stat. § 501.204 (Count Six); common law indemnity (Counts Seven and Eight); breach of fiduciary duty (Count Nine); fraud (Count Ten); and the wrongful act doctrine (Count Eleven). (Doc. # 149). The filing of the Cross-claim calls into question the relationship between the Defendants. Aguieus and Bingham are not currently represented by counsel and have not yet responded to the Cross-claim.

and serves as a Director and advisor for UWSI. (<u>Id.</u> at ¶ 15).

**B.   <u>The Letter of Intent and Nondisclosure Agreements</u>**

In early 2014, Aguieus approached Adams with a proposal for the two companies to work together on a bid to supply high-powered military rifles designed and built by Adams to the Peruvian military. (<u>Id.</u> at ¶ 18).  According to Bingham, the Ministry of Defense of the Republic of Peru (the "Peruvian MOD") contacted UWSI concerning the opportunity to secure a multi-year contract for the supply of rifles. (<u>Id.</u> ¶ 19). "The Peruvian MOD was purportedly funding the purchase through the Peruvian Factory of Weapons and Ammunition from the Army S.A.C. ('FAME')." (<u>Id.</u>).  The rifles would be constructed based on the Peruvian MOD's specifications "with input by UWSI and its business partners." (<u>Id.</u> ¶ 20).  Adams alleges that "Aguieus and UWSI, through Mr. Bingham and Mr. Aurich, solicited [Adams] to be a business partner in the project." (<u>Id.</u>). The project would require Adams to provide UWSI with products, such as demonstration rifles, to disclose trade secrets and confidential information, and allow a tour of Adams' manufacturing facility. (<u>Id.</u> at ¶ 21).

On February 24, 2014, as an "inducement" for Adams to join the project, Aurich and Bingham, on behalf of Aguieus, executed a "Mutual Confidentiality and Nondisclosure

Agreement" with Adams "in which Aguieus agreed not to use [Adams'] confidential information, including [Adams'] technical data, trade secrets, and know-how, for its own use or for any purpose other than the commercial relationship between [Adams] and Aguieus." (Id. at ¶ 22).[2]   The Mutual Confidentiality and Nondisclosure Agreement allowed Aguieus to share Adams' confidential information with others, such as UWSI, so long as they "acknowledged and agreed to be bound by the [Mutual Confidentiality and Nondisclosure Agreement]." (Id.).

Thereafter, on April 29, 2014, Bingham sent Adams a six-page Letter of Intent, which UWSI and Adams executed. (Id. at ¶ 23).  The Letter of Intent describes the "mutual intentions" between "Unified Weapon Systems ('Buyer') and Adams Arms ('Seller')." (Doc. # 117-3 at 1)(emphasis in original). "After signing the [Letter of Intent], on or about June 25, 2014, Mr. Bingham represented to [Adams] that there would be an immediate order for 3,000 units for use by the Peruvian MOD." (Doc. # 106 at ¶ 32).

During that time, General Parker met with Adams'

---

[2]   There are at least two Adams Arms Mutual Confidentiality and Nondisclosure Agreements on file dated February 24, 2014. One is executed by Aurich (Doc. # 106-1 at 4) and the other is executed by Bingham. (Doc. # 106-2 at 4). Both of these Agreements name "Aguieus" as the "Receiving Party." (Id.).  General Parker signed a different version of the agreement on June 24, 2014. (Doc. # 106-4 at 8).

President and CEO, Michael Froning, "and represented to Mr. Froning that General Parker possessed significant expertise and knowledge regarding foreign and domestic military matters, which would be helpful to [Adams] in negotiating the rifle contract with UWS[I]." (<u>Id.</u> at ¶ 33). According to Adams, General Parker failed to disclose that he was a Director and advisor for UWSI and "when Mr. Froning asked General Parker whether he had any conflicts of interest or ties with UWS[I] that would prevent him from being loyal to [Adams], General Parker misrepresented to Mr. Froning that he had no ties to UWS[I]." (<u>Id.</u> at ¶ 34).

In furtherance of General Parker's efforts to gain access to Adams' trade secrets, on June 24, 2014, General Parker executed a separate confidentiality agreement vowing to hold Adams' confidential information and trade secrets "in strict confidence" and agreeing "not to use any Confidential Information for any purpose other than the Business Purpose." (Doc. # 106-4 at 3). General Parker also executed a Consulting Services Agreement on July 7, 2014, further agreeing to keep Adams' proprietary information confidential and to only use such information in connection with providing services on behalf of Adams. (Doc. # 106-5).

C.   <u>**Adams Divulges Trade Secrets**</u>

Adams "has spent a number of years and endless resources"

developing "numerous trade secrets that are crucial and extremely valuable to its business." (Doc. # 106 at ¶¶ 29-30). Adams explains that it "exerts great efforts to ensure that its trade secrets remain confidential," such as requiring employees and third parties to sign nondisclosure agreements, maintaining security cameras at its facilities, and requiring badges for entry into its facilities. (Id. at ¶ 30).

Nonetheless, and in reliance on the Mutual Confidentiality and Nondisclosure Agreements, General Parker's confidentiality agreement, the Letter of Intent, and other assurances, Adams disclosed its trade secrets to UWSI, Aguieus, Bingham, Aurich, and General Parker. (Id. at ¶ 28).

After the parties formalized their agreements and Adams disclosed its trade secrets, the rifle project began in earnest. Between August of 2014, and February of 2015, Adams manufactured demonstration rifles for examination and testing by UWSI and the Peruvian MOD. (Id. at ¶¶ 38-44). On October 13, 2014, UWSI sent Adams a 2.1 million dollar purchase order for rifles. (Id. at ¶ 39).

> On February 8 and 9, 2015, representatives of [Adams] attended the demonstration of [Adams'] rifles to the Peruvian MOD. During the demonstration, UWSI leveraged [Adams'] brand name and weapons-making experience, identifying [Adams] as one of its lead partners, and UWSI used [Adams'] trademarks to market the rifles to the Peruvian MOD. To [Adams'] knowledge, UWSI has no ability to

6

design or manufacture any rifles.  Instead, it was
marketing [Adams'] rifles to the customer.

(Id. at ¶ 44). According to Adams, the demonstration was a
success, and "all parties approved moving forward with the
joint venture with [Adams] as the manufacturer." (Id. at ¶
45).

Between April of 2015, and September of 2015, Bingham
requested supplier pricing information for the separate
components of Adams' rifles, which Adams provided.  (Id. at ¶
46).  Bingham also requested information about Adams'
manufacturing facility and equipment, and Adams allowed tours
of its facility in Florida during which Adams revealed step-
by-step details of its manufacturing processes, machinery, and
tooling.  (Id. at ¶¶ 46-48).

Following the meetings in Florida, Bingham requested
additional confidential and proprietary information, which he
represented was necessary to secure the contract with FAME.
(Id. at ¶ 50).  This information included photographs of
Adams' facility, assembly work stations, and tool boxes; a
complete list of parts, parts configurations, parts suppliers,
and prices; a list of all tooling needed for assembly of
Adams' rifles; a breakdown of the rifle configuration; and
proprietary details of Adams' technician training program.
(Id.).

On September 25, 2015, Bingham represented to Adams that all submissions to FAME were completed on time "thanks to [Adams]." (Id. at ¶ 52). On November 19, 2015, FAME issued its bid solicitation for the rifles. (Id. at ¶ 53). On December 10, 2015, UWSI submitted a qualified offer in response to the bid solicitation using Adams' designs, procedures, and specifications. (Id. at ¶ 55). On December 18, 2015, FAME announced UWSI as the winning bidder. (Id. at ¶ 58).

### D.  **Squeeze-Out of Adams**

After UWSI obtained the winning bid, UWSI "began taking steps to squeeze [Adams] out of the final purchase contract[.]" (Id. at ¶ 61). UWSI and Bingham refused Adams' requests for documents and meetings, although UWSI and Bingham "continued to seek guidance and input" from Adams about the design of the rifles. (Id. at ¶¶ 62-64). On December 30, 2015, Aurich advised Adams that UWSI would take the entire project over now that UWSI had all of Adams' technical and pricing data. (Id. at ¶ 65). In the months that followed, Adams was excluded from multiple meetings with FAME, including another meeting in Peru to test Adams' rifles before final contract execution. (Id. at ¶ 66).

## II.  **Procedural History and Amended Counterclaims**

### A.  **Adams Sets the Stage**

8

Adams initiated this action on June 10, 2016, by filing the Complaint. (Doc. # 1).  At this juncture, the Complaint has been amended and contains the following counts: breach of Letter of Intent against UWSI (Count One); breach of Mutual Confidentiality and Nondisclosure Agreement against all Defendants (Count Two); breach of Confidentiality Agreement against General Parker (Count Three); breach of the Consulting Services Agreement as to General Parker (Count Four); misappropriation under the Defend Trade Secrets Act as to all Defendants (Count Five); misappropriation under the Florida Trade Secrets Act against all Defendants (Count Six); unfair competition under the Lanham Act against UWSI (Count Seven); unjust enrichment against UWSI and Aguieus (Count Eight); specific performance of the Mutual Confidentiality and Nondisclosure Agreement as to Aguieus and UWSI (Count Nine); and replevin (Count Ten). (Doc. # 106).

On July 13, 2016, UWSI filed its Motion to Dismiss Counts One, Two and Five of Adams' original Complaint (Doc. # 49), as well as its Answer, Affirmative Defenses, and a tortious interference Counterclaim against Adams. (Doc. # 52). Aurich likewise filed a Motion to Dismiss Counts Two and Five of Adams' original Complaint (Doc. # 50) along with his Answer and Affirmative Defenses on July 13, 2016. (Doc. # 51). Thereafter, on August 2, 2016, Adams filed a Motion to Dismiss

UWSI's tortious interference Counterclaim. (Doc. # 81).

On September 27, 2016, the Court entered a detailed Order denying all of the then-pending Motions. (Doc. # 94). Thereafter, on October 12, 2016, Adams filed a Motion to Amend the Complaint, which the Court granted. (Doc. ## 104, 105). Adams' Amended Complaint was filed on October 13, 2016. (Doc. # 106). One day later, on October 14, 2016, UWSI filed a Motion to Amend its Counterclaim, which the Court also granted. (Doc. ## 107, 108).

## B. <u>UWSI and Aguieus Lodge Counterclaims</u>

UWSI filed its Amended Counterclaim on October 17, 2016. (Doc. # 109). UWSI's Amended Counterclaim seeks relief against Adams for tortious interference (Count One), breach of the Letter of Intent (Count Two), breach of the Mutual Confidentiality and Nondisclosure Agreement (Count Three), and unjust enrichment (Count Four). In support of these claims, UWSI maintains that Adams' untimely provision of ultimately defective rifles cost UWSI the lucrative deal with the Peruvian MOD. (<u>Id.</u> at ¶¶ 13-17). When Adams did produce rifles, UWSI alleges that such rifles "did not function properly." (<u>Id.</u> at ¶ 17). According to UWSI, the rifles "jammed" and a demonstration held on February 12, 2015, "was an embarrassment and a total failure." (<u>Id.</u> at ¶ 18). "In the months following the failed demonstration, UWSI's frustration

10

grew because Adams failed to produce functioning Rifles despite having over a year to do so." (Id. at ¶ 20).

Despite losing the MOD deal, UWSI claims that it gave Adams another chance with respect to securing a deal with FAME. UWSI indicates that it "conducted ammunition testing for FAME at Adams' facility" successfully. (Id. at ¶ 24). UWSI maintains that, using its own "ingenuity," it conducted a successful rifle demonstration with the Peruvian Police in November of 2015. (Id. at ¶ 25). Thereafter, "FAME selected UWSI to co-manufacture the Rifles." (Id. at ¶ 27).

However, according to UWSI, the rifles had to be reconfigured with "numerous modifications" to meet the exacting bid specifications. (Id. at ¶¶ 28-30). UWSI explains that, as originally configured, the rifles "failed 70% of the time." (Id. at ¶ 28). "On January 13, 2015, UWSI and Adams put the Rifles through FAME testing protocol and the Rifles failed again. After several testing failures, Adams' representatives abandoned UWSI and the prototype Rifles." (Id. at ¶ 29). UWSI explains that its relationship with Adams completely deteriorated and UWSI found alternative vendors to provide the rifle parts, as such, the UWSI "Rifles that are in FAME's possession have **no** Adams parts in them." (Id. at ¶ 33)(emphasis in original).

Adams voiced its concerns to FAME officials in an email

dated May 6, 2016, asserting that the rifles subject to the bid employed technology belonging to Adams and threatening litigation. (Id. at ¶¶ 36-41).  On May 16, 2016, UWSI and FAME entered into a written agreement (the "FAME Agreement") specifying that FAME and UWSI agreed to manufacture the rifles in FAME's facilities in Peru. (Id. at ¶¶ 34-35).

UWSI asserts that the email from Adams to FAME was written "with the specific and malicious intent of interfering with UWSI's agreement and ongoing relationship with FAME and [to] disrupt the same." (Id. at ¶ 40). UWSI claims that after FAME received Adams' email, FAME "refused to issue any purchase orders for the rifles." (Id. at ¶ 50).   UWSI indicates that Adams knew about the agreement between UWSI and FAME and issued the threatening email in an effort to harm that relationship. (Id. at ¶¶ 47-48). UWSI claims that it has lost millions, if not billions, of dollars due to Adams' interference. (Id. at ¶ 39).  In addition, UWSI claims that Adams misappropriated confidential information including "UWSI's product plans, designs, and hardware configuration" to launch Adams' Small Frame .308 Rifle (aka the Patrol Rifle). (Id. at ¶¶ 62, 63).

Likewise, on October 27, 2016, Aguieus filed its Counterclaim against Adams containing allegations akin to those presented in UWSI's Counterclaim and bringing the

following claims against Adams: breach of the Mutual Confidentiality and Nondisclosure Agreement (Count One); unjust enrichment (Count Two); and breach of the Letter of Intent (Count Three). (Doc. # 117).

At this point, Adams has filed two Motions that seek dismissal of the Counterclaims pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. ## 119, 123). Adams also asserts that certain passages in the Counterclaims are subject to being stricken pursuant to Rule 12(f), Fed. R. Civ. P. (Id.). Now that UWSI and Aguieus have responded to the Motions, and the Motions are ripe for the Court's review. (Doc. ## 128, 131).

### III. **Legal Standard**

#### A. **Rule 12(b)(1) Motion to Dismiss**

Federal courts are courts of limited jurisdiction. "[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises." Smith v. GTE Corp., 236 F.3d 1292, 1299 (11th Cir. 2001).

Motions to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) may attack

jurisdiction facially or factually.  Morrison v. Amway Corp.,
323 F.3d 920, 924 n.5 (11th Cir. 2003). When the
jurisdictional attack is factual, the Court may look outside
the four corners of the complaint to determine if jurisdiction
exists.  Eaton v. Dorchester Dev., Inc., 692 F.2d 727, 732
(11th Cir. 1982).  In a factual attack, the presumption of
truthfulness afforded to a plaintiff under Rule 12(b)(6) does
not attach. Scarfo v. Ginsberg, 175 F.3d 957, 960 (11th Cir.
1999)(citing Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th
Cir. 1990)). Because the very power of the Court to hear the
case is at issue in a Rule 12(b)(1) motion, the Court is free
to weigh evidence outside the complaint.  Eaton, 692 F.2d at
732.

### B.   Rule 12(b)(6) Motion to Dismiss

A motion to dismiss a counterclaim under Rule 12(b)(6) of
the Federal Rules of Civil Procedure is evaluated in the same
manner as a motion to dismiss a complaint.  Stewart Title
Guar. Co. v. Title Dynamics, Inc., No. 2:04-cv-316-FtM-33SPC,
2005 WL 2548419, at *1 (M.D. Fla. Oct. 11, 2005).  A
counterclaim must contain "a short and plain statement of the
claim showing that the pleader is entitled to relief." Fed.
R. Civ. P. 8(a)(2).  In deciding a motion to dismiss pursuant
to Rule 12(b)(6), a court must accept all factual allegations
in the counterclaim as true and construe them in the light

most favorable to the counterclaim plaintiff. <u>See</u> <u>United Techs. Corp. v. Mazer</u>, 556 F.3d 1260, 1269 (11th Cir. 2009).

"While a [counterclaim] attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal citations and quotations marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." <u>Id.</u> (internal citations omitted).

A counterclaim plaintiff must plead enough facts to state a plausible basis for the claim. <u>Id.</u>; <u>James River Ins. Co. v. Ground Down Eng'g, Inc.</u>, 540 F.3d 1270, 1274 (11th Cir. 2008) ("To survive dismissal, the [counterclaim's] allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level; if they do not, the plaintiff's [counterclaim] should be dismissed."). Additionally, "the tenet that a court must accept as true all of the allegations contained in a [counterclaim] is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory

15

statements, do not suffice." <u>Ashcroft v. Iqbal</u>, 566 U.S. 662, 678 (2009).

### C.   <u>Rule 12(f) Motion to Strike</u>

Pursuant to Rule 12(f), Fed. R. Civ. P., a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." In addition, courts are at liberty to strike material that bears "no possible relation to the controversy, may confuse the issues, or may cause prejudice to one of the parties." <u>Ayers v. Consol. Constr. Servs. of Sw. Fla., Inc.</u>, No. 2:07-cv-123, 2007 U.S. Dist. LEXIS 86596, at *2 (M.D. Fla. Nov. 26, 2007). Although the Court has broad discretion in ruling on a motion to strike, such motions are disfavored due to their "drastic nature." <u>Royal Ins. Co. of Am. v. M/Y Anastasia</u>, No. 95-cv-30498, 1997 U.S. Dist. LEXIS 15595, at *10 (N.D. Fla. Jan. 30, 1997).

## IV.   <u>Analysis</u>

### A.   <u>UWSI's Tortious Interference Counterclaim</u>

As noted, the Complaint and the Counterclaims have been amended. Before the amendments, UWSI's original Counterclaim against Adams sought relief for tortious interference based on Adams' email to FAME, as well as Adams' initiation of the present lawsuit. (Doc. # 52). Adams filed a motion to dismiss the tortious interference Counterclaim. (Doc. # 81).   The

16

Court carefully analyzed the Counterclaim and determined that UWSI adequately pled a claim for relief for tortious interference based on the email. (Doc. # 94). However, the Court found that the filing of the present lawsuit could not form a basis for a tortious interference claim based on Florida's litigation privilege: "It cannot be disputed that Adams Arms' initiation of this suit . . . is not actionable as tortious interference." (Id. at 24-25). Specifically, the Court determined:

> "To prove tortious interference, Plaintiff must show: (1) the existence of a contract or business relationship not necessarily evidenced by an enforceable contract under which [the plaintiff] has rights; (2) defendants' knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by defendants; and (4) damage as a result of the interference." Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC, 845 F. Supp. 2d 1241, 1258 (M.D. Fla. 2012).
> A tortious interference claim will fail absent "a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 815 (Fla. 1994). Florida law also requires actual harm to a business relationship, as opposed to merely a suspicion or unsupported and speculative supposition of harm. Realauction.com, LLC v. Grant St. Grp., Inc., 82 So. 3d 1056, 1058 (Fla. DCA 2011).
> Here, the counterclaim sufficiently alleges each required element. UWS[I] claims that a business relationship existed between FAME and UWS[I] that afforded UWS[I] with existing or prospective legal rights, that Adams Arms was aware of that relationship, and that Adams Arms intentionally interfered with the relationship

17

> without justification, causing harm to UWS[I].
> Specifically, UWS[I] claims that Adams Arms sent a
> defamatory and threatening email to FAME "just as
> UWS[I] and FAME were getting ready to ink the deal"
> and that the email caused damage to UWS[I]. (Doc. #
> 90 at 3-4).  UWS[I] claims that due to the email
> from Adams Arms, FAME refused to issue any purchase
> orders, effectively depriving UWS[I] of its
> expected monetary benefits under the contract.
>      At this juncture, these allegations are
> sufficient to withstand Adams Arms' Motion to
> Dismiss.

(Doc. # 94 at 22-23).

UWSI has not altered the substance of its tortious

interference Counterclaim since the entry of the Court's

September 27, 2016, Order. Adams does not ask for

reconsideration of the Court's prior Order, which upheld the

sufficiency of UWSI's tortious interference Counterclaim.

Instead, Adams requests that the Court strike UWSI's reference

to Adams' filing of this lawsuit as a basis for tortious

interference.  Although the Court has ruled that the filing of

the present lawsuit does not constitute an act of tortious

interference by Adams, the Court sees no reason to strike all

reference to the filing of the lawsuit from UWSI's

Counterclaim.

UWSI's reference to the filing of the lawsuit is not

"redundant, immaterial, impertinent, or scandalous." 12(f),

Fed. R. Civ. P.  In addition, UWSI's allegations regarding

Adams' act of initiating the lawsuit by filing the initial

Complaint are not subject to being stricken as confusing,

18

prejudicial, or baseless. The factual allegations regarding the filing of the lawsuit provide a temporal context for the complex chain of events in question. Adams' Motion to Strike is accordingly denied with respect to UWSI's Counterclaim for tortious interference and specifically with respect to allegations regarding the filing of the lawsuit. The Court reiterates its finding that the filing of the present lawsuit is not an appropriate basis for a tortious interference claim. The Court is allowing UWSI to include in its Counterclaim some allegations regarding the filing of the Complaint merely to provide background information and temporal orientation.

**B.    UWSI and Aguieus' Unjust Enrichment Counterclaims**

The elements of an unjust enrichment claim are "(1) the plaintiff conferred a benefit on the defendant, who had knowledge of the benefit, (2) the defendant voluntarily accepted and retained the benefit, and (3) under the circumstances it would be inequitable for the defendant to retain the benefit without paying for it." My Classified Ads, L.L.C. v. Greg Welteroth Holding, Inc., No. 8:14-cv-2365-T-33AEP, 2015 U.S. Dist. LEXIS 31180, at *9 (M.D. Fla. Mar. 13, 2015).

UWSI and Aguieus have alleged each element and satisfy the burden imposed by Rule 12(b)(6). Specifically, UWSI and Aguieus claim that Adams used UWSI and Aguieus' confidential

information to launch a rifle, Adams' Patrol Rifle, for which Adams will receive financial gain; that Adams voluntarily accepted and retained the benefit of the confidential information; and that Adams has been enriched at the expense of UWSI and Aguieus. UWSI and Aguieus also allege that the circumstances are such that it would be inequitable for Adams to retain the benefit of the confidential information without paying for it. <u>See</u> (Doc. # 109 at ¶¶ 67-70; Doc. # 117 at ¶¶ 28-31). Although UWSI and Aguieus have provided a concise outline of their respective unjust enrichment Counterclaims, Adams seeks dismissal because these claims lack "requite [sic] particularity." (Doc. # 119 at 14; Doc. # 123 at 5).

The Court denies the Motion because the Counterclaims are more than sufficient to place Adams on notice of the conduct in question. In fact, Adams, in presenting its Motions to Dismiss, was able to succinctly distill the unjust enrichment Counterclaims as follows: "AA breached the nondisclosure agreement and was unjustly enriched when it utilized [the] confidential information for AA's own commercial gain in bringing a new product to market (a .308 [Patrol] rifle), a different product from those discussed in the letter of intent (a 5.56 and a 7.62 rifle)." (Doc. # 119 at 14; Doc. # 123 at 5). As such, the Court denies the Motions to Dismiss to the extent they are aimed at the unjust enrichment Counterclaims.

### C.   **UWSI and Aguieus' Breach of Contract Counterclaims**

#### 1.   **Standing**

Adams seeks an order dismissing Counts Two (breach of Letter of Intent) and Three (breach of Mutual Confidentiality and Nondisclosure Agreement) of UWSI's Counterclaim for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P.  However, rather than claiming that the Court lacks subject matter jurisdiction over UWSI's relevant Counterclaims, Adams argues that UWSI does not have standing to sue Adams for breach of the Letter of Intent and of the Mutual Confidentiality and Nondisclosure Agreement.  Adams also contends that Aguieus lacks standing to sue for a breach of the Letter of Intent because it is not a party to that contract.

Just as it was necessary to draw upon the Court's prior Order to address Adams' Motion to Dismiss UWSI's tortious interference Counterclaim, the Court must once again look back to the prior Order to assess whether it is appropriate to dismiss any breach of contract Counterclaims.  Previously, UWSI sought dismissal of Adams' breach of contract claim by arguing that UWSI was not a party to the contract.  The Court however, denied UWSI's motion to dismiss.  Based on the Court's ruling, UWSI sought leave to amend its Counterclaim to add a claim for breach of contract.  As explained by UWSI:

21

UWSI amended its Counterclaim to add counts for breach of the LOI and NDA in the event this Court ultimately finds that UWSI is a party to those agreements, as pled and argued by Adams and given this Court's rejection of UWSI's argument to the contrary in its motion to dismiss. . . . If UWSI *is* held to be  a party, then it certainly has the right to bring its own claims under those agreements. . . . Adams cannot have it both ways. It cannot claim that UWSI is a party for purposes of Adams' claims against UWSI, but not a party for purposes of UWSI's counterclaims against Adams.

(Doc. # 128 at 10-11)(emphasis in original).  Adams' subject matter jurisdiction and standing arguments miss the mark to the extent such arguments are focused on UWSI.  Adams has taken the position that Adams and UWSI are parties to various contracts and that UWSI breached those contracts in myriad ways.  UWSI contends that, if it is a party to the contracts, it was Adams that breached the contracts, not UWSI.  Surely if the Court has subject matter jurisdiction over Adams' breach of contract claims with UWSI as a Defendant, the Court has subject matter jurisdiction over UWSI's Counterclaims with Adams as a Counterclaim Defendant.

The same cannot be said for Aguieus, however, in regards to the Letter of Intent.[3]  Adams correctly points out that

---

[3] In contrast, Aguieus does specifically allege that it is a contracting party to the Mutual Confidentiality and Nondisclosure Agreement. (Doc. # 117 at ¶ 21).  At the Motion to Dismiss stage, the Court accepts this allegation as true. Furthermore, Aguieus attaches an executed copy of the Mutual Confidentiality and Nondisclosure Agreement to the Counterclaim and Aguieus is named as the "Receiving Party" on the executed Agreement. (Doc. # 117-2 at 4).

Aguieus never alleged in its Counterclaim that it is a party to the Letter of Intent.  And, Adams sued UWSI for breach of the Letter of Intent, not Aguieus.   The Letter of Intent states that UWSI is partially owned by Aguieus, but the Letter of Intent does not reflect that Aguieus is a contracting party.   Rather, the Letter of Intent is "between Unified Weapon Systems ('Buyer') and Adams Arms ('Seller')." (Doc. # 117-3 at 1)(emphasis in original).  Aguieus alleges in Count Three:

> On April 29, 2014, [Adams] executed and delivered a LOI. Pursuant to the LOI, [Adams] was to deliver three orders of the Rifles on or before September 1, 2014. [Adams] failed to timely deliver the Rifles as required by the LOI. [Adams] failed to deliver a single prototype . . . by September 1, 2014. As a direct result of [Adams'] failure to timely deliver the Rifles, the opportunity to secure a contract with the MOD for the MOD Project was lost. [Adams] materially breached the LOI by failing to deliver the Rifles before September 1, 2014, and damage has been caused by [Adams'] breach of the LOI.

(Doc. # 117 at ¶¶ 32-37).  These allegations do not support Augieus' claim against Adams for breach of the Letter of Intent because Aguieus never alleged that it is a party to the contract or that it is otherwise in privity. "It is hornbook law that privity of contract 'is essential to the maintenance of an action on any contract.'" Katchmore Luhrs, LLC v. Allianz Global Corp. & Speciality, No. 15-cv-23420, 2017 U.S. Dist. LEXIS 13778, at *14 (S.D. Fla. Jan. 31, 2017) (citing

Sumitomo Corp. of Am. v. M/V Saint Venture, 683 F. Supp. 1361, 1369 (M.D. Fla. 1988)). In addition, "[g]enerally, a contract does not bind one who is not a party to the contract" and "[u]nder Florida law, corporations are separate legal entities, and contracts made by a parent corporation do not bind a subsidiary." Whetstone Candy Co., Inc. v. Kraft Foods, Inc., 351 F.3d 1067, 1072-74 (11th Cir. 2003).   The Court accordingly grants Adams' Motion to Dismiss to the extent that Motion targets Count Three of Aguieus' Counterclaim, for breach of the Letter of Intent.   However, the Court grants Aguieus the opportunity to amend its Counterclaim in light of the recent filing of the Cross-claim, which effectively shuffles the deck regarding corporate identities, ownership, and alliances in this case.   Any amendment to Aguieus' Counterclaim must be filed by **February 21, 2017.**

### 2.   Rule 12(b)(6) Breach of Contact Analysis

The Court has determined that UWSI has standing to sue Adams for breach of the Letter of Intent and that both UWSI and Aguieus have standing to sue Adams for breach of the Mutual Confidentiality and Nondisclosure Agreement.   The Court now addresses whether UWSI and Aguieus state a claim for breach of these agreements.

The elements of a breach of contract action are "(1) the existence of a contract, (2) a breach of the contract, and (3)

damages resulting from the breach." Rollins, Inc. v. Butland, 951 So. 2d 860, 876 (Fla. 2nd DCA 2006). In the Counterclaims, UWSI and Aguieus allege that the Letter of Intent and the Mutual Confidentiality and Nondisclosure Agreement are contracts, that Adams breached the contracts, and that UWSI and Augieus suffered damages as a result. (Doc. # 109 at ¶¶ 57-64; Doc. # 117 at ¶¶ 21-26).

Adams' arguments that the relevant breach of contract Counterclaims lack specificity are unavailing. For instance, Adams argues: "Nothing indicates when the confidential information was disclosed or whether the information was conveyed in person, by phone, or through electronic transmission. . . . [the] conclusory assertions . . . do not answer such basic questions as who, what, when, or how." (Doc. # 123 at 7). However, none of the Counterclaims allege fraud, which would require such a greater specificity under Fed. R. Civ. P. 9(b). The allegations in the questioned Counterclaims accusing Adams of wrongfully using UWSI and Aguieus' confidential information to create the Patrol Rifle are sufficient to place Adams on notice regarding the nature of the claims. As argued by Aguieus:

> Count 1 of Aguieus's Counterclaim alleges that [Adams] breached the [Mutual Confidentiality and Nondisclosure Agreement] by using Aguieus' disclosed Confidential Information (a term specifically defined in Paragraph 7 of the Counterclaim and Section 1 of the [Mutual

25

> Confidentiality and Nondisclosure Agreement]),
> including product plans, designs, and hardware
> configuration information, to launch [Adams'] Small
> Frame .308 Rifle (aka-Patrol Rifle), and that
> Aguieus has been damaged as a result.  No further
> "particularity" is required for a breach of
> contract claim.

(Doc. # 131 at 6).

Adams does not agree with the factual allegations leveled by UWSI and Aguieus, but that is a matter for a later determination by a fact-finder, not for disposition on a Motion to Dismiss or Motion to Strike.  The relevant breach of contract Counterclaims contain more than sufficiently detailed factual allegations to place Adams on notice regarding the alleged breaches. The Court accordingly denies Adams' Motion to Dismiss UWSI and Aguieus' Counterclaims for breach of the Mutual Confidentiality and Nondisclosure Agreement and UWSI's Counterclaim for breach of the Letter of Intent.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED**:

(1)   Adams Arms, LLC's Motion to Dismiss or Strike Unified Weapons Systems, Inc.'s First Amended Counterclaim (Doc. # 119) is **DENIED**.

(2)   Adams Arms' Motion to Dismiss Aguieus, LLC's Counterclaim (Doc. # 123) is **GRANTED IN PART** to the extent that Aguieus' Counterclaim for breach of the Letter of Intent is dismissed with leave to amend by **February 21, 2017.**

26

The Motion is otherwise **DENIED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>8th</u> day of February, 2017.



VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

27